## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO:   PX-22-440** |
| **NADER POURHASSAN and KAZEM KAZEMPOUR,** | |
| **Defendants.** | |

### GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' RESPECTIVE MOTIONS TO DISMISS AND MOTIONS FOR SEVERANCE

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................ 19

   I.    THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS TO DISMISS ......... 19

      A.   The Indictment Against Pourhassan Is Legally Sufficient and Meets All the Pleading Requirements ................................................................................................... 21

      B.   Pourhassan Does Not Identify Any Legal Deficiencies in the Indictment.................... 27

      C.   The Rule of Lenity and Due Process Concerns Do Not Require Dismissal of the Indictment Against Pourhassan ...................................................................... 36

      D.   The Indictment Against Kazempour Is Legally Sufficient and Meets All the Pleading Requirements ................................................................................................... 37

      E.   Kazempour Does Not Identify Any Legal Deficiencies in the Indictment ................... 42

  II.   THE COURT SHOULD DENY THE DEFENDANTS' SEVERANCE MOTIONS........ 49

CONCLUSION.............................................................................................................. 57

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chapman v. United States*, 500 U.S. 453, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)................. 40

*City of Edinburgh Council v. Pfizer, Inc,* 754 F.3d 159 (3d Cir. 2014).  . ..................................... 33

*Cozzarelli v. Inspire Pharmaceuticals, Inc,* 549 F.3d 618 (4th Cir. 2008).  .................... 34, 35, 36

*Employees' Retirement System v. MacroGenics, Inc.,* 61 F.4th 369 (4th Cir. 2023).  ............ 34, 37

*Lerner v. Northwest Biotherapeutics*, 273 F. Supp. 3d 573 (D. Md. 2017) .................................. 31

*Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999) ............................................................ 37

*SEC v. Jacoby*, Civil Action No. CCB-17-3230, 2021 U.S. Dist. LEXIS 20262

   (D. Md. Feb. 2, 2021) ............................................................................................................ 49

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ....................................................................... 48

*See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) .......................................... 48

*Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018)....................................................................... passim

*States v. Andrews*, No. 1:12CR100, 2012 WL 6230450 (N.D. W. Va. Nov. 26, 2013)................. 59

*United States v. Abraham*s, 466 F. Supp. 552 (D. Mass. 1978) .................................................... 58

*United States v. Blair*, 661 F.3d 755 (4th Cir. 2011) ............................................................... 53,60

*United States v. Bongiorno*, 2006 U.S. Dist. LEXIS 24830 (S.D.N.Y. May 1, 2006) ................. 40

*United States v. Branch*, 537 F.3d 328 (4th Cir. 2008) ..................................................... 53, 59, 60

*United States v. Brugman*, 655 F.2d 540 (4th Cir. 1981) .............................................................. 53

*United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995) .................................................................... 51

*United States v. Burks*, 746 F. App'x 191 (4th Cir. 2018)...................................................... 23, 24

*United States v. Campbell*, 963 F.3d 301 (4th Cir. 2020) ............................................................ 55

*United States v. Cardwell*, 433 F.3d 378 (4th Cir. 2005) ...................................................... 53, 61

*United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982) ....................................................... 55

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ............................................................. 57

*United States v. Daniels*, 973 F.2d 272 (4th Cir. 1992)............................................................. 23

*United States v. Fitzgerald*, 514 F. Supp. 3d 721 (D. Md. 2021)........................................ 35, 38

*United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976) ............................................................... 54

*United States v. Goldman*, 750 F.2d 1221 (4th Cir.1984) .................................................... 54, 61

*United States v. Gray*, 78 F. Supp. 2d 524 (E.D. Va. 1999) .................................................... 55

*United States v. Hornsby,* 666 F.3d 296 (4th Cir. 2012) .............................................. 53, 54, 61

*United States v. Levoff*, No. 19-cr-780, 2020 U.S. Dist. LEXIS 144413

   (D.N.J. Aug. 12, 2020) ......................................................................................................... 51

*United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997) ............................................................ 23

*United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 199) ........................................................ 23, 25

*United States v. Moye*, 454 F.3d 390 (4th Cir. 2006) ................................................................ 41

*United States v. Najjar*, 300 F.3d 466 (4th Cir. 2002).......................................................... 57, 59

*United States v. Oaks*, 302 F.Supp.3d 716 (D. Md. 2018) ..................................................... 23, 37

*United States v. Perry*, 757 F.3d 166 (4th Cir. 2014)................................................................ 23

*United States v. Romanello,* 726 F.2d 173 (5th Cir. 1984)........................................................ 58

*United States v. Russo*, 74 F.3d 1383 (2d Cir. 1996)................................................................ 40

*United States v. Santoni,* 585 F.2d 667 (4th Cir. 1978)............................................................ 54

*United States v. Sarihifard*, 155 F.3d 301 (4th Cir. 1998)........................................................ 52

*United States v. Simmons*, 163 F. Supp.3d 317 (E.D. Va. 2016)............................................. 54

*United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995)..................................................... 55, 57, 58

*United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986) ........................................................... 57

*United States v. Terry*, 257 F.3d 366 (4th Cir. 2001)................................................................. 23, 36

*United States v. Turoff*, 853 F.2d 1037 (2d Cir. 1988)................................................................ 60

*United States v. Werner*, 620 F.2d 922 (2d Cir. 1980)................................................................ 60

*United States v. Wills*, 346 F.3d 476 (4th Cir. 2003) ................................................................. 24

*Wong Tai v. United States*, 273 U.S. 77, 71 L. Ed. 545, 47 S. Ct. 300 (1927) ............................. 25

*Zafiro v. United States*, 506 U.S. 534 (1993) .................................................................. 53, 54, 57

*Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015) ............................. 33, 34, 39

**Statutes and Rules**

15 U.S.C. §§ 78 .......................................................................................................... 6, 26

17 C.F.R. § 240.10b-5 .......................................................................................... passim

18 U.S.C. § 371 ................................................................................................ 6, 7, 24, 45

Federal Rule of Civil Procedure 9(b) ........................................................................ 31

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) .................................................. 22

Federal Rule of Criminal Procedure 14 ......................................................... 52, 53, 54

Federal Rule of Criminal Procedure 29 ...................................................................... 35

Federal Rule of Criminal Procedure 8(b) ........................................................... 52, 53

## <u>INTRODUCTION</u>

The United States of America, by and through its undersigned attorneys, hereby submits this omnibus response to the defendants' respective motions to dismiss (ECF 58, 61), and motions for severance (ECF 60, 62).

The defendants are charged with a brazen fraud.  Together, defendants Nader Pourhassan and Kazem Kazempour – who were the CEOs of their respective biotechnology companies – conspired to defraud investors about the status of their companies' development of a new drug.  Specifically, they deceived investors about whether and when they had submitted a completed application to the Food and Drug Administration ("FDA") for the approval of a new drug.

The defendants each moved to dismiss the indictment in its entirety.  Incredibly, Pourhassan argues that the Fourth Circuit rejected the use of the federal securities laws for the theory of fraud alleged in the indictment and that, as a result, the crimes with which the government has charged him simply do not exist.  The indictment, however, charges Pourhassan with garden variety fraud that is neither new nor novel.  Moreover, Pourhassan was aware he was engaging in fraud because he was repeatedly told by many (including the FDA) that his statements to investors were false and misleading – and he nevertheless continued in a relentless campaign of lies to raise millions of dollars and make himself rich by illegally selling company stock based on material, non-public information.

Kazempour, on the other hand, argues that the indictment is legally insufficient because it fails to allege he was a knowing participant in the fraud.  The indictment, however, alleges that Kazempour played an indispensable role in the scheme; among other things, Pourhassan directed Kazempour to submit a new drug application to the FDA that both knew that the FDA would reject

1

as incomplete in order to create the false appearance that Pourhassan's company had surpassed a milestone when, in reality, it had not.  The stated purpose of doing so was to artificially increase the price of the company's stock price.  Kazempour agreed (and, before investors learned the truth about the new drug application, Kazempour tried to sell his shares of the company's stock).

In the alternative, the defendants move for severance.  The defendants, however, fail to make a showing that special circumstances overcome the strong presumption that co-defendants who are charged with conspiring with each other should be tried together.

For all of these reasons, the Court should deny defendants' motions.

## <u>BACKGROUND</u>

During the relevant time period, CytoDyn Inc. ("CytoDyn") was a publicly traded biotechnology company focused on the clinical development and potential commercialization of leronlimab (PRO 140), an investigational drug that was being studied as a potential treatment for HIV and COVID-19.  (Indictment (ECF 1) Count 1 ¶¶ 2-3.)  CytoDyn, which was pre-revenue, financed the company's operations by selling securities regulated by the U.S. Securities & Exchange Commission ("SEC").  (*Id.* ¶¶ 4, 10.)  CytoDyn's common stock traded over the counter and was available for purchase and sale by the general public.  (*Id.* ¶ 2.)

Amarex Clinical Research LLC ("Amarex") was a contract research organization that managed numerous clinical trials investigating leronlimab for CytoDyn and served as CytoDyn's regulatory agent with the U.S. Food and Drug Administration ("FDA").  (*Id.* ¶ 6.)

Defendant Pourhassan was CytoDyn's President and CEO for years.  (*Id.* ¶ 1.)  Pourhassan communicated with CytoDyn investors and the general public through media appearances, press releases and periodic reports filed with the SEC.  (*Id.* ¶ 19.)  Pourhassan arranged the media

appearances and was responsible for reviewing, approving and signing CytoDyn's SEC filings. (*Id.*)

Defendant Kazempour was Amarex's CEO for decades.  (*Id.* ¶ 5.)  In addition, Kazempour was a member of CytoDyn's Disclosure Committee, which was responsible for reviewing and approving CytoDyn's periodic reports filed with the SEC.  (*Id.*)

Pourhassan and Kazempour both had a personal financial interest in the price of CytoDyn common stock.  (*Id.* ¶¶ 41, 43.)  Pourhassan had options to purchase millions of shares.  (*Id.* ¶ 41.) Kazempour held warrants to purchase 150,000 shares.  (*Id.* ¶ 43.)

On December 15, 2022, a federal grand jury sitting in Baltimore indicted defendants Pourhassan and Kazempour for their roles in a conspiracy and schemes to defraud investors about the status of CytoDyn's development of leronlimab as a potential treatment for HIV.  Pourhassan and Kazempour are each charged with: one count of conspiracy to commit securities fraud and wire fraud (18 U.S.C. § 371) (Count 1); three counts of securities fraud (15 U.S.C. §§ 78j(b),78ff, 17 C.F.R. § 240.10b-5) (Counts 2, 3 and 4); and two counts of wire fraud (18 U.S.C. § 1343) (Counts 5, 6 and 7).  With respect to securities fraud, Pourhassan and Kazempour are also charged with aiding and abetting (18 U.S.C. § 2.)  Pourhassan is separately charged with three counts of insider trading for selling millions of dollars' worth of CytoDyn common stock based on material non-public information (15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5) (Counts 11-13). Kazempour is separately charged with one count of making false statements to federal law enforcement agents regarding his ownership of CytoDyn stock.  (18 U.S.C. § 1001) (Count 14).

Pourhassan was also charged with one additional count of securities fraud (Count 9) and one additional count of wire fraud (Count 10) based on materially false and misleading representations he made to investors about the status of CytoDyn's development of leronlimab as

a potential treatment for COVID-19.

For every element of each crime charged, the indictment tracks the language of the relevant statutes.  The indictment also alleges specific facts detailing the conspiracy, fraudulent schemes, and false statements made by the defendants.  The relevant factual allegations are summarized below.

***The Conspiracy and Schemes Relating to HIV***

The indictment alleges that, in 2017, 2018 and 2019, certain CytoDyn directors (including one who served as Chairman of the Board) expressed concerns about Pourhassan's preoccupation with CytoDyn's stock price and Pourhassan's inaccurate and exaggerated public representations regarding leronlimab's development.  (Indictment Count 1 ¶¶ 13, 23-26.)  Similarly certain CytoDyn executives expressed concerns to Pourhassan regarding the accuracy and truthfulness of Pourhassan's representations.  (*Id.* ¶ 26.)  Pourhassan rejected the Board's oversight of his public statements, complaining that it unnecessarily limited his ability to raise new money from investors, and he marginalized and later removed from CytoDyn's Board the directors who had attempted to exercise oversight of him.  (*Id.* ¶ 23.)  Pourhassan also marginalized and terminated the employment of CytoDyn employees who expressed concerns that his public statements were potentially false and misleading.  (*Id.* ¶ 27.)  Beginning in or around 2018, Pourhassan caused CytoDyn's Board to effectively cease meaningful oversight of Pourhassan's public representations. (*Id.* ¶ 24.)  Around the same time, Pourhassan orchestrated the replacement of the Chairman with Pourhassan's own hand-picked candidate.  (*Id.* ¶ 23.)  Also in 2018, Kazempour was added to CytoDyn's Disclosure Committee and became responsible for reviewing and approving the regulatory-related contents of CytoDyn's SEC filings.  (*Id.* ¶ 5.)

