IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NADER POURHASSAN and<br>KAZEM KAZEMPOUR,<br><br>*Defendants*. | 8:22-CR-440 |

**DEFENDANT KAZEM KAZEMPOUR'S REPLY<br>IN SUPPORT OF MOTION TO DISMISS**

## ARGUMENT

In its omnibus response, the government simply doubles down on its misguided approach to this case: it lays out all the ways that Dr. Nader Pourhassan allegedly defrauded CytoDyn investors, and then strains to somehow tie those allegations to Dr. Kazem Kazempour. But neither the government's allegations—even as reframed in its effort to oppose Dr. Kazempour's motion to dismiss—nor the law can rescue the government's charges against Dr. Kazempour. Dr. Kazempour was not a knowing and willful participant in whatever scheme the government alleges Dr. Pourhassan engaged in, and the Indictment against him should be dismissed.

**I.     The Indictment lacks the essential elements of an agreement in which Dr. Kazempour knowingly and willfully participated.**

The Indictment fails to sufficiently charge Dr. Kazempour with conspiracy, co-conspirator liability, or aiding and abetting liability. Absent from the Indictment are facts constituting Dr. Kazempour's knowing participation in Dr. Pourhassan's alleged scheme to lie to the investing public about the BLA submission.

In arguing otherwise, the government misconstrues its own allegations as well as the scheme that Dr. Pourhassan allegedly perpetrated. The crux of the alleged scheme is this: Dr. Pourhassan rushed to submit the BLA (and pushed Amarex, as CytoDyn's outside regulatory agent, to submit the BLA) so he could tell the investing public it had been completed and could then sell his stock while CytoDyn's stock price was inflated by that false information. The government lists six categories of allegations that it claims reflect the essential element of Dr. Kazempour's knowing and willful participation in Dr. Pourhassan's scheme. Yet nothing in this recitation actually does so.

*First*, Dr. Kazempour's alleged membership on CytoDyn's Disclosure Committee—which the government alleges made him responsible for reviewing CytoDyn's regulatory filings, *not* its

1

press releases, Indictment ¶ 5—neither makes him an "insider" at CytoDyn somehow responsible for CytoDyn's statements to the investing public nor reflects his actual knowledge of and willing participation in Dr. Pourhassan's scheme to defraud.  *Contra* Opp'n 42.  Dr. Pourhassan perpetrated that alleged scheme through press releases and other public statements—*not* through regulatory filings.  Dr. Kazempour is not even alleged to have had any knowledge of or participation in those statements.  And the single regulatory filing the government points to—CytoDyn's August 14, 2020 Form 10-K—was made more than three and a half months *after* the BLA submission.  *See* Mem. ISO MTD at 6-9; Indictment ¶ 50.  Alleged membership on CytoDyn's Disclosure Committee did not impose any duty on Dr. Kazempour to correct statements in this filing (or anywhere else), *see infra* at 7-10, nor is there any allegation that Dr. Kazempour ever actually reviewed or approved that filing.  This allegation about the Disclosure Committee simply has no bearing on Dr. Kazempour's knowledge or participation in Dr. Pourhassan's alleged scheme centered on the BLA submission.

**Second**, that Dr. Kazempour was allegedly warned that Dr. Pourhassan was rushing the BLA submission timeline says nothing about Dr. Kazempour's (1) knowledge that, upon submitting the BLA, Dr. Pourhassan was allegedly going to lie about its status in press releases and other public statements Dr. Kazempour had nothing to do with or (2) Dr. Kazempour's willing agreement to be part of that plan.  *Contra* Opp'n 43.  Rushing the BLA is not the alleged crime: misrepresenting its status when it was submitted in April 2020, and then exploiting the market to sell stock based on that misrepresentation, is the alleged crime.  The government has failed to allege the essential facts reflecting that Dr. Kazempour knew about and willfully participated in the wrongful part of Dr. Pourhassan's alleged scheme.