In or around 2018, CytoDyn, together with Amarex, began to prepare to submit a Biologics

License Application ("BLA")[1] for leronlimab as a potential treatment for HIV to the FDA.  (*Id.* ¶ 8.)  Throughout 2018, 2019, and 2020, Pourhassan and Kazempour, among others, met regularly with the FDA to discuss the BLA review process, including the timeline and requirements for the BLA.  (*Id.*)  The FDA explicitly instructed Pourhassan and Kazempour on the requirements necessary to complete the BLA submission and warned that each required component of the BLA submission had to be complete when submitted in order for the FDA to begin its review.   (*Id.*)  The FDA expressly told them that an incomplete BLA would result in a "definite" rejection.  (*Id.*)

The FDA also repeatedly expressed concerns to CytoDyn and Amarex about the companies' proposed timeline for submitting the BLA, which Pourhassan had selected and Kazempour had conveyed to the FDA.  (*Id.* ¶ 9.)  The FDA repeatedly cautioned that CytoDyn and Amarex should slow down to ensure a complete submission that contained all information necessary for the FDA to begin its review, including with respect to a new 700 mg dosage which CytoDyn had decided to focus on in response to FDA comments.  (*Id.*)

The indictment also alleges that, throughout 2018 and 2019, Pourhassan and Kazempour repeatedly made, and caused CytoDyn to make, materially false and misleading representations about the timelines by which CytoDyn and Amarex would complete and submit CytoDyn's BLA for leronlimab as a potential treatment for HIV to the FDA.  (*Id.* ¶¶ 14, 28-35.)  These timelines were not based on defendants' opinion or belief about whether CytoDyn and Amarex could meet the FDA's requirements for a BLA, and instead were based on what Pourhassan believed would inflate and maintain CytoDyn's stock price and attract new investors.  (*Id.* ¶¶ 14, 28.)  Indeed, in 2019 and 2020, Pourhassan's communications repeatedly emphasized the link between the BLA

---

[1] A company requesting permission to introduce a biologic product into interstate commerce must submit a BLA with the FDA.  (*Id.* ¶ 7.)

timeline and CytoDyn's stock price or the ability to raise money from new investors.  (*Id.* ¶¶ 30, 32-33, 36-37.)  CytoDyn directors and executives, Amarex executives, and the FDA repeatedly warned Pourhassan and Kazempour that Pourhassan's timelines for submitting the BLA could not be met.  Pourhassan nevertheless continued to publicly tout the timelines he had selected in order to raise new money from investors.  Consistent with these warnings, CytoDyn and Amarex repeatedly failed to submit the BLA within the timelines Pourhassan had publicly announced.

The indictment further alleges that, after CytoDyn and Amarex repeatedly missed publicized timelines, Pourhassan directed Kazempour and Amarex to submit an incomplete BLA – that both knew would be rejected by the FDA – in order to artificially maintain and increase CytoDyn's stock price.  (*Id.* ¶ 37.)  And Kazempour agreed.  (*Id.* ¶ 38.)  On or about February 8, 2020, in an electronic message to Kazempour and Amarex Executive 1, Pourhassan, wrote, "We told the public on Thursday that the BLA is delayed until the end of February and on Thursday and Friday our stock dropped and our market cap went down by $200 million and everyone is asking for my head[.] If we can't get BLA done by the end of February we will have another tremendous drop in our stock[.]"  (*Id.* ¶ 33.)

On or about April 6, 2020, Pourhassan wrote an e-mail to CytoDyn Executive 2, copying Amarex Executive 1, "Please let me know if we can file both sections of BLA (CMC and Clinical) no later than April 15 and if we do what will we be risking?"  (*Id.* ¶ 34.)  Pourhassan knew at that time, because the FDA had made it clear, that submitting an incomplete BLA would result in a "definite" refusal to file by the FDA.[2]  (*Id.*)

_____

[2] On or about April 9, 2020, CytoDyn submitted its quarterly SEC filing on SEC Form 10-Q, which stated, "We expect to submit the remaining two sections of the BLA in the [sic] April of 2020."  (*Id.* ¶ 35.)  CytoDyn's 10-Q filing, which Pourhassan signed, was materially false and misleading because, in truth and in fact, Pourhassan and Kazempour, knew that data and information required by the FDA was not available to submit by the end of April 2020

On or about April 12, 2020, Pourhassan sent an electronic message to CytoDyn Executive 2 in which he stated:

> I just had another long talk with [Amarex Executive 1.] Afterwards I have been taking to several of our shareholders[.] We could do a very large fund raising of $100 million and these guys are ready now but I need to do this after BLA submission to give our stock the best chance for this very large raise[.] Please shoot for April 15 submission if possible without dangering [sic] anything and if at the end we need a few more days then so be it[.]

(*Id.* ¶ 36.)

Two days later, on or about April 14, 2020, Pourhassan, sent an e-mail to Kazempour and Amarex Executive 1, copying CytoDyn Executive 2.   (*Id.* ¶37.)   In the e-mail, Pourhassan explicitly instructed Kazempour and Amarex Executive 1 that the BLA should be filed even if it was "short" *(i.e.,* incomplete):

> Today we have so far in 1 hour almost 20% drop in our stock price. Yesterday we had drop [sic] also after putting out great results about COVID-19 patients we are seeing these [sic] type of decline. This drop will be much deeper if we don't file our BLA as the message board now is getting bombarded by investors who are very frustrated with me and CytoDyn. Please file the BLA no later than next week Wednesday, even if we are short in no matter what portion of whatever it is that we are short.

(*Id.*) Pourhassan emphasized that "if [CytoDyn's] stock continues its drift then financially we will have problems financing itself [sic]. THE MOST IMPORTANT thing now is BLA". (*Id.*)

On or about April 27, 2020, Kazempour and Amarex filed an incomplete BLA on CytoDyn's behalf.  (*Id.* ¶ 38.)  The cover letter accompanying the submission, which Kazempour signed, acknowledged that the submission did not include clinical datasets that FDA

---

(including with respect to a new 700 mg dosage) and, therefore, the remaining two sections of the BLA could not be submitted on that timeline.  (*Id.*)

had repeatedly told Pourhassan and Kazempour were required for the FDA to begin its review. (*Id.*)  Pourhassan and Kazempour knew that the BLA submission was incomplete and would result in a "definite" refusal to file as the FDA had repeatedly warned in meetings attended by Pourhassan and Kazempour, among others.  (*Id.*)  The indictment specifically alleges that the BLA submission was a "deceptive device" that Pourhassan and Kazempour carried out for the purpose of allowing Pourhassan and CytoDyn to mislead investors and the public by misrepresenting that the BLA was submitted and would therefore be reviewed by the FDA. (*Id.*)   In truth and in fact, and as Pourhassan and Kazempour knew, the FDA would reject the submission as incomplete.  (*Id.*)

After the BLA was submitted by Kazempour and Amarex, Pourhassan and CytoDyn issued a press release titled "CytoDyn Submits Completed Biologics License Application to the FDA for Leronlimab as a Combination Therapy for Highly Treatment Experienced HIV Patients."  (*Id.* ¶ 39.)  The press release specifically quoted Pourhassan as saying, "With the BLA filing for a combination therapy now complete …"  Pourhassan's and CytoDyn's representations in this press release were materially false and misleading.  (*Id.*)  In truth and in fact, and as Pourhassan and CytoDyn knew, the BLA submission was not complete because it lacked clinical datasets and other information that were required for FDA to conduct its review.  (*Id.*)  Kazempour and Amarex had only submitted the BLA so that Pourhassan and CytoDyn could misleadingly announce it had been submitted, while omitting the material information that the BLA was incomplete and would be rejected by the FDA. (*Id.*)

On or about April 27, 2020, Pourhassan and CytoDyn held an investor conference call.  (*Id.* ¶ 40.)  During the call, Pourhassan repeated materially false and misleading representations that CytoDyn had submitted the BLA to the FDA.  (*Id.*)  For example,

Pourhassan stated that the "BLA timeline was pushed back constantly," but falsely and misleadingly claimed that "these pushbacks were all due to CytoDyn's success," describing the change to the higher, 700mg dose and work on COVID-19 clinical trials. (*Id.*) In truth and in fact, as Pourhassan knew, the failure to meet the timelines was due to Pourhassan selection of the timelines based on what he believed would inflate and maintain CytoDyn's stock price and raise new money from investors, rather than basing the timelines on whether CytoDyn and Amarex could meet the FDA's requirements for a BLA. (*Id.*) Pourhassan also stated, "So in short... the BLA is submitted," while omitting the material information that the BLA was incomplete and would be rejected by the FDA. (*Id.*)

On or about April 28, 2020, the day after CytoDyn issued its false and misleading press release about the BLA submission, Kazempour sent an e-mail to CytoDyn Executive 3, copying Pourhassan and Kazempour's financial advisor, about selling shares of CytoDyn stock: "Several years ago, Board of CytoDyn [sic] gave me 150,000 share options, and after this many years, I am thinking to sell the shares now!! I talked to my brokerage [agent] (CCed here), and he told me to communicate with you and CC him so you can explain to me/him what we need to do to sell those shares." (*Id.* ¶ 41.)

The indictment further alleges that Pourhassan and Kazempour failed to correct the materially false and misleading statements made on April 27, 2020, including in the CytoDyn press release. (*Id.* ¶¶ 42-43.) On or about April 30, 2020, Kazempour forwarded an email from the FDA, dated on or about April 29, 2020, to Amarex Executive 1, who in turn forwarded the FDA's e-mail to Pourhassan. (*Id.* ¶ 42.) The FDA's April 29, 2020, e-mail had informed Kazempour that the BLA was not complete and that CytoDyn's April 27, 2020, press release contained misinformation. (*Id.*) The FDA's e-mail stated, in pertinent part:

> We have communicated to you on multiple occasions ... whereby we clarified that the BLA review clock does not begin until the applicant informs the Agency that a complete BLA was submitted.
>
> Your April 27, 2020, submissions do not constitute a completed BLA as CytoDyn has reported to the public via press release.
>
> The BLA application is not considered complete as you yourself acknowledged in your covering letter with the April 27, 2020, submission - noting that the clinical datasets remain outstanding.
>
> As the regulatory agent on behalf of CytoDyn our expectation is that you have communicated this information to CytoDyn. We ask you to take regulatory responsibility for the misinformation released in the aforementioned Press Release by notifying CytoDyn.
>
> Further we ask that you formally retract submission of the clinical module and resubmit at such a time when this module is considered fully complete. We had not made any prior agreements that an incomplete clinical module could be submitted (missing datasets).

(*Id.*)

Despite the admonishment that the FDA did not consider the BLA to be complete and would not begin reviewing the submission, and the warning from the FDA about the "misinformation" in CytoDyn's April 27, 2020, press release, neither Pourhassan nor Kazempour, who were on CytoDyn's Disclosure Committee, corrected the materially false and misleading representations that the BLA would be and had been completed and submitted in April 2020. (*Id.*)  Given their roles and their receipt of the FDA's admonishments, both Pourhassan and Kazempour had a duty to correct these representations. Instead they attempted to sell shares of CytoDyn common stock into the market which had not yet learned the truth about the HIV BLA. (*Id.*)

According to the indictment, beginning on or about April 30, 2020, Pourhassan exercised stock options and sold millions of shares of CytoDyn stock in the following approximate amounts:

   a.  On or about April 30, 2020-2.2 million shares valued at $7.8 million.

10

     b.  On or about May 1, 2020 - 1.39 million shares valued at $4.5 million.

     c.  On or about May 4, 2020 - 1.2 million shares valued at $3.3 million.

(*Id.* ¶ 43.)  Pourhassan engaged in those trades while in possession of material information not known to the public, namely that the BLA submitted to the FDA was not complete and, therefore, that CytoDyn's April 27, 2020, press release announcing a "completed" BLA was false. (*Id.*)

    Pourhassan engaged in at least the May 1, 2020, and May 4, 2020, transactions while in possession of additional material information not known to the public, namely that the FDA had already communicated to CytoDyn through Kazempour and Amarex, as CytoDyn's regulatory agent, that (i) the BLA was not complete and would not be reviewed, and (ii) the April 27, 2020, press release that Pourhassan caused to be issued contained "misinformation" that must be corrected.  (*Id.*)  After paying for the CytoDyn stock shares at the option purchase price and paying taxes on the subsequent stock sales, Pourhassan personally gained approximately $4.4 million.[3]  (*Id.*)

    The indictment further alleges that Pourhassan falsely claimed that a complete BLA would and had been submitted knowing that CytoDyn did not possess the necessary data to complete the BLA.  (*Id.* ¶¶ 45-50.)