*Third*, for the same reasons, the only communications identified between Dr. Pourhassan and Dr. Kazempour—the emails referring to CytoDyn's stock price and directing individuals *other* than Dr. Kazempour to file the BLA—do not show that Dr. Kazempour knew about Dr. Pourhassan's alleged scheme or agreed to participate in it.[1] *Contra* Opp'n 43. Again, the problem is not that Dr. Pourhassan pushed to submit the BLA on an expedited timeline or that he "communicate[d] the fact of the BLA submission to investors and the general public." *Id.* The problem, according to the government's own theory, is that he falsely communicated to the public that the BLA submission was *complete*. Nowhere in the alleged emails to Dr. Kazempour did Dr. Pourhassan reveal his plan to so misrepresent the BLA submission. All Dr. Pourhassan told Dr. Kazempour—and therefore all Dr. Kazempour is alleged to have known—is that Dr. Pourhassan wanted the BLA submitted to maintain CytoDyn's stock price. Any such knowledge does not constitute knowledge of the alleged scheme to defraud by *misrepresenting* the BLA's status and thereby *inflating* the stock price, nor does it reflect Dr. Kazempour's willing agreement to take part in the same.

*Fourth*, Dr. Kazempour (and Amarex) *did* fulfill their regulatory duty to "notify[] *CytoDyn*" that its initial press release contained misinformation. *Contra* Opp'n 43; *see* Indictment ¶ 42. The Indictment fails to allege facts showing that Dr. Kazempour had some other duty to correct CytoDyn and Dr. Pourhassan's statements, *infra* at 7-10, but even if he did, that duty would not equate to *knowledge* of or *willing participation* in Dr. Pourhassan's scheme to make those statements in the first place.

---

[1] The April 14 email also said nothing about submitting the BLA to "permit the company the opportunity to resume selling securities to finance its business and operations." *Contra* Opp'n 43; Indictment ¶ 43. For whatever reason, the government repeats this mischaracterization of the email—an email the Indictment quotes directly—no less than five times.

3

***Fifth***, and similarly, the government's assertions about any supposed cover-up by Dr. Kazempour months after submission of the BLA are incorrect, but they fail to show any knowing participation in the scheme at the time it was executed regardless. *Contra* Opp'n 43.

***Sixth and finally***, the Indictment fails to link Dr. Kazempour's alleged inquiry about selling his stock (a sale he did not effect until after CytoDyn issued corrective press releases) with any knowledge that Dr. Pourhassan had misrepresented or would misrepresent the status of the BLA submission, much less any willing agreement to participate in that effort.

The Indictment simply lacks the essential elements of knowledge or willing agreement on Dr. Kazempour's part. Nothing in the facts the government recites (and at times misstates) shows differently. The conspiracy charge must therefore be dismissed, and the government barred from imposing aiding and abetting or co-conspirator liability on Dr. Kazempour. *See* Mem. ISO MTD at 14-15.

**II.    The Indictment lacks the essential elements of securities fraud.**

The government's attempt to salvage its securities fraud charges against Dr. Kazempour rests on two faulty premises: that (1) the BLA submission qualifies as a deceptive device, and (2) Dr. Kazempour had a duty to correct alleged misrepresentations made by Dr. Pourhassan and CytoDyn. Neither premise holds water. The securities fraud charges should thus be dismissed.

**A.    The BLA submission was not inherently deceptive.**

The government asserts that the BLA "was by nature deceptive" because Dr. Kazempour purported to submit the BLA for "a legitimate purpose" but did so to "create the false appearance that CytoDyn had surpassed a milestone." Opp'n 44. But the confidential BLA submission to the FDA, standing alone, created *no* appearance at all to the investing public. Only Dr. Pourhassan's subsequent statements *about* the submission—which the government fails to allege Dr.

4

Kazempour knew he would make or participated in in any way—did that. Indeed, the BLA submission was not even a necessary part of those misstatements—Dr. Pourhassan could have told the public anything he wanted about the BLA, whether Dr. Kazempour submitted it or not, given that its submission and status were confidential. It was Dr. Pourhassan's and CytoDyn's public statements that created a false impression. The BLA, by itself, and especially given that it (and Amarex's cover letter) openly notified the FDA that additional datasets would be provided later, did no such thing. *See* Mem. ISO MTD 19.