---

[3] On or about May 4, 2020, Pourhassan filmed a video interview, which Pourhassan caused to be disseminated via the Internet, in which he made materially false and misleading representations to conceal the fraudulent scheme on investors and the fact that he traded CytoDyn stock based on material, non-public information.  (*Id.* ¶ 44.)  Pourhassan explained that he "exercised [his] options" in order to provide the company with funding for the following five to six weeks, which "took a tremendous beating on [him]' because he "ha[d] to pay hefty taxes[.]" (*Id.*)  Pourhassan added, "I try to sacrifice for the company anytime I can."  In truth and in fact, Pourhassan had exercised his options based on material non-public information and personally gained approximately $4.4 million from this insider trading.  (*Id.*)

On or about May 4, 2020, and again on or about May 6, 2020, Pourhassan caused CytoDyn to issue press releases that represented that "the [BLA] will be considered completed after the clinical datasets are submitted on May 11, 2020." (*Id.* ¶ 45.) In each press release, those representations were placed at the end of a boilerplate paragraph generally describing leronlimab and HIV that was included in nearly all of CytoDyn's press releases. (*Id.*) Each of those press releases not only omitted important information about what the FDA had communicated and why the BLA would not be considered completed until after the clinical datasets were submitted, but also failed to disclose that CytoDyn had submitted an incomplete BLA (and thus failed to correct the inaccurate April 27, 2020, press release) and did not have the information necessary to complete the BLA submission. (*Id.*)

It was not until on or about May 8, 2020, after Pourhassan had gained approximately $4.4 million through insider trading, that CytoDyn issued a press release titled "CytoDyn Clarifies Status of [BLA]" that stated in the opening paragraph that the company "today further clarified the status of [its] submission of its [BLA]. The BLA will not be considered completed until the Company submits to the FDA clinical datasets required to address FDA comments it received in March 2020, as described in the Company's press releases on May 4 and May 6, 2020. CytoDyn expects to submit these clinical datasets on May 11, 2020." (*Id.* ¶ 46.) Even Pourhassan's and CytoDyn's representations in this May 8, 2020 press release were materially false and misleading because the release failed to disclose that CytoDyn had submitted an incomplete BLA (and thus failed to correct the inaccurate April 27, 2020, press release) and did not have the information necessary to complete the BLA submission. (*Id.*)

On or about May 13, 2020, Pourhassan and CytoDyn issued a press release claiming

that CytoDyn "Completed Submission of All Remaining Parts of [BLA] on May 11, 2020."
(*Id.* ¶ 47.)  Pourhassan's and CytoDyn's representations in this press release were materially
false and misleading because, at a minimum, Pourhassan and CytoDyn knew that the BLA
did not contain data required to support the 700mg dosage because no analysis had been
performed to produce such data and CytoDyn did not possess it.  (*Id.*)

On or about June 8, 2020, Pourhassan and CytoDyn issued a press release touting a
"BLA Acknowledgement Letter From the FDA" and suggesting that the FDA could inform
CytoDyn by July 10, 2020, of its target date for completing review of the BLA.  (*Id.* ¶ 48.)
Pourhassan's and CytoDyn's representations in this press release were materially false and
misleading because, in truth and in fact, and as Pourhassan and CytoDyn knew, the critical
dose justification data that was necessary for FDA to conduct its review had not been
submitted with the BLA.  (*Id.*)

On or about June 9, 2020, and June 10, 2020, Kazempour exercised stock options
and sold his approximately 150,000 shares of CytoDyn stock valued at $427,500.  (*Id.* ¶ 49.)

On or about August 14, 2020, CytoDyn submitted its annual SEC report on SEC Form
10-K.  Pourhassan reviewed, approved, and signed this filing.  (*Id.* ¶ 50.)  Kazempour was
responsible for reviewing and approving the regulatory-related contents of the filing in his
role on CytoDyn's Disclosure Committee.  Pourhassan and Kazempour used CytoDyn's 10-
K filing to conceal their prior conduct in furtherance of the conspiracy and schemes, and to
continue to mislead investors about the prospects for and timing of resubmitting a completed
BLA to the FDA.  (*Id.*)  For example, CytoDyn's 10-K filing included the following
representations:

As of the date of this filing, the Company had filed all three portions of its BLA, however, in July 2020, the Company received a Refusal to File letter from the FDA requesting additional information. The Company has requested a Type A meeting and plans to supply the additional information in a timely manner.

*       *       *

The BLA was initially submitted with the FDA in April 2020 and the BLA submission was completed on May 11, 2020. In July 2020, the Company received a Refusal to File letter from the FDA regarding its BLA filing requesting additional information, and the Company has requested a Type A meeting to discuss the FDA's request for additional information, which the Company expects will be resolved on a timely basis during calendar year 2020.

*       *       *

In July 2020, the Company received a Refusal to File letter from the FDA regarding its BLA submission in April and May of 2020 for leronlimab as a combination therapy with HAART for highly treatment experienced HIV patients. The FDA informed the Company its BLA did not contain certain information needed to complete a substantive review and therefore, the FDA would not file the BLA. The FDA's request does not require any additional clinical trials to be conducted, rather that the Company conduct specifically requested additional analysis of the completed trials data. The Company has scheduled a Type A meeting to discuss the FDA's request for additional information. The Company expects to resubmit the BLA with the additionally required data by the end of calendar year 2020.

(*Id.*)

The indictment alleges that these representations in the 10-K filing were materially false and misleading because, among other things, they concealed the true nature of the FDA's numerous concerns with the BLA submission (which included dozens of deficiencies) and instead misleadingly suggested that the FDA merely wanted more information about leronlimab. (*Id.*) To the contrary, on or about July 8, 2020, the FDA had issued a Refusal to File letter to CytoDyn through Kazempour as CytoDyn's regulatory agent. (*Id.*) The FDA

14

stated that the BLA "has numerous omissions and inadequacies so severe as to render the application incomplete and also introduces significant impediments to a prompt and meaningful review because there is the need for substantial amounts of additional data and analyses along with corrections in datasets." (*Id.*) Most notably, the letter identified the lack of dose justification data for the 700 mg as an impediment to review despite multiple prior occasions on which the FDA informed CytoDyn and Amarex that such data were required in the BLA submission. (*Id.*)

The indictment also alleges that Pourhassan used investor money to silence his critics and conceal the fraud. (*Id.* ¶¶ 51-52.) To respond to public criticism about his conduct, and in furtherance of the scheme to defraud and raise new money from investors, Pourhassan hired and paid with CytoDyn funds an investor-facing media firm to film video interviews, which were posted on the Internet. (*Id.* ¶ 51.) Pourhassan scripted the questions asked to him in the video interviews, which frequently allowed him to attack individuals who published critical comments in online news articles and chat boards, or elsewhere on the Internet, in furtherance of and in order to conceal the fraudulent scheme. In addition, Pourhassan hired and paid with CytoDyn funds a stock promoter to respond to critical commentary (without attribution to Pourhassan or CytoDyn) in online chat boards and elsewhere on the Internet, in furtherance of and in order to conceal the fraudulent scheme on investors. (*Id.* ¶ 52.)

In addition, indictment alleges that, to conceal the conspiracy and schemes from law enforcement, Kazempour made materially false statements to federal law enforcement agents regarding his ownership of CytoDyn stock. (*Id.* ¶¶ 21, 53.) Specifically, during a voluntary interview, Kazempour falsely stated that he had only ever owned a "couple hundred" shares of CytoDyn stock, a "hundred or two hundred" shares, or a "bonus of two hundred share[s]"

that CytoDyn had awarded him, which Kazempour also referred to as "options." (*Id.* ¶ 53.)

In truth and in fact, Kazempour had not received a "hundred or two hundred" shares of CytoDyn

stock; rather he had been given warrants to purchase 150,000 shares of CytoDyn stock that he

attempted to exercise the day after CytoDyn falsely announced that it submitted a completed BLA

to the FDA, and that Kazempour ultimately did exercise to purchase and sell CytoDyn stock in

or around June 2020. (*Id.*)

### The Scheme Relating to COVID-19

The indictment separately alleges that Pourhassan engaged in a scheme whereby he

defrauded CytoDyn investors about CytoDyn's investigation and development of leronlimab as a

potential treatment for COVID-19. (Indictment Count 9 ¶¶ 5-11.) The FDA repeatedly told

Pourhassan and CytoDyn that the company's clinical trials had failed to demonstrate that

leronlimab was an effective COVID-19 treatment and that the company's public statements about

the result of these clinical trials were materially misleading. (*Id.*) Pourhassan ignored the FDA

and continued to make material misrepresentations regarding leronlimab's effectiveness as a

COVID-19 treatment to investors and the general public in order to artificially increase CytoDyn's

stock price and raise new money. (*Id.*)

The indictment contains specific factual allegations detailing Pourhassan's fraudulent

scheme. For example, on or about December 22, 2020, Pourhassan and CytoDyn issued a press

release claiming, among other things, that CytoDyn's CD10 clinical trial for COVID-19 "produced

statistically significant results for NEWS2." (*Id.* ¶ 5.) This was materially false and misleading

because, in truth and in fact, as Pourhassan and CytoDyn knew, the data had not been run through

the proper statistical tests to correct for multiplicity and therefore were not statistically significant.

(*Id.*) On or about December 23, 2020, the FDA held a conference call to inform CytoDyn that its

claims in the December 22, 2020, press release were misleading.  (*Id.*)

On or about December 24, 2020, Pourhassan and CytoDyn issued a press release that omitted the material information that the FDA had informed CytoDyn that its December 22, 2020, press release was misleading and the CD10 clinical trial data were not statistically significant.  (*Id.* ¶ 6.)  Instead, at the end of a lengthy quote attributed to Pourhassan, the press release stated only that the "CD10 trial will not support an eIND request."  (*Id.*)

By in or around February 2021, CytoDyn received the results of its CD12 clinical trial for COVID-19 that showed that leronlimab failed to meet the primary or secondary endpoints (i.e., goals) of the study.  (*Id.* ¶ 7.)  CytoDyn and Amarex prepared an executive summary report (the "Executive Summary") for the FDA discussing the CD12 clinical trial results. Pourhassan urged CytoDyn employees, including CytoDyn Executive 1, to make the Executive Summary more positive than the data supported.  (*Id.*)

In or around February 2021, Pourhassan became concerned with CytoDyn's declining stock price and asked Amarex to prepare an addendum to the Executive Summary (the "Addendum").  (*Id.* ¶ 8.) Amarex drafted the Addendum at Pourhassan's direction, with input from other CytoDyn executives. (*Id.*)  The Addendum included post hoc analysis of data for patient subpopulations in an effort to suggest that leronlimab was effective in treating certain COVID-19 patient subgroups.  CytoDyn Executive 1 warned Pourhassan that the analysis was not statistically or scientifically sound. (*Id.*)  Kazempour also expressed concern about the statistical analysis that Pourhassan wanted to present in the Addendum.  (*Id.*)  Despite knowing that Pourhassan's request was improper, Pourhassan told CytoDyn Executive 1 that Amarex would include the post hoc analysis of data because Amarex does what its client asked.  (*Id.*)

At Pourhassan's direction, CytoDyn and Amarex submitted the Addendum to the FDA.

(*Id.* ¶ 9.)  Specifically, on or about February 23, 2021, Pourhassan sent Kazempour and others an email with the subject line, "CytoDyn - Leronlimab_CD12_COVID-19_Executive Summary_Addendum FINAL," instructing Kazempour to submit the addendum to the FDA.  (*Id.*) The FDA subsequently disagreed with the analysis in the Addendum and called an urgent meeting with CytoDyn and Amarex to express its concerns that the post hoc analysis of COVID-19 patient subgroup data was misleading.  (*Id.*)

According to the indictment, Pourhassan and CytoDyn repeatedly made materially false and misleading representations of leronlimab's effectiveness as a COVID-19 treatment based on patient subpopulations that they knew, because the FDA and CytoDyn personnel had explicitly informed them, derived from flawed calculations and results that were neither statistically significant nor scientifically sound. (*Id.* ¶ 10.)  For example, on or about March 8, 2021, Pourhassan caused CytoDyn to file a Current Report on SEC Form 8-K that attached a combined version of the Executive Summary report to FDA and analysis from the Addendum, despite the prior warnings from CytoDyn and Amarex personnel, and the FDA, that the analysis in the Addendum was misleading.  (*Id.*)

In response to Pourhassan's and CytoDyn's serial misrepresentations regarding leronlimab's effectiveness as a COVID-19 treatment, on or about May 17, 2021, the FDA released a public statement on its website to correct CytoDyn's public misrepresentations regarding leronlimab.  (*Id.* ¶ 11.)  The FDA's "Statement on Leronlimab" explained, in pertinent part:

> Focusing on only the most favorable of many subgroup analyses, even if the sub- groups are pre-specified, can lead to overestimating the evidence of benefit, because regardless of a drug's true efficacy, some analyses are likely to appear favorable by chance when a large number of analyses ate conducted.
>
> With the conclusion of both the CD10 and CD12 clinical trials, it has become clear that the data currently available do not support the clinical benefit of leronlimab for the treatment of COVID-19....

CytoDyn has publicly communicated differences in small subgroups from the CD12 trial (e.g., a sub-group analysis of 62 of the 394 patients studied) suggesting that the data demonstrated a mortality benefit in certain patients who had received leronlimab. Subgroup analyses have well-established limitations, especially in the context of a clinical trial that has failed to show a benefit in the overall study population. For example, subgroups are often small, and therefore imbalances are common. Here, the data from CD12 illustrated imbalances in mortality among subgroups, some favoring leronlimab and some favoring placebo. None of these analyses met statistical significance when using established and reliable analytical methods that correct for multiple comparisons.

(*Id.*)

The indictment further alleges that, on or about September 22, 2021, notwithstanding the FDA's repeated warnings and public statement regarding leronlimab and COVID-19, Pourhassan filmed a video interview that was posted and publicly available on the Internet in which he again made materially false and misleading representations regarding leronlimab's effectiveness as a treatment for critically ill COVID-19 patients.  (*Id.*)

## ARGUMENT

### I.      THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS TO DISMISS

Defendants Pourhassan and Kazempour have both moved, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), to dismiss an indictment for failure to state an offense.  The Fourth Circuit has instructed that, to be legally sufficient, an indictment "must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) (quoting *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992)).   In reviewing a motion to dismiss, the Court must accept all factual allegations in the indictment as true. *United States v. Oaks*, 302 F.Supp.3d 716, 720 (D. Md. 2018).  Further, the court should construe the indictment in a "practical," as opposed to a "purely technical,"

19

manner. *Id.* (citing *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)).  *See also United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

"To overcome such a motion, the indictment must include every essential element of the offense."  *See United States v. Burks*, 746 F. App'x 191, 198 (4th Cir. 2018) (citing *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014)).  In general, it is "sufficient that an indictment set forth the offense in the words of the statute itself."  *Perry*, 757 F.3d at 171 (quotations omitted).  "[I]f the indictment meets this standard, it 'is valid on its face' and the court may not 'review the sufficiency of evidence supporting' the indictment because a valid 'indictment returned by a legally constituted and unbiased grand jury' is 'enough to call for trial of the charges on the merits.'"  *Burks*, 746 F. App'x at 198  (quoting *United States v. Wills*, 346 F.3d 476, 488-89 (4th Cir. 2003)).[4]

The indictment no doubt meets the basic pleading requirements sufficient to survive a motion to dismiss with respect to each and every crime with which the defendants are charged. There is no legal deficiency.  Accordingly, the Court should deny the defendants' motions to dismiss.