The limited case law the government cites only confirms this view. The BLA submission did not "creat[e]" any false "appearance" or "disguise" anything: the submission reflected that additional datasets would soon be provided and that it was not yet complete. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005). Dr. Pourhassan's alleged public statements that the BLA submission was "complete," in contrast, disguised what Dr. Kazempour made no effort to hide in the actual submission. So Dr. Kazempour did not "substantially participate[] in [any alleged] manipulative or deceptive scheme by [himself] directly or indirectly employing a manipulative or deceptive device." *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010). All he is alleged to have done is submit the BLA, and the BLA submission was not "deceptive when performed." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).

For the same reasons, the government's new assertion that Dr. Kazempour somehow deceived the FDA, Opp'n 45, is also unavailing. There was nothing deceptive about the BLA, nor did Dr. Kazempour "misrepresent" anything to the FDA. *Contra* Opp'n 43. The only representations that Dr. Kazempour and Amarex made to the FDA were in the cover letter to the application relaying the submission as CytoDyn's regulatory agent—and nothing in that letter certified or represented Dr. Kazempour's "purpose" in submitting the application. And, as the

5

government has acknowledged, the cover letter accompanying the BLA truthfully and accurately informed the FDA that the BLA was missing certain data that would be provided within weeks (which it was.).  Mem. ISO MTD, Ex. A.[2]

Moreover, though the government's case is plainly about alleged fraud on the investing public and not on the FDA,[3] it is just as plain that the FDA was in no way deceived by the submission.  Based on the cover letter, the FDA was able to immediately inform Amarex of its view that CytoDyn's press release was not accurate, a concern that Amarex promptly communicated to CytoDyn.  If Dr. Kazempour's intent had been to deceive the FDA into believing the BLA contained something that it did not, he would not have included the disclaimers that he did.  The only alleged deceit here comes from Dr. Pourhassan's and CytoDyn's alleged public statements to the market, not from Amarex's submission of the BLA.

The securities fraud charges against Dr. Kazempour should be dismissed.  In particular, Count 3, based on the BLA submission, lacks the essential element of a fraudulent device.  And Count 2, which the government apparently bases on the same flawed theory that the BLA submission was a deceptive device, fails for the same reason.[4]

---

[2] The government provides no authority contradicting Dr. Kazempour's showing that, in evaluating the Indictment's legal sufficiency, this Court may consider the government's own evidence it repeatedly cites in both the Indictment and its Opposition.  *Contra* Opp'n 20 n.4.

[3] Indeed, the government's contorted theory that Dr. Kazempour can be criminally liable for an alleged securities fraud and wire fraud scheme to deceive the investing public without having the intent to deceive investors is simply incorrect.

[4] Count 2 also fails because it requires showing that Dr. Kazempour either made the interstate communication at issue or *caused it to be made*. *See Modern Federal Jury Instructions*-Criminal P 57.03, Instruction 57-25 (2023).  Nothing in the Indictment reflects that Dr. Kazempour caused Dr. Pourhassan to send the April 14, 2020 email on which Dr. Kazempour was merely copied as one of several recipients and never directly addressed, and in which Dr. Pourhassan enlightened no one about his alleged plan to later misrepresent any BLA filing.  Mem. ISO MTD 5-6; *id.*, Ex. B.

### B. Dr. Kazempour had no duty to correct Dr. Pourhassan's or CytoDyn's alleged misstatements in the press releases.

It is far from clear exactly what theory the government relies on to support the various securities fraud counts. But if the government bases Counts 2 and 3 on some alternative theory that Dr. Kazempour had a duty to correct Dr. Pourhassan's and CytoDyn's alleged misrepresentations in press releases and other public statements, *see* Opp'n 40, 47, that theory fails.

*First*, neither Dr. Kazempour's role on CytoDyn's Disclosure Committee nor as CytoDyn's regulatory agent before the FDA is alleged to or created any duty to correct press releases and public statements *unrelated* to any SEC filings or regulatory submissions. Though the Indictment makes no such allegation and the law provides no basis for one, the government now uses Dr. Kazempour's external role on the Disclosure Committee to assert that Dr. Kazempour was an "insider" to CytoDyn in all respects, one with direct responsibility for the content of CytoDyn's statements to the investing public. The government tries to buttress this argument by pointing to Dr. Kazempour's role as CytoDyn's regulatory agent. But no law or facts support this view.