---

[4] Kazempour argues that, when resolving his motion to dismiss, it would be appropriate for the Court to look beyond the four corners of the indictment in this case to the evidence that the government produced in discovery.  (ECF 61-1 at 4, n.1.)  The government objects to Kazempour's attempt to transform his motion to dismiss into a motion for summary judgment (which is only available in civil actions and not a mechanism to seek pre-trial dismissal in criminal cases).  The government has not purported to make a full proffer of the evidence it intends to introduce at trial and the parties have not agreed on a stipulated record.  Moreover, the material facts are not undisputed such that only issues of law remain.

**A.  The Indictment Against Pourhassan Is Legally Sufficient and Meets All the Pleading Requirements**

*Count 1 – Conspiracy*

Count 1 alleges that Pourhassan and Kazempour conspired to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371.  In order for a defendant to be guilty of a conspiracy to violate federal law, the government must prove beyond a reasonable doubt: (i) first, that such a conspiracy existed; (ii) second, that at some point the defendant knowingly and willfully joined and participated in the conspiracy; and (iii) third, that at least one overt act in furtherance of the conspiracy was knowingly and willfully committed by at least one member of the conspiracy. *Modern Federal Jury Instructions*, Criminal No. 19-3S (2023).  As the Fourth Circuit explained, "where conspiracy is the 'gist of the crime'[,] all that is necessary in the indictment is that the object of the conspiracy be set forth sufficiently to identify the offense which the defendant is charged with conspiring to commit."  *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (quoting *Wong Tai v. United States*, 273 U.S. 77, 81, 71 L. Ed. 545, 47 S. Ct. 300 (1927)).

Tracking the statutory language of Section 371, the indictment alleges the specific offenses the defendants conspired to commit (namely, securities fraud and wire fraud) (Indictment Count 1 ¶ 11), and sets forth the purpose of the conspiracy (defrauding CytoDyn investors about the status of the company's development of leronlimab as an HIV treatment, among others and personally benefit themselves) (*id.* ¶ 12).  The indictment also describes the manner and means of the conspiracy (*id*. ¶¶ 13-21), and details the many overt acts taken by each of the defendants in furtherance of the conspiracy (*id*. ¶¶ 22 – 53).  Among other things, the indictment alleges in February 2020, Pourhassan wrote to Kazempour explicitly stating that it was necessary to file the BLA in order to increase and maintain CytoDyn's stock price.  (*Id.* ¶ 33.)  In April 2020, after

CytoDyn and Amarex repeatedly missed publicized timelines to submit the HIV BLA, Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as incomplete in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  (*Id*. ¶¶ 8.a, 8.b, 15, 33, 34, 36-41.)  Pourhassan told Kazempour, in an email dated April 14, 2020, submitting the BLA was necessary to prevent CytoDyn's stock price from dropping further and permit the company the opportunity to resume selling securities to finance its business and operations. (*Id*. ¶ 37.)  This was the second time – in writing – that Pourhassan drew the explicit link between submitting the BLA and increasing CytoDyn's stock price.  Both Kazempour and Pourhassan attempted to sell their shares of CytoDyn stock before the public learned the truth about the BLA Kazempour had submitted at Pourhassan's direction.  (*Id.* ¶¶ 41-44.)  The day after Kazempour submitted the incomplete BLA to the FDA, he  attempted to sell 150,000 shares of CytoDyn stock before the market learned the truth, but was unsuccessful.[5]  (*Id*. ¶ 41.)  Pourhassan, however, sold millions of dollars' worth of CytoDyn stock based on material non-public information, including information about the fact that the BLA was incomplete and that the FDA had, as anticipated, rejected the BLA.  (*Id*. ¶¶ 42-44.)

After the FDA notified Kazempour – and Kazempour in turn notified Pourhassan – that the BLA was incomplete and that it was aware that Pourhassan and CytoDyn had lied to the public about its BLA submission, both defendants took steps to conceal their fraudulent scheme.  Pourhassan and Kazempour, who also had a unique role as a CytoDyn insider who sat on the

---

[5] Later, on or about June 9 , 2020, and June 10, 2020, Kazempour successfully exercised stock options and sold his approximately 150 ,000 shares of CytoDyn stock valued at $427,500.  (*Id.* ¶ 49.)  As set forth in the indictment, at the time Kazempour sold his shares, Pourhassan was continuing to make materially false and misleading about the fact that CytoDyn had completed its submission of remaining parts of the BLA to the FDA when, in truth and in fact, it had not.  (*Id.* ¶ 47.)

company's Disclosure Committee, failed to correct Pourhassan and CytoDyn's materially false and misleading statement about the company's submission of a completed BLA (*id.* ¶¶ 42-44), used CytoDyn 10-K dated August 14, 2020 to conceal their prior conduct in furtherance of the conspiracy (*id.* ¶ 50). In addition, to conceal the conspiracy and schemes from law enforcement, Kazempour made materially false statements to federal agents regarding his ownership of CytoDyn stock. (*Id.* ¶¶ 21, 53.)

### Counts 2, 3, 4 and 9 – Securities Fraud

Counts 2, 3 and 4 allege Pourhassan and Kazempour committed securities fraud relating to the HIV BLA in violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78ff) and Rule 17 C.F.R. § 240.10b-5 thereunder. Count 9 alleges Pourhassan committed securities fraud relating to COVID-19 in violation of the same statutes and rule.

In order for a defendant to be guilty of securities fraud, the government must prove beyond a reasonable doubt:

(i)     first, that in connection with the purchase or sale of CytoDyn stock, the defendant did any one or more of the following:

(a)     employed a device, scheme or artifice to defraud; or
(b)     made an untrue statement of a material fact or omitted to state a material fact that made what was said, under the circumstances, misleading; or
(c)     engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

(ii)    second, that the defendant acted willfully, knowingly and with the intent to defraud; and

(iii)   that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

*Modern Federal Jury Instructions*-Criminal No. 57-20 (2023).

Tracking the statutory language of Section 10(b), the indictment alleges that Pourhassan

23

made numerous materially false and misleading statements, and omitted materials facts, relating to the HIV BLA, including:

(i)     Pourhassan made materially false and misleading representations about the timelines by which CytoDyn and Amarex would complete and submit the HIV BLA to the FDA. These statements were materially false because CytoDyn directors and executives, Amarex executives, and the FDA had repeatedly told Pourhassan that the timelines he selected for submitting the BLA could not be met because, among other things, CytoDyn did not have the additional data needed to support the 700mg dosage (which still required substantial additional work). These statements were also materially misleading because Pourhassan omitted to disclose that these timelines were not based on whether CytoDyn and Amarex could meet the FDA's requirements for a BLA, but on what Pourhassan believed would inflate and maintain CytoDyn's stock price and attract new investors. (Indictment Count 1 ¶¶ 14, 28-35.) The indictment includes numerous examples, including how, in April 2020, Pourhassan publicly stated in a Form 10-Q that he signed that CytoDyn expected to submit the BLA to the FDA in April 2020 around the same time that Pourhassan privately was emailing the individuals responsible for the BLA to acknowledge the BLA was still incomplete and discuss submitting it anyway. (*Id.* ¶¶ 34-37.)

(ii)     After Kazempour submitted an incomplete BLA to the FDA at Pourhassan's direction, Pourhassan made materially false and misleading representations about how the BLA had been submitted to the FDA and was "completed". Pourhassan, however, knew the BLA was not complete and that Kazempour and Amarex had only submitted the BLA so that Pourhassan could misleadingly announce it had been submitted while omitting the material information that the BLA was incomplete and would be rejected by the FDA. (*Id.* ¶¶ 15-16, 37, 39-40.)

(iii)     After the FDA informed Kazempour, who in turn informed Pourhassan, that the BLA was incomplete and that a CytoDyn press release stating the opposite was misleading, Pourhassan failed to correct the false and misleading press release. (*Id.* ¶¶ 17, 42-43.) Instead, Pourhassan sold millions of shares of CytoDyn stock while in possession of material information not known to the public, namely that the BLA submitted to the FDA was not complete and, therefore, CytoDyn's April press release announcing a "completed" BLA was false, and that the FDA had already communicated to CytoDyn through Kazempour and Amarex, that the BLA was not complete and would not be reviewed.[6] (*Id.*)

---

[6] Counts 11, 12 and 13 charge Pourhassan with insider trading, also in violation of Section 10(b). In addition to the elements described above, in order for a defendant to be guilty of insider trading, the government must prove beyond a reasonable doubt that, on the basis of material, non-public information obtained from his employer, the defendant executed and caused to be executed trades in the securities of CytoDyn. *Modern Federal Jury Instructions*-Criminal No. 57-23 (2023). The

(iv)     Pourhassan made materially false and misleading statements about how his sale of CytoDyn was personally harmful to his financial interest when, in truth, he personally gained approximately $4.4 million from this insider trading.  (*Id*. ¶ 44.)

(v)     Pourhassan again falsely claimed that a completed BLA had been submitted, when he knew that CytoDyn did not possess the necessary data to complete the BLA – including data required to support the 700mg dosage.  (*Id.* ¶¶ 45-48.)

In addition, the indictment specifically alleges that Pourhassan employed a "deceptive device" when Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as incomplete.  (*Id.* ¶¶  8.a, 8.b, 15, 33, 34, 36-41.)  The indictment alleges that Pourhassan did so in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  (*Id.*)

Moreover, the indictment is replete with factual allegations that Pourhassan acted willfully, knowingly and with the intent to defraud.  Specifically, the indictment alleges Pourhassan was repeatedly warned he was making false and misleading statements to investors about CytoDyn's development of leronlimab, including by CytoDyn directors and officers, Amarex executives, and the FDA, among others.  (Indictment Count 1 ¶¶ 23, 26, 27, 42; Count 9 ¶¶ 5, 9, 11.)  In response, Pourhassan marginalized, terminated, silenced, and/or sidestepped those who told him that his public statements were untruthful.  (Indictment Count 1 ¶¶ 13, 23-27, 42; Count 9 ¶¶ 10-11.)  His purpose in doing so was to eliminate any obstacles to raising money by defrauding new investors.  (Indictment Count 1 ¶¶ 23-25.)  In addition, the indictment alleges that, on April 14, 2020, Pourhassan sent an email in which he described his plan to deceive

---

factual allegations referenced here clearly establish that element for the purpose of the insider trading charges.

investors in order to artificially inflate CytoDyn's stock price.  (*Id.* ¶ 37.)  The indictment also alleges that after the FDA caught Pourhassan lying about CytoDyn's submission of a complete BLA, Pourhassan did not timely take steps to correct his material misrepresentations but, instead sold millions of dollars of CytoDyn stock for his own personal benefit before the public could learn the truth (*id.* ¶¶ 42-43) – and then lied to investors about that too (*id.* ¶ 44.)  The indictment further alleges that after the FDA caught Pourhassan lying about CytoDyn's submission of a complete BLA, Pourhassan lied again about the same thing in May 2020.  (*Id.* ¶¶ 45-48.) Moreover, the indictment alleges that Pourhassan hired and paid with CytoDyn funds a stock promoter to respond to critical commentary (without attribution to Pourhassan or CytoDyn) in online chat boards and elsewhere on the Internet, to conceal Pourhassan's fraudulent scheme on investors.  (*Id.* ¶ 52.)  These factual allegations are more than sufficient to establish that Pourhassan acted willfully, knowingly and with the intent to defraud relating to the HIV BLA.[7]

Tracking the statutory language of Section 10(b), the indictment separately alleges that Pourhassan engaged in a scheme whereby he defrauded CytoDyn investors about the status of CytoDyn's development of leronlimab as a potential treatment for COVID-19.  (Indictment Count 9 ¶¶ 5-12.)  The indictments alleges that the FDA repeatedly told Pourhassan and CytoDyn that the company's clinical trials had failed to demonstrate that leronlimab was an effective COVID-19 treatment and that the company's public statements about the result of these clinical trials were

---

[7] Facts in support of the third element – that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct – are specifically alleged in Counts 2, 3, 4 and 9 do not appear to be a subject of defendants' motion.  (Indictment Counts 2, 3 and 4; Count 9.)

materially misleading. (*Id*.) Pourhassan ignored the FDA and continued to make material misrepresentations regarding leronlimab's effectiveness as a COVID-19 treatment to investors and the general public in order to artificially increase CytoDyn's stock price and raise new money – without disclosing that the FDA had rejected CytoDyn's analysis. (*Id*.)

Moreover, the indictment is replete with factual allegations that Pourhassan acted willfully, knowingly and with the intent to defraud. The allegations described above are incorporated in Count 9 and establish that Pourhassan acted with the requisite intent with respect to the scheme to defraud investors about the status of CytoDyn's development of leronlimab as a potential treatment for COVID-19. Importantly, these allegations concern events that largely pre-dated the time when Pourhassan made the materially false and misleading statements about COVID-19 and therefore are relevant to establish his state of mind at the time he made them. In addition, the allegations that Pourhassan continued to make the same materially false and misleading statements about the effectiveness of leronlimab as a potential treatment for COVID-19 after the FDA made an unprecedented public statement correcting Pourhassan's earlier misrepresentations further demonstrates his fraudulent intent. (*Id*. ¶ 11.)[8]

**B. Pourhassan Does Not Identify Any Legal Deficiencies in the Indictment**

Pourhassan's primary argument for dismissal is that the Fourth Circuit rejected the use of the federal securities laws for the theory of fraud alleged in the indictment and that, as a result, the crimes with which the government has charged him simply do not exist. (ECF 58 at 2-4.) Pourhassan is wrong.