According to the Indictment, the absolute most the Disclosure Committee role did was make Dr. Kazempour (ostensibly alongside other Committee members) responsible for "reviewing and approving the regulatory-related contents *of the [SEC 10-K] filing*." Indictment ¶ 50 (emphasis added). It did not create any duty to review, approve, or later correct CytoDyn press releases or Dr. Pourhassan's videos—and the government provides no authority showing that it did. Nor is Dr. Kazempour even alleged to have had any such involvement with those public statements (because he did not). *See* Mem. ISO MTD 7-8. If he were such an "insider," as the government asserts (again, without having alleged so in the Indictment), wouldn't the

7

government's allegations and evidence reflect that he read, saw, or at least knew in advance about CytoDyn's press releases? Yet they reflect the opposite. *Id.*

In fact, it was the FDA that informed Dr. Kazempour of the April 27th press release and the fact that it allegedly contained misinformation. Indictment ¶ 42. That communication, contrary to the government's characterization, did not reflect that Amarex or Dr. Kazempour, as regulatory agent, had a duty to publicly correct CytoDyn's statements. Rather, the FDA asked Amarex only "to take regulatory responsibility for the misinformation released in the . . . Press Release *by notifying CytoDyn*" that the press release was inaccurate. *Id.* (emphasis added). That is, the regulatory agent's job was simply to communicate the FDA's objection to the press release to CytoDyn—nothing more. And Dr. Kazempour and Amarex performed that job. *Id.* Nothing about Dr. Kazempour's Disclosure Committee or regulatory agent roles, then, gave rise to any duty (or authority) to correct alleged misrepresentations in CytoDyn's and Dr. Pourhassan's press releases and public statements.

**Second**, the government's pivot to claim that Dr. Kazempour had a duty to correct CytoDyn's statements because he sold his shares on June 9, 2020 is perplexing and lacking in any support. *Dr. Kazempour is not charged with insider trading*, nor does anything in the Indictment allege that he committed insider trading. Dr. Kazempour sold his shares a month after CytoDyn issued a May 8, 2020 press release "[c]larifying" that the BLA would not be "completed" until further submissions were made on May 11. Indictment ¶¶ 45, 48, 50. He did not, at that point, possess any inside information or have any duty to correct CytoDyn's and Dr. Pourhassan's alleged misrepresentations—indeed, the government does not specify what he had a "duty to disclose" on that date. *Contra* Opp'n 47.

Counts 2 and 3 thus lack the essential elements of any fraudulent misrepresentation or omission Dr. Kazempour had a duty to correct. They should be dismissed.

C. **Dr. Kazempour was not involved in and had no duty to correct CytoDyn's 10-K filing.**

Count 4, based on the Form 10-K submission, also lacks the essential element of any material misstatement or failure to speak where a duty existed. The government's reliance on the Disclosure Committee again fails to satisfy this requirement (as do the government's other liability theories, for the same reasons explained above).

*First*, the Indictment does not allege the essential facts showing that Dr. Kazempour made, or caused to be made, any alleged misstatements in the Form 10-K. The Indictment alleges that Dr. Kazempour was "responsible" for reviewing and approving that form's regulatory contents, *but never alleges that Dr. Kazempour in fact did so*. Instead, it is Dr. Pourhassan who, according to the government, "reviewed, approved, and signed" the 10-K. Indictment ¶ 50. Nothing in the Indictment suggests that Dr. Kazempour played any role in the submission or its contents.

*Second*, Dr. Kazempour's role on the Committee did not require him to correct any alleged misstatements in the 10-K. The government dismisses authority finding that membership on such a committee does not create an affirmative duty to speak, *see* Mem. ISO MTD 21, yet provides *no* authority for the idea that this role *ever* creates that duty, much less created one here for Dr. Kazempour, *see* Opp'n 46. That is because no such authority exists and the government's theory in this case is not supported by a single case. The "'duty to speak' arises only in limited

situations"—situations that are not present here and *do not* include mere membership on a committee. *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006).[5]

Count 4 should also be dismissed.