---

[8] The elements of wire fraud (Counts 5, 6 and 10) are substantially similar to those required to plead securities fraud. *See Modern Federal Jury Instructions*-Criminal No. 44-3 (2023). Accordingly, these allegations are also sufficient to meet the basic pleading requirements for wire fraud for the same reasons set forth above.

First, the cases on which Pourhassan relies address only the heightened pleading standards that a private plaintiff must meet in other to plead a civil Section 10(b) claim with sufficient particularity pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[9]  The Fourth Circuit affirmed the dismissal of the federal securities class action complaints in those cases because the private plaintiffs had failed to plead sufficient facts to establish falsity or fraudulent intent.  The Fourth Circuit did not address or discuss the viability of the legal theories underlying those private plaintiffs' claims, let alone foreclose them as a matter of law in criminal cases.  Moreover, and perhaps most importantly, there is no question that fraud in connection with securities transactions is a federal crime – and neither Pourhassan nor any of the cases on which he relies suggests otherwise.

Second, Pourhassan mischaracterizes the indictment as alleging that Pourhassan made "overly optimistic statements about drug approval expectations."  (ECF 58 at 2.)  It does not.  With respect to the HIV BLA, the indictment alleges that:  (i) Pourhassan selected timelines for submission to the FDA that he knew CytoDyn and Amarex could not meet based on what he believed would artificially inflate and maintain CytoDyn's stock price and attract new investors (Indictment Count 1 ¶¶ 34-37); (ii) Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as incomplete in order to create the false

---

[9] "These heightened pleading standards exist because Congress recognized the potential for abuse in the securities fraud context, including 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'"  *Lerner v. Northwest Biotherapeutics*, 273 F. Supp. 3d 573, 585 (D. Md. 2017) (quotations and citations omitted).  These heightened pleading standards do not apply in criminal cases.  Civil federal securities fraud claims are also different from criminal federal securities fraud claims in a number of other key respects.  For example, private plaintiffs are required to plead and prove different additional elements in order to recover under the federal securities anti-fraud provisions, namely reliance, causation and loss.  In addition, private plaintiffs are limited to seeking recover from "primary" violators; private plaintiffs are foreclosed from recovering under aiding and abetting or conspiracy-based theories.

appearance that CytoDyn had surpassed a milestone when, in reality, it had not (*id.* ¶¶ 15, 37); (iii) Pourhassan falsely claimed in April 2020 that CytoDyn had submitted a "completed" BLA when he know that it had not (*id.* ¶¶ 16, 39-40); (iii) after the FDA caught Pourhassan lying about CytoDyn's submission of a complete BLA, Pourhassan did not timely take steps to correct his material misrepresentations but, instead sold millions of dollars of CytoDyn stock for his own personal benefit before the public could learn the truth (*id.* ¶¶ 17, 42-43) – and then lied to investors about that too (*id.* ¶ 44); and (iv) in May 2020, Pourhassan again falsely claimed that a complete BLA had been submitted, knowing that CytoDyn did not possess the necessary data to complete the BLA (including the data required to support the 700mg dosage) (*id.* ¶¶ 45-48).

With respect to COVID-19, the indictment alleges that Pourhassan falsely represented that leronlimab was an effective treatment for COVID-19 without disclosing that the FDA had rejected the company's findings and analysis and admonished the company for making misleading public statements about results of its clinical trials.  (Indictment Count 9 ¶¶ 5-12.)

Significantly, the Fourth Circuit has held that a plaintiff sufficiently pleaded that a biotech company misled its investors when plaintiffs alleged that the company chose to inform the market that it was training surgeons on how to obtain reimbursements for its medical devices but failed to disclose that it was doing so through a fraudulent reimbursement scheme operation.  *See Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018).  The Fourth Circuit has also specifically found allegations that a biotech company failed to disclose critical information received from the FDA during the new drug application – while releasing less damaging information that the company knew was incomplete – to be sufficient to permit a strong inference that the defendants knowingly misled investors. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015).

Third, the facts of the cases on which Pourhassan purports to rely (ECF 58 at 2-3), are completely different from those alleged in the indictment and do not undercut the government's allegations. If anything, these cases underscore the strength of the indictment.

For example, in *City of Edinburgh Council v. Pfizer, Inc.*, the Third Circuit affirmed the dismissal of federal securities class action claims finding plaintiffs failed to plead falsity because (i) the defendants had not actually made any statements about the strength of the interim clinical trial results that were the subject of the complaint, and (ii) the defendants had explicitly cautioned investors that no conclusion could be drawn about the interim results until the clinical trial as completed. 754 F.3d 159, 168-69 (3d Cir. 2014). In this case, however, the criminal charges against Pourhassan are based on statements that were obviously false and misleading such as the company's representation that it had submitted a completed BLA when, in reality, it had not, and the company's statements that clinical trials had demonstrated leronlimab to be an effective treatment of COVID-19 when, in reality, the FDA had already rejected the company's findings and analysis.[10]

The Fourt Circuit's decision in *Employees' Retirement System v. MacroGenics, Inc.*, is also inapposite. 61 F.4th 369 (4th Cir. 2023). There, the Court affirmed the dismissal of federal securities class action claims finding that plaintiffs failed to plead falsity because they did not

---

[10] The Third Circuit's opinion in *Pfizer* directly contradicts Pourhassan's mistaken claim that such allegations are inactionable. In *Pfizer*, the Third Circuit explained that "a company's failure to accurately disclose clinical trial data may be actionable under the securities laws, … [when] they involve plausible allegations of affirmative false statements about a drug's efficacy and safety." 754 F.3d at 170. The Third Circuit further explained that allegations concerning the interpretation of clinical trial results, which are opinions, may also be actionable "if they are not honestly believed and lack a reasonable basis." *Id.* Here, the indictment alleges affirmative false statements about leronlimab's efficacy, and facts showing that, to the extent Pourhassan purported to express an opinion, they were not honestly believed and lacked a reasonable basis. (*See, e.g.*, Indictment Count 1 ¶¶ 13-14, 23-35, 42; Count 9 ¶¶ 5, 9-11.)

allege material adverse facts that were inconsistent with the company's positive public statements about interim results of its clinical trials. *Id.* at 384-85. Here, in stark contrast, the indictment alleges that Pourhassan and his company failed to disclose many critical facts that directly contradicted their public statements, including, for example, that: the HIV BLA was submitted under false pretenses, the HIV BLA was incomplete when submitted, and the FDA had repeatedly rejected the company's findings and analysis about the effectiveness of leronlimab as a treatment for COVID-19.[11]

Pourhassan's reliance on *Cozzarelli v. Inspire Pharmaceuticals, Inc.*, is similarly misplaced. 549 F.3d 618 (4th Cir. 2008). In *Cozzarelli*, the plaintiffs' primary allegation of fraudulent intent focused on a corporate officer's use of an imprecise medical term when describing the endpoint of a clinical study, allegedly with the intent to mislead investors to think that the study was likely to succeed. *Id.* at 624-26. The Fourth Circuit concluded that not only was the general term used by the corporate officer "more or less interchangeable" with the precise term not referenced, but that the pharmaceutical company also informed investors that it would not disclose the details of the study for "competitive reasons." *Id.* at 626. For that reason, the Court Circuit concluded in *Cozzarelli* that the corporate officer's chosen language did not support a strong inference of scienter. *Id.* at 627-28. The indictment's allegations of fraudulent intent, however, do not turn on the use of an imprecise medical term but on a history and pattern of deceptive conduct on the part of Pourhassan described above.[12]

---

[11] Fourth Circuit cases cited and discussed in the *MacroGenics* opinion – namely *Zak*, 780 F.3d 597 and *Singer*, 883 F.3d 425 – directly contradict Pourhassan's argument that holding defendants accountable under the federal securities laws in cases like this one would contravene Fourth Circuit precedent. 61 F.4th at 385-86.

[12] To the extent Pourhassan relies on *Cozzarelli* for the proposition that, in a securities fraud lawsuit, a strong inference of fraud does not arise merely from seeking capital to support a risky

Pourhassan also argues that the indictment fails to sufficiently allege that he knowingly made materially false and misleading statements for five reasons (ECF 58 at 7-14), all of which the Court should reject.

First, Pourhassan argues that the indictment fails to allege fraudulent intent because he only sold around some (around 4.8 million) but not all (around 8 million) shares of CytoDyn stock that he owned.  (ECF 58 at 8.)  As a threshold matter, this argument is inappropriate on a motion to dismiss and instead is more properly asserted in a Rule 29 motion or as a defense argued to the jury.  *See United States v. Fitzgerald*, 514 F. Supp. 3d 721, 745 n.4 (D. Md. 2021) ("The Court's role in a motion to dismiss is not to speculate on the evidentiary proof offered by either party, but instead to judge the legal sufficiency of the indictment.") (citing *Terry*, 257 F.3d at 371).  In any event, the indictment alleges that Pourhassan sold 4.8 million shares of CytoDyn stock based on material non-public information, including that the BLA was incomplete and the FDA had rejected it – and then lied to investors about the fact that he personally benefited when, in truth, he received $4.4 million.  (Indictment Count 1  ¶¶ 42-44.)  These "unusual" and "suspicious" circumstances surrounding Pourhassan's sale are not only indicative of fraudulent intent, *Cozzarelli*, 549 F.3d at 628, but also constitute a federal crime: insider trading (Indictment Counts 11-13).[13]

---

venture (ECF 58 at 3), it still does not support his argument:  the indictment does not rely on the fact that Pourhassan worked aggressively to finance CytoDyn by selling securities, but on a myriad of allegations that Pourhassan was repeatedly warned he was making false and misleading statements to investors about CytoDyn's development of leronlimab, including by CytoDyn directors and officers, Amarex executives, and the FDA, among others, and responded by marginalizing, terminating, silencing, and/or sidestepping those who told him that his public statements were untruthful so that he could continue to raise new money by selling securities. (Indictment Count 1 ¶¶ 13, 23-27, 42; Count 9 ¶¶ 5, 9-11)

[13] Pourhassan wrongly argues that the Indictment makes no allegation that he sold CytoDyn securities entirely for his own personal benefit. (ECF 58 at 8.)  To the contrary, the indictment repeatedly alleges that the purpose of his fraudulent conduct was to benefit him personally, including by obtaining $4.4 million for himself by engaging in illegal insider trading.  (Indictment Count 1 ¶¶ 12, 43; Count 9 ¶ 2.)  The indictment also alleges that he lied to investors to conceal

Second, Pourhassan argues that the indictment fails to allege that Pourhassan knew that Kazempour submitted an incomplete BLA to the FDA.  (ECF 58 at 9.)  According to Pourhassan, the indictment alleges that (i) Pourhassan directed Kazempour to submit a "short" BLA; and (ii) Kazempour directed Executive 1 to inform Pourhassan that the BLA was incomplete – but does not allege that Executive 1 did so.  (*Id.* (citing Indictment Count 1 ¶¶ 16, 17,18).)  He is mistaken. The indictment clearly alleges that: "On or about April 30, 2020, **KAZEMPOUR** forwarded an email from the FDA, dated on or about April 29, 2020, to Amarex Executive 1, *who in turn forwarded the FDA's e-mail to* **POURHASSAN.** The FDA's April 29, 2020, e-mail had informed **KAZEMPOUR** that the BLA was not complete and that CytoDyn's April 27, 2020, press release contained misinformation."  (Indictment Count 1 ¶ 42 (emphasis added).)

Pourhassan also argues that had known that he had committed a crime by directing Kazempour to submit an incomplete BLA to the FDA, then he would not have publicly acknowledged that crime once, let alone three times in three "corrective" press releases (issued on May 8, 2020, May 13, 2020 and June 8, 2020).  (ECF 58 at 9.)  These arguments too are inappropriate for a motion to dismiss and instead, should argued at trial.  *Fitzgerald*, 514 F. Supp. 3d at 745 n.4.  In any event, the indictment specifically alleges that these press releases also contained materially false and misleading statements that were intended to conceal his fraudulent conduct, not correct the record.  (Indictment Count 1 ¶¶ 46-48.)  In reviewing a motion to dismiss, the Court must accept these factual allegations as true.  *Oaks*, 302 F.Supp.3d at 720.

Third, Pourhassan argues that the representing in the Form 10-Q filed on April 9, 2020 - stating that "We expect to submit the remaining two sections of the BLA in the [sic] April of 2020"

---

the truth about the fact that he personally benefitted from his illegal insider sales.  (Indictment Count 1 ¶ 44.)

– is not actionable because it is "opinion" or "puffery".  (ECF 58 at 10.)  Even if it were "opinion" or "puffery" (which it clearly is not), "[a]lthough a statement of opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *MacroGenics, Inc.*, 61 F.4th at 386 (citing *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).  Here the statement is clearly factual because, as alleged in the indictment, Pourhassan knew the statement was false when made.[14]  (Indictment Count 1 ¶ 35 ("**POURHASSAN** … knew that data and information required by the FDA was not available to submit by the end of April 2020 and, therefore, the remaining two sections of the BLA could not be submitted on that timeline.").)  The indictment also alleges it is material – based, in part, on Pourhassan's own words. (*Id.* ¶ 37 ("THE MOST IMPORTANT thing now is BLA. ...").)