### III.   The Indictment lacks the essential elements of wire fraud.

The government does not even mount any independent defense of its wire fraud charges against Dr. Kazempour.  It simply drops a footnote asserting that the wire fraud charges should stand for the same reasons as the securities fraud charges.  Opp'n 47 n.19.  Because the government's efforts to salvage the securities fraud charges fail, and for all of the reasons in Dr. Kazempour's opening memorandum, Mem. ISO MTD 21-23, the wire fraud charges (Counts 7 and 8) should also be dismissed.

### IV.   The Indictment lacks the essential elements of a false statement charge.

The tacked-on false statement charge against Dr. Kazempour also warrants dismissal.

***First***, in charging Dr. Kazempour with making a false statement about the amount of stock he owned, the government fails to explain where the Indictment alleges the essential facts constituting knowing and willful conduct by Dr. Kazempour—an immigrant whose first language is not English and who voluntarily underwent hours of questioning by agents, at the end of which he was asked about shares of CytoDyn stock he had sold over a year before.  Because those essential facts are absent (rather than merely insufficient, *contra* Opp'n 48), so is this essential element of the charge.  That legal deficiency requires dismissal.

***Second***, the Indictment also lacks the essential facts reflecting that Dr. Kazempour's alleged misstatement was material.  It is not enough for the government to simply allege that it

---

[5] Because Dr. Kazempour was not part of CytoDyn and had nothing to do with the August 2020 Form 10-K, the fact that a corporation must ensure the completeness of its disclosures is irrelevant. *Contra* Opp'n 46.

was material—the "*essential facts* constituting" that element must also be alleged. *See United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (emphasis in original). If those essential facts and thus the essential element of materiality are missing, there is no need to wait for a jury—the charge is legally deficient and should be dismissed. And they are missing here.

The government asserts that Dr. Kazempour's alleged failure to accurately convey his stock interests owned "speaks directly to the question of his personal motive to conspire with [Dr.] Pourhassan." Opp'n 48. That is, the government argues that the statement's alleged falsity shows motive and thus makes it material. But materiality requires that the actual statement, when made, had the objective ability to influence an investigation's direction. That the government later discovered the statement was allegedly false (and now wants to use it to support its broader, deeply flawed conspiracy case) does not retroactively make it material. It must have been material in the first instance, such that it could have led agents to focus on a different suspect, pursue different lines of investigation, or even abandon the inquiry. *United States v. Smith*, 54 F.4th 755, 766 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1097 (2023). Nothing about Dr. Kazempour's statement that he owned CytoDyn shares (and simply stating the wrong number of shares) could have done so, and there is no allegation to the contrary. This charge should be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss the Indictment in full.


Dated: August 29, 2023               Respectfully submitted,


                                     */s/ Benjamin A. O'Neil*
                                     Benjamin A. O'Neil (Fed. Bar No. 29078)
                                     **McGuireWoods LLP**
                                     888 16th Street N.W., Suite 500
                                     Black Lives Matter Plaza

11

        Washington, DC 20006
        Telephone: (202) 857-2466
        Fax: (202) 828-2966
        boneil@mcguirewoods.com

        Caroline Schmidt Burton (Fed. Bar No. 13303)
        (Admitted as "Caroline Susan Schmidt")
        Kathryn M. Barber (Admitted *pro hac vice*)
        **MCGUIREWOODS LLP**
        Gateway Plaza
        800 East Canal Street
        Richmond, Virginia 23219-3916
        Telephone: (804) 775-7651
        Fax: (804) 698-2049
        cburton@mcguirewoods.com
        kbarber@mcguirewoods.com

        Jason H. Cowley (Admitted *pro hac vice*)
        **MCGUIREWOODS LLP**
        201 North Tryon Street, Suite 3000
        Charlotte, NC 28202
        Telephone: (704) 343-2030
        Fax: (704) 373-8830
        jcowley@mcguirewoods.com

        ***Counsel for Defendant***
        ***Kazem Kazempour***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2023, a copy of the foregoing document was electronically filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ Benjamin A. O'Neil*
Benjamin A. O'Neil (Fed. Bar No. 29078)
**MCGUIREWOODS LLP**
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 857-2466
Fax: (202) 828-2966
boneil@mcguirewoods.com