Fourth, Pourhassan argues that the Form 10-K filed August 14, 2020 was not materially false and misleading because it disclosed that CytoDyn received a "Refusal to File" letter from the FDA regarding the HIV BLA.  (ECF 58 at 10-11.)  These arguments are inappropriate for a motion to dismiss and instead, should argued at trial.  *Fitzgerald*, 514 F. Supp. 3d at 745 n.4.  The government does not disagree that the Form 10-K acknowledges that the company received a "Refusal to File" letter.  The indictment, however, alleges that, in spite of this disclosure, Pourhassan and Kazempour used the August 14, 2020 10-K to conceal their prior conduct in furtherance of the conspiracy and schemes, and to continue to mislead investors about the prospects for and timing of resubmitting a completed BLA to the FDA.  (Indictment Count 1 ¶¶ 50.a, 50.b and 50.c.)  At this point in the case, for the purpose of deciding Pourhassan's motion, the Court must accept these factual allegations as true.  *Oaks*, 302 F.Supp.3d at 720.

---

[14] In *Longman*, the Fourth Circuit explained that "opinions could be false and factual if the [defendants] did not believe what they said they believed and proof could be had through the orthodox evidentiary process."  197 F.3d at 683 (quotations omitted).

Fifth, Pourhassan argues that his materially false and misleading representations that leronlimab was an effective treatment for COVID-19 are not actionable because the indictment alleges only that he failed to disclose "mere disagreements" with the FDA and such "mere disagreements" about the results of clinical trials are not actionable in the Fourth Circuit. Pourhassan is wrong in all respects.  (ECF 58 at 12.)  The indictment does not allege that Pourhassan had a "mere disagreement" with the FDA.  Far from it, the indictment alleges that: (i) the FDA rejected the company's findings and analysis about the effectiveness of leronlimab as a treatment for COVID-19; (ii) the FDA repeatedly admonished the company for making materially false and misleading statements about the effectiveness of leronlimab as a treatment for COVID-19; and (iii) Pourhassan and the company continued to repeat these materially false and misleading statements to investors without disclosing that the FDA had rejected the company's findings and analysis and had admonished the company.  (Indictment Count 9 ¶¶ 5-12.)

Moreover, under Fourth Circuit law, allegations that a defendant failed to disclose critical information received from the FDA, while releasing less damaging information that he knew was incomplete, is sufficient to plead securities fraud.  *See generally Zak*, 780 F.3d 597.  The cases on which Pourhassan relies do not suggest otherwise.  (ECF 58 at 12.)  To the contrary, those cases are inapposite because they concern disagreements with plaintiffs or amongst medical researchers, not actions taken by a company's primary federal regulator.

Finally, Pourhassan claims that any legal deficiencies with respect to the securities fraud charges (Counts 2, 3, 4 and 9) would also require dismissal of the remaining charges (Counts 1, 4, 5, 6, 10, 11-13), which he claims are "entirely dependent for their viability on the existence of the securities fraud charges".  (ECF 58 at 4.)  This is simply not true.  As explained above in Section I.A., the elements of conspiracy and insider trading are different and, for all the reasons set forth

in that section, the indictment against Pourhassan is legally sufficient and meets all the pleading requirements with respect to these charges.

### C. The Rule of Lenity and Due Process Concerns Do Not Require Dismissal of the Indictment Against Pourhassan

Pourhassan incorrectly argues that, because the indictment against him is based on a theory of wrongdoing that the Fourth Circuit has rejected, seeking to hold him criminally liable under such circumstances would undermine fundamental principles of lenity and due process.  (ECF 58 at 4-7.)  His argument is wrong and should be rejected for several reasons.

First, as explained above, the Fourth Circuit did not address or discuss the viability of the legal theories underlying the indictment, let alone foreclose them as a matter of law in civil or criminal cases.  To the contrary, Fourth Circuit law approves of well-pleaded allegations asserting claims like those alleged in the indictment.  *See, e.g., Zak*, 780 F.3d 597; *Singer*, 883 F.3d 425.

Second, Pourhassan's arguments disregards the clear language of Section 10(b) and Rule 10b-5, both of which leave no doubt that fraud in connection with securities transactions is a federal crime.  *See United States v. Bongiorno*, 2006 U.S. Dist. LEXIS 24830, at *26-27 (S.D.N.Y. May 1, 2006) (citing *Chapman v. United States*, 500 U.S. 453, 463, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991) ("The rule of lenity … is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute." ) (quotations omitted)).  Moreover, the securities fraud crimes with which he is charged are garden variety.  There is nothing new or novel about these charges.  But even if they were, "[n]ovel or atypical methods should not provide immunity from the securities laws."  *United States v. Russo*, 74 F.3d 1383, 1390 (2d Cir. 1996).

Third, Pourhassan's claim that he lacked notice he was engaging in fraud is incredible. As alleged in the indictment, Pourhassan was repeatedly warned he was making false and misleading statements to investors about CytoDyn's development of leronlimab, including by CytoDyn directors and officers, Amarex executives, and the FDA, among others. (Indictment Count 1 ¶¶ 23, 26, 27, 42; Count 9 ¶¶ 5, 9, 11.) In addition, as also alleged in the indictment, Pourhassan knew that he was misleading investors and that his lies were actionable as evidenced by, among other things, an e-mail he sent on or about January 23, 2020, in which he wrote: "We will be getting many lawsuits from our shareholders if we can't deliver the BLA section of our [Chemistry, Manufacturing and Controls] [sic]." (Indictment Count 1 ¶ 32.)

For all of these reasons, the rule of lenity and Due Process concerns do not require dismissal of the indictment against Pourhassan.

### D. The Indictment Against Kazempour Is Legally Sufficient and Meets All the Pleading Requirements

*Count 1 – Conspiracy*

For all of the reasons set forth above in Section I.A in significant detail, the allegations in the indictment are legal sufficient and meet all of the requirements for pleading a conspiracy charge against Kazempour.

*Aiding and Abetting*

The indictment pleads factual allegations that are legally sufficient to find Kazempour criminally liable for aiding and abetting Pourhassan's fraud. In order to find Kazempour guilty of aiding and abetting Pourhassan, the government must prove beyond a reasonable doubt that: (i) first, the crime charged was in fact committed by someone other than Kazempour (namely Pourhassan); (ii) second, Kazempour participated in the crime charged as something he wished to bring about; (iii) third, Kazempour associated himself with the criminal venture knowingly and

voluntarily; and (iv) fourth, Kazempour sought by his actions to make the criminal venture succeed.  *See United States v. Moye*, 454 F.3d 390, 398 (4th Cir. 2006).

In addition to alleging that Pourhassan committed fraud (as Kazempour essentially concedes in his opening submission), the indictment alleges specific facts establishing that Kazempour knowingly participated in Pourhassan's fraudulent schemes.  For example, the indictment alleges that beginning in 2018, Kazempour and Pourhassan together attended meeting with the FDA at which the FDA clearly set forth the requirements to submit a BLA for review, including that the BLA be complete at the time of submission.  (Indictment Count 1 ¶ 8.)  The indictment further alleges that in 2019, Kazempour affirmatively acknowledged – in writing – that the FDA had concerns about CytoDyn's "rush[ed]" timeline for submitting the BLA.  (*Id.* ¶ 9.) CytoDyn directors and executives, as well as Amarex executives, also repeatedly warned Kazempour that Pourhassan's timelines for submitting the BLA could not be met.  (*Id.* ¶ 14.)  The indictment further alleges (in great detail) that Pourhassan explained to Kazempour (in writing) that it was necessary to file the BLA in order to increase and maintain CytoDyn's stock price.  In February 2020, Pourhassan wrote to Kazempour explicitly stating that it was necessary to file the BLA in order to increase and maintain CytoDyn's stock price.  (*Id.* ¶ 33.)  In April 2020, after CytoDyn and Amarex repeatedly missed publicized timelines to submit the HIV BLA, Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as incomplete in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  (*Id.* ¶¶ 8.a, 8.b, 15, 33, 34, 36-41.)  Pourhassan told Kazempour, in an email dated April 14, 2020, submitting the BLA was necessary to prevent CytoDyn's stock price from dropping further and permit the company the opportunity to resume selling securities to finance its business and operations. (*Id.* ¶ 37.)  This was the second time – in writing – that Pourhassan

drew the explicit link between submitting the BLA and increasing CytoDyn's stock price.

The indictment also alleges facts sufficient to plead that Kazempour sought by his actions to make the criminal venture succeed.  The indictment alleges that he submitted an incomplete BLA even though he knew that, by doing, the FDA would not actually review the application and instead would definitely reject it.  (*Id.* ¶ 38.)  The indictment also alleges that Kazempour attempted to profit from the criminal venture by selling his shares of CytoDyn stock before the public could learn the truth about the incomplete BLA submission.  (*Id.* ¶ 41.)  The indictment further alleges that Kazempour took steps to conceal Pourhassan's fraudulent scheme.  Pourhassan and Kazempour, who also had a unique role as a CytoDyn insider who sat on the company's Disclosure Committee, failed to correct Pourhassan and CytoDyn's materially false and misleading statement about the company's submission of a completed BLA (*id.* ¶¶ 42-44), and used CytoDyn 10-K dated August 14, 2020 to conceal their prior conduct in furtherance of the conspiracy (*id.* ¶ 50).  In addition, to conceal the conspiracy and schemes from law enforcement, Kazempour made materially false statements to federal agents regarding his ownership of CytoDyn stock.  (*Id.* ¶¶ 21, 53.)

The indictment readily satisfies the basic pleading requirements with respect to aiding and abetting.

### Counts 2, 3 and 4 – Securities Fraud

Tracking the statutory language of Section 10(b), the indictment alleges that Kazempour committed securities fraud in three principal respects.

First, the indictment specifically alleges that Kazempour participated in a deceptive scheme by, among other things, employing a "deceptive device" when Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as

incomplete.  (Indictment Count 1 ¶¶  8.a, 8.b, 15, 33, 34, 36-41.)  The indictment alleges that Pourhassan did so in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  (*Id.*)

Second, Kazempour failed to correct CytoDyn's materially false and misleading representations that the BLA would be and had been completed and submitted in April 2020 when Kazempour knew that the BLA would not be completed in April 2020 and had not been complete at the time he submitted it on April 27, 2020.  (*Id.* ¶ 42.)  This duty to correct these misrepresentations arise from Kazempour's role as a member of CytoDyn's Disclosure Committee, where he was responsible for reviewing and approving the regulatory-related contents of the company's filings with the SEC.[15]  (*Id.* ¶¶ 5, 42, 50.)

Third, Kazempour made several materially false and misleading representations in the August 14, 2020 Form 10-K, that Kazempour was responsible for reviewing and approving the regulatory-related contents of the filing in his role on CytoDyn's Disclosure Committee. (*Id.* ¶ 50.) The indictment specifically alleges that Kazempour used CytoDyn's 10-K filing to conceal his prior conduct in furtherance of the conspiracy and schemes, including by continuing to suggest that CytoDyn submitted the BLA in April 2020 without disclosing that, at that time, Pourhassan and Kazempour knew that the submission was incomplete and that the FDA would issue a refuse to file notice in response, and they nonetheless submitted it.  *See, e.g.*, *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018).

Moreover, the indictment contains numerous factual allegations that Kazempour acted willfully, knowingly and with the intent to defraud.  Specifically, the indictment alleges that: (i)

---

[15] In his initial submission, Kazempour does not appear to dispute that he had a duty to correct these materially false and misleading representations about the BLA submission.

Kazempour submitted a BLA that he knew the FDA would reject as incomplete (*id.* ¶ 38); (ii) the purpose was to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not, in order to artificially inflate CytoDyn's stock price (*id.* ¶¶ 8.a, 8.b, 15, 33, 34, 36-41); (iii) Kazempour attempted to profit from the fraud by selling his shares of CytoDyn stock before the public could learn the truth about the incomplete BLA submission (*id.* ¶ 41); and (iv) Kazempour took various steps to conceal his role in the fraudulent scheme, including by lying to federal law enforcement agents (*id.* ¶¶ 21, 42-43, 50, 53). These allegations are more than sufficient to plead willfulness, knowledge and intent.

Facts in support of the third element – that the defendant knowingly used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct – are specifically alleged in Counts 2, 3, and 4. (Indictment Counts 2, 3 and 4.)[16]

### Count 14 – False Statement

Count 14 alleges that Kazempour made a false statement to federal law enforcement agents in violation of 18 U.S.C. § 1001. In order for a defendant to be guilty of making a false statement, the government must prove beyond a reasonable doubt: (i) first, that the defendant made the statement, as charged in the indictment; (ii) second, the statement was false; (iii) third, the falsity concerned a material matter; (iv) fourth, the defendant acted willfully, knowing that the statement was false; and (v) fifth, the false statement was made or used for a matter within the jurisdiction of a department or agency of the United States. *Modern Federal Jury Instructions*-Criminal No.

---

[16] The elements of wire fraud (Counts 7 and 8) are substantially similar to those required to plead securities fraud. *See Modern Federal Jury Instructions*-Criminal No. 44-3 (2023). Accordingly, these allegations are also sufficient to meet the basic pleading requirements for wire fraud.

36-9 (2023).

Tracking the statutory language of Section 1001, the indictment alleges that when being interviewed by law enforcement agents, Kazempour falsely stated that he only ever owned a "couple hundred" shares of CytoDyn stock, a "hundred or two hundred" shares, or a "bonus of two hundred share[s]" that CytoDyn had awarded him.  (Indictment Count 14.)  In truth and in fact, Kazempour had not received a "hundred or two hundred" shares of CytoDyn stock, but as Kazempour knew, he had been given warrants to purchase 150,000 shares of CytoDyn stock, which Kazempour attempted to exercise the day after CytoDyn falsely announced that it submitted a completed BLA to the FDA, and that Kazempour ultimately did exercise to purchase and sell CytoDyn stock in or around June 2020.  (*Id*.)  The indictment further alleges that Kazempour made materially false statements to federal agents to conceal the conspiracy and schemes from law enforcement.  (Indictment Count 1 ¶¶ 21, 53.)  These allegations are more than sufficient to meet the pleading requirements.

### E.  Kazempour Does Not Identify Any Legal Deficiencies in the Indictment

#### *Conspiracy and Aiding and Abetting*

Kazempour essentially makes the same arguments with respect to the conspiracy and aiding and abetting charges, namely that "[t]here is simply nothing even remotely suggesting that Dr. Kazempour—the CEO of a different company that was working *for* CytoDyn in a limited capacity centered on communicating with the FDA—knew about Dr. Pourhassan's alleged scheme or agreed to participate in it."  (ECF 61-1 at 12-15.)  These arguments ignore the factual allegations which, in reviewing a motion to dismiss, the Court must accept as true.  *Oaks*, 302 F.Supp.3d at 720.  Specifically, the indictment alleges:

- Kazempour was an insider (not an outsider) who was a member of CytoDyn's Disclosure Committee responsible for reviewing and approving the regulatory-

42

related contents of CytoDyn's SEC filings.  (Indictment Count 1 ¶ 50.)

- CytoDyn employees, Amarex employees and the FDA repeatedly warned Kazempour that Pourhassan's timelines for submitting the BLA could not be met. (*Id.* ¶ 14.)

- Pourhassan explained to Kazempour that it was necessary to file the BLA in order to increase and maintain CytoDyn's stock price and that, after CytoDyn and Amarex repeatedly missed publicized timelines to submit the HIV BLA, Pourhassan directed Kazempour to submit a BLA that Pourhassan and Kazempour knew the FDA would reject as incomplete in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  (*Id.* ¶¶ 8.a, 8.b, 15, 33, 34, 36-41.)  Pourhassan told Kazempour, in an email dated April 14, 2020, submitting the BLA was necessary to prevent CytoDyn's stock price from dropping further and permit the company the opportunity to resume selling securities to finance its business and operations. (*Id.* ¶ 37.)  For all of these reasons, Kazempour is alleged to have had knowledge that Pourhassan planned to communicate the fact of the BLA submission to investors and the general public.

- After Kazempour learned from the FDA that it had rejected the BLA and was aware that CytoDyn had made false and misleading statements about the BLA submission to the public, Kazempour did not take steps to correct the misinformation.  (*Id.* ¶¶ 42-44.)

- Kazempour took additional actions to conceal the fraud, including abusing his position on the CytoDyn Disclosure Committee to permit a materially false and misleading 10-K to be filed that concealed Kazempour and Pourhassan's prior misconduct, and making false statements to federal law enforcement agents about his ownership of CytoDyn stock.  (*Id.* ¶¶ 21, 50, 53.)

Kazempour also argues that he did not have insight into any alleged plans Pourhassan had to sell his stock.  (ECF 61-1 at 14.)  Even if it were true, which is speculative argument not appropriate for a motion to dismiss, such a fact is not relevant.  Kazempour had insight into his plans to sell his own stock, which he attempted to do after he filed the incomplete BLA submission that he knew the FDA would reject and Kazempour attempted to do so before the truth became known and CytoDyn's stock price dropped further.  (Indictment Count 1 ¶ 41.)

For all of these reasons, Kazempour fails to identify any legal deficiencies with respect to either the conspiracy or aiding and abetting charges.[17]

### Securities Fraud

Kazempour's primary argument with respect to the scheme allegations concerning the BLA submission is his claim that the BLA was not inherently deceptive at the time it was submitted – rather the BLA became deceptive only because of a subsequent public misrepresentation made by Pourhassan and CytoDyn.[18]  (ECF 61-1 at 19.)  This argument lacks merit.  The submission of the BLA was by nature deceptive because it depended on a fiction, namely that Kazempour submitted the BLA to the FDA for a legitimate purpose; in truth, Kazempour submitted the BLA to the FDA because Pourhassan had asked him to do so in order to create the false appearance that CytoDyn had surpassed a milestone when, in reality, it had not.  It is impossible to separate the deceptive nature of the BLA submission from the deception actually practiced upon CytoDyn's investors and for that reason it is actionable under Section 10(b).  *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d

---

[17] For these reasons, Kazempour could also be potentially held liable under a *Pinkerton* theory.  It was "reasonably foreseeable" that Pourhassan would misrepresent the BLA submission as a milestone when, in reality, it was not because, as alleged in the indictment, that is the only reason why Pourhassan sought to file an incomplete BLA – and he expressly stated as much in his April 14, 2020 email to Kazempour.

[18]  While Kazempour organized his arguments around each count (ECF 61-1 at 16-21), the government organizes it responses based on the theory of liability alleged.  This is because each of the counts is based on a specific instance of the defendants' use of an instrumentality of interstate commerce, each of which constitute a separate and distinct criminal offense.

Importantly, it is not necessary that a defendant be directly or personally involved in any use of interestate means of communication, nor is it necessary that the interstate communication contain the fraudulent representation.  *See generally Modern Federal Jury Instructions*-Criminal P 57.03 (2023).  For that reason, Kazempour's argument that he did not send the April 14, 2020 email and that the email does not contain a fraudulent misrepresentation does not constitute a legal deficiency in the indictment (ECF 61-1 at 17) – neither is required for pleading purposes.

472, 504 (S.D.N.Y. 2005) (holding that arrangements involving the regular factoring and securitization of worthless invoices by a third-party bank were deceptive devices or contrivances for purposes of Section 10(b) because they were inventions, projects, or schemes with the tendency to deceive because they created the appearance of a conventional factoring or securitization operation when the reality was quite different and they were in fact a trick to disguise the third-party bank's loan to the defendant issuer); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) ("Section 10(b) and Rule 10b-5 impose primary liability on any person who *substantially participates* in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (such as the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.")

Even if Kazempour did not make any public misrepresentations about the BLA submission at the time he submitted it, neither Section 10(b) nor Rule 10b-5 speaks of limiting the nature of a violation to cases involving fraud on investors. Rather, "[t]he plain text of Rule 10b-5 makes it unlawful to engage in any act that 'would operate as a fraud' upon 'any person.'" *SEC v. Jacoby*, Civil Action No. CCB-17-3230, 2021 U.S. Dist. LEXIS 20262, at *28 (D. Md. Feb. 2, 2021) (quoting 17 C.F.R. 240.10b-5(c)). Accordingly, in light of the fact that he misrepresented to the FDA that he had submitted the BLA to the FDA for a legitimate purpose (when, in truth, Kazempour submitted it for a fraudulent purpose), Kazempour clearly engaged in deceptive conduct.

Kazempour's primary argument with respect to the allegations concerning the August 14, 2020 10-K is that his silence is not actionable absent a duty to speak, which he claims the indictment does not sufficiently allege. (ECF 61-1 at 20-21.)

45

Kazempour first argues the indictment is insufficient in this respect because it alleges only that Kazempour was "responsible" for reviewing was responsible for reviewing and approving the regulatory-related contents of the filing in his role on CytoDyn's Disclosure Committee, and does not use the word "duty" in this paragraph.  (*Id.*)  Kazempour does not explain why there is a meaningful difference between a "responsibility" and a "duty" in this context for pleading purposes.  And in any event, the indictment does allege – in Count 1 paragraph 42 – that Kazempour's role on CytoDyn's Disclosure Committee gave rise to a duty to correct misrepresentations that the company made about the BLA submission.  (Indictment Count 1 ¶ 42.) The indictment also alleges that Kazempour's specific responsibility in this role was to "review[] and approv[e] the regulatory-related contents of the filing", which included the parts of the 10-K that discuss the BLA submission for which he was responsible as CytoDyn's regulatory agent.  (*Id.* ¶ 50.)

Kazempour next argues that the case law reflects that no duty arises from a defendant's membership on a company committee.  However, the cases on which Kazempour relies do not dispute the existence of such a duty.  Rather, they hold only that the plaintiffs failed to sufficiently allege that the committee members had notice of the fraud.  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 418 (S.D.N.Y. 2003) (discussing lack of notice); *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013) (same).  Here, in stark contrast, there is no doubt Kazempour had notice of the fraud – Kazempour submitted the incomplete BLA for a fraudulent purpose.

Moreover, as Kazempour acknowledges, "[w]hen a corporation does make a disclosure-- whether it be voluntary or required--there is a duty to make it complete and accurate."  *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).  Here, the

indictment alleges that in the August 14, 2020 10-K, CytoDyn made several disclosures relating to Kazempour's submission of the BLA but that those disclosures were incomplete and inaccurate because they:  (i) continued to suggest that CytoDyn submitted the BLA in April 2020 without disclosing that, at that time, Pourhassan and Kazempour knew that the submission was incomplete and that the FDA would issue a refuse to file notice in response, and they nonetheless submitted it; and (ii) concealed the true nature of the FDA's numerous concerns with the BLA submission (which included dozens of deficiencies).  (Indictment Count 1 ¶ 50.)  Given Kazempour's unique role as both a company insider and regulatory agent who was specifically responsible for this language, Kazempour had a duty to correct these disclosures.

Kazempour's duty to speak also arose from his sale of CytoDyn stock.  "A duty to affirmatively disclose may arise when there is insider trading."  *Singer v. Reali*, 883 F.3d 425, 449 (4th Cir. 2018).  *See also United States v. Levoff*, No. 19-cr-780, 2020 U.S. Dist. LEXIS 144413, at *4 (D.N.J. Aug. 12, 2020) ("As a member of Employer's Disclosure Committee and an attorney for Employer, [the defendant] had access to material, nonpublic information, and a duty not to misuse it."); *United States v. Bryan*, 58 F.3d 933, 953 (4th Cir. 1995) ("[C]orporate insiders, such as directors and managers, and so-called temporary insiders, such as underwriters, accountants, lawyers, or consultants working for a corporation, are under a duty to disclose or abstain".)  Here, the indictment alleges that Kazempour sold his shares of CytoDyn stock when he was in possession of material non-public information on June 9, 2020.  (Indictment Count 1 ¶¶ 41, 49.)  As a result, at the latest, Kazempour had a duty to disclose by that date (which preceded the August 14, 2020 10-K).[19]

---

[19] Kazempour's arguments with respect to the wire fraud counts merely repeat the arguments he made with respect to the securities fraud counts (ECF 61-1 at 21-23), and do not warrant dismissal for the same reasons explained above.

### False Statements

Kazempour acknowledges that the indictment contains allegations that he knowingly and willfully made a false statement, but argues that these allegations are unpersuasive.  (ECF 61-1 at 24.)  Such arguments, which concern the sufficiency of the evidence, are inappropriate for a motion to dismiss and instead should argued at trial.  *Fitzgerald*, 514 F. Supp. 3d at 745 n.4.

Kazempour also disputes the materiality of the false statements, arguing that his false statements to federal law enforcement agents about the number of CytoDyn shares he owned could not have influenced their investigation.  (ECF 61-1 at 24-25.)  Among other things, Kazempour suggests that his false statements should not have mattered to law enforcement because "he simply misstated the quantity of shares and perhaps mixed up terminology that any layman would confuse".  (*Id.* at 25.)  These arguments lack merit.  There is no dispute that the indictment alleges that Kazempour's false statements were "material[]".  (Indictment Count 1 ¶ 21; Count 14.)  There is also no dispute that the indictment alleges facts sufficient to establish that Kazempour's false statements were material: he significantly understated his ownership of CytoDyn shares which speaks directly to the question of his personal motive to conspire with Pourhassan to inflate the price of the company's stock.  To the extent Kazempour disputes the sufficiency of this evidence, he should make those arguments at trial.  The Fourth Circuit has specifically addressed materiality as a jury question.  *See United States v. Sarihifard*, 155 F.3d 301, 306–07 (4th Cir. 1998) ("the jury is the ultimate arbiter of whether the government has met its burden of proof" with respect to whether a false statement "was capable of influencing the decision making body to which it was addressed") (citations omitted).

## II.   THE COURT SHOULD DENY THE DEFENDANTS' SEVERANCE MOTIONS

As an initial matter, the defendants do not challenge that the charges in this case have been properly joined under Rule 8(b).  *See* ECF 60-1  at 2; 62-1 at 1.  That concession is appropriate, because the charges clearly are based on the same set of acts and transactions: they each involve the defendants' actions surrounding CytoDyn's drug, leronlimab, from 2018 through 2021, including the defendants' conspiracy together to commit securities and wire fraud by filing an incomplete BLA and then releasing false statements regarding the matter (Indictment Count 1 ¶ 11); their commission of substantive securities fraud (*Id.* Counts 2-4 ¶2); and their commission of wire fraud (*id*. Counts 5-8 ¶¶ 2-8).  Pourhassan is also charged with filing a fraudulent 8-K in March 2021 related to leronlimab's application to Covid-19 (*id.* Count 9 ¶ 12; *id.* Count 10 ¶ 2), and with insider trading related to sales of stock around the time the incomplete BLA application (*id.* Counts 11-13 ¶ 2).  Kazempour is also charged with an additional false statement related to his attempts to exercise stock options after the incomplete BLA was submitted.  (*Id*. Count 14 ¶ 2.)

In cases like this, where joinder under Rule 8 is proper, "the defendant's only recourse is to convince the court that the charges should be severed under Rule 14 – *a difficult task.*"  *United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (emphasis added).  Rule 14(a) provides that the district court "may order separate trials of counts" "[i]f the joinder of . . . defendants . . . in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government[.]"  Fed. R. Crim. P. 14(a).  The Fourth Circuit has repeatedly characterized those situations in which a discretionary severance is appropriate under Rule 14 as "rare."  *United States v. Hornsby,* 666 F.3d 296, 308-09 (4th Cir. 2012); *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).  When there is proper joinder under Rule 8(b), "[b]arring special circumstances, individuals indicted together should be tried together."  *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir.

1981).  The presumption that co-defendants should and will be tried together applies equally to defendants indicted on conspiracy charges.  *Zafiro v. United States*, 506 U.S. 534, 537-38 (1993).

The party requesting severance under Rule 14 "bears the burden of demonstrating 'a *strong* showing of prejudice[.]'"  *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008) (quoting *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir.1984)) (emphasis added).  It is not sufficient for a defendant to show that a separate trial might offer him or her a better chance of acquittal, or to show that joinder will make his or her task more difficult.  *Goldman*, 750 F.2d at 1225; *see also Zafiro*, 506 U.S. at  540 ("[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.").  Courts have recognized that the inherent prejudice of a joint trial is insufficient to justify severance under Rule 14 and the judicial inefficiency, inconvenience, and expense wrought by severance.  *See United States v. Santoni,* 585 F.2d 667, 674 (4th Cir. 1978) ("The trial court must weigh the inconvenience and expense to the government and witnesses of separate trials against the prejudice to the defendants inherent in a joint trial[.]"); *United States v. Simmons*, 163 F. Supp.3d 317, 322 (E.D. Va. 2016) ("Severance is appropriate only if the risk of actual prejudice outweighs the interest in [the] efficient administration [of] justice.").  "[A] district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence."  *Hornsby*, 666 F.3d at 309 (4th Cir. 2012) (quoting *Zafiro*, 506 U.S. at 539).

An early Fourth Circuit decision interpreting Rule 14 identified three distinct forms of prejudice that could merit a permissive severance of offenses: (i) if there is a serious likelihood that the jury would confuse and cumulate the evidence relating to the various offenses; (ii) if the defendant would be confounded in attempting to present a defense as to certain charges because

of their joinder with others for trial; and (iii) if there is a substantial risk that the jury may decide that since the defendant is guilty of one offense or group of offenses, he has a criminal propensity and is therefore likely to be guilty of the other. *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir. 1976); *Gray*, 78 F. Supp. 2d 524, 532 (E.D. Va. 1999).   None of those circumstances apply in this matter.

First, there is no risk the jury would confuse and cumulate the evidence relating to the various offenses.  Kazempour argues that there is a significant risk of "spillover prejudice" given the "different levels of alleged culpability between the defendants." (ECF 62-1 at 9.)  But there is no right to severance because one defendant is more culpable than the others. *See United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995).  Nor is there a right to severance because the evidence against one defendant is stronger or more inflammatory than the evidence against another defendant. *See United States v. Campbell*, 963 F.3d 301, 318-319 (4th Cir. 2020). The vast bulk of the allegations in the indictment apply equally to Kazempour and Pourhassan: they were co-conspirators in the scheme to submit an incomplete BLA to defraud investors.  And even the securities fraud charges against Kazempour and the false statements against Pourhassan relate to the same set of facts: the defendants' personal attempt to defraud investors and personally profit from the incomplete BLA submission.  Pourhassan's was successful; Kazempour attempted to do so, trying to exercise 150,000 options the day after CytoDyn falsely announced that it had submitted a completed BLA, but could not exercise the options quickly.  Then he lied to the FBI about his actions.  (*See* Indictment Count 14 ¶ 2).  As for the charges related to Pourhassan's securities fraud with respect to a Covid-19 application of leronlimab, the underlying facts of that charge significantly overlap with those of the other charges in the case, concerning the same company, drug, and witnesses (including CytoDyn employees and FDA officials).  But the charges

are sufficiently distinct that the jury can easily be instructed to consider evidence related to those particular charges only with respect to Kazempour, and the jury should not have difficulty in separating out the clearly distinct charges. *See United States v. Carmichael*, 685 F.2d 903, 910 (4th Cir. 1982) ("Although every bit of evidence that was admissible in the defendants' joint trial might not be admissible against each of them in separate trials of the obstruction charges, we perceive no particular danger that the jury would cumulate such evidence against either [defendant].").

Second, both defendants argue that they should be granted severance because they will present "mutually antagonistic" defenses. Pourhassan argues that he will present evidence that he "relied on the relevant and specialized expertise of Mr. Kazempour, who was a former FDA Clinical Reviewer, in connection with communications with and submissions to the FDA." (ECF 60-1 at 4.) Kazempour argues the "crux of [his] defense will be that he was not a knowing or willing participant in Dr. Pourhassan's scheme because Dr. Pourhassan was not truthful with him." (ECF 62-1 at 8.)

But the evidence will show that neither defendant was a wide-eyed innocent misled by the other. They were active co-conspirators engaged in a plan to deceive investors that they discussed together and carried out in concert. Pourhassan and Kazempour were *both* present at critical meetings with the FDA where the BLA process was discussed, including on December 14, 2018, where *both* received instructions from the FDA regarding what constituted an incomplete BLA, and that filing an incomplete BLA would result in a Refuse to File. (Indictment Count 1 ¶ 8.) In addition, Pourhassan selected the timeline for the BLA, which he provided to Kazempour to file. (*Id.* ¶ 9.) And the FDA repeatedly warned *both* Pourhassan and Kazempour that their public timelines were infeasible. (*Id.* ¶ 9.)

On April 4, 2020, in an email neatly summarizing their joint conspiracy, Pourhassan told

Kazempour to file the BLA "even if we are short" in order to prop up the stock price. Pourhassan emailed Kazempour:

> Today we have so far in 1 hour almost 20% drop in our stock price. Yesterday we had drop [sic] also after putting out great results about COVID-19 patients we are seeing these [sic] type of decline.  This drop will be much deeper if we don't file our BLA as the message board now is getting bombarded by investors who are very frustrated with me and CytoDyn.  Please file the BLA no later than next week Wednesday, even if we are short in no matter what portion of whatever it is that we are short.

(Indictment Count 1 ¶ 15.)   And then, Kazempour did exactly as they had discussed, filing an incomplete BLA to allow Pourhassan to mislead investors on the status of leronlimab's approval, and each attempted to personally profit from their actions. (*See Id*. ¶¶ 39-41.)

In response, Pourhassan argues that—despite being the CEO of a biotechnology company—the fact that he has a PhD from over three decades ago in mechanical engineering and not life sciences means he had to rely on Kazempour's expertise.  (ECF 60-1 at 3.) But understanding the explicit instruction of the FDA does not require a PhD in biology; and Pourhassan's emails and messages throughout show that he was intimately familiar with the BLA process, and the effect it had on CytoDyn's stock price.[20]

The presence of insufficient or conflicting or antagonistic defenses, standing alone, does not require severance. *See Zafiro*, 506 U.S. at 538; *United States v. Chavez*, 894 F.3d 593, 605-06 (4th Cir. 2018) (the fact that one defendant denied foreknowledge of the murder plot was not sufficient to require severance); *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (holding that the right to severance requires more than "finger pointing," that is that a defendant intends to

---

[20] Pourhassan also claims in support that Amarex issued a press release of its own indicating the BLA was complete.  (*See* ECF 60-1, at 5.)  But evidence presented at trial, including testimony by relevant individuals at Amarex, will show that this press release was drafted by Amarex, but never in fact issued.

exculpate himself by inculpating his co-defendant); *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986) ("The mere presence of hostility among defendants . . . or the desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trial").

In *United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995), the Fourth Circuit upheld a single trial for the most culpable co-defendant and a co-defendant who persistently portrayed themselves as *his* victims, that is, as being "misled or hooked" *by their co-defendant* into joining the criminal scheme. *Id*. at 1266. That appears to be what each defendant contemplates arguing in this case—that it was all the other's fault. (*See* ECF 60-1 at 6.) But as the Fourth Circuit as noted, "Because joint participants in a scheme often will point the finger at each other to deflect guilt from themselves or will attempt to lessen the importance of their role, a certain amount of conflict among defendants is inherent in most multi-defendant trials." *Smith*, 44 F.3d at 1266-1267. Similar to the co-defendants in *Smith*, the mere fact that Pourhassan "blame[d]" Kazempour "as the architect of the scheme," is not enough to merit severance (or vice versa), as there is ample evidence of each defendants' "willing participation," and the "facts establishing their participation" is "sufficiently distinguishable for the jury to assess independently the guilt of each participant." *Id*. at 1267. To do otherwise would effectively allow any co-conspirator to claim he was not responsible but was merely misled, and therefore sever cases. That is precisely the outcome *Smith* sought to avoid.

In support, Pourhassan cites a nearly fifty-year-old district court case from Massachusetts to support severance. *See* ECF 60-1 at 7, *citing United States v. Abraham*s, 466 F. Supp. 552, 555 (D. Mass. 1978). But even that half-century-old case from another District is unhelpful to the defendant. *Abrahams* relied heavily on the fact that in order to make a defense, the co-defendants in that case (whose cases were not severed from each other) would have to introduce evidence of

"Abrahams' prior criminal background" which would be "highly prejudicial to him," while "exclusion of such evidence might be prejudicial to the other defendants." *Id.* at 555. No such issues exist here. Similarly, Pourhassan's reliance on *United States v. Romanello*, a forty-year-old case from another Circuit, is similarly misplaced. In that case, one defendant argued that the co-defendants had actually *robbed him*. *See* 726 F.2d 173, 177-78 (5th Cir. 1984). There is no allegation here that one co-defendant robbed the other or committed a similar criminal act against the other. To the contrary, the overwhelming evidence shows that they conspired together to do exactly what they had discussed: submit an incomplete BLA in order to inflate the stock price.

Each defendant also claims that they will face the prospect of objecting to evidence the other puts on, and that trying the two together would put him in the role of being a "second prosecutor." (ECF 60-1 at 9; ECF 60-2 at 9.) But the simple fact that co-defendants may "point the finger" at each other is no surprise—it is exactly the sort of situation the Fourth Circuit contemplated in *Najjar*, where it held that the right to severance requires more than "finger pointing" at a co-defendant. 300 F.3d at 474. What's more, the defendant's lead case in support, *States v. Andrews*, No. 1:12CR100, 2012 WL 6230450, at *5 (N.D. W. Va. Nov. 26, 2013), provides no support for his position whatsoever. While defendant Pourhassan describes *Andrews* as holding that "joint trials create an incentive for defendants to shift culpability onto their codefendant during the guilt stage of a trial to soften punishment during the sentencing phase," (ECF 60-1 at 9), this creative invocation of *Andrews* fails to address the fundamental core of its holding: *Andrews* concerned *the death penalty* which would be imposed by *the same jury which tried the underlying case*. As the Court declared there, trying the defendants together "creates an incentive for Andrews to shift culpability onto Bellinger during the guilt phase *in an effort to avoid the death penalty* at the sentencing phase." *See* 2012 WL 6230450, at *6. While the offenses charged here are serious,

they are far from the death penalty and the unique considerations that poses as addressed in *Andrews*.

Finally, contrary to the defendants' arguments, judicial economy favors joined.  (*See* ECF 60-1 at 11; ECF 62-1 at 9.)  Broad joinder promotes judicial efficiency by avoiding "needless duplication of judicial proceedings, . . . particularly where evidence of one charge would be admissible to prove another charge[.]"  *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008) (citations omitted).  Indeed, "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding."  *Blair*, 661 F.3d at 768-69 (citation omitted).  *See also United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988) (Rule 8 "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused"); *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980) (noting "the important policy behind this branch of Rule 8(a) and other provisions of Rule 8, namely, that of trial convenience and economy of judicial and prosecutorial resources, considerations of particular weight," and rejecting motion for severance where granting it would have required two witnesses to testify at both resulting trials).  Thus, joinder between two charges is particularly appropriate where evidence of one charge is admissible to prove the other.  *Branch*, 537 F.3d at 341.

Here, the evidence against each co-defendant is nearly identical and largely concern the defendants' attempts to submit an incomplete BLA in order to commit securities fraud and profit from the ensuing market manipulation.  Pourhassan points to the false statement charges against Kazempour, but those charges pertain to false statement Kazempour made regarding his own ownership of stock options which he *tried to exercise the day after the incomplete BLA was submitted*, activities which parallel Pourhassan's own attempts to profit off their conspiracy to

submit an incomplete BLA (and for which Pourhassan was charged with insider trading). Pourhassan successfully sold stock; Kazempour tried to and then lied about his failed attempt to the FBI. Proving one additional lie will not involve substantial extra time or testimony. But holding two trials to prove that each engaged in the same conspiracy, involving the same witnesses repeating twice what they have testified two in separate trials, will be an enormous strain on the Court's time and resources.

Rather than being the "rare" case calling for severance, the defendants cannot show any prejudice, let along the "strong" showing the law requires to justify the inefficiency, inconvenience, and expense wrought by severance. *See Hornsby*, 666 F.3d at 308-09; *Cardwell*, 433 F.3d at 387; *Branch*, 537 F.3d at 341 (quoting *Goldman*, 750 F.2d at 1225); *Santoni,* 585 F.2d at 674. Their motions should be denied.

## <u>CONCLUSION</u>

For the reasons set forth below, the government respectfully requests the Court deny defendants' motions to dismiss and motions for severance.

Respectfully submitted,

Erek L. Barron
United States Attorney


By:   ____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney

Glenn S. Leon
Chief
Fraud Section, Criminal Division
United States Department of Justice

By:   _____/s/_____
Christopher Fenton
Trial Attorney

Michael T. O'Neill
Assistant Chief
Fraud Section, Criminal Division
United States Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher Fenton, hereby certify that on August 15, 2023, I caused the foregoing filing to be electronically filed with the Clerk of Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to the parties who have entered an appearance in this case.

By:     <u>*/s/ Christopher Fenton*</u>
Christopher Fenton
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 320-0539
Christopher.Fenton@usdoj.gov