```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       GREENBELT DIVISION


 3    _____
                                             )
 4    UNITED STATES OF AMERICA,              )
                                             )
 5         Plaintiff,                        )
                                             )Docket Number
 6              vs.                          )8:22-cr-00440-PX
                                             )
 7    NADER POURHASSAN,                      )
                                             )
 8         Defendant.                        )
      _____)
 9
                     TRANSCRIPT OF MOTIONS HEARING
10               BEFORE THE HONORABLE PAULA XINIS
                 UNITED STATES DISTRICT COURT JUDGE
11             FRIDAY, SEPTEMBER 6, 2024, AT 10:00 A.M.

12    APPEARANCES:

13    On Behalf of the Plaintiff:

14         BY: AARON ZELINSKY, ESQUIRE
           U.S. ATTORNEYS OFFICE, DISTRICT OF MARYLAND
15         36 S. Charles Street
           Baltimore, MD  21201
16         (410)209-4928
           aaron.zelinsky@usdoj.gov
17


18         BY:  LAUREN ARCHER, ESQUIRE
                MATTHEW REILLY, ESQUIRE
19         U.S. DEPARTMENT OF JUSTICE
           1400 New York Avenue NW
20         Washington, DC  20530
           (202)538-3859
21         lauren.archer2@usdoj.gov

22          **COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   On Behalf of Defendant Nader Pourhassan:

 3        BY:  ADAM LURIE, ESQUIRE
          LINKLATERS, LLP
 4        601 Thirteenth Street NW, Suite 400
          Washington, DC  20006
 5        (202)654-9227
          adam.lurie@linklaters.com

 6
          BY:  DOUGLAS TWEEN, ESQUIRE
 7             CHARLENE WARNER, ESQUIRE
               NICOLE JERRY, ESQUIRE
 8        LINKLATERS, LLP
          1290 Avenue of the Americas
 9        New York, NY  10104
          (917)588-9852
10        charlene.warner@linklaters.com
          nicole.jerry@linklaters.com

11

12   On Behalf of Defendant Kazem Kazempour:

13        BY:  BENJAMIN O'NEIL, ESQUIRE
               CAROLINE BURTON, ESQUIRE
14             JASON COWLEY, ESQUIRE
          McGUIRE WOODS, LLP
15        888 16th Street NW
          Black Lives Matter Plaza
16        Suite 500
          Washington, DC  20006
17        (202)828-2966
          boneil@mcguirewoods.com
18        cburton@mcguirewoods.com

19
     ALSO PRESENT:  Nader Pourhassan, Defendant (via telephone)
20                  Kazem Kazempour, Defendant

21

22

23

24

25
```

1                          I N D E X

2    DEFENDANT WITNESSES:                          PAGE

3    TESTIMONY OF DAVID DENIS

4        Direct Exam by Mr. Tween                   31
         Voir Dire by Ms. Archer                    40
5        Direct Exam (Continued) by Mr. Tween       48
         Cross-Exam by Ms. Archer                   70
6        Direct Exam by Mr. Lurie                  123
         Voir Dire by Mr. Zelinsky                 134
7        Continued Direct Exam by Mr. Lurie        135
         Cross-Exam by Mr. Zelinsky                147
8        Redirect Exam by Mr. Lurie                157

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S

 2        (Court called to order.)

 3            DEPUTY CLERK:  All rise.  The United States District

 4   Court for the District of Maryland is now in session.  The

 5   Honorable Paula Xinis presiding.

 6            THE COURT:  Good morning, everyone.  You all can have

 7   a seat.

 8        Government, call the case.

 9            MR. ZELINSKY:  United States of America v. Pourhassan

10   and Kazempour, Case Number PX-22-440.  Aaron Zelinsky, Lauren

11   Archer, and Matthew Reilly on behalf of the United States.  And

12   we're here today for a Daubert hearing, Your Honor.

13            THE COURT:  Who is starting on the defense?

14            MR. TWEEN:  I am, Your Honor.  Douglas Tween for

15   Defendant Nader Pourhassan.  And with me are my colleagues,

16   Adam Lurie, Nicole Jerry, and Charlene Warner.

17            MR. O'NEIL:  Good morning, Your Honor.  For

18   Dr. Kazempour, it's Ben O'Neil, Jason Cowley, and Caroline

19   Burton.

20            THE COURT:  And I understand we have Dr. Pourhassan

21   on the line with us; is that correct?

22            MR. LURIE:  That's right, Your Honor.

23            THE COURT:  And as we have done before, you all have

24   waived his personal appearance, and just make sure that if

25   Dr. Kazempour for some reason -- I mean, Pourhassan loses his
```

1    connection, that he has a way to let you all know so we can

2    make sure he's here.

3            **MR. LURIE:**  Thank you, Your Honor.  I'm available by

4    phone and text to Dr. Pourhassan right now.

5            **THE COURT:**  Okay.  Great.

6            **MR. TWEEN:**  And, Your Honor, Professor Denis is in

7    the witness room.

8            **THE COURT:**  Yes.  Perfect.  Okay.  Thank you.  You

9    need not get him yet because I want to discuss some preliminary

10   matters.

11       First, I understand that there has been a scheduling

12   conflict with Mr. Melley, so the government may be switching

13   him out, and so the motion pertaining to him needs to be tabled

14   for another day; is that right?

15           **MS. ARCHER:**  Yes, Your Honor.

16           **THE COURT:**  Okay.  Have you all discussed available

17   dates for that, a followup hearing date?

18           **MS. ARCHER:**  We have been working towards resolving

19   the issues that were before the Court.  So --

20           **THE COURT:**  You might want to move your mic.

21           **MS. ARCHER:**  If we could have one more day to see

22   whether we can set something, or we can notify the Court that

23   there's no longer a need for a hearing, that would be

24   preferable.

25           **THE COURT:**  All right.  Otherwise, if I don't hear

1    from you all, and if there is any issue, it's going to be

2    rolled into the pretrial conference, if we don't have a hearing

3    for anything else.  Okay?

4         All right.  Pending today, and up for discussion, is

5    ECF 173, which is the motion to exclude Mr. Denis' testimony;

6    ECF 174, which is the motion to reconsider an aspect of

7    Mr. Denis' testimony.

8         And then I do want to follow up with you on the -- why I

9    invited you all is a motion to reconsider on the question of

10   legal duty.

11        What I would like to do today is set the stage with regard

12   to the legal duty first, and then give you all an opportunity

13   to consider a case that I found, because I would like for you

14   all to treat it later, and we'll deal with duty at the end of

15   the day.

16        So I spent burning many a midnight hour trying to figure

17   out this duty question.  And I am going to have some questions

18   about the superseding indictment and what exactly is the

19   government's theory.  But when I look back on this, the genesis

20   of this question of duty seemed to stem from the fact that

21   Dr. Kazempour, as an undisputed fact, was not the, quote,

22   unquote, maker of the statement.

23        And so from the Supreme Court's decision in *Janus,* the

24   defense has lodged a series of arguments that the government

25   has to essentially either plead a preexisting duty in the

1  indictment, or there is a legal duty, or there is not

2  sufficient notice for Mr. Kazempour -- Dr. Kazempour because he

3  wasn't the maker of the statement.

4      The case that I'm going to hand to you all is a case

5  called *Prousalis,* it's a published Fourth Circuit opinion

6  issued 2014, on facts I think to be somewhat similar to this

7  one in which -- at a 2255, the Fourth Circuit held pretty

8  expressly that *Janus* does not apply in the criminal context.

9  And it was a lawyer who was not the maker of a statement that

10  was published in SEC filings when he helped take a company

11  public.  He profited handsomely from the false statements that

12  were in the SEC filings, but he wasn't the maker, the

13  corporation was.

14      And you can read the case.  But that's sort of the --

15  that's the nugget, in my view, that the Fourth Circuit is

16  saying *Janus* just doesn't apply in the criminal context.

17      Still, I have some lingering questions about even if we

18  were under sort of a shift rubric, what is the government

19  pleading here and why?  So I'll have some questions for you

20  about that.

21      But I thought in fairness, let me get you a copy of

22  *Prousalis,* we'll deal with the Denis motions first, and then

23  we'll come back to duty.  Okay?

24          **MR. ZELINSKY:**  Thank you, Your Honor.

25          **THE COURT:**  Okay.  Great.

1          Now, with respect to Mr. Denis, where I am on ECF 173 is

2     that the government makes three arguments to exclude Mr. Denis

3     broadly, and I'll start with the one that I think is the least

4     persuasive, and I'm going to deny on this ground.

5          The government makes the argument that his opinion in the

6     event study is not relevant and risks confusion under 401 --

7     401, not relevant; 403, risks confusion.  And I deny the motion

8     on that ground.

9          An event study, as you all have educated me, that's a

10    pretty standard way in which either party can challenge --

11    either prove or challenge materiality of the statements at

12    issue.  And an event study does just that, it takes certain

13    statements made on certain days to the investor public.  And if

14    I understand it right, an economist can perform a regression

15    analysis to determine whether the statement did or did not have

16    a material effect on the stock price, which is, in an efficient

17    market, one way to demonstrate materiality or cast doubt on it.

18         So for that reason, I do believe that if the event study

19    is otherwise sound, it is a relevant piece of evidence.

20         Secondly, with regard to I should strike the opinion

21    because it is -- the disclosure is insufficient under Rule 16,

22    this is a closer call largely because of the way in which the

23    defense continues to insist on producing things.

24         I mean, yes, you do not have to submit a report, but on

25    something as complicated as this, it was difficult, frankly, to

9

1  piece together what Mr. Denis' opinions will be and the reasons

2  and the bases therefore.

3      I think the reason why, at this juncture, it would be

4  imprudent for me to strike on that ground is because Mr. Denis

5  supplemented.

6      So there was the initial disclosure that was not

7  sufficient; then there was the supplemental disclosure in June,

8  after I had initially denied, excluded the expert, but

9  Mr. Lurie convinced me otherwise, and that disclosure was thin.

10     The government raised several challenges to the

11 reliability and the underlying bases of the opinions, and

12 Mr. Denis supplemented with an affidavit and attachments.  And

13 I think that that -- those three things in combination give the

14 government and me sufficient notice as to what the opinions

15 will be and the methodology that was used, and events study,

16 and the -- the reasons for them.

17     Now, that said, the government has raised some genuine

18 challenges to the underlying methodology, how it was

19 implemented and the reliability of the opinions, in a way that

20 I think squarely triggers the Daubert challenge.  And so I do

21 expect that the defense will have Mr. Denis testify as to his

22 opinions and the reasons and the bases therefor, give him an

23 opportunity to explain it, so I can understand it sufficient to

24 determine whether the jury can hear from him, and then give the

25 government the opportunity to fully examine him on this.  And

10

```
 1    then I'll make a decision.

 2         So -- so denied as to the first two grounds and deferred

 3    until we hear from Mr. Denis at the Daubert hearing.  So that's

 4    173.

 5         Does Mr. Denis have any time constraints where we have to

 6    get him on and off at a particular time?

 7              MR. TWEEN:  No, Your Honor.  He's got all day.

 8              THE COURT:  And I have to take a break -- if I

 9    haven't said this already, I said it in my head, I meant to

10    tell you all, I do have to take a break at 12:25 for a half

11    hour for a conference call.  So we'll go until 12:25 and then

12    give you all a break.

13         With regard to 174, my understanding is that the defense

14    is saying since the government is calling Mr. Flack to offer an

15    opinion as to the warrants, I ought to reconsider the ruling on

16    limiting Mr. Denis' expert opinion on warrants.

17         Where I am with this right now, is that I don't believe

18    Mr. Flack is being offered as an expert.  He's a summary

19    witness.  But nonetheless, with regard to the first part of the

20    proffered opinion, I don't have any problem, and I want to hear

21    what the government -- what the problem might be in Mr. Denis,

22    based on his training and experience, educating the jury as to

23    what a warrant is.  That's the first part of the proffered

24    opinion, right?

25         Let's just get to it really quickly.
```

1    I'm in the wrong binder.  Hold on.

2    All right.  At ECF 174-1, the opinion that you're asking

3  for first says it's reasonable, common and appropriate industry

4  practice for companies, particularly small, publicly-traded

5  ones, to issue warrants to board members and key executives for

6  the dual purpose of providing incentive compensation to board

7  members and executives for their services to the company; and

8  two, raising capitals -- capital to fund important company

9  operations.

10    I don't think that's a controversial proposition.  And if

11  Mr. Denis demonstrates that he has the bona fides to testify to

12  that, does the government have a problem with that?

13         **MR. ZELINSKY:**  No, Your Honor.

14         **THE COURT:**  Okay.  Then the second opinion is that

15  it's also reasonable, common and appropriate industry practice

16  for a corporate executive or board member of such company to

17  exercise warrants in order to finance important operations of

18  the company.  And then it goes on, when most executives

19  exercise warrants and trade in accordance with industry

20  practices, it's unlikely that the conduct reflects a purpose to

21  trade on material nonpublic information.

22    And this is where I think we get into choppy waters.

23  Okay.

24    First, I do find that these opinions, as the opinion goes

25  on, especially, is argumentative.  And it is not -- and

 1  secondly, not necessarily on all fours with *Diaz*.

 2      So I would like to hear from the defense first on those

 3  two issues, and then turn to the government.

 4          **MR. TWEEN:**  Your Honor, Mr. Lurie is taking the

 5  warrants issue.

 6          **THE COURT:**  Okay.

 7          **MR. LURIE:**  Thank you very much, Your Honor.

 8      Your Honor, I'll start with whether or not -- maybe your

 9  opening point, just whether or not the reason for the

10  reconsideration is based solely on the government's proffer of

11  Mr. Flack.

12      And I think by the end, Your Honor anticipated, where we

13  might go with that, we think there's two other reasons why we

14  also are offering this very consideration.  The first is *Diaz*,

15  as you just mentioned.

16      And the second is our perception, right or wrong, but our

17  perception that with respect to other experts who we've

18  proffered, where we sense the Court has been drawing the line

19  is on this issue of industry standard versus very specifically

20  what was in Dr. Pourhassan's mind.

21          **THE COURT:**  Right.

22          **MR. LURIE:**  So it's those two additional reasons why

23  we've sought reconsideration.

24      Maybe I'll start with -- unless you prefer otherwise, I'll

25  start with the third one, and then come back to *Diaz*?

1          **THE COURT:**  Sure.  Okay.

2          **MR. LURIE:**  In our view, that last opinion, the

3    beginning, "Accordingly, when most executives trade in

4    accordance with these industry practices, it is unlikely," dot,

5    dot, dot, I would just respectfully disagree that it's

6    argumentative, and perhaps might help if the Court hears from

7    Professor Denis on that.

8          Because I don't think it will come out as argumentative.

9    I think what you will hear is, in his experience, and given his

10    studies of the markets, his experience with finance, that

11    where -- where an executive has been given warrants, and the

12    idea is to fund a corporate transaction, and where the warrants

13    are exercised in a way just like we say, that's consistent with

14    a company's corporate governance processes, that would be --

15    those would be inconsistent with somebody who is trying to

16    profit personally.

17          And I guess I would just offer Professor Denis on that

18    because I think it will come out much less argumentatively,

19    perhaps, than the Court has perceived it.

20          And we also think, Your Honor, when you look at *Diaz*, and

21    I take your point, that you don't see it as on all fours, I

22    would agree with you that the entire opinion is not necessarily

23    on all fours.  But this particular provision is quite close to

24    *Diaz*.

25          I mean, *Diaz*, there, of course, the Supreme Court allowed

1   the government to introduce expert evidence on the mental state

2   of others similarly situated to the defendant.

3         **THE COURT:**  Well, I guess that's where I'm -- I'm

4   not -- I'm not quibbling with *Diaz*'s decision.  It's the

5   Supreme Court.  We'll certainly follow it.  I think Justice

6   Jackson's concurrence makes that point that what's good for the

7   goose is good for the gander.

8       The problem that I'm having, is where I say it's not on

9   all fours, is the bases for your expert opinion.  The bases for

10  the expert opinion in *Diaz* was a law enforcement officer who

11  customarily comes in and says, in my X number of years of

12  engaging with the criminals, right?  With the drug traffickers

13  and their operations, their methodologies, I have firsthand

14  information about this, this is what I've learned.

15      Perhaps you're right.  Perhaps we need to hear from

16  Mr. Denis on this.

17      But I suspect that the basis for his opinion about when

18  those suspected of self-dealing, insider trading, profiting on

19  nonmaterial public information, nonpublic information --

20  material nonpublic information, his experience -- his basis of

21  experience is just it's not going to pan out.

22      Now, maybe I'm wrong, and maybe you expect to elicit from

23  Mr. Denis that he has robust experience with insider traders

24  and those who commit securities fraud.

25      But -- but if that's not the case, then it really isn't on

15

```
 1   all fours with Diaz.
 2            MR. LURIE:  Well, your Honor, if I may?
 3            THE COURT:  Yeah.  Go ahead.
 4            MR. LURIE:  I think that the way that question is
 5   framed assumes that Dr. Pourhassan is engaged in a crime.  And
 6   we're coming at it from the opposite way, which is Professor
 7   Denis, you'll hear, has engaged with corporations, financial
 8   professionals, and he will say in his experience, where one
 9   exercises options --
10            THE COURT:  Right.
11            MR. LURIE:  -- and does so in a way that we think the
12   evidence will show ultimately at trial that Dr. Pourhassan
13   exercised his options in a way that was consistent with the
14   company's corporate governance processes, at the same time he
15   was trying to finance a very important financial issue for
16   CytoDyn.  He's not going to talk about those specific facts,
17   but I think once the Court marries up what he has observed --
18            THE COURT:  I understand that.  But I think you're
19   misunderstanding my point, which is in Diaz, the reason why the
20   government elicited that expert opinion is because the defense
21   was "I didn't know."  Right?  I mean, that's what the defendant
22   said, "I am not guilty because I didn't have the mens rea."
23       And so the government was permitted to put on a witness
24   who had experience with these kinds of crimes to say most of
25   them -- right?
```

1      So why isn't the experience based here, why doesn't it

2  need to be similarly situated?  In other words, it's not

3  relevant or it doesn't aid the trier of fact that there are a

4  world of other CEOs not accused of this offense who do exercise

5  warrants and give back to the company.  How is that matching up

6  with anything that the government is alleging here?

7           **MR. LURIE:**  Well, Your Honor, we're -- Professor

8  Denis' testimony will match up with what the defense is

9  presenting.  I mean, this is a defense expert --

10           **THE COURT:**  But it doesn't aid the trier of fact.

11           **MR. LURIE:**  I mean, this is a defense expert -- I'm

12  sorry, go ahead, Your Honor.

13           **THE COURT:**  It doesn't aid the trier of fact.  You

14  can do that in argument.

15           **MR. LURIE:**  Well, Your Honor, in *Diaz*, it just

16  happened to be that the government was putting on its expert.

17  In this case, we have an expert --

18           **THE COURT:**  No, I get it.

19           **MR. LURIE:**  -- who is going to basically say, in our

20  case, the defense is, on this issue, this was not an effort to

21  profit personally and trade on inside information.  This was an

22  effort to fund the really critical financial issue for the

23  company.

24           **THE COURT:**  Let me ask you a question.  If you have

25  that fact in evidence, if you have -- the money shows that

1  Dr. Pourhassan took what he made in exercising the warrants and

2  pumped it back into the company, right, why do you need an

3  expert to say that most -- non-prosecuted, innocent CEOs, in

4  other words, they are not charged with insider trading, do that

5  too?

6        MR. LURIE:  The same reason the government sought an

7  expert in *Diaz.*  Surely, in *Diaz,* the government had evidence

8  that the defendant's intent and knowledge was that the

9  defendant was transporting drugs.  And by that logic, why did

10 the government need an expert?

11       THE COURT:  The government needed the expert because

12 the defense put the mens rea at issue, and the government had

13 an expert with that experiential base.

14       MR. LURIE:  Right.

15       THE COURT:  In other words, the jury doesn't know how

16 drug traffickers work.

17       MR. LURIE:  Right.

18       THE COURT:  How drug traffickers work.

19    That, by analogy, the jury doesn't know, if you want to

20 put on an expert in this regard, how insider traders work, or

21 how fraudsters work.

22       MR. LURIE:  I understand, Your Honor.

23    But in this case, if the government will be putting at

24 issue and will be arguing, uh-uh, Dr. -- no, Dr. Pourhassan's

25 intent was to trade on inside information --

1    **THE COURT:**  Yeah.

2    **MR. LURIE:**  -- the jury, much like in *Diaz,* they

3    don't understand how drug couriers work.

4    **THE COURT:**  Yeah.

5    **MR. LURIE:**  In our case, the jury doesn't understand

6    how the granting of warrants works.  They don't necessarily

7    understand how granting of warrants and when you exercise them

8    can be inconsistent with the government's theory.

9    And having that expert will provide context and explain

10   that when a -- when an executive like Dr. Pourhassan exercises

11   warrants, does it at the very moment they have to pay off a

12   major debt, and does it in a way that's consistent with the

13   company's processes -- for example, Dr. Pourhassan was

14   transparent with the general -- the company's general counsel

15   on the exercise of warrants.  They are going to hear that.

16   Dr. Pourhassan advised the board that he would be

17   exercising warrants and why.  The jury will hear that.

18   **THE COURT:**  And then he took that money and put it

19   back into the company?

20   **MR. LURIE:**  Yes, Your Honor.

21   **THE COURT:**  That's going to be the evidence?

22   **MR. LURIE:**  Yes, Your Honor.

23   **THE COURT:**  Okay.  Let me hear -- I get it.

24   **MR. LURIE:**  At least a substantial portion of the

25   money.

1          **THE COURT:**  All right.  Let me hear from the

2     government as to why it wouldn't be appropriate for Mr. Denis

3     to testify that that -- what you just described, which is

4     putting meat on the bones of what the facts will show, is sort

5     of customary or industry practice when you've got a CEO who

6     needs to pay off a loan, or to -- you know, to satisfy a debt

7     of the company.

8          **MR. LURIE:**  Thank you, Your Honor.

9          **THE COURT:**  Okay.  All right.

10     Mr. Zelinsky?

11          **MR. ZELINSKY:**  Thank you, Your Honor.

12     I think the starting point is where the Court is, which is

13     what's the relevant body of experience that we're dealing with

14     here?

15     We've had a moving target as to what Mr. Denis is going to

16     say in these circumstances, and it keeps moving.  Right?  And

17     so the first objection that we had is it's not even clear that

18     this is within his area of expertise, from the disclosures

19     we've gotten.

20          **THE COURT:**  And I agree with you, Mr. Zelinsky, which

21     is why it's great we've got Mr. Denis here.  Let's make the

22     record, right?  Okay.  So on that, let's just get it out.

23          **MR. ZELINSKY:**  So that's our first problem.

24     This is an economist.  He's not -- we don't have an

25     indication that he's an expert on insider trading or on trading

1   at large.  There's the issue of stocks and warrants as to --

2   even the proffered testimony here.  So that's sort of our first

3   problem, which is we're trying to nail Jello to the wall, and I

4   think potentially it will be more helpful, but based on what

5   we've gotten, we don't even think there's an adequate basis.

6       The basis is no more adequate today than it was when the

7   Court initially denied this.  So we don't think that we should

8   be -- once the Court has denied it on a motion to reconsider,

9   the answer should be let's let them supplement one more time on

10  the stand with Mr. Denis.  We think we've gotten the

11  disclosures --

12          **THE COURT:**  And in fairness to the defense, *Diaz* was

13  issued on the day that we last met.

14          **MR. ZELINSKY:**  It's true --

15          **THE COURT:**  So I don't -- I want to be careful.  You

16  know, this is going up if the defense -- if the defendants are

17  convicted.  And the way to narrow the issues and give a good

18  record to the Fourth Circuit is to get it all out.

19      So I hear you, but *Diaz* was decided in June, so --

20          **MR. ZELINSKY:**  It's true, Your Honor, *Diaz* was

21  decided in June, but that is only relevant as to whether or not

22  that makes a material difference on the opinion.  It's not

23  relevant to the Court's determination as to whether the opinion

24  is unsupported by facts in the record.

25          **THE COURT:**  Okay.  No, I agree with you on that, but

1  I think we have to develop that, just so that -- the witness is

2  here, let's see what he's going to say, and you --

3        **MR. ZELINSKY:**  And I hear the Court on that.  All I'm

4  saying, as the record stands right now, what we are engaged in

5  is, is a fourth bite at the apple, by my count, for Mr. Denis.

6  Because the Court has said it doesn't work, that it was

7  insufficient, we're here on a motion for reconsideration, and

8  now we're saying, well, we'll reconsider your motion by

9  allowing you to put the guy on and change it one more time.

10    So I -- it's a difficult moving target for the government

11  to hit.

12        **THE COURT:**  And -- and the defense will not have

13  another opportunity because the witness is here.

14        **MR. ZELINSKY:**  Okay.  Thank you, Your Honor.

15        **THE COURT:**  They took their shot, and we'll see where

16  we are at the end.

17        **MR. ZELINSKY:**  Understood.

18    So moving on to *Diaz* for a moment, I think there is, as

19  the Court has identified, a couple of different issues that are

20  at play in *Diaz*.

21    I do think *Diaz* is somewhat narrower than the defense

22  would put it on for.  You're not able to just wholesale put on

23  experts to testify to the guilt or innocence of a defendant.

24  That's clear black letter law that *Diaz* didn't undo.

25    And I think when you read the opinion, there's no claim as

1    to that matter.

2        There's also -- and *Diaz*, and here I think you get into an

3    intent versus knowledge element.

4        What's happening in *Diaz*, as the Court put its finger on,

5    there is no question that Diaz in that case has drugs in the

6    car, right?  Everybody says there's drugs in the car.

7        **THE COURT:**  Right.

8        **MR. ZELINSKY:**  The expert gets up to say, based on my

9    experience of all these people that have drugs in the car --

10       **THE COURT:**  They know.

11       **MR. ZELINSKY:**  -- they know it.  You don't give, you

12   know, 50 pounds of methamphetamine, whatever it is in *Diaz*, I

13   mean, without knowing that there's something in the car.  It

14   doesn't happen.

15       And I've seen an -- interacted with tons of drug dealers.

16   I know the people upstream, they don't stick the drugs into the

17   car without telling the person that's got them in the car.

18   That goes to the person's knowledge of what was in the car.

19       What's being offered here, with Mr. Denis, is a vague

20   notion of intent in the circumstances in which executives

21   trade.  We think those are distinguishable.  And they go to

22   different elements of the offense and different parts of

23   expertise.  So *Diaz* doesn't kick the door open to just start

24   putting on experts willy nilly to say, you know, you can do

25   whatever you want.  And based on people that, you know, drive a

1    certain speed, and look like this, they have committed a crime.

2    That's profile evidence.

3        And, in fact, they note in their opinion -- in their reply

4    brief that there was a citation to *Jones* on Page 40 of the

5    petitioner's brief, the Fourth Circuit case.  But *Diaz* doesn't

6    overturn *Jones.*  It doesn't wholesale kick the door open for

7    both sides to just start putting on experts and trying the

8    whole case through experts.  It goes to a limited, and as I

9    think this Court noted, a very limited and concise set of

10   circumstances, which is, in this circumstance, somebody that

11   has experience with people that carry drugs, people that have

12   committed offenses, whether or not they would know that there

13   are drugs in the car.

14       **THE COURT:**  Let me ask you something.  Mr. Flack, his

15   summary testimony will show that on a given day, Dr. Pourhassan

16   exercised warrants at a certain price.

17       **MR. ZELINSKY:**  Correct.

18       **THE COURT:**  And are you following the money?  What

19   happens next to the money?  What will your evidence show?

20       **MR. ZELINSKY:**  If I could -- we're going to show --

21   I -- here we'll have a factual issue.  I am not aware that

22   Mr. Pourhassan then pumps the money back into the business.

23       **THE COURT:**  So that's not -- because I asked

24   Mr. Lurie that.  That's not part of your case in chief, that

25   you're following the money either into -- past Dr. Pourhassan's

```
 1   bank account.  And so that will have to be some evidence that
 2   the defense raises or introduces, where it goes next?
 3           MR. ZELINSKY:  Court's indulgence for one moment.  If
 4   I could speak to Ms. Archer.
 5           THE COURT:  Okay.  Let's make sure.
 6           MR. ZELINSKY:  So, Your Honor, I just want to be
 7   clear on this.
 8           THE COURT:  Yeah.
 9           MR. ZELINSKY:  Because there's -- there's -- because
10   there are warrants, I think there's a little bit of potential
11   ambiguity in the language of what Mr. Lurie is proffering.
12       So a warrant, as the Court knows, is an ability to
13   purchase a stock.
14           THE COURT:  Right.  It's a contract, right?  Between
15   the executive and the company.
16           MR. ZELINSKY:  Right.  So when you exercise a
17   warrant, you, by definition, put some money in to purchase the
18   stock from the company that you then sell.  So --
19           THE COURT:  Okay.
20           MR. ZELINSKY:  So, for example, just to take very
21   simple numbers, a warrant that you have a strike warrant price
22   at one dollar, and the stock price is three dollars, you give
23   the company a dollar, and you get three dollars from the other
24   person.
25       So in that sense, the exercisable warrant, by definition,
```

1   has to include giving some money to the stock company.

2       You can't exercise a warrant without giving the company --

3   because it's the ability to buy stock from the company.

4           **THE COURT:**  So with that -- just make sure I

5   understand it, because I don't -- I've been a good public

6   servant, I don't have many exercising of warrants.

7           **MR. ZELINSKY:**  Likewise, Your Honor.  That's why I

8   have to consult with counsel.

9           **THE COURT:**  So if a CEO is -- one method of

10  compensation is a CEO is given warrants to exercise.  When does

11  the CEO put the money in to exercise the warrant?

12          **MR. ZELINSKY:**  At the point of purchase.  So a

13  warrant is the ability to buy a stock price.

14          **THE COURT:**  That's the contract.

15          **MR. ZELINSKY:**  Correct.

16          **THE COURT:**  And then you --

17          **MR. ZELINSKY:**  When you buy, you've got to give --

18  now, as long as your stock -- as long as your warrants are not

19  under water, that is, the current prevailing purchase price is

20  above --

21          **THE COURT:**  Right.

22          **MR. ZELINSKY:**  -- you're going to make money.

23      So there's -- there's two different sets of funds.  There

24  is the money that we allege in the indictment Mr. Pourhassan

25  clears from the sale of the warrants.

1      **THE COURT:**  Right.

2      **MR. ZELINSKY:**  The millions of dollars that's the gap

3  between the exercised price and the -- the exercise price and

4  the warrant price.  That's Mr. Pourhassan -- Dr. Pourhassan's

5  profit.

6      That -- that's the -- what he gains from the insider

7  trading, right?  He doesn't gain the warrant price, because the

8  whole point is to exercise your option what's above the warrant

9  price.  And our allegations are that he knows that he's

10 boosting the trading price of the stock to get it higher.

11     **THE COURT:**  So he can exercise the warrant and make

12 profit.

13     **MR. ZELINSKY:**  Correct.

14     **THE COURT:**  That's your -- right.

15     **MR. ZELINSKY:**  There is no evidence that we have, and

16 I'm aware of no evidence -- I'm happy to be corrected on

17 this -- that Dr. Pourhassan takes the profit, that is --

18     **THE COURT:**  And puts it back.

19     **MR. ZELINSKY:**  And puts it back.  That's the

20 allegation.  That's the money that we're talking about that we

21 think is --

22     **THE COURT:**  That's an important material fact.

23     **MR. ZELINSKY:**  And I just want to be clear, because I

24 think there's some ambiguity.

25     **THE COURT:**  Yeah, I want to be clear, too, because I

1  don't want to waste anybody's time.  And -- and the way I

2  thought I was asking the question was will the evidence show

3  the money was pumped back into the company.  I think I used

4  those words.

5      Is that the evidence that's going to be shown, is

6  Dr. Pourhassan took his profit from the exercise?

7          **MR. LURIE:**  Thank you, Your Honor.  And apologies for

8  misunderstanding the question perhaps.

9      But there is profit that he keeps.  But our argument is

10 going to be the moment he exercised these warrants was not an

11 opportune time to exercise the warrants at all.  It was a

12 substantial amount of money that he pumped into the company

13 when he exercised the warrants.  And you'll see evidence at

14 trial, Your Honor.

15         **THE COURT:**  Per the contract?  Per the warrant -- the

16 warrant is the contract, and the contract, if I understand

17 it -- a preexisting condition is, when you, as the CEO,

18 exercise the warrant, let's just use the government's analogy,

19 you have to give back one dollar in order to realize the -- the

20 stock price, you keep the rest of it.  So anything north of a

21 dollar, you keep as the CEO.

22     So in this -- in this situation, stock price is three

23 dollars, that means Dr. Pourhassan gives the one dollar, right,

24 to exercise his option, and he keeps the two.  Am I right about

25 that?

1        **MR. LURIE:**  That sounds right, Your Honor.

2        **THE COURT:**  Okay.  And there's no evidence that of

3    the two dollars, he puts any of that back into the company?

4        **MR. LURIE:**  Not that I'm aware of right now, Your

5    Honor, no.  But the idea is --

6        **THE COURT:**  So then how is this testimony that is,

7    basically, the fact of the contract, that the dollar goes back

8    to the company, how is that the subject of expert testimony?

9        **MR. LURIE:**  Well, I think, Your Honor, that's what

10    Professor Denis will explain.  He will explain why it is, when

11    you exercise warrants, you have the ability to help fund the

12    company's operations.

13        **THE COURT:**  You can argue that.  I do not see why you

14    need the patina of the expert to get that out, especially

15    since, you know, the evidence is not what you proffered it to

16    be.

17        Now, that said, listen, this is where I am with this.  I

18    want the Fourth Circuit to have it all in the event that the

19    defense is convicted.  And I think that is for the sanctity of

20    the process and for the sanctity of the conviction.

21        So I'm fine with your eliciting the testimony, and I'm

22    fine with the government exploring this on cross.  But I have

23    to tell you, I'm very skeptical.  And I'm still of the mind

24    that that's not expert testimony.  It's not triggered by *Diaz*

25    because of all the reasons we've discussed.  But I'm going to

29

```
 1  give you your opportunity.
 2         MR. LURIE:  Thank you, Your Honor.  I appreciate
 3  that.  I mean, with the jury not here, I would like to, with
 4  your permission, go through this opinion with him.
 5         THE COURT:  Yeah.
 6         MR. LURIE:  At least have him explain how
 7  these exercise -- the exercise of warrants work, why it's
 8  important, and why when the -- the way in which Dr. Pourhassan
 9  did it.
10         THE COURT:  Yeah, no, I'm with you.  I say go for it.
11         MR. LURIE:  Okay.
12         THE COURT:  Make your record, right?  So that there
13  is just no doubt, since we got the witness here, what your
14  opinion is going to be, and what the bases are, what his
15  qualifications are.  Go through it all, the government will
16  challenge it, and then I'll make my ruling.
17      You know, unlike many other cases where we don't have this
18  opportunity because it's in the middle of trial, we've got an
19  opportunity, and we've got a little bit of time on it, so let's
20  make the record.  Okay?
21         MR. LURIE:  Okay.  Thank you, Your Honor.
22         THE COURT:  All right.  That is, I think, all that I
23  have before we put on Mr. Denis.  Is there anything else that
24  we need to discuss before the defense calls their witness?
25         MR. ZELINSKY:  Nothing further from the government.
```

```
 1              MR. TWEEN:  No, Your Honor.

 2              THE COURT:  All right.  Let's do it.

 3              MR. TWEEN:  And, Your Honor, what I would propose is

 4    we examine -- that I examine Professor Denis on his

 5    methodology, stop, let the government cross him on that, and

 6    then go to the warrants issue, and then cross on that.

 7              THE COURT:  No, I think get it all out.  Get it all

 8    out on direct.  Let's do it once, cross, redirect, done.

 9              MR. TWEEN:  Okay.

10              THE COURT:  I mean, I don't want to split it up.  You

11    can split it up into chapters.

12              MR. TWEEN:  Mr. Lurie and I are going to split the

13    examination, then.

14              THE COURT:  I'm fine with that.  Do it whatever way

15    you want.  I really am at this point.  We don't have a jury, so

16    if that's how you prepared it, I'm okay with that.

17         And you can split it, too, government, if you feel more

18    comfortable with that.

19         (Recess taken.)

20              THE COURT:  Back on the record.

21              DEPUTY CLERK:  Mr. Tween, for the record, the name of

22    your witness?

23              MR. TWEEN:  Professor David Denis, D-E-N-I-S.

24              DEPUTY CLERK:  Please raise your right hand.

25                         DAVID DENIS,
```

*DIRECT EXAM OF DAVID DENIS BY MR. TWEEN*

 1  having been first duly sworn, was examined and testified as

 2  follows:

 3          **THE WITNESS:**  I do.

 4          **DEPUTY CLERK:**  Thank you.  You may be seated.

 5      Please speak loudly, closely, and clearly into the

 6  microphone, adjust it as needed.

 7      Please state your full name for the record and spell both

 8  your first and last name.

 9          **THE WITNESS:**  David Denis, D-A-V-I-D, D-E-N-I-S.

10          **DEPUTY CLERK:**  Thank you.

11                    **DIRECT EXAMINATION**

12  BY MR. TWEEN:

13  **Q.**   Good morning, Professor Denis.

14  **A.**   Good morning.

15  **Q.**   Where are you currently employed?

16  **A.**   I'm a professor at the University of Pittsburgh.

17  **Q.**   And what do you teach?

18  **A.**   I teach finance.

19  **Q.**   How long have you worked at the University of Pittsburgh?

20  **A.**   I've been at the university since 2011.

21  **Q.**   And prior to that, where did you work?

22  **A.**   I've taught at a number of different universities:

23  University of Toledo for one year; Virginia Tech for six years;

24  and Purdue University for 16 years.

25  **Q.**   Okay.  So during that time, what courses have you taught?

1  **A.**    I've taught course -- various courses in the finance area,

2  investment courses, evaluation courses.  Primarily corporate

3  finance courses and financial management courses.

4  **Q.**    Can you tell us about your education?

5  **A.**    Sure.  I received a Bachelor of Science in finance in

6  managerial statistics from Syracuse University; an MBA with a

7  concentration in finance from the University of Michigan; and a

8  Ph.D also in finance from the University of Michigan.

9  **Q.**    Can you tell us about your publication history?

10  **A.**    I've published between 50 and 60 articles in peer-reviewed

11  journals.  I've edited a book called The Handbook of Corporate

12  Finance, coedited a book on corporate restructuring as well.

13  **Q.**    What were some of the topics of your published articles?

14  **A.**    My articles are primarily in the area of empirical

15  corporate finance, so topics like corporate restructuring,

16  corporate evaluation, corporate financing activities, corporate

17  payout policy, corporate governance, incentive, compensation.

18  All the areas within corporate finance really.

19  **Q.**    Have you ever been retained as an expert witness?

20  **A.**    I have.

21  **Q.**    How many times?

22  **A.**    I've testified roughly 15 times at deposition or trial.

23  **Q.**    And what were some of the subjects on which you were

24  retained as an expert?

25  **A.**    A variety of matters.  Again, mostly with a connection to

1  the corporate finance area, so some were securities

2  litigations, some are bankruptcy insolvency matters, some are

3  pure corporate evaluation matters, like appraisal remedy sort

4  of cases.

5  **Q.**   Okay.  Let me turn to event studies.  Can you tell us what

6  an event study is?

7  **A.**   Sure.  An event study is a primary methodology in

8  financial economics that is designed to assess whether a given

9  disclosure of -- of information is viewed as value relevant by

10  investors, so does it have a significant impact on the stock

11  price on that day.

12         **THE COURT:**  Mr. Tween, are you moving into the

13  substance of Mr. Denis' opinion?

14         **MR. TWEEN:**  Um --

15         **THE COURT:**  Or are you still laying the bona fides

16  out?

17         **MR. TWEEN:**  I mean, I'm still a little bit of

18  foundation on what an event study is --

19         **THE COURT:**  No, I'm asking about qualifications,

20  because I would give the government -- you have to move to

21  admit him as a particular expert, and then I have to give the

22  government an opportunity to voir dire.

23         **MR. TWEEN:**  I see.

24         **THE COURT:**  So you let me know when.

25         **MR. TWEEN:**  Yes, Your Honor, we're prepared to move

1  him as an expert.

2        **THE COURT:**  In what area?

3        **MR. TWEEN:**  In the area of corporate finance and, in

4  particular, with respect to the events study that he conducted

5  in connection with this case.

6        **THE COURT:**  Okay.  All right.  Mr. Zelinsky or -- who

7  is taking this witness on this issue?

8        **MS. ARCHER:**  We would like the opportunity to --

9        **THE COURT:**  To voir dire.

10        **MS. ARCHER:**  -- voir dire.

11        **THE COURT:**  Who is going to do the --

12        **MR. ZELINSKY:**  Your Honor, sorry to interject, we're

13  going to split up, just as I think the defense is.

14        **THE COURT:**  Yeah, sure.

15        **MR. ZELINSKY:**  I just want to be clear on what we're

16  qualifying the witness for.

17        **THE COURT:**  Well, that was a question I had, but I

18  figured that it's part of your cross on voir dire, then you can

19  explore that or leave it as is.  I'm not -- I'm not -- you're

20  qualifying Mr. Denis as corporate finance?

21        **MR. ZELINSKY:**  And, in particular, I heard in the

22  area of the events study, was what Mr. Tween said.

23        **THE COURT:**  Right.

24        **MR. TWEEN:**  Yeah, Your Honor.  But -- yes, Your

25  Honor, but I would lay more of a foundation for the events

 1  study.

 2          **THE COURT:**  Go into the training, education and

 3  experience for that, then.  Do you see what I'm saying?

 4          **MR. TWEEN:**  Yes, I do.

 5          **THE COURT:**  And then give the government an

 6  opportunity to cross on that before we get into the substance

 7  of the opinions.

 8          **MR. TWEEN:**  Got it.

 9          **THE COURT:**  Sorry, Mr. Denis.

10          **THE WITNESS:**  No problem.

11          **THE COURT:**  Okay.  Go ahead.

12  **BY MR. TWEEN:**

13  **Q.**  Can you explain, Professor Denis, what an events study

14  demonstrates?

15  **A.**  Well, the events study, I think I was getting at a minute

16  ago, is demonstrating the extent to which, if at all, a given

17  piece of information as disclosed to the marketplace is deemed

18  by investors to be value relevant.

19  **Q.**  Okay.  In your experience, is event study methodology

20  common?

21  **A.**  Extremely common.

22  **Q.**  Is that something that you've taught in school?

23  **A.**  I've taught event studies really since the start of my

24  career, mostly in Ph.D-level courses that I've taught since

25  arriving at Virginia Tech in 1989.

1   **Q.**    Okay.  Have you ever in your -- in being retained as an

2   expert witness, have you ever conducted an event study before?

3   **A.**    I have.

4   **Q.**    How often?

5   **A.**    In testimony, I would guess probably two or three times.

6   **Q.**    And in matters where you didn't have -- it didn't lead to

7   testimony, but you were still retained as an expert witness,

8   how often?

9   **A.**    I don't recall any that I used event studies per se.

10  **Q.**    In your courses, have you -- in teaching your courses,

11  have you -- I know you said you've taught event studies.  Have

12  you, as part of your courses, ever created and conducted event

13  studies?

14  **A.**    Yes, I have.  The course -- the course work sort of

15  contains two components, and one component is the -- teaching

16  the methodology itself.

17      And the second component is using the methodology to

18  analyze various corporate finance decisions.  So both of those

19  components have been elements of the courses I've taught.

20  **Q.**    So let's talk about how the event studies that you've

21  conducted either as an expert witness or in the courses you've

22  taught, how those have been conducted.  What exactly do you do?

23  **A.**    Well, to do an event study, it obviously starts with the

24  events themselves, identifying the relevant disclosures that

25  you're analyzing.  Then what you're essentially doing is trying

1  to estimate what's known as an abnormal return, or abnormal

2  stock price reaction to -- to the event itself.  And what I

3  mean by that is, you're looking at the actual rate of return on

4  the stock on a given day and deducting from that what you

5  estimate to be a normal return on that day, given variations in

6  the marketplace and in the industry in which the company

7  operates.

8  **Q.**   Okay.  Can you define what you mean by an abnormal return

9  as opposed to a normal return?

10      **THE COURT:**  I think we're getting into the substance

11  of the opinion.

12      Can you all approach?  I don't want to do this in front of

13  the witness.

14      **MR. TWEEN:**  Sure.

15      (A bench conference was held on the record as detailed

16  below:)

17      **THE COURT:**  Yeah, I think it's really important that

18  we not bleed qualifications and bona fides and scope of the

19  opinion into the opinion itself.

20      **DEPUTY CLERK:**  Your Honor --

21      **THE COURT:**  Yes.  Okay.  I'll say it again.

22      I don't want the two areas to be bleeding into one

23  another.  You've got to qualify him, and then I have to give

24  the government the opportunity.  They have asked for voir dire

25  on this to challenge the bona fides, for whatever it's worth.

*DIRECT EXAM OF DAVID DENIS BY MR. TWEEN*

```
 1  Then you can get into the -- what is an event study, how is
 2  it -- right?
 3       So far, you've gotten that he has -- he's educated on it,
 4  he studied it, he's taught it, he's taught both components of
 5  it, he's done it for the -- for his entire career.
 6            MR. TWEEN:  Right.
 7            THE COURT:  He's testified on it.  Is there anything
 8  else you want to explore in terms of his qualifications --
 9            MR. TWEEN:  Okay.
10            THE COURT:  -- before I turn it over to the
11  government?
12            MR. TWEEN:  Before --
13            THE COURT:  Correct, yeah.
14            MR. TWEEN:  Understood.  Okay.
15            THE COURT:  All right.  So you all think about it,
16  but that's sort of where I'm -- why I called you all up here.
17       You disagree, government?
18            MS. ARCHER:  No.
19            THE COURT:  Okay.  Let's just try to keep them
20  segregated.  Okay?  Very good.
21       (The bench conference concluded and proceedings resumed as
22  follows:)
23  BY MR. TWEEN:
24  Q.   Okay.  Professor Denis, in connection with event studies,
25  have you ever -- have you reviewed any literature on event
```

*DIRECT EXAM OF DAVID DENIS BY MR. TWEEN*

1  studies?

2  **A.**    I have, sure.

3  **Q.**    Can you describe that?

4  **A.**    Well, there's a -- voluminous academic literature on event

5  studies, some of which I use as a teaching tool, some of which

6  I've used as background for myself conducting event studies in

7  my own research.

8  **Q.**    Okay.  Have you ever read event studies conducted by

9  anyone else?

10  **A.**    Yes, I mean, I've served as an editor of two of the

11  leading journals in our field, and so I've reviewed probably

12  hundreds of studies that have used event studies.

13  **Q.**    Okay.

14        **MR. TWEEN:**  Your Honor, I'm going to have Mr. Lurie

15  jump in now to lay a foundation on his expertise on the warrant

16  opinion.

17        **THE COURT:**  Okay.  That's fine, I suppose.  Is

18  that -- does that make sense, in terms of how we do it?

19        **MR. ZELINSKY:**  I think, Your Honor, it might make

20  sense --

21        **THE COURT:**  For the voir dire on --

22        **MR. ZELINSKY:**  -- to have the voir dire on this issue

23  now, which Ms. Archer will do.  And then Mr. Lurie will go, and

24  I will voir dire.

25        **THE COURT:**  Okay.  That's fine.  All right.  So

1    when -- you're offering Mr. Denis up as an expert --

2              **MR. TWEEN:**  Correct.

3              **THE COURT:**  -- in the area of corporate finance and

4    conducting of an event study?

5              **MR. TWEEN:**  Correct, Your Honor.

6              **THE COURT:**  Okay.  All right.  Ms. Archer, voir dire.

7                              **VOIR DIRE**

8    **BY MS. ARCHER:**

9    **Q.**    Good morning, Professor Denis.

10   **A.**    Good morning.

11   **Q.**    Professor Denis, you -- you testified that you had written

12   and published more than 50 to 60 articles over the course of

13   your career.

14        Were any of those articles written on the methodology of

15   event studies?

16   **A.**    Written about -- on the methodology itself as opposed to

17   using the methodology, is that your question?

18   **Q.**    Yes.

19   **A.**    No.

20   **Q.**    Have you written at all on -- on the use of event studies

21   as a standalone subject matter?

22   **A.**    No, I don't believe I have.

23   **Q.**    And so in what context have you written about event

24   studies?

25   **A.**    What I've written about event studies is in the context of

1  conducting the event studies themselves as part of my own

2  research.  So each time you write an article like that, and you

3  attempt to publish it in a scientific journal, you're going to

4  have to lay out the methodology you're using and why it is

5  you're doing the specific things you're doing in that

6  methodology.

7  **Q.**    And do I understand correctly that then -- so you've

8  written about the -- are you referring to the two to three

9  event studies that you personally conducted that you've written

10 about?

11 **A.**    No, the two to three answer was in the context of

12 litigation matters.  In my own research, I'm not sure what the

13 number would be, but -- of those 50 to 60 publications.  I

14 believe at least 15 or so used event studies.  So I've

15 conducted event studies in those -- in those specific articles.

16 **Q.**    Okay.  And with respect to the two to three that I

17 understand relate to event studies that you've testified about,

18 were any of those criminal cases?

19 **A.**    No.

20 **Q.**    Okay.  What were the cases that you -- where you conducted

21 event studies for when you were engaged as an expert?

22 **A.**    These are securities litigation matters.

23 **Q.**    Okay.  What were the names of the cases?

24 **A.**    I'm not sure I can reveal all the names of the cases,

25 actually.

1    **Q.**    Are they provided in the list with your CV?

2    **A.**    At least one involving M&T Bank would be on my -- on the

3    list.  And there are two matters that I'm currently working on

4    that wouldn't be on that list yet.

5    **Q.**    Okay.  So --

6    **A.**    But are also similar sort of securities litigation

7    matters.

8    **Q.**    So you've testified in one matter historically, and then

9    two that are ongoing; is that correct?

10   **A.**    Correct.  I'm trying to think if there are -- if there are

11   others that are on that list that specifically used event

12   studies.  Off the top of my head, I can't -- I can't name

13   another one on the list that you have.  There may be, but I --

14   I don't know.

15   **Q.**    And when you were conducting -- when you were engaged as

16   an expert in those matters, historically and currently, to

17   conduct event studies, what was the purpose of the study?

18   **A.**    The purpose of the study is to assess whether certain

19   disclosures that were made that are alleged to be

20   misstatements, whether they had a significant impact on the

21   stock price.

22   **Q.**    Were you tasked with determining whether there was loss in

23   the case, for example?

24   **A.**    Whether there was -- sorry?

25   **Q.**    Whether there was a loss stemming from the litigation at

1    issue?

2    **A.**    At least one of them, yes.

3    **Q.**    Okay.  But are there any other issues that you were --

4    that dealt within the scope of the purpose of the events study?

5    **A.**    I'm sorry, can you repeat that?

6    **Q.**    The issues that arise in event studies in criminal cases

7    and in civil cases are different, right?

8    **A.**    My understanding, yeah.

9    **Q.**    The standards are different.

10        So do you have any experience with the subject matter of

11    your testimony -- of your -- for the event study that you

12    conducted here, which is to opine on materiality as opposed to

13    loss or reliance?

14    **A.**    Well, I think the conduct of the event study is exactly

15    the same in the sense that ultimately I'm determining whether a

16    particular statement is -- is deemed by investors to be

17    relevant to the value of those shares.

18    **Q.**    But your experience has been limited to the civil context,

19    correct?

20    **A.**    My experience in litigation has been limited to civil

21    cases, yes.

22    **Q.**    Okay.  And in those cases, where you -- where you

23    conducted event studies, have you ever conducted an event study

24    for a single company, a single issuer?

25    **A.**    Yes.

1  **Q.**    And have you ever done an event study where that issuer

2  company traded over the counter?

3  **A.**    Yes, I believe that M&T case, they did.

4  **Q.**    Okay.  And in that -- when you conducted that event study,

5  were you able to -- did you analyze the factors related to

6  market efficiency?

7  **A.**    Yes.

8  **Q.**    And were you able to -- were you able to analyze each of

9  the factors in that -- in that case?

10  **A.**    In that case, it didn't go as far as analyzing all those

11  factors because the other side conceded market efficiency.

12  **Q.**    Okay.  So have you ever had an experience where you were

13  asked but you were unable to analyze the factors related to

14  market efficiency?

15  **A.**    I don't believe so.

16  **Q.**    Have you ever -- so just to clarify one thing, you had

17  mentioned that your -- I want to clarify your testimony versus

18  your engagement as an expert on cases.

19        So for M&T Bank, is it your testimony that that was a --

20  was testimony, or you did not testify in that case?

21  **A.**    In that case, I filed two expert reports; and there -- in

22  the end, there was no testimony.

23  **Q.**    Okay.  Have you ever been qualified as an expert and

24  testified as to an event study?

25  **A.**    I don't believe so yet.

```
 1              MS. ARCHER:  No further questions.

 2              THE COURT:  I just have one for you, sir.

 3      Has any court ever not admitted you as an expert or not

 4  permitted you to testify as to certain opinions?

 5              THE WITNESS:  Not to my knowledge, no.

 6              THE COURT:  Okay.  Only what you know.  Okay.  Very

 7  good.

 8      And how many times have you been admitted in court as an

 9  expert?

10              THE WITNESS:  I think roughly 15.

11              THE COURT:  Okay.  All right.  Thank you.

12      Government, any challenge?

13              MS. ARCHER:  Yes.

14              THE COURT:  Okay.  Approach.

15      (A bench conference was held on the record as detailed

16  below:)

17              THE COURT:  All right.  Ms. Archer, what's the

18  challenge?

19              MS. ARCHER:  So Professor Denis has substantial

20  academic experience.  However, the issues in this case are

21  nothing like the experiences that he has had either --

22  certainly not testifying or as a retained expert consulting on

23  a case, in part because the issues here are related to market

24  efficiency.  He has not had to assess that issue.

25              THE COURT:  That goes to the -- yeah, I don't think
```

1    so.  That goes to the substance of his opinion.  But he has

2    already testified that he is well read, taught on the subject,

3    used it in the academic setting for practical effect, right?

4    Because it's finance.  It's not -- I mean, he's not actually an

5    expert, an economist, he's in finance.  He's testified as an

6    expert.  He's used it in his expert capacity.  He admits that

7    he's never had a situation in which he couldn't assess

8    inefficiency, but that's -- that's -- you're going to explore

9    that as whether the opinion is reliable.

10       What about his bona fides don't make him qualified to

11    opine in this area?

12         **MS. ARCHER:**  Our objection is based on the lack of

13    his experience and be qualified as an expert to testify about

14    event studies.  He's been qualified as an expert in corporate

15    finance.  He hasn't testified about events that --

16         **THE COURT:**  Everyone needs a first qualification.

17    Every judge has to cross that bridge at some point.  So what

18    about -- other than that, is there anything else?

19         **MS. ARCHER:**  Additionally, that the issues are

20    different in criminal cases than civil cases, and where he

21    hasn't had experience in prior criminal cases, even in a

22    consulting context, and only has one experience in a civil

23    context.

24         **THE COURT:**  I'm not sure how that relates to his bona

25    fides in conducting event studies.  That may be sort of the

1    inference on it.

2        But I hear your argument.  I'm going to deny the motion.

3    I do find that his training, education and experience makes him

4    qualified in the area of finance and, more particularly, in how

5    event studies are conducted, to conduct one, and to render an

6    opinion as to the effect or lack of effect of a particular

7    statement to the public.

8        So I'm going to admit him as an expert in the proffered

9    area.

10       Thank you, though.

11           **MS. ARCHER:**  Thank you.

12           **THE COURT:**  Okay.

13       (The bench conference concluded and proceedings resumed as

14   follows:)

15           **THE COURT:**  All right.  Mr. Denis, welcome to this

16   court.  I admit you as an expert in the area of corporate

17   finance and, more specifically, conducting an event study in

18   this case.

19       Do you wish, Mr. Lurie, to now voir dire or set the bona

20   fides for your second opinion, or would you like to wait until

21   after -- how are we doing this?

22           **MR. LURIE:**  Your Honor, I'm in the Court's hands.  I

23   think his testimony in this part might inform some of what he

24   says on his qualifications as well.

25           **THE COURT:**  You want to do this first and then we'll

1    move to the second?

2              **MR. LURIE:**  Sure.

3              **THE COURT:**  All right.  So that means, Mr. Tween,

4    you're up for the opinions themselves.

5              **MR. TWEEN:**  Okay.  Thank you, Your Honor.

6                    **DIRECT EXAMINATION (CONTINUED)**

7    **BY MR. TWEEN:**

8    **Q.**   Professor Denis, I asked you before, but let's basically

9    talk about how you go about conducting an event study.  And you

10   had said -- you testified that you basically identify

11   disclosures and estimate whether there was a normal or an

12   abnormal return on the particular day in connection with the

13   disclosure; is that right?

14   **A.**   That's correct.  Sorry.  That's correct.

15   **Q.**   Okay.  So what does statistical significance mean in the

16   event study context?

17   **A.**   Well, in the context of event study, as we've been

18   describing, you're -- you're first estimating what -- what's

19   referred to as the abnormal stock return on a given day, which

20   is simply the difference between the actual return on that day

21   and the predicted return on that day where the predicted return

22   comes from general market movements and industry movements.

23        So you have this abnormal return, and then the question

24   you're asking is whether that abnormal return is unusual in any

25   way.  And when we say unusual, I'm using that term in a

1  statistical sense.

2      So if you were to calculate abnormal returns on every day

3  of the year, you will see that there's variation of those

4  abnormal returns.  So statistical significance is gauging

5  whether a particular day is unusual relative to the normal

6  variation in abnormal returns.

7  **Q.**  Okay.  And is there -- what is -- what does it mean

8  there's a standard confidence level for statistical

9  significance?

10  **A.**  Well, in any sort of statistical exercise, what you're

11  worried about are false positives, where concluding that

12  something is statistically significant when, in fact, it's not,

13  when the -- the true return that day is actually zero.

14      So a confidence level is sort of the -- your -- your level

15  that you're willing to accept for false positives.

16  **Q.**  And is there -- in addition to sort of measuring the

17  return -- or are there parameters that have to be determined

18  when conducting an event study?

19  **A.**  Well, yes.  In terms of estimating what the normal or

20  predicted return would be on a given day, you're going to have

21  to estimate parameters that get at the sensitivity of the

22  returns of the stock that you're analyzing to general market

23  movements, as well as industry movements.  Those parameters

24  have to be estimated, as does the normal volatility of the

25  abnormal return, so that you can gauge whether the abnormal

1  return on a given day is unusual relative to that normal

2  variation.

3  **Q.**   And so what would be the -- what would be examples of the

4  types of parameters that would be put in place?  Would they be

5  relevant to the period that you're reviewing, or something

6  else?

7  **A.**   Well, you're generally estimating those parameters over a

8  period of time prior to the period that you're -- you're

9  analyzing on a particular event date.  So you need to estimate

10 the parameters ahead of time, use those parameters to predict

11 what the return would be on the event day given market

12 movements and industry movements, and then back out the

13 abnormal return based on those estimated parameters.

14 **Q.**   Can you explain what confounding information is?

15 **A.**   Well, confounding information simply is referring to

16 the -- the observation on any given day there may be multiple

17 pieces of information that are revealed to the marketplace.

18     So, for example, you know, let's say a company announces

19 that it's going to seek to acquire another company in a merger

20 and acquisition transaction.  And on the same day, the company

21 releases its earnings for the last quarter.  You may observe an

22 abnormal stock price change on that day, but it -- you're --

23 your ability to infer what's -- what's driving that change is

24 confounded by this multiple pieces of information being

25 revealed to the marketplace.

1  **Q.**    So, in other words, if one of the pieces of information

2  was the subject of the events study, but a different piece of

3  information, or securities filing or something else, was not

4  subject, how do you, if you can, sort out which of those pieces

5  of information, or either, impacted the movement of a share

6  price?

7  **A.**    Well, if you're just looking at the return over the course

8  of the day, you're not going to be able to discern.

9  **Q.**    You've discussed market efficiency earlier on cross, and

10 also in your disclosures.  Can you explain what that is and why

11 it's important to analyze market efficiency?

12 **A.**    Sure.  Well, market efficiency is referring to the idea

13 that all relevant and publicly available information is

14 reflected in the stock price of the company.  Why that's

15 important is that if you're doing methodologies like the event

16 study methodology that involve analyzing changes and prices

17 over time, you have to have some confidence that those prices

18 reflect the information that has been revealed.

19      So in this sort of matter, whether there's alleged

20 misstatements on a given day, in order to conduct the event

21 study, you have to have the presumption that any information

22 content that is part of those statements is going to be

23 impounded into the price on that day.

24 **Q.**    Okay.  I'll -- I'll come back in a little while to how you

25 went about assessing whether the market for CytoDyn was

*DIRECT OF DAVID DENIS BY MR. TWEEN*

1  efficient or not.  But let me now just ask you, generally, let

2  me turn specifically to the work you did in connection with the

3  event study of CytoDyn, what specifically were you asked to do?

4  **A.**   Well, I was asked to assess the alleged misstatements that

5  I mentioned in the indictment, and the extent to which, if at

6  all, those alleged misstatements led to a significant change in

7  the stock price for CytoDyn.

8  **Q.**   Okay.  I'm going to ask you to look at Tab 2 of your

9  binder, which is the exhibit marked as PX955.

10  **A.**   Okay.

11  **Q.**   What is that?

12  **A.**   This is a tactical appendix that is just laying out the

13  event study methodology that I used.

14  **Q.**   Okay.  And I mean, specifically, can you -- well, let me

15  ask you a few questions based on this.

16      There's a reference here to market and industry indices in

17  the second page, the second bullet.

18  **A.**   Yes.

19  **Q.**   What is a -- what's a market index?

20  **A.**   Well, market index is just either an equal weighted or an

21  evaluated index of stocks that trade in the same market as the

22  company that you're interested in evaluating.

23  **Q.**   Okay.  And in the case of CytoDyn, what was that?

24  **A.**   That is the OTCQB market.

25  **Q.**   And what kind of market is that?

1    **A.**    That's a market of smaller companies.  These are companies

2    that are generally smaller than you'll see on the NYSE, for

3    example.

4    **Q.**    Now, there's also reference to industry indices.  What's

5    an industry index?

6    **A.**    Industry index is, again, a market cap -- generally market

7    cap weighted, but sometimes equal weighted index of companies

8    that operate in the same -- roughly same economic sector as

9    the -- as the company that you're evaluating.

10   **Q.**    And did you use an industry index in connection with your

11   event study of CytoDyn?

12   **A.**    I did.

13   **Q.**    Okay.  How did you go about selecting what companies would

14   be in that index?

15   **A.**    Well, what I used was a set of companies that were

16   identified by two compensation consultants that CytoDyn had

17   hired.  I think they originally contacted them in 2019.  Mercer

18   and Pay Governance.  These -- these two compensation

19   consultants were hired to evaluate the compensation plans of

20   CytoDyn, CytoDyn's executives, and I think board members as

21   well.

22        And so as part of doing that, they are benchmarking

23   CytoDyn's compensation to what they believed to be peer

24   companies.

25   **Q.**    Okay.  I'm going to ask you now to look at Tab 4, which is

1  Exhibit PX957.

2  **A.**    Okay.

3  **Q.**    Okay.  And ask you to turn to Page 22 of that, with the

4  Bates number ending in 760.

5  **A.**    Okay.

6  **Q.**    Page 23.  Sorry.

7      Is that a description of one of the compensation studies

8  that you were mentioning?

9  **A.**    I may be looking at the wrong thing.  I'm not seeing the

10  compensation study itself on this page.

11  **Q.**    Okay.  One moment.

12  **A.**    Oh, I'm sorry.  There is mention of Mercer and Pay

13  Governance in the third paragraph, yeah.

14  **Q.**    Okay.  Let's turn to Tab 5, which is Defense Exhibit

15  PX958.

16  **A.**    Okay.

17  **Q.**    Can you tell us what that is?

18  **A.**    Yeah, that is the data that was used by one of the

19  consultants, Pay Governance, for evaluating CytoDyn's incentive

20  compensation.

21  **Q.**    And what kind of companies did Pay Governance identify as

22  peers of CytoDyn?

23  **A.**    They are generally looking at other biopharma companies

24  that were roughly the same size as CytoDyn.

25  **Q.**    Okay.  What are return measurement intervals?

1  **A.**   Well, that's just the period of time over which you're

2  actually calculating the return.  So, for example, in what I've

3  described so far, I've been identifying a one-day return in the

4  stock as the difference between today's price and yesterday's

5  price.

6     You could measure returns over a month, a year, however --

7  whatever interval you -- you would like.

8  **Q.**   Why did you choose one day?

9  **A.**   Well, again, that goes back to the notion of market

10  efficiency.  If information is revealed to the marketplace, it

11  should be rapidly incorporated into the price in an efficient

12  market, so that will happen over the course of one day.

13  **Q.**   And what is estimation period?

14  **A.**   The estimation period is the period of time over which

15  you're estimating the parameters of the event study model

16  itself.  So as we were talking before, I referred to estimating

17  the sensitivity of the stock price, in this case, of CytoDyn to

18  the market index, the OTCQB index, and the industry index.

19     The estimation period is telling you the length of time

20  over which you're estimating that sensitivity.

21     And same thing with estimating the volatility of the

22  abnormal returns, you're estimating that over the -- over the

23  same period of time.

24  **Q.**   And so in the case of CytoDyn, what did you choose for the

25  estimation period and why?

**A.**    I used an estimation period of three months, so roughly 63 trading days prior to each of the events.  So it's a different estimation period for different event days.

And that reflects the usual tradeoff that you make as a -- as a scholar, researcher using the event study methodology.  The tradeoff faces -- like any estimation -- statistical estimation, more data is generally better, gives you more accurate estimates of your parameters, if those parameters are stable through time.

But the problem is, when you're dealing with real companies, is that those parameters shift over time, and if they have shifted, using the longer estimation periods, you introduce error into the parameter estimates.

In this case, because CytoDyn experienced a fairly sizable increase in its volatility in 2019 and 2020, using a longer estimation period is going to produce a downward bias in the volatility, and, therefore, is going to lead you to a lot of false positives in the event study method.

So the tradeoff is to have enough data in order to get an accurate estimate of the parameters versus, you know, taking into account any shifts in -- in the parameters over time. And, you know, my judgment is a three-month period is about right for that.

**Q.**    Okay.  How do you evaluate the stock returns on the days of the alleged misstatements or events here?

*DIRECT OF DAVID DENIS BY MR. TWEEN*

1  **A.**    How do I calculate those returns?

2  **Q.**    Well, how did you evaluate them?

3  **A.**    Well, what I'm evaluating is, again, using the event study

4  method, you're evaluating the abnormal change in the stock

5  price on those -- on those days.  And so you're calculating the

6  difference between the actual return and the predicted return

7  that I described earlier and comparing that to the normal

8  variation and the abnormal return.

9       So you're evaluating in the end is this abnormal return

10  that you've -- that you've calculated statistically

11  significant.

12  **Q.**    And how do you go about assessing whether an abnormal

13  return is statistically significant or not?

14  **A.**    You're simply taking the ratio of the abnormal return

15  itself to the standard deviation of that abnormal return.

16  **Q.**    Okay.  Can you explain that a little bit?

17  **A.**    Well, when you do so, you're -- you're calculating

18  what's -- what's known as a T statistic.  That T statistic, you

19  can then calculate what's known as a P value.

20       I apologize for getting overly technical, but P value is a

21  probability value, which is really assessing the likelihood of

22  you making a false positive conclusion and concluding that

23  something is statistically significant, when, in fact, the

24  return is actually zero.

25  **Q.**    Okay.  Let's -- I want to talk now --

1          **THE COURT:**  Can I just ask a question?  Before you

2     move on, I just want to understand what you mean when you say

3     that the return is likely zero.

4        What do you mean by that?

5          **THE WITNESS:**  I'm saying on your -- if you start --

6     and again, apologize for using --

7          **THE COURT:**  That's okay.

8          **THE WITNESS:**  -- statistic speak, but if your null

9     hypothesis is that there's no abnormal return, so the abnormal

10    return is zero, the P value is telling you, well, how likely is

11    it that you would see an actual abnormal return as large as it

12    is on that day if the true return was zero.

13         **THE COURT:**  But is your null hypothesis here there is

14    no abnormal return?

15         **THE WITNESS:**  That is, in general, the null

16    hypothesis of the event study.

17         **THE COURT:**  Even though here you were asking, like,

18    the flip question.  And what I mean by that is, often -- isn't

19    it true often studies are -- event studies are predicting

20    whether a particular statement made to the public had an effect

21    on the stock price, a statistically significant effect?  Where

22    here, you're asking -- you're being asked whether it didn't

23    have an effect, right?  Or were you?

24         **THE WITNESS:**  No, I think I'm being asked to assess

25    whether it did have an effect.

1          THE COURT:  Okay.

2          THE WITNESS:  And the way you do that is to -- is to

3  determine the likelihood that you would see a -- a return that

4  large, if, in fact, there was no effect.

5          THE COURT:  So you --

6          THE WITNESS:  If that likelihood is low -- I'm sorry.

7          THE COURT:  Go ahead.

8          THE WITNESS:  If that likelihood is low, so the P

9  value is low, then that tells you that there was, in fact, a

10  significant impact that day.

11          THE COURT:  Okay.  I think I understand it.

12     Mr. Tween?

13  BY MR. TWEEN:

14  Q.   Professor Denis, let's turn to market efficiency.  Okay?

15     What does it mean for the market -- for security to be

16  efficient?

17  A.   If the market for security is efficient, that's saying

18  that any relevant and available information is impounded into

19  the stock price on that day.

20  Q.   And, conversely, what does it mean for a market to be

21  inefficient?

22  A.   If the market were inefficient, then you could have some

23  value-relevant information that is available to investors, but

24  the stock price does not reflect that information.

25  Q.   How do you go about assessing whether a market is

1  efficient or inefficient, and what are the factors you look at?

2  **A.**    A number of factors that have been endorsed by courts, as

3  well as some academics.  These are all indicators of

4  efficiency.  I would say none of them are dispositive, none of

5  them can say, therefore, the market is efficient, or,

6  therefore, the market isn't efficient.

7      But there are factors that get at the ability of investors

8  to trade and incorporate information into price, any

9  restrictions on that, as well as some of the parties who might

10  help uncover information that would be impounded in the price.

11      So these are items like volume of trade, the float, public

12  float of the shares; bid-ask spreads; the existence of market

13  makers; the ability to short sell the shares; whether there are

14  security analysts following the stock; is the company eligible

15  to file an S3 if it's doing a securities offering.

16      So, again, any -- all of these things tend to be

17  correlated with efficiency, none of them give you the full

18  story necessarily.  But they are indicators.

19  **Q.**    I didn't hear you mention market cap.  Is that a factor?

20  **A.**    Market cap is one.  That one, I think, is more standard in

21  academic circles and less -- less so in -- I think -- I don't

22  know if it's been -- well, no, I take that back, I think it has

23  been endorsed by the courts as well.

24  **Q.**    And as part of your work on this matter, did you look at

25  each of those factors to assess whether the market for CytoDyn

1  was considered efficient?

2  **A.**   I did.

3  **Q.**   And what was your conclusion?

4  **A.**   My conclusion was that I couldn't reject the -- the -- the

5  hypothesis that the market is efficient.

6  **Q.**   Now, the way you phrased that, you couldn't reject that

7  the market for CytoDyn was inefficient, explain why you are

8  phrasing it that way.

9  **A.**   I couldn't reject that it is efficient.

10 **Q.**   That it is efficient.  Sorry.

11 **A.**   Your question is again?  I'm sorry.

12 **Q.**   Well, is there a presumption that you start with when

13 looking at the question of market efficiency?

14 **A.**   Well, in general, it's -- in using event studies, most --

15 most scholars will assume that a market is efficient if -- if

16 the stock is trading on a national market exchange.  So the

17 real presumption is that, yes, the market is likely to be

18 efficient.  And there's lots of studies that have demonstrated

19 that these individual markets themselves are efficient.  So

20 it's a natural presumption that a stock that's trading on that

21 market is also efficient.

22      So in -- in conducting this analysis of these factors,

23 that you're really trying to look for indicators that your

24 presumption is correct.

25 **Q.**   And you say -- I mean, is that a standard approach, when

1   conducting a market -- an events study?

2   **A.**   Yes.  In fact, I think most event studies that are

3   conducted don't even take the additional step of looking at the

4   individual factors.  It becomes more relevant when you're

5   looking at single companies like -- like we're looking at here.

6   But, yes, that's a standard approach.

7   **Q.**   Okay.  Okay.  I'm going to ask you to turn to Tab 6, which

8   is Defendant's Exhibit PX959.

9        What is that?

10  **A.**   All right.  So this is -- this is listing out the

11  abnormal -- actual and abnormal returns on each of the 14 days

12  that I analyzed.

13  **Q.**   Okay.  And let's walk through -- let's walk through this

14  from left to right.

15          **THE COURT:**  Before you do that, Mr. Tween, I just

16  have to -- I need to get some clarity on this.  I can't rule

17  out that the market is efficient.

18       Let me just pose one question to you, and I'm going to lob

19  it back.

20       If you were asked today to render an opinion to a

21  reasonable degree of certainty in your field as to whether the

22  market at issue here is efficient, could you do that?

23          **THE WITNESS:**  I mean, I think I would say that I see

24  no reason to conclude that it's inefficient, so, therefore, I

25  guess, to use your language, with a reasonable degree of

1  certainty, I think it is.

2      **THE COURT:**  Okay.  And given that you also assessed

3  the ten factors involved and found you couldn't come to

4  conclusions to some, some pointed in the direction of

5  efficiency, some pointed in the direction of inefficiency, you

6  would stand by -- well, what I want to know is, can you come to

7  the conclusion that it is efficient?  Not rule out a

8  presumption, but can you independently, putting aside the

9  academic presumption where earlier you said, you know, it

10  wasn't challenged in a particular case, so I get the

11  presumption, but I'm asking if you can come to an independent

12  conclusion based on your expertise in this regard.

13      **THE WITNESS:**  I mean, I think I understand what

14  you're asking.  I -- I would go back to saying that none of

15  these factors are going to -- are going to be conclusive.

16  You're not going to be able to say -- even if all ten factors

17  you get -- you could measure and say well, they -- they fall

18  within the bounds that courts have endorsed as implying

19  efficiency, they are not conclusive to say, therefore, the

20  market is efficient, or, therefore, it isn't efficient.

21      And so even if you look at some of the factors that --

22  that I looked at that -- I think you said that point towards

23  inefficiency, I wouldn't use that language.  I said they don't

24  necessarily support efficiency, but -- because one example

25  would be the number of security analysts that are following the

1    stock.

2              **THE COURT:**  Right.

3              **THE WITNESS:**  In this case, there's just one.

4        And so taken on its own, you might say, well, maybe that's

5    not enough of an analyst following to -- to really generate

6    information in order for investors to -- to impound that

7    information into prices.

8        But you have to -- you can't really look at these factors

9    on their own, because at the same time, you look at the stock

10   and say, well, there is high trading volume, they are eligible

11   for S3 filing of securities offerings, so there doesn't look

12   like -- there's no restrictions on short selling that we can

13   observe.

14       So there's no evidence that there's -- there's anything

15   that's getting in the way of investors trading on -- on

16   information.  So that's the sense of which, you know, just

17   because you only had one analyst following the share doesn't

18   mean that information isn't getting impounded into the price.

19             **THE COURT:**  But your ultimate opinion is -- it's

20   based on an efficient market, right?

21             **THE WITNESS:**  Correct.  Without an efficient market,

22   looking at stock price changes on a given day aren't going to

23   tell you very much about the value relevance of that

24   disclosure.

25             **THE COURT:**  All right.  Thank you.

1      Mr. Tween?

2           **MR. TWEEN:**  Okay.

3   **BY MR. TWEEN:**

4   **Q.**   Okay.  Let's -- let's walk through Exhibit PX959.

5        From the left, you have event date, and a column of dates.

6   And to the right of that, you have new synopsis, and it's

7   either press release or -- yeah, basically press -- dates of

8   various press releases that were issued.

9        And then to the right of that, it says CYDY actual return,

10  parens, natural log.

11       Can you explain what that means?

12  **A.**   So this is essentially just giving us the percentage

13  change in the stock price on that day.

14  **Q.**   Okay.  So, in other words, the share price on -- if you

15  take the first column, the share price on November 13th, 2018,

16  went up 2.7 percent from the prior day?

17  **A.**   Correct, the prior trading day.

18  **Q.**   Prior trading day.  Okay.

19       And then the next column is CYDY abnormal return, natural

20  log.  And there -- maybe let's take the second line down

21  because it's a little different.

22       So there, you have actual return of 5.0 percent.  And then

23  in the right column, you have 4.7 percent.

24       What's the 4.7 percent, and why is it different from the 5

25  percent?

*DIRECT OF DAVID DENIS BY MR. TWEEN*

1  **A.**    So the 4.7 percent is the -- is the abnormal return that I

2  described before.  So the difference between the actual return

3  on that day and the return that was predicted for -- for

4  CytoDyn, given how the market and the industry moved on that

5  day.

6      So the fact that there's a 0.3 percent difference, you can

7  back out the fact that the predicted return on that day, given

8  market and industry movements, was that CytoDyn would go up by

9  0.3 percent.  In fact, it went up by 5 percent, so the abnormal

10 stock price change or abnormal return is 4.7 percent.

11 **Q.**    Okay.  And then below that, you have a parentheses, 0.17,

12 closed parens.

13     What is that?

14 **A.**    So this is the P value that I was describing before.  So

15 what's the probability that that 4.7 percent that you would

16 observe, 4.7 percent return, if the true return on that day was

17 zero.

18 **Q.**    Okay.  And is there a threshold for statistical

19 significance when you're looking at that?

20 **A.**    Generally, you're looking to see that that P value is .05

21 or less.

22 **Q.**    And why would that?  Explain why that's statistically

23 significant at that point.

24 **A.**    Well, what you're trying to do is eliminate the

25 possibility or -- you never totally eliminate it, but minimize

1  the possibility of false positives.  So you don't want to

2  conclude that something was a significant return on that day,

3  if, in fact, it wasn't.

4  **Q.**  So if we go down here, your testimony, your opinion would

5  be that the first -- one, two, three, four, five, six, seven,

6  eight -- nine, each of those events were statistically not

7  significant?

8  **A.**  That's correct.

9  **Q.**  Okay.  And then on the tenth one, the December 22, 2020,

10  you have an actual return of negative 13.1 percent, an abnormal

11  return of 12.6 percent, and a P value in the parentheses of

12  0.07.  And you have an asterisk next to that one, why?

13  **A.**  Well, the asterisk is referring to the -- sort of the

14  probability level.  So the level at which this is statistically

15  significant.  So one asterisk means that something is

16  significant at the 10 percent confidence level.

17      As I said, generally speaking, you like the confidence

18  level to be 5 percent or below, .05 or below; this one is

19  significant at the 10 percent level.

20  **Q.**  Okay.  And then if you go down to -- you have March 5th,

21  2021, you have an actual return that day of negative

22  33.1 percent, an abnormal return of negative 30.8 percent, and

23  a P value of .0004.  And you have three asterisks next to that

24  one.

25      Can you explain that?

*DIRECT OF DAVID DENIS BY MR. TWEEN*

**A.**    All right.  So what that is saying is that that negative

return on that day, the negative abnormal return of minus

30.8 percent is statistically significant at better than the

1 percent level.

**Q.**    Okay.  The 14 event dates on your -- on this exhibit,

PX959, how did you select those?

**A.**    Well, what I did, first of all, was identify the alleged

misstatements that were mentioned in the government's

indictment and then proceeded to run the event study on those.

Those included 20 events, as I recall.  And as you can see

on here, there's 14 that I've analyzed.

The six that aren't included, there are two that are on

days that are part of the 14 that I analyzed.  So they are

being analyzed, they are just repetitive on those particular

days.

There are two others that are press releases of -- I think

they are press releases, but they are releases of information

that were disclosed at an earlier date.  And the standard

practice in event studies is to use the first announcement of a

piece of information, again, under the idea that an inefficient

market information is impounded when it's first received by the

market.  So a duplicate like that would be normally excluded.

And the last two were dates of releases of SEC filings,

10-Ks and 10-Qs.  And I excluded those simply because 10-Ks and

10-Qs include all kinds of different information, not just the

1  information that's at issue here.  So there's -- because of the

2  degree of confounding information in those, it would be

3  impossible for me to draw any inferences on those days.

4  **Q.**    Okay.  Would it be possible to run your event study on

5  other dates other than these 14?

6  **A.**    Sure.  Any of the dates within the period of time for

7  which I've provided the data to the government could -- a study

8  could be conducted on any of those dates.

9  **Q.**    Let me turn your attention to Exhibit P954, Tab 1.

10        If you look at the bottom of the first page, where it

11  says, specifically, this production includes the following:

12  One, the input date to run the event study, including all

13  relevant underlying stock price information; two, the script,

14  slash, code to run the event study on the input date; three,

15  the output generated by running the event study code on the

16  input date; four, a summary table with event study results for

17  the 14 press releases at issue; five, a detailed description of

18  Professor Denis' event study methodology; and six, two

19  foundational journal articles describing event study

20  methodology; and seven, an overview of confounding news events

21  for specific press releases, including copies of confounding

22  news sources.

23        With all of that information, could the government do an

24  event study of its own on these dates or any other dates in the

25  relevant period?

*CROSS OF DAVID DENIS BY MS. ARCHER*

1  **A.**    They could, yes.

2  **Q.**    Okay.

3           **MR. TWEEN:**  Nothing further, Your Honor.

4           **THE COURT:**  Okay.  Ms. Archer?

5           **MS. ARCHER:**  Your Honor, there is one exhibit that --

6  it's entered into -- it's been filed as ECF 173-4.  We provided

7  a copy for the Court.  And to the extent that the defense needs

8  it, I'll provide copies for them.

9           **THE COURT:**  Okay.  And for this hearing, do you want

10 to just identify it by its ECF?

11          **MS. ARCHER:**  I will, yes.  I just wanted everyone to

12 have a copy before we get started.

13          **THE COURT:**  Okay.

14                    **CROSS-EXAMINATION**

15 **BY MS. ARCHER:**

16 **Q.**   Okay.  Professor Denis, I would like to start with market

17 efficiency.

18          **THE COURT:**  Can you move the microphone closer to

19 you, Ms. Archer?  Thank you.

20 **BY MS. ARCHER:**

21 **Q.**   Professor Denis, I would like to start with market

22 efficiency.

23      Before we get into the Cammer factors, have you -- are you

24 familiar with any literature related to market efficiency,

25 specifically as it relates to over-the-counter markets?

1  **A.**   I've seen lots of literature; yes, I've studied that.

2  **Q.**   Well, are there things about over-the-counter markets that

3  are different from, let's say, the New York Stock Exchange or

4  NASDAQ that weigh against market efficiency?

5  **A.**   I don't know that I would say they weigh against market

6  efficiency.  But if you look at general indicators of

7  efficiency, they are different than the OTC market relative to

8  the NYSE.  For example, companies are smaller, they have

9  spreads that are larger, in general.  So these are -- you know,

10  these are correlated with efficiency.

11  **Q.**   Is there sometimes greater volatility in over-the-counter

12  markets?

13  **A.**   There is.

14  **Q.**   And --

15  **A.**   On average.

16  **Q.**   And I believe you testified, as well, that with single

17  issuers, there can be -- event studies, there can also be

18  concerns related to market efficiency; is that right?

19  **A.**   Yeah.  I think the point I was making there is that if you

20  have studies of efficiency of certain markets, they can tell

21  you something about the market as a whole.  They don't

22  necessarily tell you something about the -- an individual

23  stock.

24  **Q.**   Okay.  So in this particular case, you analyzed the

25  factors related to market efficiency.  This is in your

1    declaration signed July 29th of 2024.  And I would like to go

2    through them and ask you some questions.

3         The first one is trading volume.  And in that -- why did

4    you use the particular time period that you used to analyze

5    trading volume?

6    **A.**   Well, I'm just trying to get a sense over the -- over the

7    period of time that's relevant here, what is -- what is the

8    trading volume.

9    **Q.**   What is your understanding of the relevant time period?

10   **A.**   Well, I think we have a time period over which these

11   alleged misstatements have been made.

12   **Q.**   Did you -- so is it correct that you limited your analysis

13   of trading volume for the purposes of assessing efficiency to

14   the 2020 calendar year only?

15   **A.**   To be honest, off the top of my head, I don't remember the

16   specific time period that I used.

17   **Q.**   Sure.  So this is in your declaration, if you would like

18   to turn to it, at Tab 3, and it's Paragraph 16.

19   **A.**   15, I believe.

20   **Q.**   Thank you very much.  So Page 4, Paragraph 15, you analyze

21   the 2020 period; is that correct?

22   **A.**   Correct.

23   **Q.**   And did you consider a broader period than that?

24   **A.**   I think I just looked at it one year because -- and this

25   is the year which most of these alleged misstatements were

 1  made.

 2  **Q.**   You read the indictment in this case, right?

 3  **A.**   I did.

 4  **Q.**   Do you -- you're aware that the scheme -- the securities

 5  fraud scheme, the conduct that's charged here, spanned over a

 6  2018 to 2021 period?

 7  **A.**   Yes, I'm aware of what the indictment said.

 8  **Q.**   Okay.  Did you consider any broader time period before

 9  determining that 2020 was the period you were going to use?

10  **A.**   I think in terms -- you know, as with most studies,

11  there's a -- there's a tradeoff between getting the data and

12  being able to analyze it in a timely manner.  And this is the

13  time period over which most of the alleged misstatements were

14  made, so it seemed like the logical time period in which to

15  assess the volume of trade.

16  **Q.**   Are you familiar with the differences in trading volume

17  between 2018, '19, '20, and '21?

18  **A.**   Are you asking for in general trade volume, or CytoDyn in

19  particular?

20  **Q.**   For CytoDyn in particular.

21  **A.**   No, I'm not -- off the top of my head, I don't -- I'm not

22  familiar with the changes over time.

23  **Q.**   So if -- if the relevant period went beyond 2020, and

24  there was a significant difference in trading volume during

25  2020 versus the rest of the period, would that have been

1  something you would consider?

2  **A.**   Well, again, I think -- what I'm interested in is

3  what's -- what is the normal trading volume over the period of

4  time in which most of these press releases are made.

5  **Q.**   So your -- your decision to focus exclusively on the press

6  releases, was that your decision, or did someone direct you to

7  focus only on those particular events?

8  **A.**   In terms of analyzing trade volume?

9  **Q.**   In terms of identifying the relevant events for the study.

10  **A.**   I think I was asked to evaluate the alleged misstatements

11  that are specifically mentioned in the indictment.

12  **Q.**   You would agree that the -- the period covered in the

13  indictment is broader than the period that you used to assess

14  market efficiency, correct?

15  **A.**   It's broader than the 2020 period in which I've estimated

16  the trading volume.

17  **Q.**   Okay.  So you did find that with respect to trading

18  volume, at least in 2020, that the factor weighed in favor of

19  efficiency, correct?

20  **A.**   It trades at a rate that's higher than the threshold

21  that's been identified by courts, yes.

22          **THE COURT:**  Can I ask one question?  Just one real

23  factual question.

24          Sir, you say that most of the statements were made in

25  2020?  Is that your testimony?  I mean, I just want to

1   understand it, because I'm looking at your opinion, and a full

2   one-third of them are outside of 2020 for the 12 --

3           **THE WITNESS:**  I guess maybe most I would change to

4   majority, then.

5           **THE COURT:**  Does that matter?  I mean, one way or the

6   other, I just want to understand your testimony.  Does it

7   matter that one-third of the 12 statements that you did render

8   an opinion on are outside of 2020?

9           **THE WITNESS:**  Not necessarily.  I think I'm just

10  trying to gauge the sense in which -- over a period of time in

11  which the alleged statements -- misstatements were made, does

12  it look like there's a reasonable amount of trading volume in

13  these shares.

14          **THE COURT:**  Okay.  Thanks.  Go ahead.

15  **BY MS. ARCHER:**

16  **Q.**   Moving to the second factor, analyst coverage, you found

17  that that was insufficient to conclude the market was

18  efficient; is that right?

19  **A.**   Correct.  There's just one security analyst following the

20  shares.

21  **Q.**   Okay.  And then the third factor, the presence of market

22  makers, you could not analyze that factor; is that right?

23  **A.**   Correct.  It could conceivably be analyzed with, you know,

24  purchase of additional data.

25  **Q.**   With respect to the fourth factor, the eligibility to

 1  issue new securities, did you determine that that weighed in
 2  favor of efficiency?
 3  **A.**    Yes.
 4  **Q.**    And was there any limitations on the time periods that you
 5  looked at related to that?
 6  **A.**    I don't remember if I -- what specific years, but I -- you
 7  know, I did look at multiple years, and they are consistently
 8  eligible to use the S3 approach, so that's what led to the
 9  conclusion.
10  **Q.**    And with respect to the fifth factor, the empirical
11  cause-and-effect relationship, you could not analyze that
12  factor either?
13  **A.**    Right, a company like CytoDyn, you're not going to be able
14  to do that because that's typically analyzed using known events
15  like earning releases or dividend announcements.  We know it's
16  coming, and then you can see whether the market reacts to this
17  known event.  But it's a pre-revenue company.  It's not
18  generating earnings for which you could do this sort of
19  analysis.
20  **Q.**    So with respect to at least the Cammer factors, three of
21  the five you didn't analyze or found weighed in favor of
22  inefficiency, correct?
23  **A.**    No, I think it was three out of five weighed in favor of
24  efficiency; am I right?
25  **Q.**    Well, number two you said was inefficient; number three,

1  you can't analyze; and number five, you can't analyze.

2  **A.**    Okay.  That's fair, yeah.

3  **Q.**    Number -- with respect to number one, you considered the

4  efficiency of the market only during a period applicable to

5  certain of the events that you examined?

6  **A.**    Correct.  I -- for the majority of those events, yes.

7  **Q.**    Okay.  For the Krogman factors, you testified about market

8  cap, and that that was efficient, and that the size of the

9  public float was efficient, correct?

10  **A.**    Correct.

11  **Q.**    And then with the remaining factor, the bit-ask spread,

12  you didn't analyze it?

13  **A.**    Right.  That's also the data issue.

14  **Q.**    So my question is, in part, are there degrees in market

15  efficiency, is that something that you're familiar with in the

16  literature?

17  **A.**    I mean, people have referred to degrees of efficiency,

18  but, generally, they are -- in the end, they are talking about

19  what's known as semi-strong form efficiency, which is all

20  relevant and publicly available information.

21  **Q.**    Are some markets more efficient than others?

22  **A.**    Sure.  I'm sure there's markets for some individual stocks

23  that are not particularly efficient.

24  **Q.**    And you hesitated a little bit in concluding, certainly in

25  your filings, and even here today, as to whether you could

1   conclusively say that the market was efficient for CytoDyn

2   stock?

3   **A.**    I think I'm hesitating, as any academic would hesitate or

4   any statistician would hesitate, because you're making a

5   probabilistic statement ultimately.  None of these factors will

6   tell you that the market is inefficient.

7           **THE COURT:**  But can I just stop for a second?

8   Because let me ask, sir, because you've been an expert before,

9   when I asked you a question about to a reasonable degree of

10  certainty in your field, it's not a -- it's not an absolute,

11  right?  It's -- that's basic in what you do when you perform

12  all kinds of analysis in your field, right?

13          **THE WITNESS:**  Correct.

14          **THE COURT:**  Okay.  So, again, when it comes to market

15  efficiency, is your testimony that you cannot give an opinion

16  to a reasonable degree of certainty in your field on the

17  efficiency of this market?

18          **THE WITNESS:**  No.  I think what I'm saying is that

19  nobody can definitively conclude efficiency, but to a

20  reasonable degree of certainty, I think I can.

21          **THE COURT:**  Okay.

22          **THE WITNESS:**  And that's the only basis on which I

23  would proceed with the event study.  If I didn't believe that,

24  the event study really doesn't have the same meaning.

25          **THE COURT:**  So you're saying here, you're concluding

1  to a reasonable degree of certainty in your field that the

2  market was efficient such that you could render an opinion?

3          **THE WITNESS:**  Yes, I think that's a fair way to put

4  it.

5          **THE COURT:**  Okay.  All right.  Thanks.

6  **BY MS. ARCHER:**

7  **Q.**  Two of the -- two of the five factors that you found

8  couldn't support your decision -- your opinion that it's an

9  efficient market were limited to the 2020 time period, correct?

10  **A.**  Two, meaning the volume and --

11  **Q.**  Market cap.

12  **A.**  -- the market cap at that point in time, yes.

13  **Q.**  Did you at any time during your engagement on this assess

14  a broader period before deciding to use the 2020 period?

15  **A.**  I don't think I did, no.

16  **Q.**  Okay.  Let's move to the industry -- the market index, and

17  the industry index that you used in this -- in this study.

18      With respect to the industry index specifically, did you

19  consider any established indexes different from the ones that

20  you used here?

21  **A.**  With respect to that -- I'm sorry, the industry index not

22  the market index?

23  **Q.**  For example, the NASDAQ biotech index.

24  **A.**  As I recall, we thought about a number of different ways

25  that this could be done.  And keep in mind that, you know, what

1  you're doing with an industry index is asking whether there may

2  be some additional normal influences on the share price over

3  and above what you've already captured in -- in the market

4  index that you're using.

5      So they tend to be -- these additional would tend to be

6  targeted towards a specific sector that the company is -- is

7  operating in.  So you could use something like a broad biotech

8  sort of index, and that is something that I remember

9  discussing.

10     In this case, felt like, you know, these are specific

11 peers that have been identified by -- by others for the

12 purposes, as I mentioned before, of evaluating compensation

13 plans.

14     So they have already been identified by third parties as

15 being particularly relevant to this specific company.

16     So in that sense, I felt like that would be a better

17 choice than using some broad biotech that would include things

18 outside of the -- the biopharma space that CytoDyn was

19 operating in.

20 **Q.**   Are there any potential risks in using a narrower index?

21 **A.**   Well, the only risk I could identify would be if, for

22 example, there is some component of information that's embedded

23 in the broader index that isn't already included in the broad

24 index you've used, the market index, and also is not included

25 in the specific index of companies, the 36 that I used.  So the

1  probability of that is pretty small.

2  **Q.**  And you testified that the 36 that you used, that that was

3  selected by a group of consultants that were hired by

4  CytoDyn -- CytoDyn to evaluate executive compensation, correct?

5  **A.**  Two sets of consultants, yeah.

6  **Q.**  And -- and so have you ever used, in any of your prior

7  event studies, a list that was self-selected by the company?

8  **A.**  Well, to correct you there, it's not self-selected by the

9  company.  These are the third-party consultants that have

10  identified these -- these peers.

11  **Q.**  Is that -- is that typical?  Is that something you've

12  experienced before?

13  **A.**  I've seen that many times, yes.

14  **Q.**  Do you have any concerns with a potential -- both

15  potential self-selection or using an index that was designed

16  for a purpose other than assessing market efficiency?

17  **A.**  Not in this instance, because if you think about what they

18  are using these companies for, they are trying to benchmark the

19  compensation of CytoDyn to what would be appropriate for other

20  companies' executives operating in similar lines of businesses

21  and similar stages of life cycle.  That's the type of

22  correlation with returns that you're trying to get at.

23      And, you know, if it turns out to be a bad index of any

24  sort, that would just mean there isn't a sensitivity of the

25  returns to that.

*CROSS OF DAVID DENIS BY MS. ARCHER*

1  **Q.**   So with respect to the other methodological choices that

2  you made as part of the event study, you testified about the

3  time period that you selected.  You testified that it could be

4  one year or one month, right?

5  **A.**   The return measurement --

6  **Q.**   Yes.

7  **A.**   -- interval?  Yeah.

8  **Q.**   But you chose one day.  And why was that?

9  **A.**   Well, that goes to the whole notion of the way in which

10  information is impounded in the prices.  And if you believe

11  that the market is efficient, and, again, I do in this case,

12  that any information that's released should be impounded within

13  the data.

14  **Q.**   So immediately?

15  **A.**   As soon as it's known.

16  **Q.**   Okay.  So where you have concerns about the efficiency of

17  the market, because not all the factors weighed in favor of it,

18  why didn't you select a larger return period?

19  **A.**   I don't think it's fair to say that I had concerns about

20  the efficiency of the market.  I mean, I -- I think if you were

21  to look at a broad set of companies that are trading on the --

22  on this -- on this market, and looked at each of those

23  individual factors, that you'll find many cases in which not

24  every factor points to efficiency in the way we've described.

25       But that's not indicative of inefficiency.  For example,

1   you don't need any volume of trade in order to observe a price

2   change.

3        So the fact the volume was low on the stock doesn't mean

4   that the market was inefficient, it doesn't mean that

5   information was not impounded into that price.

6   **Q.**   Is it your opinion that -- can you testify with a

7   reasonable degree of certainty that -- that within one day of

8   an event, that that information would be incorporated into the

9   market for CytoDyn stock?

10  **A.**   Right.  Again, with -- with national exchanges like we see

11  in this market, there is evidence that those markets tend to be

12  efficient.  I look at individual factors.  And based on the

13  analysis of those factors, I can't reject that idea of

14  efficiency.  So, therefore, I proceed with the event study as

15  if that information is being impounded in the price on the day

16  that it's released.

17  **Q.**   But this is not a national -- I mean, it's not -- it's not

18  the same as a NASDAQ or New York Stock Exchange where you have

19  that degree of confidence, right?

20  **A.**   They are different markets, I agree -- I agree with that.

21  But nonetheless, there's evidence that these markets trade in

22  an efficient manner as well.

23  **Q.**   So you have the same degree of confidence with respect to

24  this over-the-counter market for CytoDyn stock as you do with

25  NASDAQ or -- a stock traded on NASDAQ or the New York Stock

*CROSS OF DAVID DENIS BY MS. ARCHER*

1  Exchange?

2  **A.**    I mean, based on my analysis of the additional factors,

3  and based on my knowledge of the studies of this market, I'm

4  confident that within a day, the information is going to be

5  impounded into the price.

6  **Q.**    And for that reason, you did not select a longer return

7  period to analyze?

8  **A.**    That's correct.

9  **Q.**    Okay.  With respect to the choice of the estimation

10 period, you testified that you selected a period of 63 days,

11 correct?

12 **A.**    That's correct.

13 **Q.**    Have you ever used that time period in any other event

14 studies that you've conducted?

15 **A.**    I'm guessing the answer is yes, but I couldn't point you

16 to a specific instance.  I've used a variety of different

17 estimation intervals for, you know, the reasons I've described

18 before.

19 **Q.**    Well, the reasons that you described, I recall, is that

20 you discussed that more data is better, correct?

21 **A.**    All else equal, more data is better for statistical

22 estimates.

23 **Q.**    And I believe you -- one of the materials that you relied

24 upon is a journal article that discussed the benefits of using

25 longer estimation periods?

1  **A.**    I believe it does, yeah.  I did some -- if you're

2  referring to the methodological article.

3  **Q.**    So is there a -- is it more common to use a lengthier

4  period in doing event studies?

5  **A.**    Lengthier than what?

6  **Q.**    Than three months?

7  **A.**    I think it depends on the context you're asking the

8  question.  If you're asking about an event study that an

9  academic might do that involves multiple events by a lot of

10 different companies, it's probably more common to use longer

11 than three months in that case.

12     If you're talking about litigation matters that I've seen,

13 three months is pretty common, because those are -- those are

14 not dealing with a wide set of companies.  They are dealing

15 with just a single company where the worry about changes in the

16 event study parameters is very real.

17 **Q.**    Isn't it true that you also described another concern that

18 would -- would be the case with the single issuer where

19 volatility and the stock price in volume trading over a longer

20 period of time could introduce error?

21 **A.**    Yes, the changes in the volatility over time could

22 introduce error in your inferences.

23 **Q.**    So is that the reason why you selected the time period you

24 did?

25 **A.**    The time period, again, being the estimation interval?

1  **Q.**   Did you select the period of 63 days because of the

2  volatility that you observed over a longer period of time?

3  **A.**   I chose the 63 days because I noted the rather sharp

4  increase in volatility that occurred in -- mostly in the 2020

5  period, into 2021.

6  **Q.**   And in your -- in your disclosure, you indicated that it

7  was your understanding that the increased volatility was

8  driven, in large part, by days that were not associated with

9  the alleged conduct in this matter, correct?

10  **A.**   That was my observation in the data, yes.

11  **Q.**   So would it have changed your analysis if the events that

12  you were analyzing took place over the entire period of that

13  volatility?

14  **A.**   I'm not sure I'm understanding the question.

15  **Q.**   You looked at a set of -- you looked -- at the 2020 period

16  was your focus, right?

17  **A.**   Well, my focus is on all of the -- all of the events that

18  were disclosed, the majority of which are in 2020.

19  **Q.**   But in evaluating market efficiency, you focused on 2020?

20  **A.**   For some of the data.

21  **Q.**   And in making certain methodological choices about the

22  design of the event study, you focused on 2020 because that was

23  the period of the statements, some of the statements you looked

24  at?

25  **A.**   Right.  And that is a period of time over which the

1  volatility took a sharp upward drift as well.

2  **Q.**    If the -- did you assume that the volatility over the

3  broader period was not related to the events that you weren't

4  analyzing?

5  **A.**    Again, I'm not sure exactly what you're asking there.

6  **Q.**    In your disclosure, you stated that increased -- the

7  increased volatility that you observed, beginning in late 2019

8  and extending through mid 2021, is driven in large part by days

9  not associated with the alleged misstatements in this matter.

10  **A.**    That's correct.

11  **Q.**    And your understanding of the relevant time period and the

12  misstatements in this matter is driven by events that were

13  identified by you personally, or that you were instructed to

14  analyze?

15  **A.**    The events that were identified by the government in the

16  indictment.

17  **Q.**    So the government identified the period from 2018 through

18  2021.  Why didn't you consider a lengthier time period?

19  **A.**    Well, again, let me try to be clear on what's going on

20  here, is that I observe that beginning in late 2019 and

21  extending into 2021, there is a sharp increase in volatility.

22  When we're talking about an estimation period, we're talking

23  about an estimation period before each of these events.

24      So to the extent that you have a long estimation period

25  prior to these events, you're incorporating a period of time in

1  which the volatility is low relative to what you know it

2  actually is during the event period of time, which is going to

3  cause you to overestimate the statistical significance of the

4  abnormal return.

5  **Q.**   Okay.  So if you are -- but -- if you're assuming that the

6  volatility is unrelated to the fraud, is that the reason why

7  you would make that decision?

8  **A.**   Well, the fact that it's unrelated to the alleged fraud is

9  simply telling me that there -- there are other reasons why

10  stock prices are changing, and so the event study methodology

11  is, in a sense, controlling for those other reasons by

12  capturing the normal -- quote, unquote, normal volatility that

13  you're seeing during this period of time that is -- that is

14  driven by other factors than what you're testing in the event

15  study.

16      And so you can ask, then, is the return on the specific

17  event day different from the variation returns that you're

18  typically seeing during that period of time?

19  **Q.**   You testified that longer -- a longer period could result

20  in false positives due to volatility and being unrelated to the

21  alleged misstatements in this matter.  Can you explain what you

22  meant by that?

23  **A.**   I would drop the last part of that, the unrelated.  That

24  statement is more general than that, simply that if you are --

25  if you are estimating the volatility of abnormal returns over a

1    long period of time that includes periods in which volatility

2    is low, and then you take the ratio of the abnormal return to

3    your estimate of volatility, you get an upward biased estimate

4    of that so-called T statistic, which is going to lead you to

5    conclude that something is statistically significant, when, in

6    fact, it probably is not.

7    **Q.**    Was there any analysis that you did in order to determine

8    that the volatility that you observed from 2019 through 2021

9    was not associated with the conduct at issue in this case?

10   **A.**    Yeah, I -- the analysis that I did was to plot that

11   volatility through time, observe when there is high volatility

12   periods of time, and really connect the dots, if they are

13   there, to see whether -- are those the periods in which the

14   alleged misstatements were made, or are they other periods of

15   time?  And the latter was true.

16   **Q.**    So -- but you looked at statements from 2019, correct?

17   **A.**    I did, I looked at all of them.

18   **Q.**    And you analyzed statements from 2021, right?

19   **A.**    Uh-huh.

20   **Q.**    And you read the indictment, which covers the entire

21   period?

22   **A.**    Yes.

23   **Q.**    Okay.  So there's a disconnect between your -- your

24   testimony that you were informed by the time period that you

25   were looking at for the events and limiting the scope of the --

1  the estimation period, right?

2  **A.**    Again, I'm not sure what you're asking here.  I was

3  limited in what sense?

4  **Q.**    How is it possible that if you looked at events from --

5  you analyzed events from 2019 and 2021, that you were able

6  to -- and all of these different factors say that the relevant

7  period was 2020?

8  **A.**    I'm not sure what you mean by I'm saying the relevant

9  period is 2020.  Are you asking about the market efficiency

10  test?

11  **Q.**    Well, you also said that the period of volatility that you

12  observed was unrelated to the alleged misstatements in this

13  matter and, therefore, it justified a shorter period of -- a

14  shorter estimation period, even though that can be less

15  reliable.

16  **A.**    No, I think that last part is incorrect.  I'm saying it

17  will be more reliable because of the observation that the

18  volatility has changed over time.  So you want your methodology

19  to incorporate that change in volatility through time.  And the

20  way you do that is to have a little bit shorter estimation

21  period.

22      So if three months before each of the press releases, if

23  later press releases, say, in 2020, right in a period of high

24  volatility, you've captured that in your estimation period.

25  Where the earlier ones that don't have that increase in

1  volatility, that increase in volatility will not be part of the

2  estimated standard deviation of the abnormal returns, because

3  you've estimated volatility before that period of time in which

4  the spike in volatility took place.  So the methodology allows

5  you to accommodate these changes.

6  **Q.**  Let's -- let's move on to confounding events.

7      You testified that when -- a piece -- a piece of

8  information has -- when an event has multiple pieces of

9  information, that it can be difficult to isolate the issue

10  that's causing an impact on the stock price; is that right?

11  **A.**  Correct.

12  **Q.**  And you testified that you can't discern the impact of

13  each?

14  **A.**  If you're looking at the return over the course of that

15  day, you would be unable to do that.

16  **Q.**  And what do you mean by over the course of that day?

17  **A.**  I mean a one-day return, to be more precise.

18  **Q.**  So in this case, where you used a one-day return, you're

19  unable to discern the impact of events that had multiple pieces

20  of information in them?

21  **A.**  Right.  I'm saying that if, on a given day, there is a

22  press release at issue, but there's a -- there's another piece

23  of information that's disclosed, and we observe an abnormal

24  return on that day, for that -- using that daily return, I

25  can't deduce, then, what is -- what is driving that abnormal

1  return.

2  **Q.**   And did you read the press releases that you analyzed in

3  this -- the 14 press releases that you analyzed for this event

4  study?

5  **A.**   I did.

6  **Q.**   And did they have multiple pieces of information in them?

7  **A.**   As I recall, there are some that do.

8  **Q.**   For example, do some address both issues related to this

9  admission of a BLA and COVID-19 clinical studies?

10  **A.**   I would have to refresh my recollection, but that sounds

11  right.

12  **Q.**   Most of them, perhaps -- is it possible that most of them

13  address more than one issue that could have had an impact on

14  the stock price?

15  **A.**   I guess it depends what you do -- what you mean as an

16  issue.  I mean, different investors could look at the same

17  piece of information and see different issues, I suppose.

18  **Q.**   So, for example -- for example, you looked at a press

19  release, and I'll turn -- I'll point you to the number on the

20  table.

21          **THE COURT:**  And where are you in the exhibits,

22  Ms. Archer?

23          **MS. ARCHER:**  I am --

24          **THE COURT:**  And we have two minutes before I have to

25  break.

1             **MS. ARCHER:**  Okay.

2       I am on Exhibit 959.

3             **THE COURT:**  Okay.

4  **BY MS. ARCHER:**

5  **Q.**   So -- it would be best if I turned to the -- I'm on --

6  I'll do 959.

7       For example, I'll point you to number -- I can point you

8  to Number 5.

9       If you recall the submission of the BLA in May of 2000 --

10  May 4th of 2020 --

11             **MS. ARCHER:**  Perhaps it would be best if we look at

12  the press releases themselves, if this is an issue, or --

13             **THE COURT:**  Or whatever the basis --

14             **MS. ARCHER:**  Yeah.

15             **THE COURT:**  Let me just ask you, Mr. Denis, before we

16  break, what specifically were you looking at when you were

17  looking at the statement to which you were going to determine

18  if there was an effect?  Were you looking at the indictment, or

19  were you looking at a press release, or both?

20             **THE WITNESS:**  I'm looking first at the indictment,

21  which is identifying --

22             **THE COURT:**  Correct.

23             **THE WITNESS:**  -- press releases.  I've looked at the

24  press releases as well.  But the indictment is identifying the

25  date on which I'm going to conduct the event study.

1       **THE COURT:**  And then you're going to look at the

2  primary source, the press release, the SEC filing, to determine

3  whether you can make a -- render an opinion as to its effect,

4  right?

5       **THE WITNESS:**  I look at those, and that will help me

6  determine whether there is so-called confounding information.

7       **THE COURT:**  Correct.  Okay.  So then with that, it

8  sounds like you all can use the break, because if you're going

9  to talk about these, you have to have --

10       **MS. ARCHER:**  Yes.  We could take a break now, I could

11  ask just two more questions about the -- the basis, and then we

12  can go into the specifics, if that's okay.

13       **THE COURT:**  Sure, if you can -- just so that you can

14  make use of your break, let's quickly, because I got to --

15       **MS. ARCHER:**  We can break now, then, that's fine.

16  Thank you.

17       **THE COURT:**  Okay.  Do you need to ask the question,

18  or no?

19       **MS. ARCHER:**  No, that's fine.  Thank you.

20       **THE COURT:**  All right.  Great.  We're going to take a

21  break until 1:00.

22    Mr. Denis, you are under oath.  Don't talk to anybody

23  about your testimony, or do any work.  Just take a break, and

24  we'll see you back here at 1:00.

25    Okay.  Thanks so much.

 1          **DEPUTY CLERK:**  All rise.  This Honorable Court now

 2  stands in recess.

 3      (Recess taken.)

 4          **DEPUTY CLERK:**  All rise.  This Honorable Court now

 5  resumes in session.

 6          **THE COURT:**  All right, everyone.  You all can have a

 7  seat.

 8      Mr. Denis is in the witness box.  We are ready to go,

 9  whenever you're ready, Ms. Archer.

10          **MS. ARCHER:**  Thank you.

11      Your Honor, we've marked as government exhibits some of

12  the documents, which I'll lay a foundation for it, that are on

13  the -- that are events that were analyzed.

14      But I would like to -- I've passed copies up for the

15  Court, and they are being marked as Government Exhibits 1 and

16  2.  This will be 1, this will be 2.

17      I apologize for the delay.

18  **BY MS. ARCHER:**

19  **Q.**   Okay.  Professor Denis, we were discussing confounding

20  events.  And as part of your events, you looked at 14 press

21  releases, correct?

22  **A.**   That's correct.

23  **Q.**   And you also identified some confounding events; is that

24  correct?

25  **A.**   That's correct also.

1   **Q.**   How did you identify confounding events?

2   **A.**   Well, I searched for other press outlets to see if there

3   was other news that came out on that particular day.

4   **Q.**   Did you look at any other days when evaluating whether

5   there were confounding events, or only events on the same day?

6   **A.**   Not necessarily events on that day, but events that would

7   be captured in the price on that day.  So, for example, if it

8   was something that was released over the weekend, I wouldn't

9   be -- I'd be incorporating -- the presumption would be that

10  would be incorporated into the price on Monday, or the next

11  trading day if Monday was not a trading day.

12  **Q.**   Okay.  Did you do that search on the same day of each of

13  the press releases for all 14 events that you analyzed?

14  **A.**   I don't believe so.  I think I was focusing mostly on

15  those that appeared to be statistically significant.

16  **Q.**   So did you for every -- is it -- when you say that, do

17  you -- are you -- is it -- can you explain, did you -- did you

18  do an analysis for each piece of news on the same day as the 14

19  press releases?

20  **A.**   I did an analysis of the stock price change on each of

21  those 14 days.

22  **Q.**   So my -- what I'm trying to determine is how you

23  identified confounding news that you identified in your study.

24       Did you look at every press release and see if there were

25  any other news stories that could be confounded -- considered

1  confounding news?

2  **A.**   I don't believe so, because the question I'm addressing is

3  whether the alleged misstatements that had been made had a

4  significant impact on the stock price.  So if I look at a

5  particular day, and I don't observe a significant stock price

6  change, then I've answered that question already.

7      If I do observe a significant stock price change, then I

8  need to dig a little bit more to determine whether there was,

9  perhaps, confounding information that could have caused that

10  change.

11  **Q.**   Okay.  So as an initial matter, you're only looking at --

12  you're looking only for confounding news where there could be a

13  statistically significant return; is that correct?

14  **A.**   I'm investigated only in those cases in which I did

15  observe a significant return on that event date.

16  **Q.**   Okay.  Let's look at some -- let's look at some specifics,

17  and maybe that will help us understand.

18      Can we please turn to Tab 6.  It's Defense Exhibit 959.

19  **A.**   Okay.

20  **Q.**   So, for example, can you give us an example of what you're

21  describing here, where something would trigger you to go

22  looking for -- one of these press releases would trigger you to

23  go looking for confounding events?

24  **A.**   You're asking can I give you an example, was that the

25  question?

1   **Q.**   Is Number 4 an example where you would have a reason to go

2   looking for a confounding event?

3   **A.**   No, because if the question is did the press release on

4   April 27th of 2020 result in a statistically significant change

5   in the stock price on that day, the answer is no.

6   **Q.**   Okay.

7   **A.**   That question is asked and answered then.

8   **Q.**   And did you -- but you did identify statistically -- you

9   did identify a confounding event that was relevant to your

10  analysis of that particular press release on April 27th?

11  **A.**   I think that may be correct.

12  **Q.**   So what is the standard for when you identify a

13  confounding event and when you choose not to go looking for

14  confounding events?

15  **A.**   Well, it depends on what the question is that you're

16  asking.  So if the question is did a particular announcement

17  have a significant impact on the stock price that day, and

18  you're looking at daily returns, if you have a statistically

19  insignificant stock price reaction, then that answer is no.

20  **Q.**   So for Number 4, for the April 27, 2020, press release,

21  you determined that that was not a statistically significant

22  abnormal return?

23  **A.**   That's correct.

24  **Q.**   Okay.  But in the course of preparing your event study,

25  did you assemble a table identifying the confounding events

1  that you took into consideration?

2  **A.**   On that particular day, or in general you're asking?

3  **Q.**   In general.

4  **A.**   Yes, I did.

5  **Q.**   Okay.  And that's -- we -- that is Exhibit 173-3.

6         **THE COURT:**  I think it's dash four.

7         **MS. ARCHER:**  And you identified a confounding --

8         **THE COURT:**  173-4.

9         **MS. ARCHER:**  Thank you very much.

10        **THE COURT:**  Do you have a copy of that, Mr. Denis, in

11  front of you?  Yes, great, it's on the screen.

12        **THE WITNESS:**  Oh, okay.  On the screen.

13        **MS. ARCHER:**  Okay.

14  **BY MS. ARCHER:**

15  **Q.**   Can you explain how -- what did you determine about the

16  confounding news on April 27th, 2020?

17  **A.**   What I -- well, I think the -- the press release itself,

18  the column titled press release is summarizing the alleged

19  misstatement that's contained in the press release.

20        What I determined is, that on that particular day, there

21  was also an investor call that took place in the afternoon of

22  that day.  And that investor call, you know, focused on

23  leronlimab, I hope I'm pronouncing that correctly, as a COVID

24  treatment.

25  **Q.**   Did the investor call also discuss the press release, the

1  substance of the press release that was filed on that day,

2  that's the filing of the completed BLA?

3  **A.**    I think a portion of the call did -- did talk about that.

4  **Q.**    Okay.  And is it your testimony, is that an example of a

5  situation where you're unable to attribute the significance of

6  particular events to the movement in the stock price because

7  there -- you couldn't separate them?  Segregate them?

8  **A.**    I think that's an example of one in which if you looked at

9  the daily return, if you're to find it to be statistically

10 significant, as I've described before, you would be unable,

11 using that daily return, to discern whether that is due to the

12 press release itself or some other information that is conveyed

13 in the investor call.

14 **Q.**    Okay.  So in this example, there really was no need to

15 look for confounding events because you had determined that the

16 April 27th press release was not statistically significant?

17 **A.**    What I determined is that the stock price change on that

18 day is statistically insignificant, so you could not conclude

19 that the press release led to a significant change in price.

20 **Q.**    And on that day -- and you identify it here as well in the

21 Exhibit 959, you noted that there was a 12 percent increase in

22 the price that the CytoDyn stock was trading?

23 **A.**    On April 27th, yes.

24 **Q.**    And that was not statistically significant?

25 **A.**    That was not.

*CROSS OF DAVID DENIS BY MS. ARCHER*

1  **Q.**   And with respect to the issue related to there being

2  multiple issues that you're unable to isolate, are there

3  methods that you're familiar with in the literature to be able

4  to disaggregate that and attribute movement in the stock price

5  to a certain event?

6  **A.**   You could conceivably not use daily returns but use

7  intraday returns.

8  **Q.**   So the selection of the daily one-day return contributes

9  to not being able to isolate the cause of the movement in the

10  stock price?

11  **A.**   I don't know if I'm answering exactly what you're asking

12  or not, but I think when I was referring to that before, I'm

13  speaking of using daily returns in the event study methodology.

14  If you're using daily returns, and you have multiple pieces of

15  information, the daily return itself is not going to allow you

16  to draw an inference about one of those pieces of information.

17  **Q.**   Okay.  The choice to use daily returns is a methodological

18  choice that was made by you in conducting the study, right?

19  **A.**   It is a methodological choice, is the typical choice, yes.

20  **Q.**   You could have used a different -- you could have used a

21  two-day return or a three-day return?

22  **A.**   I could have used multiple-day returns, sure.

23  **Q.**   Did you consider the fact that many of the events that you

24  were analyzing had multiple issues that had to be disaggregated

25  in order to make that determination about what a

1  significantly statistic -- let me just stop there.

2      Did you consider using the fact that the -- many of the

3  events that you were analyzing had multiple issues in selecting

4  the one-day return?

5  **A.**   No.  I think the question I was -- I was asked to assess

6  is whether those press releases that are at issue here as

7  alleged misstatements, whether those are associated with

8  significant stock price changes on those days.

9  **Q.**   But because you selected a one-day return, you are unable

10  to make a conclusive and reliable opinion about which of the

11  events, if any, moved the stock price?

12  **A.**   What I can say is that the stock price itself did not move

13  significantly on that day.  That's the conclusion I'm reaching.

14  **Q.**   Let's take a look -- so 12 percent, in your opinion, is

15  not a significant movement?

16  **A.**   Scientifically, it is not statistically significant.

17  **Q.**   Okay.  Turning back to the Exhibit 959, I would like to

18  ask you a question.

19      Please compare here Line Number -- Item Number 5, which is

20  a May 4th, 2020, press release, which is the abnormal return

21  was -- is a negative 12.6 percent.  And Line Number 10, which

22  is a December 22nd, 2020, press release, and is also -- has an

23  abnormal return of a negative 12.6 percent.

24  **A.**   Correct.  I see that.

25  **Q.**   Explain why the -- why the statistical significance for

1    these two events is different, where the percentage decreased

2    and the stock price is the same?

3    **A.**    This goes back to the issue we were talking about before

4    the break, is that in -- in estimating the parameters of the

5    model, you're estimating those parameters over the three months

6    prior to the event.  So it's a rolling window across the

7    different events.

8        So the three-month period prior to the first on the

9    May 4th, 2020, event is different than the three months prior

10   to the December 22nd event.  So the fact that the same abnormal

11   return in quantitative measure is statistically significant at

12   the 10 percent level in one and not significant at all in the

13   other reflects the fact that the volatility of those abnormal

14   returns has changed over that time, and the methodology

15   incorporates that difference in volatility.

16   **Q.**    So is it possible that there was increased volatility

17   further into the fraud in this case, and that's -- and that's

18   what is attributed to the difference?  You're saying it's the

19   amount of the volatility?

20   **A.**    This would imply that there's been a decrease in the

21   volatility.

22   **Q.**    Okay.

23   **A.**    In the three months prior to December of 2020 relative to

24   the three months prior to May 4th.

25   **Q.**    So there is more volatility around the press release that

1  said CytoDyn claimed it submitted a completed BLA than there is

2  in -- later -- the later time period?

3  **A.**    No, I wouldn't characterize it that way.  It's not the

4  volatility around the alleged misstatement itself, it's the

5  volatility in the three months prior to that.

6  **Q.**    Okay.  So in the three months prior to April 27th, 2020,

7  there's more volatility than in December 22nd, 2020, in the

8  three months prior?

9  **A.**    You say April 27th.  I think you meant May 4th?

10  **Q.**    Yes.  Thank you.

11  **A.**    But, yes, that's to imply that in the three months prior

12  to May 4th, the volatility of the abnormal returns that are

13  calculated in those three months prior to the event is greater

14  than the volatility prior -- of the abnormal returns prior to

15  December 22nd of 2020.

16  **Q.**    So would you expect to see a difference in the

17  significance of those two -- of those two events if you had

18  chosen a longer time period?

19  **A.**    I would suspect I would, simply because I observed in the

20  data that the volatility is changing a lot over this period of

21  time.  So even if you chose a longer time period, these are not

22  a hundred percent overlapping time periods at all, since we're

23  talking about, what, seven months-plus between these two

24  events.

25        So the volatility is changing over time, that's going to

 1  be reflected in your event study parameter estimates, and

 2  that's what gets reflected in the significance level.

 3  **Q.**   So do you -- without having analyzed the difference

 4  between a one-year period or a three-month period, are you --

 5  are you guessing?  Are you guessing that it would be the

 6  same -- it would be just as accurate?  Or is there more to

 7  that?

 8  **A.**   I think it's more in the sense that I'm directly observing

 9  what the volatility is in the data.  And because I'm observing

10  that increase in the volatility, that's informing my decision

11  to use the three months as opposed to something longer.

12  **Q.**   But you could have chosen one year, and you didn't?

13  **A.**   I could have chosen five years, and I didn't.  I could

14  have made lots of choices.

15  **Q.**   Yes.  Okay.

16       With respect to the confounding events, so with respect to

17  the April 27th, you determined there was no statistical

18  significance, right?

19  **A.**   April 27th?

20  **Q.**   Yes.

21  **A.**   That's correct, yeah.

22  **Q.**   And with respect to -- which of these events did you

23  determine where there was a statistical significance?

24  **A.**   It's not showing up on the -- on my screen, but down

25  towards the bottom.  March 5th and March 30th.

*CROSS OF DAVID DENIS BY MS. ARCHER*

1  **Q.**   Okay.  So let's take a look at March 5th.  So that's a

2  2021 press release, right?

3  **A.**   That's right.

4  **Q.**   So on March 5th of 2021, you analyzed a press release

5  reporting the COVID trial results.  And what was the level of

6  statistical significance that you identified?

7  **A.**   This is significant at the 1 percent level.

8  **Q.**   Where -- is that a high degree of confidence?

9  **A.**   Yes, it is.

10 **Q.**   And so you determined that the price drop of 30 percent,

11 30.8 percent was a significant event?

12 **A.**   I did, yes.

13 **Q.**   And I would like to point your attention on that Line 12,

14 where it says in parentheses, "but subsequent March 6th press

15 release indicates that this result is not statistically

16 significant."

17      What -- what do you mean by that?

18 **A.**   That's referring to the denouncement itself, the press

19 release is announcing the decrease in mortality in COVID-19

20 trials that they are conducting.  As I recall, the press

21 release itself doesn't directly say something about statistical

22 significance, but subsequently, in the March 6th release, it's

23 clear that that decreased mortality is not statistically

24 significant.

25 **Q.**   You --

1  **A.**   So it's referring to the trial as opposed to the stock

2  price reaction, that's what I'm saying.

3  **Q.**   So you're referring to the substance of the two press

4  releases?

5  **A.**   I am.

6  **Q.**   Okay.  So was the -- you're identifying a press release

7  on -- on March 6th, the day after the March 5th press release,

8  as being somewhat of a corrective disclosure in saying we

9  previously reported that this was statistically significant,

10  and we're correcting and saying it's not.

11      Is that your testimony?

12  **A.**   I'm saying that that's what it appears to be -- the

13  combination of those two statements, yes.

14  **Q.**   And based on that corrective disclosure, you determined

15  that the original press release was not statistically

16  significant?

17  **A.**   No, I did not make that determination at all.

18  **Q.**   What do you mean when it says the subsequent March 6th

19  press release indicates this result is not statistically

20  significant?

21  **A.**   It's referring to the -- the --

22  **Q.**   The content?

23  **A.**   -- the COVID-19 trial itself.  It's not referring to the

24  event study result.

25  **Q.**   Okay.  Thank you for clarifying that.

1    So you did, though, identify this as a confounding event

2  on March 6th; is that correct?  And I'm turning back to the

3  exhibit that's marked 173-4, and it's Line 3.

4  **A.**    Line 3?  I'm -- I'm not sure what you're pointing to, when

5  you say Line 3.

6  **Q.**    This is the March 5th, 2021, press release, that, as you

7  described, said that the COVID-19 clinical trial results

8  demonstrated statistically significant results.

9    And then in the confounding news column, you've identified

10  a press release the subsequent day, which corrected the prior

11  disclosure as a confounding news event.

12  **A.**    Right.  So I'm identifying as confounding in the sense

13  that the first announcement is actually being released after

14  the market closes on March 5th.

15  **Q.**    Would that be considered a corrective disclosure?

16  **A.**    The March 5th announcement?  No.

17  **Q.**    The March 6th announcement correcting the prior

18  misstatement, misrepresentation, is that a corrective

19  disclosure?

20  **A.**    I'm not treating it as a corrective disclosure per se, I'm

21  just simply observing that this is a potentially

22  information-relevant event as well.  And that and the March 5th

23  press release are going to influence the price that we see on

24  Monday, the 8th.

25  **Q.**    Would you agree that corrective disclosures are relevant

1    in event studies?

2    **A.**   Depends on the context.

3    **Q.**   Why isn't it relevant in this particular context?

4    **A.**   Why is it irrelevant?

5    **Q.**   Yes.

6    **A.**   I'm not saying it's relevant or irrelevant in this

7    context.  I'm saying that on this particular day, there is a

8    significant stock price reaction.

9    **Q.**   And what is the significance of noting that there's a

10   confounding event?

11   **A.**   I simply -- to the extent that there is a confounding

12   event -- and again, I'm repeating myself, but to the extent

13   that there are confounding events, return is measured over one

14   day, cannot necessarily ascribe that significant stock price

15   change to an individual piece of information.

16   **Q.**   So what is the opinion -- what is your opinion as to the

17   impact of these two events on CytoDyn stock price?

18   **A.**   My opinion is that the totality of information that was

19   released from between the close of trading on March 5th and the

20   open on what would be Monday, March 8th, has a significant

21   impact on the stock price of CytoDyn.

22   **Q.**   Okay.  And are there -- were there other examples where

23   you identified corrective disclosures or attempted to identify

24   corrective disclosures as part of your analysis?

25   **A.**   I think all the examples of -- I'm sorry, you said

1  corrective disclosures?

2  **Q.**    Yes.

3  **A.**    No, I didn't do any search for corrective disclosures per

4  se.

5  **Q.**    So if there were corrective disclosures, could that have

6  impacted your analysis?

7  **A.**    No, in the sense that what I've been asked to do is to

8  assess the alleged misstatements themselves, and that's what

9  I've done.

10 **Q.**    Generally speaking, you're looking at a one-day event,

11 though, correct?

12 **A.**    I'm looking at a one-day event window.

13 **Q.**    Is it relevant in an event study if there are multiple

14 days of -- if there's a continuing event, disclosure-related

15 event that could impact the stock price?

16 **A.**    I mean, if I were asked to assess the value relevance of

17 that particular press release, then, yes, I would do it the

18 same way.

19 **Q.**    So on this particular example, it was -- you looked at --

20 you looked at a multi-day event, but your -- the way you

21 conducted the study, that was not something that you did for

22 each and every example that you looked at?

23 **A.**    No.  To be clear, this example is not different than the

24 rest of them.  This is a one-day return.  This is the return

25 from the close on Friday to the open on Monday.

 1      What this is noting is the fact that over the course of

 2  the weekend, there is other information that is released that

 3  may confound the original press release.  But it's still a

 4  one-day return just like every other.

 5  **Q.**   And despite the confounding event, you're able to say that

 6  there's a statistical significance?

 7  **A.**   That is a statistical statement, is there -- is there a

 8  significant change in the stock price on that day, and the

 9  answer is yes.

10  **Q.**   So in that particular example -- I'm still struggling with

11  the -- how you identified a confounding event and determined

12  whether that event, as in the example on the first line here,

13  impacted your ability to make a determination about the impact

14  of the first event.  And yet here, the confounding event did

15  not impact your ability to make a determination.

16  **A.**   I don't think that's a correct characterization.  I think

17  in both cases, I'm able to make a determination as to whether

18  on the day of the alleged misstatement, is there a significant

19  change in the stock price?  Because the first event, the answer

20  is no; the second event, the answer is yes.

21  **Q.**   Okay.  And you did not -- you did not identify -- you did

22  not analyze the confounding news events for statistical

23  significance; is that right?

24  **A.**   That's not quite correct in the sense that they -- they

25  are part of the information set that's being released on that

 1  day.  It's the total information that's being impounded into

 2  the price on that day.

 3  **Q.**    Did -- so the -- did you analyze whether this Saturday,

 4  March 6th, press release saying that the COVID-19 clinical

 5  trials failed to meet -- they were not successful, did you

 6  analyze what the impact was of that press release on the stock?

 7  **A.**    That press release itself, I'm not able to using the daily

 8  return, because it's confounded by other information.  So I can

 9  observe that on the day that that information is released,

10  there is a significant negative stock price return.  I can't

11  point to that particular piece of information as being

12  determinative of that stock price change.

13  **Q.**    Okay.  So the -- at least in that example, due to the

14  parameters set forth in the study, that is -- you did not make

15  a determination as to whether the press release on the 6th,

16  which corrected the prior false statement, was significant?

17  **A.**    Yeah, that's correct.

18  **Q.**    Okay.

19        **MS. ARCHER:**  Can I just take a moment, please?

20        **THE COURT:**  And while you're doing that, can I ask

21  Mr. Denis a question about volatility?

22        **THE WITNESS:**  Sure.

23        **THE COURT:**  All right.  I think I understand that

24  what -- your testimony is that you corrected for the volatility

25  that you observed in the CytoDyn stock by shortening the

1    estimation period; is that right?

2            **THE WITNESS:**  That's essentially correct.  I've

3    corrected -- or I've taken into account, I think is a better

4    way to say it, I've taken into account any shifts in volatility

5    over time.

6            **THE COURT:**  And that's based on what -- what you say

7    in your report is a sustained sharp increase in volatility for

8    this stock between late 2019 to mid 2021?

9            **THE WITNESS:**  Correct.

10           **THE COURT:**  And so that means that the rate of

11   volatility was the same for this company over that entire

12   period?

13           **THE WITNESS:**  No, it doesn't mean that.

14           **THE COURT:**  Okay.  What does it mean?

15           **THE WITNESS:**  It just means that the increase in

16   volatility that took place starting in late 2019, it continued

17   to be unusually high into 2021, although the level of that

18   volatility moves, even during that 2019 to 2021 period.  And

19   that's why, for each event date, I'm moving the event window to

20   be three months before that one to take into account whether

21   volatility has gone up further, or maybe it's come back down a

22   little bit, that the methodology accounts for that.

23           **THE COURT:**  So the reason why I ask is because my

24   understanding is that the stock market generally experienced

25   episodic increases in volatility because of the pandemic,

1    right?

2              **THE WITNESS:**  Uh-huh.

3              **THE COURT:**  Yes?

4              **THE WITNESS:**  That's correct.

5              **THE COURT:**  Just for Ms. Leeper's --

6              **THE WITNESS:**  I'm sorry.  I've been good about that

7    so far.

8              **THE COURT:**  But the rate of volatility changed?  In

9    other words, it wasn't the same rate of volatility over the

10   period of time that -- that you and I are talking about?

11             **THE WITNESS:**  That's correct, for the market or for

12   CytoDyn in particular.

13             **THE COURT:**  Now, if the window of the estimation

14   period changes based on volatility, why are you using a

15   constant rate of change for all of the statements over the 2018

16   through 2021 without any adjustment for the decrease in

17   volatility?

18             **THE WITNESS:**  I'm not using a constant rate of

19   change.  I'm allowing that volatility to change for each event

20   based on the estimation window that's three months prior to

21   that event.

22        So if we're talking about March of 2020, I'm looking at

23   December, January and February of the prior three months

24   estimating volatility during that time.

25             **THE COURT:**  Right.

*CROSS OF DAVID DENIS BY MS. ARCHER*

1        **THE WITNESS:**  And then assuming that that volatility

2    applies to the March event -- March announcement.

3        **THE COURT:**  Okay.

4        **THE WITNESS:**  If I move forward to December, then I'm

5    using September through December estimating volatility for that

6    period, and assuming that one more day forward, that's constant

7    relative to the last three months.

8        **THE COURT:**  But if I understood your testimony

9    earlier, you said the estimation window is a tradeoff, longer

10    estimation, more data, but less confidence because of changes

11    to this particular --

12        **THE WITNESS:**  Yep.

13        **THE COURT:**  And volatility is one of those changes,

14    right?

15        **THE WITNESS:**  Yes.  It's a big one here.

16        **THE COURT:**  Okay.  Right.  So if you have a period

17    between 2018 and 2021 where the rate of volatility decreases,

18    for that period to get a better dataset, couldn't you use a

19    longer confidence period?  Or a longer estimation period,

20    because you don't have as much volatility?

21        **THE WITNESS:**  Well, if it decreased, then if I use a

22    longer estimation period, I'm going back further -- and then I

23    would be picking up part of that estimation period is a period

24    that had higher volatility.  And that becomes my estimate of

25    volatility.  And that's --

*CROSS OF DAVID DENIS BY MS. ARCHER*

1          **THE COURT:**  I guess what I'm trying to get at, that's

2    assuming that there is these troughs and peaks of volatility

3    that I'm not yet seeing in the record.  So, for example, your

4    testimony, or what -- you know, what we've been given in this

5    report is that there was a sharp and sustained increase in

6    volatility beginning late 2019 through mid 2021.  And you're

7    saying that the data would show, for CytoDyn, a sharp and

8    sustained -- in other words, there weren't any fluctuations in

9    the rate of volatility, it was always high for three years?

10          **THE WITNESS:**  There are changes in that volatility,

11   but over that three-year period, regardless of those

12   fluctuations, it's higher than it was prior to that point in

13   time.  So, let's say, you know, prior to late 2019, the

14   volatility is, you know, roughly 30 percent.

15          **THE COURT:**  Okay.

16          **THE WITNESS:**  And I know that number doesn't

17   necessarily mean anything, but I'm just using it.

18          **THE COURT:**  No, it's a relative.

19          **THE WITNESS:**  It's a relative number.

20          **THE COURT:**  Yeah.

21          **THE WITNESS:**  And then we see starting in 2019, it

22   jumps up to, say, 50 percent, and then it moves between, you

23   know, 50 and 70 percent over the next two years.  So that whole

24   period, it's sustained at a higher level, but the level itself

25   changes during that interval of time.  And it's those changes

 1  that I'm trying to pick up by the -- by the estimation window

 2  moving through time.

 3              **THE COURT:**  I think I understand.  Okay.  Thank you.

 4              **THE WITNESS:**  I should probably use some graphs to

 5  make this clearer.

 6              **THE COURT:**  Right.  It would be helpful if you -- if

 7  we had the underlying data.

 8              **THE WITNESS:**  That underlying data has been produced,

 9  by the way, the stock price changes itself.  You can see that

10  in the event study data that's been released.

11              **THE COURT:**  Where would I find that?

12              **THE WITNESS:**  It's part of the production to the

13  government, all of the data and event study methodology itself.

14              **THE COURT:**  Do I have that?

15              **MR. TWEEN:**  No, Your Honor, but we can -- we can

16  certainly get you a set of that production.

17              **THE COURT:**  But it was produced to the government?

18              **MR. TWEEN:**  It was produced in June to the

19  government, yeah.

20              **THE COURT:**  Okay.  All right.

21  **BY MS. ARCHER:**

22  **Q.**   Professor Denis, did your methodological approach to this

23  event study factor in that the conduct at issue is a scheme

24  that took place over a prolonged period of time?

25  **A.**   I'm not making any judgment as to whether there's some

1    scheme involved or not.  The methodology is taking into account

2    simply what are the event days, what I observed in the data

3    about, you know, volatility and other parameters that have to

4    be estimated.

5    **Q.**  So you did not consider the fact that there could be

6    multiple events over several days or weeks that were related

7    and could impact the price in a statistically significant way

8    if you had looked at it in that way as opposed to a one-day

9    return?

10   **A.**  If there were some allegations of specific events and

11   misstatements, I would have analyzed those events.  But I --

12   I'm analyzing the totality of alleged misstatements that were

13   provided to me through the indictment.

14   **Q.**  So you -- you looked at isolated alleged false statements?

15   **A.**  I looked at the specific set of 20 that I referred to

16   before.

17            **MS. ARCHER:**  Okay.  I have no further questions.

18            **THE COURT:**  Okay.  Mr. Denis, I'm -- I have

19   questions.  I want to go back.  Earlier, you did testify that

20   you would say to a reasonable degree of certainty in your field

21   that the market was efficient.  Can you just for -- describe

22   for me the data and the evidence that would support your

23   position?

24            **THE WITNESS:**  Okay.  Sure.

25        So the starting point, I think, is the general academic

1  evidence on the efficiency of markets for publicly traded

2  securities, and that would include the OTCQB market.  And that

3  evidence would suggest that these markets are efficient.

4       **THE COURT:**  And that comes -- does that come from any

5  published peer-reviewed literature?  Or where does that --

6       **THE WITNESS:**  Correct, that's peer reviewed

7  literature is what I'm referring to there.

8       **THE COURT:**  Okay.  And that would be to validate that

9  the OTCQB market is generally an efficient market?

10      **THE WITNESS:**  Correct.  In general, the market

11 itself.

12      **THE COURT:**  Okay.

13      **THE WITNESS:**  And that market consists of a whole set

14 of different stocks.  And so there's potentially a separate

15 question as to whether one stock on that market is -- is

16 efficiently traded or not.

17      **THE COURT:**  Right.

18      **THE WITNESS:**  And that's where the Cammer-Krogman

19 factors and an additional couple of other factors that I

20 analyzed come into play.

21      So you would look at indicators, volume of trade, bid-ask

22 spreads, analyst following, ability to file an S3, market cap,

23 serial correlations, returns.  All of these are individual

24 indicators that tend to be correlated with efficiency.  And I

25 think for some of the reasons I described before, none of them

1    by themselves point to one way or the other.  I think I used

2    the example of, just because you don't see high volume of

3    trade, that wouldn't mean the market is inefficient, because

4    you don't need a trade in order for information to be

5    incorporated.

6         Or if you observed that you had high bid-ask spreads in a

7    market, that wouldn't mean that it's inefficient, especially if

8    you could also observe that it did have lots of volume of

9    trade.  It would be hard to believe that a market with high

10   volume of trade could be inefficient in that scenario.

11        And so I've analyzed each of these different factors, many

12   of which point towards consistency with efficiency, a couple of

13   which don't.  I think the analyst following was one, and there

14   is a period in 2020 in which the returns of CytoDyn are

15   serially correlated.  And then there's a couple of indicators

16   that I simply wasn't able to analyze for data reasons.

17             **THE COURT:**  When you say for data reasons, what do

18   you mean by that?

19             **THE WITNESS:**  There's two reasons, really, in the

20   data that I attempted to analyze.  One -- one potentially

21   important test is sort of a cause-and-effect relationship

22   between information disclosed and price changes, which in prior

23   years, is a pretty good test.  But the way that's implemented

24   in practice is when there are known events, known dates on

25   which new information is going to be released, like earnings

1  announcements or dividend announcements.  So you know that's

2  coming, you can then observe does the stock price move on those

3  days in a quick and efficient manner?

4          **THE COURT:**  Okay.

5          **THE WITNESS:**  Can't do that in this case, because

6  this is a pre-revenue company that doesn't have earnings

7  releases and dividends releases.  So you can't do that same

8  sort of analysis.  So that's one reason why data is getting in

9  the way.

10      The other is more of a time and expense, a matter to

11  investigate the extent to which there are market makers and

12  arbitragers, or to look at the bid-ask spreads of CytoDyn that

13  requires acquiring some additional data, which, given the time

14  in doing this exercise, elected not to do, largely because it

15  seemed like the rest of the evidence was pointing me towards

16  efficiency anyway.

17      And so, you know, if it looked like bid-ask spreads were

18  wide, for example, but I'm already observing that there's a

19  high volume of trade, then it doesn't appear that the

20  widespread is precluding any trade, which would then not

21  preclude information from getting impounded into the price.

22      So -- and that's a judgment call on my part that I chose

23  not to pursue that data, because I just didn't think it would

24  make any difference.

25          **THE COURT:**  So if I'm getting it right, it's the peer

1  literature on OTCQB being an efficient market generally, the

2  ten factors that you discussed in your supplement.

3      Is there anything else, just so that I've covered the

4  waterfront with you on the basis for your opinion?

5          **THE WITNESS:**  The only other thing I would point to

6  is that in analyzing these event days themselves, it looks like

7  when there is -- when there is information that is released,

8  that appears, I suppose, to be statistically significant, it

9  does seem to be impounded in the price quickly.  So that's, I

10 guess, somewhat indirect evidence that it looks like it's

11 efficient.

12         **THE COURT:**  I see what you're saying.

13     And this opinion, because there was some conversation

14 about -- at least for one of the Cammer factors, it was limited

15 to a 2020 window, but the opinion you're offering, are you

16 limiting it to any given year, or would you hold the same

17 opinion for the indictment period, which is 2018 to 2020?

18         **THE WITNESS:**  I'm holding it for the entire period

19 that covers the events that I'm analyzing using the events

20 study methodology.

21         **THE COURT:**  Okay.  All right.  I think that was it

22 for me.

23     Anything else from the government responsive to my

24 questions?

25         **MS. ARCHER:**  No, Your Honor.

1        **THE COURT:**  Before I turn to the defense for anything

2   else?

3       All right.  Mr. Tween, whenever you're ready.

4        **MR. TWEEN:**  Okay.  Your Honor, we have nothing

5   further.

6        **THE COURT:**  Okay.  All right.  Well, then that will

7   wrap up the hearing with respect to the event study.  And so

8   why don't we turn to the next question, which you're going to

9   handle, Mr. Lurie?

10        **MR. LURIE:**  Thank you.  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12  **BY MR. LURIE:**

13  **Q.**   Good afternoon, Professor Denis.

14  **A.**   Good afternoon.

15  **Q.**   I'm going to take you back to when you first started

16  testifying today about your qualifications.  Do you remember

17  that?

18  **A.**   I do.

19  **Q.**   And during that part of your testimony, you focused on

20  your corporate finance experience.  Do you remember that?

21  **A.**   Uh-huh, yes, I do.

22  **Q.**   Now I would like you to explain to the Court what

23  expertise, if any, you have on the issue of incentive

24  compensation for executives.

25  **A.**   Well, this is a topic I've studied personally as a

1  scholar.  It's a topic I've taught in the classroom many times.

2  I've done a little bit of consulting on that as well.

3  **Q.**  Can you talk more about your consulting experience?

4  **A.**  It's twofold.  I think one is sort of put a value on some

5  incentive compensation plans, and another is to basically

6  produce a white paper on the -- on the use of incentive

7  compensation, situations in which it's useful and the types of

8  companies that would benefit from it.

9  **Q.**  And please describe the kinds of clients you perform this

10 consulting work for.

11 **A.**  This was actually for a consulting organization that sort

12 of outsourced that position paper to me.  I think they were

13 using it for a specific litigation, but I was not privy to that

14 information.

15 **Q.**  And if you said this, forgive me, but do you teach

16 students about the issue of incentive compensation?

17 **A.**  I do.  On a limited basis to the master's students, the

18 MBA students and Master's of Finance students, but on a more

19 detailed basis to the Ph.D students.

20 **Q.**  These are students -- excuse me, with respect to the

21 master's students, what kind of degrees are they pursuing?

22 **A.**  Either a Master of Business Administration, the MBA

23 degree, or a Master of Science and Finance.

24 **Q.**  Same question with respect to the Ph.D students.

25 **A.**  These are Ph.Ds, mostly in finance, although some of the

1  other disciplines on campus have the option to take the class.

2  So, periodically, I'll get someone from a different discipline

3  who takes the class if they have sufficient prerequisites.

4  **Q.**    Do you -- to what extent do you consider warrants to be

5  within the subject area of incentive compensation?

6  **A.**    Oh, they're very much in the area in the sense that they

7  are used to -- as part of the compensation package to

8  executives.  It's not the only use of warrants, but it's a

9  pretty large use.

10 **Q.**    Can you -- to the extent it's different, can you describe

11 what expertise, if any, you have with respect to the issuance

12 of warrants to executives?

13 **A.**    I think it's all part of the work on incentive

14 compensation that I've done over time, so both as a scholar and

15 as a teacher, as well as, like I said, on a limited basis, as a

16 consultant.

17 **Q.**    You -- I think I heard you correctly earlier, you

18 referenced you're familiar with literature with respect to

19 incentive compensation; is that right?

20 **A.**    That's correct, yes.

21 **Q.**    Can you describe for the Court more about that literature;

22 who writes it, where it's published, anything else that comes

23 to mind?

24 **A.**    I mean, it's a topic that fits into the general realm of

25 corporate governance, which is a subfield within corporate

1  finance.  All the leading academic journals have published lots

2  of articles on incentive compensation.  It's also a topic that,

3  as I've served as an editor of a couple different journals,

4  I've had to review many an article on incentive compensation.

5      The two handbooks that I've edited -- well, let me correct

6  this.  I was going to say both of them have elements of

7  incentive compensation, but I'm not positive about one of them,

8  so I'll say one of the two.

9  **Q.**  Do you have any expertise in any relationship between

10  corporate finance and incentive compensation?

11  **A.**  Well, the two are definitely intertwined.  To me, a big

12  part of corporate finance is analyzing the financial decisions

13  that executives and board members make, and in studying that

14  corporate governance has evolved as an important field in which

15  it gets the incentives of those individuals to make certain

16  decisions.

17  **Q.**  And specifically, Professor, what, if any, expertise do

18  you have on a company's issuance of warrants to executives?

19  **A.**  Well, I think through the research that I've done and

20  research that I've been party to as part of the an editor,

21  that's generated an understanding of the situations in which

22  warrants are used, the consequences of them being exercised,

23  and situations in which they would be exercised, there's, you

24  know, general expertise there.

25  **Q.**  Have you ever testified as an expert on issues related to

1    incentive compensation?

2    **A.**    I don't know that any of my testimony has directly

3    addressed that.

4    **Q.**    And with respect to the -- the books that you referenced

5    earlier, at least the one that you edited, who was the audience

6    for that -- that book, if you know?

7    **A.**    That book is designed to be one that young researchers,

8    like doctoral students, would be interested in to give them an

9    overview in the field.   This is a book on corporate

10   restructuring.

11        But it's also designed so that practitioners get a sense

12   of what is the academic research that might be relevant to

13   them.

14        So the goal is a combined audience.   I couldn't give you

15   figures as to the sales, as to -- you know, the distribution of

16   who bought the book, but that's the goal anyway.

17   **Q.**    Professor Denis, how, if at all, is your expertise on the

18   issue of incentive compensation relevant to a smaller company

19   like we're dealing with in this case?

20   **A.**    Well, I think the expertise is -- is -- goes to the issue

21   of what types of companies use an instrument like a warrant,

22   why do they use it, and what are the situations in which these

23   warrants are exercised and the consequences of doing so from a

24   financing perspective.

25   **Q.**    And do you have expertise about those particular issues

1  that you just described?

2  **A.**    Sure.

3  **Q.**    Is that any different expertise than you've already talked

4  about?

5  **A.**    No, I don't think so.  I think it's exactly what I've been

6  talking about.

7  **Q.**    Professor Denis, do you have -- what, if any, expertise do

8  you have in why executives exercise warrants?

9  **A.**    Well, the study of the warrants goes to a couple of

10  issues.  One is the pure incentive compensation component of

11  it, and the -- you know, it's essentially a stock option that's

12  held by the executive.  And, you know, a lot of the work I've

13  done and others have done are going to the optimal exercise

14  decisions of those who hold stock options.

15      The other component of it is the corporate financing

16  component of it, which, you know, my whole career has been the

17  study of corporate finance, so that the warrants are distinct

18  from other types of stock options in the sense that their

19  exercise produces a cash inflow to the company, and there's a

20  financing effect from the exercise of the warrant.

21      So, you know, the work I've done is, you know -- has

22  generated this understanding of this process, I guess is the

23  way I would put it.

24  **Q.**    You -- excuse me.  You used a phrase, something like the

25  optimal exercise of warrants.  Did I hear you right?

1   **A.**    I think I did use that phrase.

2   **Q.**    What do you mean by that?

3   **A.**    I mean to the extent that an individual holds a warrant,

4   it gives them the option to purchase a security at a certain

5   price on or before some sort of exercise date.  So they could

6   exercise it at any time during that -- during that interval.

7   And there's been a lot of work that's gone into, well, what is

8   the optimal exercise decision in the sense of what's going to

9   yield the greatest payoff to the individual who is holding that

10  option?

11  **Q.**    And do you have expertise on that particular -- that

12  particular issue, that optimal time period?

13  **A.**    Yes.

14  **Q.**    Again, is that expertise that you've already talked about,

15  or is there something else that relates to that particular

16  issue?

17  **A.**    No, I think it's the general expertise I've talked about

18  before with respect to incentive compensation.

19  **Q.**    This may be related, but I'm not sure.  What -- what

20  expertise, if any, do you have in whether or not executives

21  exercise warrants to fund a company's operations along the

22  lines that you've described?

23  **A.**    Well, I think I alluded to this before, is that warrants

24  are distinct from other types of options in the sense that

25  their exercise is a capital raising event.  So the study of

1  warrants has generated this understanding that this is a

2  consequence of the exercise in warrants.

3  **Q.**    Professor Denis, what, if any, expertise do you have in

4  the kinds of corporate governance processes, specifically

5  related to an executive's exercise of warrants?

6  **A.**    Well, I think, again, my expertise is generalized in that

7  in the corporate governance realm, that I have authored or

8  co-authored many papers in the corporate governance realm that

9  studies the process in which decisions are made within the

10  company.  So this would fall into that, that general category,

11  I think is the way I would put it.

12  **Q.**    Let me ask you a few specific questions about your

13  expertise.

14      What, if any, expertise do you have in a board of

15  director's involvement in an executive's exercise of warrants?

16  What expertise do you have on that issue, if any?

17  **A.**    Again, I think it's generalized in the sense of what

18  processes generally are within companies, what is normal board

19  procedures with respect to major decisions like that, and the

20  setting of compensation plans in general.

21  **Q.**    And what, if any, expertise do you have -- let me strike

22  that.  I'm just considering this for one moment.

23      Again, this may have been subsumed by some of your prior

24  answers, but I want to make it clear for the record.

25      So, Professor, what, if any, expertise do you have on the

1  issue of why a corporate executive may or may not exercise

2  warrants?

3  **A.**   Well, I think the -- the expertise that I've described

4  earlier is -- is generalized expertise about the conditions

5  under which warrants would be exercised and the timing of that

6  exercise.

7  **Q.**   By timing, you mean what, when?

8  **A.**   When.  When it's exercised relative to the entire interval

9  in which it could be exercised.

10  **Q.**   And Professor Denis, again, what, if any, expertise do you

11  have on -- in assessing -- again, with respect to the exercise

12  of warrants, whether or not that exercise is consistent or

13  inconsistent with the industry standard or the industry

14  standard of exercising warrants?

15  **A.**   Well, I think the -- the expertise that comes from the

16  knowledge of -- of my own studies and other studies of -- of

17  incentive compensation plans speaks to when it would be, quote,

18  unquote, optimal to exercise that -- that option from the

19  standpoint of the individual maximizing their payoff.  And so

20  that -- that, I think, informs that assessment of -- of an

21  exercise plan.

22  **Q.**   Professor Denis, I'm not going to get into the substance

23  of your opinion yet, but I want to direct your attention to one

24  portion of your opinion and ask you some questions about your

25  expertise, particularly related to that.  Okay?

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **A.**   Okay.

2  **Q.**   Would you agree with me that one portion of your opinion

3  addresses whether it is likely or unlikely that the exercise of

4  warrants is consistent or inconsistent with an effort to

5  finance company executives -- excuse me, company operations,

6  or, on the other hand, with a purpose to trade based on

7  material nonpublic information?  Would you agree that that is

8  one portion that your opinion addresses?

9  **A.**   That's correct.

10 **Q.**   How are you qualified to give an opinion on that issue?

11 **A.**   Well, I think it's a combination of the generalized

12 expertise we've been talking about, about why warrants are used

13 and the conditions under which they are exercised.  That,

14 combined with specific aspects of this matter that I gathered

15 through the -- through documents that I've reviewed in the

16 case.

17 **Q.**   The -- with respect to your -- the expertise you've talked

18 about, whether in literature, what you teach, all the

19 experience you've talked about, to what extent have you become

20 familiar with the behavior of executives in exercising

21 warrants?

22 **A.**   I would say very familiar in the sense that this is sort

23 of the nature of the studies that have been conducted.  You

24 know, at what point do they exercise the warrants?  What are

25 the consequences of doing so?

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **Q.**   And to what extent, if any, is that knowledge regarding

2  the behavior of executives in exercising warrants relevant to

3  your warrant opinion?

4  **A.**   Well, I think it's generalized information that, as I

5  said, I'm -- I'm matching up with the specific circumstances of

6  this case.

7  **Q.**   You're a professor -- have you -- okay.

8       **THE COURT:**  Yeah, I mean, now we're just doubling

9  back on the same information.  You got something new, let's do

10  it.  Otherwise --

11      **MR. ZELINSKY:**  We'll stipulate he's a professor.

12      **THE COURT:**  Okay.  Thank you.  He is a professor.

13  Next question.

14      **MR. LURIE:**  We'll also stipulate he's not a criminal

15  prosecutor, right?

16      **MR. ZELINSKY:**  As far as I know.  Sure.  Let's keep

17  it moving.

18  **BY MR. LURIE:**

19  **Q.**   Professor Denis, do you have any experience of observing

20  the behavior of executives involved in insider trading?

21  **A.**   Other than viewing studies that -- of alleged insider

22  trading, no.

23  **Q.**   But is -- is -- do you need experience observing the

24  behavior of executives involved in insider trading to render

25  your opinions, is that relevant to your opinions?

1    **A.**    I don't think so in this case.  I'm simply speaking to

2    what's normal industry practice and the extent to which -- what

3    I'm observing here is consistent with that or inconsistent with

4    that.

5    **Q.**    Okay.

6              **MR. LURIE:**  Your Honor, we would offer Professor

7    Denis as an expert on the issue of executive incentive

8    compensation, and especially the issuance and exercise of

9    warrants by company executives.

10             **THE COURT:**  Okay.  All right.  Voir dire?

11             **MR. ZELINSKY:**  Yes, please, Your Honor.

12             **THE COURT:**  All right.

13                         **VOIR DIRE**

14   **BY MR. ZELINSKY:**

15   **Q.**    Good afternoon, Professor Denis.

16   **A.**    Good afternoon.

17   **Q.**    My name is Aaron Zelinsky.  I'm one of the prosecutors in

18   the case.  Hopefully just a couple of quick questions, and I

19   want to start off where Mr. Lurie ended.

20       Have you ever interviewed anyone that has been convicted

21   of insider trading?

22   **A.**    I have not.

23   **Q.**    In your professional life, have you ever spoken to anyone

24   that's been convicted of insider trading?

25   **A.**    Not to my knowledge.

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **Q.**    In your professional life, have you reviewed trials of

2  individuals convicted of insider trading?

3  **A.**    Only to the extent they were described in the press.

4  **Q.**    And have you ever testified as an expert in any insider

5  trading case?

6  **A.**    I have not.

7  **Q.**    And have you ever written any scholarly works that focus

8  on the exercise of options in insider trading cases?

9  **A.**    No, I have not.

10         **MR. ZELINSKY:**  That's all we've got, Your Honor.

11         **THE COURT:**  Okay.  All right.  Well, I do find that

12  Mr. Denis does have expertise in the area of executive

13  compensation and the issuance of warrants generally.  And we'll

14  see where the testimony goes from there.

15      Okay.  So I do -- welcome again, you're admitted as an

16  expert in this area.

17         **MR. LURIE:**  Thank you, Your Honor.

18                **DIRECT EXAMINATION (CONTINUED)**

19  BY MR. LURIE:

20  **Q.**    Okay.  Professor Denis, what is a warrant?

21  **A.**    A warrant is -- is essentially a call option that gives

22  the holder the option to purchase a share of stock at a

23  specified price on or before a specified date.  The date is

24  called the expiration date of the warrant.

25  **Q.**    And earlier, your earlier testimony, you, in substance,

 1  described a warrant as it can be a corporate finance tool.

 2      Do you remember that?

 3  **A.**   I did.

 4  **Q.**   Why -- why is that?

 5  **A.**   Well, that's because, as I was referring to, the

 6  warrant -- the exercise of the warrant itself means that the

 7  holder of the warrant is purchasing shares of stock in the

 8  company at the prespecified price.  That purchase and the

 9  dollars that are used to purchase those shares are an inflow of

10  capital to the company that has issued the warrant.  In that

11  sense, it's a financing event.

12  **Q.**   And in your experience, how, if at all, do companies

13  compensate executives using warrants?

14  **A.**   Well, the warrants are used primarily as an incentive

15  compensation tool.  It's very common in -- in younger companies

16  and high growth companies that are not generating a lot of

17  current cash flow.  And so for them to pay -- pay their

18  executives at a level that the market demands, they don't

19  necessarily have the cash flow to do so.

20      So one -- one way around that is to pay a lower salary and

21  pay the executive in -- in types of incentive compensation like

22  warrants that will have hopefully, for the executive, a future

23  payoff.

24  **Q.**   Can you -- can you walk everybody, the Court through the

25  mechanics of exercising a warrant?  What happens?

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **A.**    Well, what happens is, is the executive decides they would

2  like to exercise the warrant.  And I'm assuming here we're

3  talking about executives that technically warrants could be

4  driven down through different levels of the corporation as

5  well.

6      The executive, because they are trading in shares of their

7  company at that point, they will generally run -- run this

8  through the board of directors.

9      And then the mechanics are simply that the executive is --

10  is -- is purchasing the shares from the company, so these are

11  new shares that are being issued.  So there's a flow of cash

12  from the executive to the company.  In return, the company is

13  receiving shares of stock.

14  **Q.**    And how, if at all, does an executive monetize this

15  transaction?

16  **A.**    Well, the executive then is holding shares of stock, and

17  they have to make the decision as to whether or not to sell

18  those shares.  If they wish to monetize it immediately, they

19  would sell those shares.  If they would rather hold the shares,

20  they are able to do so, monetize it at a later point in time.

21  **Q.**    Can you -- earlier, you referenced there are at least --

22  excuse me, let me start over again.

23      Earlier, you referenced that you have expertise in the

24  optimal timing to exercise shares.  Do you remember that?

25  **A.**    I did, yeah.

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **Q.**   Can you give some examples of when might be the optimal

2  time to exercise shares and suboptimal times to exercise

3  shares?

4  **A.**   Well, generally speaking, it's optimal to wait to exercise

5  an option, or a warrant in this case, until the expiration date

6  itself.  And the reason for that is that, you know, without

7  being too esoteric and mathematical about it, the value of the

8  option is worth more dead than alive -- sorry, worth more alive

9  than dead.

10      As soon as you exercise the warrant, you've distinguished

11  the option value of that warrant, the ability to cash in at a

12  later, higher price.

13      So generally speaking, the optimal exercise point is on

14  the expiration date itself, unless there's some extenuating

15  circumstance that would lead you to exercise early.  A typical

16  example that's given is a dividend-paying stock where the

17  dividend is going to reduce the value of the shares, and so it

18  might be optimal to exercise before that dividend is actually

19  paid.

20  **Q.**   To what extent is -- can capital gains tax factor into the

21  optimal time or suboptimal time to exercise warrants?

22  **A.**   Well, it can come into play to the extent that there is

23  going to be a difference between a short-term and a long-term

24  capital gain.  If exercising at an earlier point in time is

25  going to force the holder to incur a greater tax obligation,

 1    then that's going to lead them to choose, all else equal, a

 2    later expiration date.

 3    **Q.**    Professor Denis, I'm going to direct your attention to

 4    your warrant opinion.  And in particular, I'm going to focus

 5    your attention on the last sentence, which I'll read out loud,

 6    and I can put it on the screen if that would be helpful.

 7    **A.**    Okay.

 8    **Q.**    Accordingly, when most executives -- well, actually, let

 9    me do this differently.  I will put it up on the screen.

10          Just directing your attention to the middle of the page

11    that starts, "It is reasonable."

12          Do you see that block paragraph?

13    **A.**    I see that, yes.

14    **Q.**    Is that, at least, part of your warrant opinion?

15    **A.**    It is.

16          **THE COURT:**  Where are we?  Can you just -- can you do

17    it -- for the record, can you read it out loud?

18          **MR. LURIE:**  Thank you, Your Honor.  Thank you, Your

19    Honor.  Yep, I'm in Docket 174-1, and I'm on Page 1.

20          **THE COURT:**  The entire paragraph is what you're

21    pointing the witness to?

22          **MR. LURIE:**  Yes, Your Honor, from -- beginning with

23    "It is a reasonable," and ending with "to exercise warrants in

24    order."

25          **THE COURT:**  Okay.

1    **BY MR. LURIE:**

2    **Q.**    That's at least part of your warrant opinion, right?

3    **A.**    That's correct.

4    **Q.**    Okay.  And now, direct your attention to the top of Page 2

5    of the same document, Document -- excuse me, Docket Number

6    174-1.

7         Do you see the blocked paragraph continues?

8    **A.**    I do.

9    **Q.**    Is that the rest of your warrant opinion?

10   **A.**    That is.

11   **Q.**    Let me direct your attention to that last sentence,

12   starting "accordingly."

13        Do you see that?

14   **A.**    I do.

15   **Q.**    Let's start with this, Professor Denis.  Can you tell the

16   Court how you arrived at this conclusion, your methodology, and

17   how it is you arrived at it?

18   **A.**    Well, as the statement is making clear, it's a statement

19   about -- is, in general terms, of when most executives or board

20   members behave in a certain way.  So it's based, by and large,

21   on the evidence that I've seen and in -- and research, as well

22   as nonresearch settings that I've come across over the course

23   of my career.

24   **Q.**    Let me direct your attention to the word "unlikely."

25        You see my pen is pointing to it?

1   **A.**   Yes.

2   **Q.**   Okay.  Why is it unlikely that the conduct you're talking

3   about reflects a purpose to trade based on the possession of

4   material nonpublic information especially where such conduct is

5   also consistent with the company's corporate governance

6   processes, why is that unlikely?

7   **A.**   Well, I think there's two parts to that.  One is that

8   simply the general information I've talked about here talks

9   about -- or is getting at what is sort of standard practice for

10  the use of warrants.

11         And as the earlier part of the paragraph that you had on

12  the previous page is pointing to, that purpose is really

13  twofold.  One is to serve as an incentive compensation

14  mechanism for the executives, and the other is -- is for

15  purposes of being a corporate financing tool as well.  Those

16  two things are intertwined.

17         When you issue warrants to executives, you fully expect

18  that at some point, those warrants are going to be exercised.

19  And you know that when they are exercised, that's going to be

20  an event that raises capital for the company.

21         So to observe that those things happened, that there was

22  an exercise of warrants, and there was an infill of capital to

23  the company, just fits with standard industry norms.

24         And so if you observe that in an individual case, it seems

25  like the most plausible explanation is that this just sort of

1  fits the normal pattern.

2  **Q.**   And then let me direct your attention to the last clause,

3  that last sentence, beginning "especially."

4      Can you see that?  Do you see that?

5  **A.**   I do, yes.

6  **Q.**   Can you focus your testimony on that particular provision

7  of that sentence?

8  **A.**   Yeah -- yes.  I think that's, there again, to the second

9  part of what I was alluding to a minute ago, in that initial

10  issuance and exercise of that, warrants are sort of standard

11  industry practice.  And if one could argue, well, maybe there's

12  an exception in a specific case due -- for some nefarious

13  reason, to the extent that the board is aware of what -- of

14  what -- what an individual is doing and okays it, that

15  certainly makes it less plausible, in my mind, if there's some

16  nefarious reason.

17  **Q.**   How, Professor Denis, if at all, does the expertise that

18  you talked about earlier, in particular, allow you to draw the

19  conclusion in that last sentence?

20  **A.**   Well, it's more just a generalized knowledge of -- of how

21  board mechanisms work.  And, you know, again, I'm looking at

22  some facts in this matter as well.  But that's a general

23  statement I'm making there.

24  **Q.**   And is that -- is that general statement, however, based

25  on the experience you described?

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **A.**    Based on my experience in the field, yes, my understanding

2  of corporate governance practices.

3  **Q.**    I'm going to move off of 174-1 for just a moment, because

4  Professor Denis, you've referred a few time, at least twice, to

5  materials that you've looked at in this case.  Is that about

6  right?

7  **A.**    That seems about right.

8  **Q.**    Okay.  I'm going to put on the screen Docket 174-11, and

9  I'm just going to flip through the pages, and then I'll ask you

10  a question.  Okay?

11  **A.**    Okay.

12  **Q.**    So first I'll turn to Page 2 of 174-11.  Do you see

13  there's a table of documents referenced on this page?

14  **A.**    I see that.

15  **Q.**    Okay.  To save everybody time, if it's okay with the

16  Court, I would represent to you that the rest of this document

17  has a table referencing various documents.  You accept that

18  representation?

19  **A.**    That's my recollection of this document, yes.

20  **Q.**    You've seen this document before.

21      Is -- what does this document -- what is this document?

22  What does this reflect?

23  **A.**    I mean, I think this reflects a set of information that I

24  reviewed in -- in coming to the opinions that I have with

25  respect to the warrant exercise.

*DIRECT OF DAVID DENIS BY MR. LURIE*

1  **Q.**   And when you earlier, at least twice, have said, "I've

2  reviewed materials in this case in substance" that -- in your

3  mind, is consistent with that last sentence of your opinion, to

4  what extent are you referring to these materials --

5  **A.**   I've -- I'm sorry, go ahead.

6  **Q.**   -- in 174-11?

7  **A.**   I would say to a large extent because these documents are

8  sort of informing me to the extent of which this looks like it

9  was intended as a capital raising event.  They are speaking to

10 the -- the extent to which the company's corporate governance

11 was in place, and reviewing these decisions, and so on.

12 **Q.**   I put back up on the screen 174-1.  Let me take you back

13 to the last sentence of your opinion.  Okay?

14 **A.**   Okay.

15 **Q.**   And, again, my apologies.  I appreciate you covered some

16 of this in your answers, but I just want the record as clear as

17 I can.

18      Professor Denis, how, if at all, is your knowledge of

19 executive behavior, that you testified to earlier, relevant to

20 that last sentence?

21 **A.**   I think my knowledge of executive behavior would be

22 combined with my knowledge of corporate governance processes,

23 and how those processes influenced the behavior.  And so I'm --

24 I'm analyzing the extent to which what I'm observing in this

25 case seems to be consistent with normal processes.

*DIRECT OF DAVID DENIS BY MR. LURIE*

1   **Q.**    Professor Denis, if you learned that a particular

2   executive, after exercising warrants, also traded and profited

3   from those trades but didn't trade all -- like, all of his

4   shares, how, if at all, would that hypothetical fact affect

5   your opinion in the last sentence we've been focused on?

6   **A.**    Well, I mean, I think -- first of all, I would expect that

7   the executive would probably trade in those shares to the

8   extent that they are exercising the warrants for a reason.

9        And, again, this is deferred compensation that executives

10  are receiving.  You don't really monetize that compensation

11  until you sell the shares.

12       Now, when you sell the shares could be informative for

13  some of the reasons we talked about earlier, one of which is

14  the optimal exercise, you know, to the extent that it's

15  exercised at a time that looks like it would be suboptimal from

16  the standpoint of maximizing the payoff to the individual then.

17  You know, that sort of suggests that there's other reasons for

18  doing it.

19  **Q.**    With respect to those other reasons, again, a hypothetical

20  question, if you learned that a particular executive, after

21  exercising the warrants and then trading was required to -- and

22  knew -- and knew he would be required to pay short-term capital

23  gain tax, would that, in your view, support or undermine your

24  opinion, or be neutral?

25  **A.**    I mean, I think it would go to my conclusion as to whether

1    there are other reasons for the exercise.  For example, the

2    financing motive of the exercise would -- would seem more

3    plausible in such an event.  Because otherwise, the executive

4    would have been better off deferring this to a later point in

5    time where longer term capital gains rates would apply.

6    **Q.**  Couple more hypothetical -- few more hypothetical

7    questions.

8        If you learn that the executive, in fact, informed the

9    board in connection with the exercise of warrants, and did so

10   as the board required, how, if at all, would that affect your

11   opinion in the last sentence?

12   **A.**  That goes in large extent to the last sentence, which the

13   behavior is consistent with the normal corporate governance

14   process.

15   **Q.**  Same question with respect to the company -- the company

16   CFO, if it was not the CFO looking to exercise?

17   **A.**  I'm sorry, you're asking if it was the CFO who is

18   exercising it?  I'm sorry.

19   **Q.**  No.  I'll start over again.

20       If you learned that in connection with the exercise of

21   warrants, the executive informed the company CFO that the

22   executive would be exercising warrants, how, if at all, would

23   that affect your opinion in the last sentence?

24   **A.**  Well, I would say it's consistent with the opinion in the

25   sense that it's the CFO who is going to be the primary contact

1    in terms of any financing sort of event.

2    **Q.**    Same question with respect to the company general counsel.

3    **A.**    The general counsel, I think, goes more towards the

4    statement about the corporate governance practices.

5              **MR. LURIE:**   Just one minute, Your Honor.

6              **THE COURT:**   Sure.

7    **BY MR. LURIE:**

8    **Q.**    Professor Denis, would you have any reservation presenting

9    this last sentence, presenting this opinion to a conference of

10   your peers?

11   **A.**    No.

12   **Q.**    To your Ph.D students?

13   **A.**    None.

14   **Q.**    Okay.

15             **MR. LURIE:**   Nothing more, Your Honor.

16             **THE COURT:**   Okay.  Mr. Zelinsky?

17                        **CROSS-EXAMINATION**

18   **BY MR. ZELINSKY:**

19   **Q.**    Hi, Professor Denis.  How are you?

20   **A.**    Good.

21   **Q.**    You identified reasons that companies may issue warrants,

22   correct?

23   **A.**    I did.

24   **Q.**    And one of those is because it could lead to the raising

25   of capital when the warrants are exercised, correct?

1  **A.**   Correct.

2  **Q.**   And why, in your research, does a CEO or company executive

3  exercise their warrants?

4  **A.**   There's a variety of reasons why they might, but this is a

5  big -- a big component of this is deferred compensation for the

6  executive.

7  **Q.**   Simpler terms, making money; is that right?

8  **A.**   If you would like to refer to it that way, sure.

9  **Q.**   So a big reason an executive exercises the warrants are to

10  make money.

11      Now, you identified there's, in fact, two steps.  You

12  exercise the warrant, which leads to the purchase of the stock

13  from the company, correct?

14  **A.**   Correct.

15  **Q.**   And then if the executive so chooses, the executive sells

16  those stocks that they have now purchased to other individuals

17  for a profit, correct?

18  **A.**   Hopefully for a profit; otherwise, I'm not sure why they

19  would do it.

20  **Q.**   Right.  So the only reason to exercise your warrant is

21  because you want to sell them to make a profit, correct?

22  **A.**   The only reason to exercise the warrant is not simply to

23  make the profit, because if you are part of the company, then

24  there's also a financing aspect to the company, so that may be

25  part of your motive as well.

*CROSS OF DAVID DENIS BY MR. ZELINSKY*

1    **Q.**   So let me just get this straight.

2         You have an incentive to exercise the warrant, and one

3    reason is to make money, and another might be to give the

4    company some operating proceeds, correct?

5    **A.**   Could be.

6    **Q.**   Okay.  Why might an executive sell the stock that they

7    have exercised the warrant to purchase?

8    **A.**   Could be for tax reasons, that they are incurring a tax

9    liability as a result of receiving deferred compensation.

10   **Q.**   Make --

11   **A.**   And maybe sell some shares.

12   **Q.**   Making money, right?

13   **A.**   To have money to pay the government.

14   **Q.**   Right.  So making money, that's why they would sell the

15   stock, correct?

16   **A.**   Whether it's making money or not, it's producing -- it's

17   producing cash that can be used to pay taxes.

18   **Q.**   Right.  So in other words, you could well see a world in

19   your research in which you purchased stock, you exercised the

20   warrant in order to give the company some operating capital,

21   correct?

22   **A.**   Correct, you exercise the warrant.

23   **Q.**   But selling the stock that you have now bought with the

24   exercise of your warrant, that doesn't give the company any

25   operating capital, it just produces profit for the individual,

*CROSS OF DAVID DENIS BY MR. ZELINSKY*

 1  correct?

 2  **A.**    It does not produce any additional capital for the

 3  company, no.

 4  **Q.**    So I just want to break down the two steps that we have,

 5  because I think sometimes it can be a little unclear, we talk

 6  about exercising warrants versus making the stock sale that

 7  follows the exercise of the warrants.

 8       Your testimony today is that exercising the warrants, that

 9  is, purchase of the stock, let's call that step one, that can

10  be done to give the company operating capital, correct?

11  **A.**    Correct.

12  **Q.**    But step two, that is when you now have the stock, and you

13  sell it to someone else, that doesn't provide the company with

14  any operating capital, does it?

15  **A.**    It does not.

16  **Q.**    And it only is done either for tax purposes or to create a

17  benefit because you bought the stock for $1, and you're selling

18  the stock for $3, correct?

19  **A.**    That's fair.  You have a personal decision to make as to

20  when to sell those shares.

21  **Q.**    So the sale of the stock is not in any way related to

22  raising capital for the business, I just want to be clear on

23  that, correct?

24  **A.**    That's correct.

25  **Q.**    Okay.  I want to talk to you for a little bit about your

1  opinions, that is, you say that the analysis here is based on

2  your generalized understanding, correct?

3  **A.**    In a large part.

4  **Q.**    And you say that you read the indictment in this case,

5  correct?

6  **A.**    I did.

7  **Q.**    So you're aware of the allegations that in this

8  circumstance, Dr. Pourhassan was told by the FDA that he had --

9  that the press release that had gone out regarding the BLA was

10  untrue and needed to be corrected; is that right?

11  **A.**    I read that in the indictment, yes.

12  **Q.**    I'm not asking you whether or not it's true, you obviously

13  don't know that.  Just asking about the allegation.

14       You know that allegation, correct?

15  **A.**    I know that allegation.

16  **Q.**    And you know that the indictment then alleges that

17  Dr. Pourhassan continued to sell stock after that message was

18  transmitted from the FDA, correct?

19  **A.**    I recall that, yes.

20  **Q.**    And that, in fact, he sold quite a large amount of

21  stock -- I understand you're in finance, but I would call a

22  large amount, 1.39 million shares, and then 1.2 million shares,

23  and got $4.4 million after -- from those stock sales.

24       Does that sound right?

25  **A.**    Those numbers sound familiar.

1  **Q.**    Does the fact that Dr. Pourhassan -- assume those

2  allegations are proven, right?  Let's assume that for a second.

3  Does that in any way change your analysis as to the reasons for

4  his exercising of the warrants and subsequent sale of the

5  stock?

6  **A.**    Well, I think the process you're describing is a normal

7  process for an executive in the sense that they are -- they are

8  receiving warrants as a form of compensation, and they are

9  going to exercise those warrants and monetize them at some

10  point.

11  **Q.**    Dr. Denis, you have a Ph.D from the University of

12  Michigan, right?

13  **A.**    I do.

14  **Q.**    You've been teaching corporate finance for 36 years; is

15  that right?

16  **A.**    Yes.

17  **Q.**    Give or take?  I mean, probably TA'd when you were a Ph.D.

18  **A.**    I would like to forget those days.

19  **Q.**    Is it your testimony today before this court that it seems

20  that it would follow normal corporate governance practices for

21  a CEO to receive a correspondence saying that a press release

22  is false, that it's misleading and needs to be corrected, and

23  if they kept exercising warrants without correcting the press

24  release, after receiving that information, that you think that

25  would be in line with good corporate governance, and that it

1  would lead you to think the individual wasn't trading on

2  nonpublic information?

3  **A.**    I don't think that's what I said.  What I said was that

4  the fact that an executive has warrants, they exercise those

5  warrants and subsequently sell the shares is normal behavior.

6  The part that's connected to corporate governance is the fact

7  that he's disclosing this to parties within the company that

8  are monitoring this behavior for governance.

9  **Q.**    But is it abnormal for an executive to exercise the shares

10  after they have been told that there's a misleading press

11  release that they have failed to correct?  Is that, in your

12  corporate governance experience, an abnormal happening?

13  **A.**    I don't know that I have any direct experience with that.

14  **Q.**    Well, let's extrapolate from your experience.

15      In your experience, is it normal for an executive to

16  receive correspondence saying that their press release is

17  misleading, and to continue to exercise and sell shares without

18  correcting the press release?  Does that raise any concerns for

19  you from a corporate governance or finance perspective?

20  **A.**    Well, I think it depends a little bit on the extent to

21  which those allegations are associated with meaningful changes

22  in the information set that investors use to price the shares.

23  And if the answer is no, then I don't think it raises the

24  issues.

25  **Q.**    So from a governance perspective, it raises no issues for

1  you that an executive is told that a press release has been put

2  out that is misleading, yet continues to exercise warrants

3  prior to the correction of that misleading press release?

4  **A.**   It wouldn't raise issues to me if the executive is told

5  that information and clears the trades with parties that are

6  important for the governance of that company.

7  **Q.**   Are you familiar with a concept of a 10b5-1 plan?

8  **A.**   Yes.

9  **Q.**   What's a 10b5-1 plan?

10  **A.**   As I understand, 10b5-1 plans are -- are plans in which

11  executives commit to selling shares at particular points in

12  time.

13  **Q.**   In corporate practice, is it good corporate practice for

14  executives to have 10b5-1 plans?

15  **A.**   I don't know if I would say it's good or bad, but it's

16  fairly common.

17  **Q.**   And why is it fairly common for executives to have 10b5-1

18  plans?

19  **A.**   I think it's common so as to remove any confusion as to

20  what the motive might be for a sale of shares.

21  **Q.**   And is the presence or absence of a 10b5-1 plan in any

22  way, does that affect your analysis that you've gone over with

23  Mr. Lurie today?

24  **A.**   No, I don't think so.  I don't think that changes anything

25  that I've said.

1  **Q.**   So if the exercise of warrants were done pursuant to a

2  10b5-1 plan, that wouldn't change your assessment over the

3  motive for the exercise of those options?

4  **A.**   I think if it was done pursuant to the 10b5-1 plan, you

5  wouldn't be asking me these questions.  I think that would --

6  we know that the -- those shares are going to be sold at a

7  certain point in time.

8  **Q.**   And you talked about reasons that you might exercise

9  warrants, and you said there was an optimal time to exercise

10 the warrant, and that in your expert opinion, the optimal time,

11 generally speaking, to exercise the warrant is the last

12 possible date of exercise, correct?

13 **A.**   Correct.

14 **Q.**   And you said there were some other reasons that you might

15 not want to exercise at the last possible date.  You talked

16 about dividends as one possibility, correct?

17 **A.**   Correct.

18 **Q.**   How about being in possession of materially nonpublic

19 information that you know and the market doesn't, could that be

20 another reason someone would want to exercise a warrant at a

21 different date than the final date?

22 **A.**   I mean, I guess it would depend on when you think that

23 information, if ever, is -- is going to be impounded in the

24 prices.

25 **Q.**   So let's assume, for instance, you have information

1    indicating that your press releases are untrue, and you know

2    that you've been sent a note by a regulatory agency telling you

3    you need to correct your press release, might it be efficient

4    for you to exercise your warrant, prior to that press release

5    being corrected, in order to maximize your income?

6    **A.**    Well, not if those press releases fail to have an impact

7    on the price in the first place.

8    **Q.**    But I'm asking from a corporate governance perspective,

9    right, you said there are different reasons you might give for

10   exercising of warrants.  Could that be a reason for the

11   exercise of a warrant not at the latest point in time?

12   **A.**    Well, in theory, yes, but it would be difficult for me to

13   see how you get that cleared through the governance processes

14   of your company.

15   **Q.**    And when you examined this -- these circumstances, have

16   you, in these circumstances, ever tried to study how often

17   exercise of warrants by executives is related to nonpublic

18   information that they possess?

19   **A.**    I have not, no.

20   **Q.**    Have you read anything about the exercise of warrants

21   based on possession of nonpublic information?

22   **A.**    I've certainly read anecdotes and individual cases in the

23   press, and I've certainly read articles about insider trading

24   more generally, but --

25   **Q.**    In your professional career, have you ever examined the

*REDIRECT OF DAVID DENIS BY MR. LURIE*

1  percentage or how often the exercise of warrants is related to

2  the possession of nonpublic information?

3  **A.**    I have not.

4  **Q.**    Have you ever researched how to determine whether or not

5  the exercise of warrants is related to the possession of

6  nonpublic information?

7  **A.**    I've never conducted research of that sort.

8  **Q.**    Have you ever taught anyone about how to determine whether

9  or not the exercise of warrants is related to the possession of

10  nonpublic information?

11  **A.**    I don't believe so.

12          **MR. ZELINSKY:**  Nothing further, Your Honor.

13          **THE COURT:**  Mr. Lurie, anything else?

14          **MR. LURIE:**  Just one moment, Your Honor.  Thank you.

15                    **REDIRECT EXAMINATION**

16  **BY MR. LURIE:**

17  **Q.**    Professor Denis, the prosecutor, you remember, kept asking

18  you questions about things the FDA told Dr. Pourhassan.

19      Do you remember that?

20  **A.**    I do.

21  **Q.**    At this point in the case, do you have an understanding

22  that those are just allegations?

23  **A.**    That is my understanding, yes.

24  **Q.**    They are not proven?

25  **A.**    Correct.

*REDIRECT OF DAVID DENIS BY MR. LURIE*

1  **Q.**   And they may turn out to not be true, isn't that possible?

2  **A.**   I assume that's true, yeah.

3  **Q.**   During the cross-examination by the prosecutor, with

4  respect -- do you remember being asked questions about the

5  press releases and the information that they contain?

6  **A.**   I remember --

7  **Q.**   Excuse me, let me ask that again.  Let me ask that again.

8       Do you remember being asked questions that the FDA advised

9  Dr. Pourhassan allegedly that the press release, with respect

10  to the BLA, contained inaccurate information, and allegedly

11  Dr. Pourhassan then traded with that information.

12       Do you remember that?

13  **A.**   I do.

14  **Q.**   And you said something along the lines of -- correct me if

15  I'm wrong, you referenced whether the information in that press

16  release was material or was important.

17       Did I hear you right?

18  **A.**   Yes.  I referred to whether that -- that information was

19  value relevant.

20  **Q.**   Can you explain your answer more?

21  **A.**   Well, I think if I -- if -- if Dr. Pourhassan has been

22  notified that some -- some information that he has released is

23  inaccurate and misleading, but it hasn't produced any change in

24  the stock price, then he's not -- there's no benefit to him

25  from an early exercise of the warrant in that situation.

1          **MR. LURIE:**  Nothing else.

2          **THE COURT:**  Okay.  Anything?  Any recross before we

3    end this?

4          **MR. ZELINSKY:**  I think we're done, Your Honor.

5          **THE COURT:**  Okay.  All right.  Mr. Denis, it's been a

6    long day for you.  You are finished.  You may step down.  And

7    if you would do me the courtesy of stepping out of the room,

8    because we're probably going to discuss your testimony, that

9    would be great.

10          **THE WITNESS:**  Thank you, Your Honor.

11          **THE COURT:**  Thanks so much.

12       All right.  Counsel, which issue do you all want to take

13    up first?

14          **MS. ARCHER:**  Should we go in -- should we go in

15    order?

16          **THE COURT:**  We can do that.

17       Defense, do you have anything to add to the Daubert piece?

18    What would you like me to know?

19          **MR. TWEEN:**  No, Your Honor, we don't.

20          **THE COURT:**  Okay.  All right.  Government?

21          **MS. ARCHER:**  May I?

22          **THE COURT:**  Yeah.

23          **MS. ARCHER:**  I would just like to speak briefly and

24    summarize some of the issues that we think go directly to the

25    reliability of Professor Denis' proposed testimony.

 1          As you heard here today, the market efficiency

 2   determination is a threshold issue in determining reliability

 3   of an event study.  And here, where Mr. -- Professor Denis

 4   analyzed the Cammer and Krogman factors, these are, like, the

 5   widely accepted factors among experts in the field, he found

 6   that half, four of the eight factors couldn't be analyzed or

 7   weighed in favor of finding that market was efficient.

 8          The two additional factors that he identified were, I will

 9   say, arbitrarily, in the government's view, limited to a

10   one-year time period despite the fact that the relevant time

11   period is clearly four years.

12          And so of four of the six events, nearly half, and to that

13   point, four of the six events that were analyzed occurred

14   outside of the 2020 time period.

15          So with all of that, half of the Cammer and Krogman

16   factors did not support a finding of efficiency, yet Professor

17   Denis chose a one-day return period, which assumes that

18   information is immediately incorporated into the stock price,

19   and that is the market is the most efficient it can be.

20          He did not identify any peer reviewed publications that

21   support his theory that over-the-counter markets are as

22   efficient as listed exchanges.  The defendants have not

23   identified any cases that support that theory.

24          The government did identify a publication that explains

25   that over-the-counter markets are volatile, do not incorporate

 1  information as efficiency as listed exchanges.  That's in

 2  ECF-173 at Footnote 4.

 3      In addition, Professor Denis spoke about the volatility,

 4  which is something that's inherent -- that's common, frequent

 5  in over-the-counter markets.  But he addressed that by

 6  selecting, again, a short estimated period -- a short

 7  estimation period of 63 days, despite acknowledging and relying

 8  on -- and acknowledging that the standard in the industry, and

 9  he relied on a publication which specifically spoke about how

10  it's -- a longer period is more reliable, and there are

11  tradeoffs to selecting that narrower time period before an

12  event.

13      And we can see that from the discrepancy between two

14  events during one year -- that 2020 time period, which had the

15  same percentage impact, like, on a stock price, and yet, one --

16  there were different -- yet they yielded different results in

17  terms of, like, the significance of their impact on the stock

18  price.

19      Professor Denis also draws an unfounded conclusion that

20  the increased volatility that began in late 2020 and went

21  through the middle of 2021 was not associated with any of the

22  alleged misstatements in this matter.  That's in his technical

23  appendix at Exhibit -- that's Exhibit 955 on Page 2.

24      And that's a clear example of his failure to account for

25  obvious alternative explanations, which is another factor the

1    courts in the Fourth Circuit considered.  And we've cited a

2    case in the Eastern District of Virginia in our motion, again,

3    Page 173 at Page 8.

4        Finally, the methodology that Professor Denis decided to

5    use in this event study was not reliably applied to this case.

6    He treats it as a false statements case with 14 isolated

7    misrepresentations, when -- and ignores the fact that this is a

8    scheme.  And it involves both false statements and corrective

9    disclosures and, often, additional false statements after the

10   fact that revealed the prior misrepresentations.

11       So it's the combination of these --

12           **THE COURT:**  So can I ask you a question about that?

13           **MS. ARCHER:**  Yes.

14           **THE COURT:**  You have -- you've alleged, whatever it

15   is, 19, 20 statements in the indictment, and I think we've had

16   prior conversation about that's -- that's the sweet spot of the

17   government's case.  That's what you'll be eliciting in your

18   case in chief.  And you're not -- you're not really going much,

19   if at all, beyond those statements, am I right about that, in

20   your case in chief?

21           **MS. ARCHER:**  The important piece to understand is

22   that in the indictment, the allegation, the direct cite might

23   be from the initial false statement.  The BLA -- the completed

24   BLA was filed.  And then there's a corrective disclosure.  And

25   then the FDA says you didn't properly correctly correct it.

1          **THE COURT:**  Right.

2          **MS. ARCHER:**  You need to correct it again.

3     And then there's another false statement.  There's this

4     trickling of information --

5          **THE COURT:**  I understand that.  But in terms of --

6     I'm going somewhere where I think both sides need to sort of --

7     this hasn't been argued, so I want to understand what's

8     happening with the volley of the evidence.

9          The case in chief is the 19 false statements, or 20 false

10    statements to the public, right?  And if this expert opines,

11    based on only those statements, are you intending to cross --

12    if I allow him to testify, to cross on the fact that there are

13    lots of other statements out there that you wouldn't otherwise

14    be bringing in in your case in chief, but it's relevant to the

15    expert opinion?  Do you see what I'm asking?

16         Or, to the defendant's point, are you intending, in your

17    case in chief, to go much more broadly, which then raises other

18    issues that the defense is saying, well, you know, the

19    government is now saying there's hundreds of statements, we've

20    never been given notice about this, this now means we should be

21    able to put in a good faith opinion, and all that other stuff

22    that I had already decided.

23         So that's why I want to understand the case in chief

24    versus where you might go if this expert testifies.

25         **MS. ARCHER:**  There are just two points I would like

164

 1  to make in response to that.  The first is that we do not

 2  intend to introduce all 200 press releases that were put out

 3  over the course of a four-year period by CytoDyn.

 4      However, the corrective disclosures, which may not be

 5  referenced directly in the indictment, are evidence of the

 6  falsity of the first press release which made the false

 7  statement, if that makes sense.

 8      So where there is a repeated -- repeated misinformation

 9  into the market despite the FDA continually saying, like, you

10  need to correct that, that is evidence of intent of the falsity

11  of the initial statement, because it's later corrected, and

12  then additional misinformation is put out.  It's not always

13  through press releases.

14      That's -- so the second point is that this fails to

15  account for the fact that there may be, with the example of

16  the -- of the COVID-19 clinical trials, a statement that the

17  trials were successful, a correction, actually, they didn't --

18  they weren't successful.  Then in the SEC filings, another

19  false statement saying that they were successful, and

20  interviews that are done on television, again, promoting the

21  idea that they are successful.  All of that is evidence of the

22  falsity of the initial statement and the defendant's intent to

23  continue to promote that narrative despite knowing --

24          **THE COURT:**  Right.  And that's kind of my point, is

25  if the defense puts an expert on to cast doubt on the

1  materiality of the statement, and now you are left to cross

2  examine on the methodology in the underlying evidence that he

3  considered --

4      **MS. ARCHER:**  Yeah, so we would seek to cross examine

5  him about the related information that he did not consider.

6      **THE COURT:**  That he had at his disposal.

7      **MS. ARCHER:**  That he had at his disposal.

8      **THE COURT:**  Okay.  I mean, what I'm struggling with,

9  Ms. Archer, and maybe you can address this, is the line between

10 weight and admissibility.

11     You know, I'm not the fact finder.  I can't -- if I were,

12 I would have my opinions as to whether I would credit this

13 opinion.  But if -- if I find that Dr. -- Mr. Denis adequately

14 justified why he did what he did but left a whole lot of room

15 for cross, then I have to admit him, right?  I mean, that's

16 where -- that's where I'm struggling right now.

17     And so maybe if you can distinguish some of your comments

18 with, well, this is a threshold issue that, you know, it can't

19 go to the jury because of the following reasons, versus this is

20 a weight issue that, you know, we'll -- we are going to go very

21 much through this at trial, defendant beware, that would be

22 helpful for me.

23     Does that make sense to you?

24      **MS. ARCHER:**  Yes, it does.

25      **THE COURT:**  Okay.

1      **MS. ARCHER:**  So I won't go backwards, but the market

2  efficiency issues, and everything that I covered in the first

3  half, are very clearly reliability issues.

4      With respect to the idea that it's a -- something that

5  goes to weight and not admissibility or not reliability, I

6  think the best example is -- is the bundling, the fact that

7  Professor Denis did not disaggregate the issues that are

8  covered in the various events that he analyzed.

9      **THE COURT:**  You consider that to be a threshold

10  issue?

11      **MS. ARCHER:**  Yes.  And the defendant identified it as

12  an issue that went to weight.

13      And it -- it -- as you heard from Professor Denis today,

14  because of the fact it's a dual -- it's two factors, because of

15  the fact that he shows a one-day return period and did not use

16  any of the -- the accepted methods for disaggregating

17  information where there's, like, multiple issues covered, he

18  cannot offer a reliable opinion.  That was his testimony.

19      **THE COURT:**  Well, see, the problem, though -- like,

20  let's disaggregate those two.

21      The problem that -- the answer that he gave to the

22  disaggregation issue was disaggregation isn't relevant if my

23  first conclusion is it is not a statistically -- there is no

24  statistically significant change based on false statements.

25      So he -- his first opinion is, for statement number one,

1  it made no difference in the stock price; therefore, I don't

2  have to disaggregate anything.  It's a non sequitur.

3      But it sounds like what you're saying is, that first

4  opinion is based on a faulty premise, because you only pick a

5  one-day window if the market is super efficient, and there's

6  very little reliability in that determination.  So that's why

7  it's like, you know, we're -- we're running in quicksand here

8  because of that.

9      If the market -- let me flip it around.  If the market

10  were efficient and the one-day window were solid and reliable,

11  then you would agree his point is well taken, you don't have to

12  disaggregate if the opinion is no effect on the price, right?

13          **MS. ARCHER:**  I was with you until the last part.

14          **THE COURT:**  So I'm trying to understand what the real

15  issue is.

16          **MS. ARCHER:**  So I agree -- so, yes, it is part the

17  reflection of the one-day return period.  It's also -- so in an

18  efficient market, a 12 percent drop in the stock price or

19  increase in the stock price may not be an abnormal -- you know,

20  that may not be an abnormal statistically significant event.

21  And that's what this is being compared to.

22          **THE COURT:**  Right.  So if the background -- let me

23  make sure I understand the opinion, right?

24      He takes the expected return based on the market that he

25  identifies, and then he compares the actual return to be

expected.  And if they are the same, then it's not

statistically significant.  There's no significant effect that

the statement had on the stock price.

   So the fact that it dropped 12 percent means nothing if

the entire market dropped 12 percent, right?

            **MS. ARCHER:**  Correct.

            **THE COURT:**  Okay.  So he uses a one-day return window

to assess whether the statement was significant.  And that's

because he concludes it's an efficient market, right?  All of

which -- am I --

            **MS. ARCHER:**  Yes.

            **THE COURT:**  Okay.  I'm getting it right?  I just want

to make sure I understand it.

   Now, your disaggregation point, my understanding of his

testimony was, it doesn't matter, I don't need to disaggregate

multiple statements if the statement in question had no effect.

   Do you -- do you disagree with that?

            **MS. ARCHER:**  No.

            **THE COURT:**  So the real -- the real rub here is how

the first opinion is arrived at, the it had no effect.

            **MS. ARCHER:**  If there's no effect, it's -- it's a

moot point, right?  Whether or not --

            **THE COURT:**  Right.  That's why I was wondering --

            **MS. ARCHER:**  Which of the statements impacted the

price.

1          **THE COURT:**  Correct.

2          **MS. ARCHER:**  Right.

3          **THE COURT:**  That's why I was wondering what's the

4    whole reason you and Dr. -- Mr. Denis were going back and forth

5    about those days where there was, according to him, no effect

6    on the stock price based on the statement, but yet he didn't

7    disaggregate multiple statements.

8         Like the April 24th, 2020, you all talked about that.

9         But that was an opinion where he said there was no effect

10   of -- on the stock price.  There was no effect because -- the

11   false statement didn't have an effect on the stock price.

12        So I was just trying to understand why you all were having

13   that conversation.

14         **MS. ARCHER:**  In part, related to Professor Denis'

15   analysis of the confounding news and apparent, you know,

16   selection of pieces of information.  And, for example, an

17   investor call, his testimony was initially that they believed

18   that the investor call was confounding news, because it wasn't

19   about a completed BLA, it was about COVID results.

20         **THE COURT:**  Yeah.

21         **MS. ARCHER:**  And from the time of the investor call

22   to the end of the day, the price increased 12 percent.  That --

23   that is inconsistent with the standard that's applied in most

24   event studies where there are bundled issues, there should be

25   some disaggregation.

1          But your point is correct, that as a fundamental --

2               **THE COURT:**  Right.

3          **MS. ARCHER:**  -- initial point in the analysis, it has

4    to be statistically significant to matter.

5               **THE COURT:**  And that's the difference, is when the

6    government uses an event study, it is to show materiality based

7    through a statistically significant change based on the false

8    statement, and then disaggregation matters.  So we see that in

9    a lot of cases.

10         But here, the defense is using it to cast doubt on

11   materiality.  And I think that's why -- I think I was satisfied

12   by his answer on the disaggregation piece.  And you know,

13   Mr. Tween, you can address this before we move on, but I'm

14   still troubled by the efficiency piece.  That's where I think

15   you're right, it's a threshold issue, and I'm not quite sure

16   where I land yet.  Is that weight or admissibility?

17              **MS. ARCHER:**  One other -- one other related point --

18              **THE COURT:**  Yeah.

19              **MS. ARCHER:**  -- just for you to consider.

20         In some of those examples, had the return period been

21   longer than one day, even if it was two days, there would have

22   been a statistically significant return combining the impact of

23   the two events on one day.  It would have been not a 12 percent

24   increase, but a 24 percent increase.

25              **THE COURT:**  Right.  And my understanding was, he

1  picked that interval, that return interval because he first

2  assumed efficiency, then said, "I had no reason to reject an

3  efficient market," and then today said, "Well, I can say with a

4  reasonable degree of certainty it is an efficient market," but

5  then pointed to the factors that are troubling, which, you

6  know, some point that way, some point the other way.

7      And really it came down to, in my view, you know, it's my

8  experience, it's my education -- it's my educational

9  background.

10     And that may be enough.  I really haven't decided it yet,

11  whether this is where you -- you have to do -- you know, you

12  have to cross in front of the jury on the basis for the

13  opinion, or whether it just doesn't come in at all because it's

14  not reliable under Daubert.  I'm not sure yet.

15     But that's where I think the fighting ground is, unless

16  you think there's somewhere else in addition I need to look.

17         **MS. ARCHER:**  That's right.  Those are our concerns.

18  Our concern is that it is not reliable.  And the way that it's

19  been applied wouldn't be helpful to the jury because it looks

20  at such a small number of the relevant conduct that's charged

21  in the indictment.

22         **THE COURT:**  Okay.  All right.  Thank you, Ms. Archer.

23     Mr. Tween, do you want to address this question about

24  market efficiency?

25         **MR. TWEEN:**  I do, Your Honor.  Just briefly, I would

 1  point you to a couple of things.

 2          **THE COURT:**  Okay.

 3          **MR. TWEEN:**  First of all, his testimony was

 4  ultimately -- I mean, and I'll concede it took him a little

 5  while to get there, but ultimately he did say to a reasonable

 6  degree of certainty, that his conclusion was that the market

 7  for CytoDyn stock was efficient.  That's the first.

 8      I would point you to our filing on Docket --

 9          **THE COURT:**  And on that, just so you know, maybe this

10  will matter where you go next, but I did ask him for all the

11  evidence and the bases and the reasons.  And he did, in

12  addition to the ten factors, point to the over-the-counter

13  market as being efficient.  And I took that to mean as

14  efficient as any other index.

15      I'm going to go back and read the government's article in

16  that regard, because that's -- that's -- frankly, not sure

17  how -- how solid that opinion is.

18      But putting that to the side, he then -- he goes back to

19  the same ten factors, many of which are a wash, some point in

20  the other direction.  One is problematic, because he uses only

21  a one-year window to make it fit with Cammer, one could say.

22      So what do I do with that?  Like, what do I do with the

23  fact that those ten factors in the affidavit were supportive of

24  I can't reject a presumption, and now they are supportive of an

25  affirmative opinion?

1          **MR. TWEEN:**  Well, I would point the Court to Docket

2    177-1.

3          **THE COURT:**  Okay.

4          **MR. TWEEN:**  On Page 3.11, which is our filing, which

5    says -- I think this is his declaration, "When approaching an

6    events study, financial economists assume market efficiency

7    unless they are able to convincingly demonstrate that the

8    market for the shares is not efficient."

9      And it cites to a number of treatises and articles for

10   that proposition.

11         **THE COURT:**  And maybe you can help me out, because

12   you all do this more than I do.  Isn't the presumption for

13   efficiency based on, like, NASDAQ, Standard and Poor's, like a

14   very different index than what I've seen referred to as, like,

15   the penny shares traders?  Like the -- the OT -- the OTCQB is

16   just a different -- it's a different kettle of fish, and so how

17   can I take that presumption that seems to apply to different --

18   much more --

19         **MR. TWEEN:**  It's still public -- it's still a public

20   market, Your Honor.  And it's still -- I think the public

21   markets are presumed efficient.

22     I mean, if you look at the *Basic v. Levinson* case we cited

23   in our papers --

24         **THE COURT:**  Yeah.

25         **MR. TWEEN:**  It's a Supreme Court.  And it's a little

difference, because there they are talking about reliance.  But they are still talking, in that opinion, about the presumption that the public markets are efficient.  And that's kind of your starting point.

And a statistician looks at this problem and says, "I'm starting with the presumption that this market is efficient; and unless I can conclusively demonstrate that it is not efficient, I'm staying on that conclusion that it is efficient and going forward and doing my events study."

**THE COURT:**  How is that a reliable opinion when the same expert says, and here are the factors that -- that we as economists use, or we as finance experts use, and the courts use, and the majority of them do not point in the direction of efficiency?  They either are a wash, or they point in the -- like, there's a few that point in the direction of efficiency, and then there's a bunch that don't.

**MR. TWEEN:**  Because I don't think they all have equal weight.

**THE COURT:**  Correct.

**MR. TWEEN:**  I think that some of them --

**THE COURT:**  Yeah, that's true.

**MR. TWEEN:**  The ones that point in the direction of efficiency in this case are a lot weightier than the ones that don't.  The fact that one analyst covered CytoDyn stock gives little weight, but that was the one he kept going to.  But to

1  me, that should carry very little weight.  It's just not nearly

2  as important as some of the other things he said, to spread

3  between bid and ask, and the volume of trading, and things like

4  that.

5          **THE COURT:**  Did he adequately explain that today?  I

6  mean, if I were a juror, I would have no idea what he was

7  talking about.  Because it didn't -- you know, and that's my --

8  as the gatekeeper, I have to make sure that the opinion is well

9  grounded in the first instance so that the jury can understand

10  it and it can aid them.

11      Maybe it's just my limitations, but I need to go back and

12  figure it out.

13          **MR. TWEEN:**  I mean, to be honest, I mean, this is

14  certainly dense material.  And, you know, certainly, if and

15  when the jury hears it, it's going to be simplified

16  dramatically.

17      I think today, we were trying to spend a lot more time and

18  methodology to try to -- to try to pull out how he did what he

19  did.

20          **THE COURT:**  Got it.

21          **MR. TWEEN:**  You know, I think he would say that, you

22  know, there's a lot of judgment that goes into this, the

23  different -- you know, the market indices, the peer company

24  indices, the index indices.  Those are -- those are judgment

25  questions that could be cross-examined on and go to weight.

1   The --

2          **THE COURT:**  But there was no -- there was really not

3   a lot of testimony about "I chose these parameters because they

4   are consistent with the standard in my field of expertise."

5          I mean, he did indicate that part of why he chose the

6   estimation period was to account for volatility.  And he did

7   indicate that he chose one day because it's -- it's a -- it's

8   an efficient market.

9          But he didn't ground that in any sort of accepted -- you

10  know, larger accepted methodology.  In other words, you know,

11  experts in my field have -- and maybe he did, I got to go back

12  and read it.

13         **MR. TWEEN:**  I mean, I think he did.  I think he said,

14  you know, these are the judgments I made based on my experience

15  and expertise.

16         **THE COURT:**  Right.  But I'm saying the way -- how do

17  I assess that that's different -- how do I assess that what

18  he's saying is based on his expertise and not ipse dixit, take

19  my word for it?

20         It's -- by saying, like, in my field, we have certain

21  preestablished parameters, and these are the bases for those

22  parameters.

23         **MR. TWEEN:**  He did say, for instance, the three-month

24  period, the three-month look-back period was something that was

25  frequently used, and in particular, in insider trading cases.

1      So -- or was it -- not insider training, in securities

2  fraud cases.

3           **THE COURT:**  Yeah, because he has very little

4  experience in that area, maybe he did.

5           **MR. TWEEN:**  No, you're right.  In securities fraud

6  cases.

7      So, I mean, he certainly did.  And I think, you know,

8  similarly, certainly, with the indices, he explained how he

9  arrived at those.  You know, those have been selected as peers

10 by CytoDyn long before any of this arose.  And that certainly,

11 I think, seemed like a defensible choice.

12     But, again, somebody could quibble with it and say you

13 should have picked these other 50 companies as peers, or

14 something like that.

15     I guess --

16          **THE COURT:**  No, I think that -- I -- where I am

17 really -- is at least tentatively, I want to go back, I want to

18 read the transcript, is that for the most part, I think the

19 other issues are weight issues.  But the threshold issue of --

20 of efficiency, market efficiency, is very bothersome to me.

21 And I think it's bothersome that the opinion moved.  It moved

22 from presumption, to "I can't exclude it," to "This is my

23 opinion," and I do not -- and it is -- it is tied to all the

24 metrics he then chose.  The reason why he chose one day is

25 because the market is efficient.

1      Sort of everything -- so much of his opinion is based on

2  that presumption.

3      But, that may also be a weight issue.  I just haven't -- I

4  haven't landed on it yet.

5          **MR. TWEEN:**  I think it probably is, and that is the

6  logical starting point.

7          **THE COURT:**  Well, we'll see.

8          **MR. TWEEN:**  And again, he's approaching this as a --

9  you know, as a statistician in the sense of "Unless I can

10  affirmatively disprove that it's efficient, I'm going to do my

11  work on the presumption that it's efficient, and here's all the

12  reasons why I think" --

13          **THE COURT:**  Although he said in the other case, in

14  which this came up, the M&T case, it was because it was not

15  contested.  You know, he didn't have to justify -- the

16  presumption was agreed to by both sides in the one other case

17  that I remember him talking about, well, how do you -- you

18  know, how do you come to this conclusion, or what does it mean

19  to presume efficiency?

20      So, anyway, the record is in, and that's where I think I

21  have to -- I'm not -- I'm going to defer today, because I'm not

22  quite sure I can decide that it is sufficiently reliable under

23  Daubert and 702.

24          **MR. TWEEN:**  Okay.

25          **THE COURT:**  But you'll get an answer before trial

1  starts for sure.

2      Yes.

3          **MR. LURIE:**  Just a couple -- few comments, Your

4  Honor.  I have the benefit of hearing, thinking about it as

5  you're speaking.

6          **THE COURT:**  Sure.

7          **MR. LURIE:**  Just on -- I'm sure the Court will think

8  about this, but I would urge the Court to do what I -- what I'm

9  sure it will do, to look at this question of admissibility

10  through the constitutional prism of a criminal defendant, not a

11  civil case.

12          **THE COURT:**  Yep, absolutely.

13          **MR. LURIE:**  You know, we have the right to challenge

14  every element, the constitutional right to put on a complete

15  defense.

16          **THE COURT:**  Yep.

17          **MR. LURIE:**  And the Fourth Circuit's approach to

18  expert opinion is that it comes in unless there's some real

19  exception or reason why it shouldn't.

20      Just on the point the Court is clearly so thoughtful

21  about, which is the Court's observation that in your view, his

22  testimony shifted a little bit towards some degree of certainty

23  versus the presumption.

24      I'm not sure if we -- if we brought him back in here, and

25  I don't think he's here, I'm not sure he would say it shifted.

1    I think he would say, "That's what I was saying at first."

2        When I --

3        **THE COURT:**  Well, that was a very inartful way of

4    saying it.  I mean, you're an expert, you know what it means to

5    say to a reasonable degree of certainty, this is the evidence I

6    rely on, as opposed to -- a presumption is one that you go in

7    assuming a fact to be true.

8        **MR. LURIE:**  I get that.

9        **THE COURT:**  The difference, though, is here now I

10   asked him do you have evidence to support that fact?

11       And -- and so that's -- that's -- that is different.

12       Why -- why does it matter so much to you that I used the

13   word "shifted"?  If I come down on it -- well, it's about

14   weighted anyway, so the government can cross him on it.

15       **MR. LURIE:**  Well, I don't -- if you come down on

16   weight, that's -- that's fine.  Then it comes in.

17       **THE COURT:**  Right.  Okay.

18       **MR. LURIE:**  But because, Your Honor, when I hear you

19   potentially thinking he shifted, I hear a credibility concern

20   from the Court, and I want to urge the Court that there is no

21   credibility issue.

22       **THE COURT:**  Well, there may very well be, but it

23   doesn't -- I think the credibility issue is not nearly as

24   significant as the lack of evidence on the basis for the

25   testimony, on the reliability of it.

1    In other words, credibility I think of as that's what you
2    cross examine the witness on.  If there's a basis -- so let me
3    put it this way.
4    If I just take Mr. Denis, his -- his opinion where he
5    agreed to a reasonable degree of certainty, this is an
6    efficient market, and I look at the underlying basis for it,
7    and I reject it, that's not a -- that's not a credibility
8    determination.  That's just you have no -- you know, you're
9    pointing me to ten factors, seven of which, you know, you
10   didn't -- you said either were a wash or point in the other
11   direction, your opinion is not reliable.
12   That's -- that's where I'm concerned right now, more than
13   so -- if I spoke, you know, inartfully, forgive me, more than
14   it started off as "I presume," and then "I reject," and now "I
15   embrace."  I think that's more what the government can use for
16   cross.
17       **MR. LURIE:**  That's what I was going to say, Your
18   Honor.  And I understand.
19   I would just then come back to, really, where my colleague
20   ended up --
21       **THE COURT:**  Yeah.
22       **MR. LURIE:**  -- which is it's -- it's uncontroverted
23   in this case, there's no evidence from the government to the
24   contrary, that it is appropriate, reasonable, and the right
25   thing to do for an expert to presume efficiency.  He has

1    testified to that under oath.  He swore to it in his affidavit.

2    He gives evidence to back it up.

3             **THE COURT:**  No, the government does.  The government

4    does.  They definitely challenge it.

5             **MR. LURIE:**  Well, they challenge it, but they don't

6    put any evidence to the contrary.

7             **THE COURT:**  Well, I don't think they need to at this

8    point, because you bear the burden of demonstrating reliability

9    under 702 and Daubert.

10            **MR. LURIE:**  I understand that perfectly, Your Honor.

11   I'm just trying to shine a light on the fact that you have his

12   testimony and, obviously, some cross-examination of that.

13            **THE COURT:**  Yeah.

14            **MR. LURIE:**  No evidence to the contrary that would

15   undermine that it's appropriate for him --

16            **THE COURT:**  I think the government would say, and

17   this is where I'm struggling, tell me if I'm wrong, is that his

18   own affidavit is evidence to the contrary.  It's like the

19   affidavit itself doubles back on itself, and, you know, here's

20   the ten factors.  And like I said, some point one way and some

21   point the other.

22        Listen, at the end of the day, I just got to wrestle with

23   whether this is a showstopper in terms of Daubert and

24   reliability, or whether it is fodder for cross.  That's --

25   that's where I just got to go back and think about it some

1    more.

2              MR. TWEEN:  And, Your Honor, just so I have the math

3    right, my colleagues have pointed out in his declaration,

4    Docket 177-1, he points to five factors in favor of efficiency,

5    he points to two that are not in support, and he points to two

6    that there's not enough data.

7              THE COURT:  Well, the first is the one where the

8    government has pointed out, and he agreed, he's only looking at

9    2020.  That's Number 15, right?

10             MR. TWEEN:  Yep.  Okay.  Yep.

11             THE COURT:  Okay.  And then there's second and third,

12   and the second and third, I don't believe -- they do point in

13   the direction of efficiency, right?

14             MR. TWEEN:  Uh-huh.

15             THE COURT:  And then there's --

16             MR. TWEEN:  The public --

17             MS. ARCHER:  The third was also looked at in 2020.

18             THE COURT:  I'm sorry?

19             MS. ARCHER:  The third was also limited only to the

20   2020 time period.

21             THE COURT:  So which did you say was only limited?

22             MS. ARCHER:  So one and three.

23             THE COURT:  One and three?

24             MS. ARCHER:  So Paragraphs 15 and 17 are the two

25   factors that weighed in favor of efficiency, in his opinion,

```
 1   but were only limited -- the analysis was limited to the 2020
 2   time period.
 3            THE COURT:  Yes.  Okay.  Got it.  Yeah.  Okay.
 4       I agree with you, I got to go back and count them up, but
 5   those two, there's a secondary issue, which is why are you
 6   limiting it to 2020.
 7       And so -- yeah, but I hear you.  Thank you.
 8            MR. TWEEN:  Okay.
 9            THE COURT:  All right.  Thank you, Mr. Tween.
10       So that's -- we're deferring on that.  You'll have my
11   answer when you have my answer.
12       Second issue is -- listen, I'm not -- you can make your
13   record.  I think you've exhaustively made your record, and so I
14   really don't think I need to go at this again, but I'm going to
15   allow -- I haven't moved off of my position, which is I'm going
16   to allow Mr. Denis to testify as to the -- what a warrant is,
17   how it is used in common -- you know, common industry practice.
18       That there are, in fact, and he's going to talk about
19   this, two pieces to it.  There's the exercise of the warrant,
20   the purchase, which is the part that gives the company the
21   capital; and then there's the selling of the warrant, which
22   gives the executive the compensation that -- you know, the
23   profit or the revenue.
24       And I have to say, I can -- you know, you can even elicit
25   from this witness, I think, that some of the factors that an
```

1   executive might consider when determining whether to sell or

2   hold, like tax implications, right?  You open yourself up to

3   potential cross.

4         But I think that's fair, to say here are the

5   considerations, and if they are consistent with the evidence,

6   then you can argue from it.

7         You can elicit opinions about how warrants are typically

8   issued.  You know, how does a board make that decision?  How

9   does a board -- how are they informed about the question of

10  sale?  I think all of that is consistent.

11        But what you're not going to be able to do is elicit from

12  this witness, that means the negative is also true.  It's not

13  because the person is trading on material, nonpublic

14  information.  This witness has no basis, even under *Diaz,* like,

15  none.  He has never even been involved, never talked to an

16  insider -- a person convicted of insider trading.  It's not his

17  field of expertise.  It's argumentative.

18        I mean, there's so many issues, I think, that are

19  problematic with that last part of the -- of the opinion, that

20  I'm not going to permit that piece of the opinion to be

21  elicited.

22        And so it's granted in part and denied in part, I suppose.

23        And if there's -- you know, as we get into trial, if

24  there's any question about the scope of that ruling, you let me

25  know.  But I think we've -- we've exhausted that issue.

1      Okay.  All right, gang.  It's 3:22.  Does anyone need a

2  break before we talk about duty?  Or do you want to jump right

3  in?

4      Okay.  Ms. Leeper, the most important person in the room,

5  needs a break.

6      Let's do this.  Ten minutes?  All right.  Very good.  See

7  you in ten.

8          **DEPUTY CLERK:**  All rise.  This Honorable Court now

9  stands in recess.

10     (Recess taken.)

11         **DEPUTY CLERK:**  All rise.  This Honorable Court now

12  resumes in session.

13         **THE COURT:**  All right.  Everyone can have a seat.

14     Give me a second to move all of this out of the way.

15     Okay.  So let me just give you an overview as to where I

16  am with the duty question.

17     My understanding from Dr. Kazempour is this issue of

18  pleading a preexisting duty does not implicate conspiracy,

19  correct?  It doesn't implicate A and C of the securities fraud,

20  right?  The device and the -- the two issues that I think have

21  been a lock on -- from *Schiff* on forward, and even it does not

22  implicate an aiding and abetting theory as to B or any of the

23  other counts.

24     To the extent it implicates fraud, I don't believe it

25  does, and I'll give you the reason why in a minute.

1    But this is -- it seems like to me that the real fighting

2    ground is about substantive, like non aiding and abetting

3    theory of liability on 10b-5(b), that theory of guilt.

4        **MR. COWLEY:**  The way we think about it, Your Honor,

5    where this issue is implicated, it's on a very small -- is that

6    okay, Your Honor?

7        **THE COURT:**  Yes, thanks.

8        **MR. COWLEY:**  It's on a very small part of the

9    government's theory.  I think the government has said as much

10   as well.

11      The way we think about it, it relates to their theory with

12   respect to material admissions or failure to correct certain

13   statements, right?

14       **THE COURT:**  Correct, uh-huh.

15       **MR. COWLEY:**  Like, that's the small universe.

16      And in terms of the overall architecture of their theory,

17   as I understand it, there are sort of two separate prongs,

18   right?  Prong number one is did Mr. Kazempour make or cause to

19   make -- and that's relevant, because that's the section to

20   aiding and abetting language that we fully agree, you know,

21   applies in the criminal context, did he make or cause to make

22   affirmative false statements.

23       **THE COURT:**  Right.

24       **MR. COWLEY:**  You know, that is what we're going to

25   have a factual debate about at a trial.  That's what there's a

1   lot of law around that we can construct a jury instruction

2   around.

3            **THE COURT:**  And the case I just gave you, I think,

4   goes to that maker question.

5            **MR. COWLEY:**  That's exactly right, Your Honor.

6   *Janus,* and that case you just mentioned, I think relate to that

7   prong in ultimately a debate or dispute about what the jury

8   instructions should say about making or causing.

9            **THE COURT:**  Maker.  Okay.

10           **MR. COWLEY:**  So we're totally all on the same page

11   about that.

12       The second theory that they have, which I call the sort of

13   the standalone duty theory is -- relates to trying to hold

14   Dr. Kazempour accountable for material omissions and statements

15   that he had no role in -- in making or causing to be made, or

16   in failing to correct statements that he had -- that he did not

17   make or cause to make.  That is a bridge too far and is not

18   supported by -- by the law.

19       I don't think the case that you found has anything to do

20   with that prong, I think, as you already noted.  And there's a

21   lot of cases that we cited that make clear that you have to

22   have some sort of preexisting duty to be on the hook

23   criminally, to be responsible for material omission or for

24   failing to correct a statement made by another.

25       And here, there are -- there are sort of three alleged

 1   bases for that duty.

 2        The first one, we don't dispute, which is if you are the

 3   maker, or you caused to make a statement, then you're on the

 4   hook to make sure it's a complete statement.  Okay?  We

 5   don't -- we don't disagree with that.

 6        But if he has nothing to do with causing the statement or

 7   making the statement, their two theories are, well, he

 8   nonetheless has a duty to the investing public by virtue of

 9   being a member of the disclosure committee in CytoDyn, as an

10   outside consultant, or by virtue of the fact that he's the

11   regulatory agent for CytoDyn.

12        Those two bases for some sort of freestanding duty theory

13   for omissions or failing to correct are without a legal basis.

14        **THE COURT:**  And you're pointing me -- I have read all

15   the cases on duty and the failure, when there's an omission

16   case, the failure to plead a legal duty.

17        In the securities context, are you relying on *Schiff* and

18   the Third Circuit, or are you going somewhere else?

19        **MR. COWLEY:**  I think *Schiff* is the best articulation

20   of that principle.  There are other examples, as well.  You

21   know, I don't think it's a particularly controversial point

22   that in the securities fraud and wire fraud context, for

23   omission-based liability, you need some sort of preexisting

24   duty.

25        **THE COURT:**  And I'm having a little trouble with --

1  in this case calling it omission-based liability.

2      I do want to ask the government, because the way that the

3  government has articulated it in certain parts, is a failure of

4  a duty to correct.

5      And that's where I am -- that's where the rubber is

6  meeting the road for me, as to what does that mean, exactly,

7  and what -- what rubric does it fall into?  And maybe they are

8  one and the same.

9      Maybe that's where you're saying the omission theory comes

10  from?

11          **MR. COWLEY:**  No, Your Honor.  They are --

12          **THE COURT:**  Where in the indictment, then?

13          **MR. COWLEY:**  -- different.

14      So I'm trying to think of the best example.

15      Let's go to -- let's go to Paragraph 26 of the superseding

16  indictment.

17          **THE COURT:**  Okay.  All right.  I'm there.

18          **MR. COWLEY:**  Okay.  Great.

19      So this is one, you know, explicit reference to omitting

20  material information.  They have added Kazempour.  And you

21  know, what they say is that Pourhassan and Kazempour made

22  materially false and misleading misrepresentations and omitted

23  material information from, you know, CytoDyn press releases,

24  SEC filings, interviews.  And, you know, interestingly, they

25  didn't -- I'm not sure if this was intentional or not, they

1   didn't modify the "he" right, which probably only defined

2   Pourhassan, but interviews he distributed on the internet, was

3   in print and online media, et cetera.

4       You know, this, I think, is a good example, because

5   there's no evidence that Dr. Kazempour had anything to do with

6   Pourhassan's interviews, when he was going out and putting,

7   like, videos online and et cetera.  But they are creating this

8   omissions theory to try to hold him liable for those based on

9   these two bases that are -- that are just lawless.

10      There's no case law, statute or regulation that says that

11  if you're a regulatory agent interfacing with the FDA, you have

12  this duty that triggers this material omissions liability.  Nor

13  is there a single case, statute, or -- or anything else that we

14  discovered or that the government has identified that says

15  sitting on a disclosure committee as an external consultant

16  somehow triggers that duty to CytoDyn investors as well.

17          **THE COURT:**  Okay.  And I get that argument.  Let me

18  ask you this before I turn to the government.

19      The whole genesis of the duty question in -- in securities

20  law appears to be, you know, when there's some fiduciary duty

21  to the investors.  And that's why, like, with the CEO it's

22  pretty straightforward.

23          **MR. COWLEY:**  Right.

24          **THE COURT:**  That duty can arise, though, in different

25  ways.  And this is where I'm still struggling with is this a

1    question of fact or a question of law.

2         If the government pleads a duty, and they tell me, well,

3    if you're looking at *Schiff,* Judge, it's going to be the

4    fiduciary duty that's akin to the insider trading cases, right?

5    Because those all come from like -- what tripped me up about

6    *Schiff* is they say, you know, there's three exclusive

7    categories, one is insider trading.  But they don't explain

8    why.

9         So when I try to figure out why, it seems like it's based

10   on a fiduciary duty analysis.

11        In here, there are facts which conceivably could support

12   the existence of fiduciary duty.  What do I do with that?

13        Like, say I agree with you, listen, as to the three *Schiff*

14   reasons, there's no statutory duty, they haven't pled it, it's

15   not there.  He's not the maker of the statement as *Schiff*

16   intended it to be.  Not there.

17        Insider trading, if I see that as a proxy for fiduciary

18   duty, and there are facts to support it, what do I do with

19   that?

20        **MR. COWLEY:**  So I'm really glad you asked, Your

21   Honor, because this is a critical distinction.

22        Insider trading and the duties that are around insider

23   trading are completely different from the duties that we're

24   talking about with respect to the making of public statements

25   by a publicly traded company.  They occupy -- I mean, they are

1  different elements, they are different claims.  And the

2  universe of people that can have different sets of duties are

3  entirely different.

4      So the number of people that can have a fiduciary duty

5  that is triggered for insider trading purposes is vastly more

6  expansive.  And the reason why that is, is because, you know,

7  every employee of the company, right, is exposed to inside

8  information that by virtue of having -- you know, being an

9  employee of that company, it can --

10         **THE COURT:**  Right.  Right.

11         **MR. COWLEY:**  Contractual, fiduciary, whatever, right

12  that comes with a duty to not go --

13         **THE COURT:**  Right.  Yeah.

14         **MR. COWLEY:**  -- and use that information for personal

15  benefit, et cetera, right?  That just does not map onto the

16  securities fraud charges in this case, which is making false

17  statements or material omissions to the investing public.

18  Not --

19         **THE COURT:**  But doesn't it, given the allegations of

20  trading and profiting off of -- subsequent to the material

21  nonpublic information?

22         **MR. COWLEY:**  Remember, Dr. Kazempour is not charged

23  with insider trading.  We're not --

24         **THE COURT:**  I know, but it's alleged.  I mean, it's

25  in the facts that -- it's in the factual allegations, right?

 1  So I was with you on that one --

 2          **MR. COWLEY:**  Yeah.  Yeah.

 3          **THE COURT:**  I thought, well, it's not -- it's not a

 4  charge.

 5      But I'm not in the Third Circuit, and since it seems like

 6  the question is really that fiduciary duty that's created by

 7  virtue of Mr. -- Dr. Kazempour's relationship with the company

 8  and the investing public, isn't what the government's pled

 9  enough?

10      And let me just cut to the chase, because even though this

11  isn't alleged, it's come up in this -- in this motion before,

12  and in other cases, Dr. Kazempour has a contractual

13  relationship on behalf of Amarex with CytoDyn.

14          **MR. COWLEY:**  Yeah.

15          **THE COURT:**  And that contract very expressly requires

16  both -- both corporations, through their CEOs, to review and

17  approve public statements.

18          **MR. COWLEY:**  Yeah.  So -- so that, I think -- I mean,

19  you're getting to another thing, which I think is a critical

20  distinction here, is the distinction between having some sort

21  of duty to CytoDyn as a company, right, versus having a direct

22  fiduciary duty somehow to investors, to the public -- the

23  underlying investors in a publicly traded company.  Those are

24  two different things.

25      So, you know, whether or not Dr. Kazempour did a good job

1  contractually for CytoDyn is -- that's not what we're here for.

2      **THE COURT:**  But can't the same be said for

3  Mr. Prousalis?  I mean, he had a contractual duty and a

4  fiduciary duty to his company, Busybox, he was the lawyer,

5  right?

6      **MR. COWLEY:**  Yes, but that -- that -- my reading of

7  *Prousalis,* that is not --

8      **THE COURT:**  At issue?

9      **MR. COWLEY:**  -- at issue.  I mean, Prousalis

10 basically wrote the statements that -- I mean, that basically

11 he did write the statements that were ultimately --

12     **THE COURT:**  And one can be said factually --

13 that's -- it goes back to what -- isn't this a question of

14 fact?

15     Like, if it comes out at trial that Dr. Kazempour was in

16 there with Dr. Pourhassan writing these statements, improving

17 these statements, making them more positive, as the superseding

18 indictment says.

19     **MR. COWLEY:**  Yeah.

20     **THE COURT:**  Then that may trigger the duty, right?

21     **MR. COWLEY:**  Yes, that's absolutely right, Your

22 Honor.

23     **THE COURT:**  Okay.

24     **MR. COWLEY:**  Let me unpack that for you.  That's all

25 in the rubric of this first line of liability that I've

1 described, which is making or causing to be made.

2           **THE COURT:**  Not the maker.  I got it.

3           **MR. COWLEY:**  Yeah, like maker or causing to be made.

4           **THE COURT:**  Okay.

5           **MR. COWLEY:**  Let's have that factual debate.  Let's

6 have that discussion at trial, and let's craft jury

7 instructions that define those terms for the jury.  We can do

8 that, right?

9           **THE COURT:**  Okay.

10          **MR. COWLEY:**  The thing that we're concerned about is

11 let's say there is no evidence, you know, of -- various

12 statements that Pourhassan is out there making, that there's no

13 evidence that Kazempour had anything to do with them, knew

14 about them, had no control of them, et cetera.

15     Under the defendant's theory, as they've articulated, you

16 know, in this back-and-forth we've had, he's still liable for

17 those somehow, because somehow he has a duty to the CytoDyn

18 investors by virtue of sitting on a disclosure committee and

19 being the regulatory agent.

20          **THE COURT:**  Right.

21          **MR. COWLEY:**  And that's just wrong.  There's just not

22 a legal basis for that.  There's not a single case that says

23 that.

24          **THE COURT:**  Well, there's not a single case that

25 doesn't, either.

1    In other words, if we're having this conversation about

2  being the maker, and -- and part of it is based on duties that

3  are created in contract, right?

4        **MR. COWLEY:**  No, I would disagree with that, Your

5  Honor.

6        **THE COURT:**  Didn't you -- didn't you in the first

7  round of motions give me jury instructions in which you favored

8  them, and the judge had actually instructed that the jury has

9  to find a duty based on statute, profession, or contract?

10        **MR. COWLEY:**  I don't know, Your Honor.  But sitting

11  here, there's not --

12        **THE COURT:**  I'm pretty sure you did.

13        **MR. COWLEY:**  The contract --

14        **THE COURT:**  Tell me if I'm wrong, but didn't you

15  append to the first motion?  It was -- it was either the motion

16  to dismiss or the motion in limine.  Maybe it was the

17  government.  Who gave me the instructions?  I thought it was

18  the defense, that there has to be a legal duty.

19        **MR. ZELINSKY:**  That's correct, Your Honor.

20        **THE COURT:**  Arising in statute, contract, or the

21  professional sort of, you know, background duties inherent in

22  the profession.

23    Why did you give me those if now we're walking away from

24  them?

25        **MR. COWLEY:**  They're -- Dr. Kazempour has no contract

1    with the investing public.  He has no contract with the

2    investing public.

3           **THE COURT:**  He has a contract with a publicly traded

4    company that has to do with his review and approval of public

5    statements.  That seems to go to the heart of the government's

6    case, right?

7           **MR. COWLEY:**  Again, the victim here is not -- is not

8    CytoDyn, it's not an insider trading case where Dr. Kazempour

9    has breached some duty to CytoDyn.  It's not talking about or

10   wrestling with whether or not there was a duty that CytoDyn --

11   a duty to CytoDyn that existed.

12      The legal case, the legal question that -- that triggers

13   whether or not he can be criminally liable for material

14   omissions of statements made by somebody else, or criminally

15   liable for failing to correct statements made by somebody

16   else --

17          **THE COURT:**  Yeah.

18          **MR. COWLEY:**  -- is if he owes a duty to CytoDyn

19   investors.  And, again, there's just no basis for that.

20      Like, I know that -- I think what you -- and we talked

21   about this before, if memory serves, is that, you know, you

22   have sort of step one, a fact, right?  Kazem is the regulatory

23   agent for CytoDyn.

24          **THE COURT:**  Right.

25          **MR. COWLEY:**  Or Kazem sits on the disclosure

 1  committee as an external consultant.

 2      And you have sort of step three, which is the conclusion

 3  that they want you and/or the jury to reach, that that creates

 4  a direct fiduciary duty from Dr. Kazempour to CytoDyn

 5  investors.

 6      The problem is, there's no step two.  There's no legal

 7  basis saying that either of these things can -- can be a basis

 8  to trigger that, right?

 9          THE COURT:  Right.

10      MR. COWLEY:  And unlike causing or -- you know,

11  making or causing to be made, there's sort of a body of law

12  that acknowledges, yeah, that's how a direct duty to CytoDyn

13  investors is triggered, and we can craft a jury instruction

14  around that, and that's, you know, all essentially black

15  letter.

16          THE COURT:  Right.

17      MR. COWLEY:  There's not that connective tissue for

18  this theory of some freestanding fiduciary duty that

19  Dr. Kazempour owes to investors.

20          THE COURT:  To correct or to not omit?

21      MR. COWLEY:  Yeah, to correct or to not omit the

22  statements made by another person that he did not cause -- that

23  he did not make or cause to make.

24      And --

25          THE COURT:  Well -- but we already acknowledged that

1    the government can pursue and make or cause to make theory.

2         **MR. COWLEY:**  Correct.  Correct.  That's why I said

3    just the last statement I did, is the problem area that we're

4    talking about is statements that the government can't prove

5    Dr. Kazempour made or caused to be made.  We -- they can --

6    they can try to prove that he made or caused to be made various

7    things.

8         **THE COURT:**  Or they can put on -- let me maybe make

9    sure I'm right about this.

10        **MR. COWLEY:**  Yeah.

11        **THE COURT:**  They can put on all the evidence they

12   want about the contractual duties and the course of conduct

13   arising from Dr. Kazempour's role as the CytoDyn, you know, CEO

14   with these contractual obligations, and they can put in other

15   evidence that for certain of the statements and certain of the

16   press releases, this is how Dr. Kazempour and Dr. Pourhassan

17   worked, and then they can argue to the jury to make the

18   inference, and then it's going to be up to the jury to infer

19   whether this was a course of conduct, or whether this -- do you

20   see what I'm saying?

21        And then you would argue, no, there's not sufficient

22   evidence on those other statements that this is how it worked

23   for these other statements.  That's fair, right?

24        **MR. COWLEY:**  Yeah, I think that's right.  They can

25   say, look, this is -- this is why Dr. Kazempour is connected

with this statement, right?  Even though it didn't come out of

his mouth, he wasn't the maker, he caused it to be made for XYZ

reasons.  Like, here are the e-mail exchanges, or here's the

witness testimony, whatever.  We can have that debate.  We can

have that discussion.

What is -- what is just completely prejudicial to us and

not founded in the law, is if they stand up and try to argue,

okay, here's this other body of statements that Dr. Pourhassan

and CytoDyn made that Dr. Kazempour had no role in creating

these statements, he didn't cause them.

**THE COURT:**  If there is such -- if there is such a

statement, I'll hear from the government on this.

**MR. COWLEY:**  Yeah.

**THE COURT:**  If there is -- you're saying if there's a

subset of statements, there's no evidence Dr. Kazempour had

anything to do with it, then they can't argue some preexisting

duty to correct?

**MR. COWLEY:**  Exactly.  They can't stand up and say

you don't need to find that Dr. Kazempour was the maker or

caused these statements to be made in order to find him on the

hook for these statements because you have this freestanding

duty out there for Dr. Kazempour to correct or to be on the

hook for material omissions that are made by these other

people's statements if he was not the maker or caused them to

be made.  That's the problem.

1      And, again, like, I -- taking a step back, like, this is

2  alleged in their indictment, this theory.  But as the

3  government said last time, I presume it's a very small part of

4  their case.

5              **THE COURT:**  Right.

6          **MR. COWLEY:**  And it would be great --

7          **THE COURT:**  Which is why I want to turn to the

8  government and find out, you know, how likely is this to be an

9  issue?  And if it is, why not just -- you have, like, 16

10 different guilt theories here that are not being challenged,

11 why -- why are we, you know, having this conversation?

12     So is there anything else before I turn to the government

13 on this?

14     I think I -- I think we've narrowed it substantially.  And

15 there's a couple of different ways that the government maybe

16 would want to resolve it or not.  Then I'll call it.

17         **MR. COWLEY:**  Yeah, I would -- yeah, I would welcome

18 that dialogue.  We called the government after the superseder

19 to confirm that that sort of second -- the freestanding duty

20 theory, as I described it, was still in play, and they said it

21 was.

22              **THE COURT:**  Let me hear from the government on that.

23         **MR. ZELINSKY:**  Your Honor, as to the Court's first

24 point, different theories of guilt for the government are like

25 children, we love them all equally.

1         **THE COURT:**  Sure, but sometimes you have to let one
2  go off to college.

3         **MR. ZELINSKY:**  Touché.

4     I think the first point I want to make, because I do
5  think, in one sense, it's something I want to underscore just
6  on the conversation we just had, which is in addition to the
7  make or caused to be made, there's also the conspiracy theory
8  that's there.

9         **THE COURT:**  Right.  Absolutely.

10         **MR. ZELINSKY:**  That's very much -- and we all agree
11  that there's no question that the government has alleged that
12  Dr. Kazempour is in a conspiracy with somebody who owes a duty.
13  That is Dr. Pourhassan that we all agree with.

14     And so in that sense, we don't have to prove an
15  independent duty from the conspiracy theory.

16         **THE COURT:**  You do not.

17         **MR. ZELINSKY:**  And we're all on board there.

18         **THE COURT:**  And I'm going to tell you right now,
19  like, I don't think you need to prove an independent duty for
20  conspiracy, for A and C on securities fraud, for aiding and
21  abetting, clearly, on B, and for wire fraud.  And I'm going to
22  say why in a moment.

23     But as to the substantive theory of B, on a duty to
24  correct or omissions, what are we doing with that?

25         **MR. ZELINSKY:**  So we continue to believe that the

1    Court's decision that that is a jury question, that's a factual

2    matter to be decided by the jury, is correct.

3        And that the indictment properly pled on that B clause,

4    that there is a duty that is owed by virtue of the fact that he

5    is the regulatory agent and the fact that he sits on the

6    disclosure committee.  And that is enough, given what we have

7    pled there, for the jury to be able to determine whether or not

8    there is a duty.

9        Now, of course, the Court has an opportunity to consider,

10    after all the evidence has come in in the case, whether or not

11    we've put into sufficient evidence to be able to substantiate

12    that theory, as it would any other theory of guilt at -- that's

13    contained in the indictment.

14        But it doesn't make sense, and we cannot find a case, nor

15    do I believe can defense counsel find a case to support the

16    notion that that's a determination which has been properly pled

17    to be made by the Court in advance of the presentation of

18    evidence.

19        So we have consistently held and consistently argued, and

20    this Court has held --

21            **THE COURT:**  But just to, again, put a finer point --

22    listen, I'm doing this because I just want to get it right.

23    Not because I'm creating some new -- like, you can come back 18

24    times on a motion for reconsideration, I'll hear you every

25    time.

1        This is an important legal issue, and it's a hard one.

2        The defense has really narrowed this to those statements,

3    if there are any, where there's no evidence Dr. Kazempour

4    helped create or caused to create the statement.

5        And yet, the government's theory is based on a preexisting

6    legal duty, he has a duty to correct the misstatement in the

7    public domain.

8        Are there those in this case?

9            **MR. ZELINSKY:**  Your Honor, just to be clear, there

10   are statements that Dr. Pourhassan makes, for example, in

11   interviews that are given, right, when we go over the YouTube

12   interviews, that Dr. Pourhassan did not edit or create.  They

13   are not like the one where he says "I want to make this more

14   positive."

15           **THE COURT:**  You mean Dr. Kazempour?

16           **MR. ZELINSKY:**  I'm sorry, Dr. Kazempour didn't edit

17   or create.

18       Dr. Pourhassan goes out there to continue -- and those are

19   done in furtherance of the conspiracy.  And they are not

20   created by Dr. Pourhassan -- I'm sorry, they are not created by

21   Dr. Kazempour, he's not the maker, he didn't cause them to be

22   made.

23           **THE COURT:**  Right.

24           **MR. ZELINSKY:**  But they are made in furtherance of

25   the conspiracy.

1          THE COURT:  And you can use them for that.  I don't

2    see that there's -- I mean, for you to be able to say --

3    because conspiracy law, right, is not so precise that the jury

4    can consider all of this.

5          MR. ZELINSKY:  So in answer to the Court's question,

6    which was --

7          THE COURT:  Yeah.

8          MR. ZELINSKY:  -- are there any statements that are

9    made by Dr. Pourhassan that are not approved by Dr. Kazempour

10   that are not made in -- that are not covered by their

11   conspiracy, the answer to that would be no.  We think that

12   everything that Dr. --

13         THE COURT:  But I guess here's my more specific

14   question, is are there any of those statements that you will

15   use to support 10 -- Section 10b-5(b), liability, which

16   prohibits the making, causing others to make untrue statements

17   of material fact, and omitting to state and causing others to

18   omit to state material facts necessary in order to make

19   statements made in the light of the circumstances under which

20   they were made not misleading.

21       Are you standing up and saying, listen, there's ten ways

22   that Dr. Kazempour can be guilty of this provision, and one way

23   is, even though he wasn't the maker of the statement, the

24   statement that Dr. Pourhassan made, Dr. Kazempour can be guilty

25   of this subsection because he had a preexisting duty to

1    correct?

2    **MR. ZELINSKY:**  Yes.  And this Court rightly found

3    that the duty is a question to be determined by the jury and

4    not the judge in advance of the trial.

5    **THE COURT:**  Right, I did find that.  But I am -- I am

6    now -- this is the one I'm revisiting, because I -- I think

7    I -- I better understand the moving target.  The target has

8    landed.

9    And I have gone over these cases again.  And if I credit

10   the Third Circuit, which I'm not saying I'm going to, right?

11   Because that's another question, is I'm not really sure the

12   Third Circuit rationale would live in the Fourth Circuit.

13   But if I do, doesn't it stand for the proposition that

14   there has to be -- there has to be a duty that is pled in the

15   indictment that either -- either is maker of the statement,

16   preexisting -- statutory duty or insider training.

17   Maybe what you're saying to me is, we're going with maker

18   of the statement, and for that, you got *Prousalis,* and that's

19   enough.  Defense is saying it isn't.

20   **MR. ZELINSKY:**  Well, we are, in part, going with

21   maker of the statement.

22   And I think part of it is, it's very difficult to have

23   these kind of discussions in a vacuum.

24   **THE COURT:**  I know.

25   **MR. ZELINSKY:**  And that's part of why we think that

1  this is an issue that shouldn't -- and that's why we put in all

2  the support for this, it's just not an issue that's ripe for

3  determination at this point in time.

4         **THE COURT:**  Yeah.

5         **MR. ZELINSKY:**  And so I think it's very difficult to

6  sit here today to talk about what may or may not happen as to

7  how this comes in at trial.

8      I think that's why the government has consistently said

9  this is not an issue to be decided at this juncture.  It's an

10  issue to be decided when the Court and, frankly, the parties

11  have the benefit of the whole record that comes in, and that's

12  why it's a jury question.

13      So in answer to the Court's question, the answer is yes,

14  there could be statements like that where we will say both this

15  is he made it or caused to be made, or if you don't find that

16  he made it or caused it to be made, he had a duty to correct

17  it.

18      How do you know he had a duty to correct it?  It was by

19  virtue of the fact that he was a regulatory agent, he had a

20  contractual relationship, and that he was the -- on the

21  disclosure committee.

22      And we will argue that they can find that there's a duty

23  as a result of those obligations.

24         **THE COURT:**  And that's where I am not sure you're

25  right.

1          **MR. ZELINSKY:**  And the Court -- and all I'm saying

2    is, we don't think that that is the appropriate -- that now is

3    the appropriate juncture to make that determination in a

4    vacuum.

5          We believe that it is a jury question, as the Court -- and

6    we think that this is not the right time to make that

7    determination.

8          That we should -- we won't argue it in opening, right?

9    But we should let the evidence come in, and then we can have a

10   discussion, when we get to the jury instructions, which would

11   be the logical time that this sort of matter would usually come

12   up, right?  This first came up in a jury -- preliminary jury

13   instructions when we have our charging conference, and we make

14   a determination with the full benefit of the record that's in

15   place as to what the Court's opinion on the matter will be.

16          **THE COURT:**  So what I'm thinking about is that what

17   you don't have a problem with here, defense, is notice.  You're

18   on full notice as to what the government's theory is.

19          They are not going to -- they are not going to come up

20   with some statutory duty or some other preexisting duty.  They

21   have told you what the bases of the duty are, and they have

22   told it to me, you know, more than once.

23          And so -- and the evidence is going to come in either way.

24   It's going to be what it's going to be.  I mean, there's not --

25   if I went with your theory here, I'm not going to exclude

1  anything because it all comes in as conspiracy, as scheme, as

2  maker.  It either is this maker of the statement or is not the

3  maker of the statement.

4      So where I am on this is it's slightly different, because

5  you have been given notice, unlike some of these other cases,

6  and then the question is, is it a proper theory of guilt, like,

7  as a matter of law?

8      I cannot wait until the evidence comes in and then put the

9  question to the government again, which is what do you have

10 that supports this theory where I should even let this go to

11 the jury in this form?

12         **MR. COWLEY:**  Yeah, a few -- a few just observations

13 on that.

14         **THE COURT:**  Okay.

15         **MR. COWLEY:**  One is, and I'll admit, this is sort of

16 responsive to the inverse of your question, you know, we've

17 given you a lot of cases that -- that show the ability of

18 courts sitting in the exact position you are now to make a

19 determination as this stage as to whether or not a duty exists.

20 You have the ability to do so now.

21     You know, in terms of, you know, if you're thinking is it

22 a good idea to sort of table this issue, is it going to affect

23 the evidence coming in, I mean, it could.

24     You know, I fully concede the fact that -- that

25 Dr. Kazempour was CytoDyn's regulatory agent, right?  That's

```
 1   coming in.  Like, we're not asking for that to be --

 2         THE COURT:  Sure, it goes to conspiracy, it goes to

 3   scheme.  It's part of the --

 4         MR. COWLEY:  -- excluded.  It's just part of the

 5   relevant facts, right?

 6         THE COURT:  Right.

 7         MR. COWLEY:  You know, in terms of him sitting on the

 8   disclosure committee --

 9         THE COURT:  Might it change, for example, if you are

10   able to elicit that Dr. Kazempour and 25 other people were on

11   the disclosure committee, and, like you had put in at the

12   motion to dismiss, that doesn't matter a hill of beans as to

13   what goes into an SEC filing?  This is the real evidence of who

14   decides what goes into the filing.  Isn't that like --

15         MR. COWLEY:  That -- that is all relevant as to who

16   is the maker or causing to be made, so that comes in.  If they

17   can connect --

18         THE COURT:  But doesn't it also go to duty?

19         MR. COWLEY:  What's that?

20         THE COURT:  Couldn't it also go to duty?  Couldn't

21   it, like, undermine the government's theory of duty completely

22   if you show that being a member of the disclosure committee

23   makes not a difference as to -- I mean, because I -- I guess

24   what I'm struggling with is, you have to go to the maker of the

25   statement, but doesn't it also, the flip of it, go to the duty
```

1    to correct?  And their argument would be like --

2         **MR. COWLEY:**  Only to the extent it's relevant to

3    the -- to the maker -- to whether or not by virtue of Kazem's

4    role on that committee that he was a maker or causing a

5    statement to be made.  That's how it's relevant.

6         There's no -- again, I -- I think there's -- the problem

7    is sort of this step one, step two, step three thing.  Like,

8    step one, the fact that he was on the disclosure committee, I

9    mean, is a fact, right?  There's nothing that's going to be

10   adduced at trial that's going to provide a legal basis for the

11   premise that mere membership, which is their theory, right?

12   Mere membership on the disclosure committee is what triggers a

13   direct duty to CytoDyn investors.  Like, nothing -- the trial

14   evidence isn't going to move the needle on that legal question.

15        **THE COURT:**  So I think this is where I -- where I am

16   in terms of just out of an abundance of caution.

17        The facts of the case -- you know, every case is

18   different, and every case comes in differently.

19        And given that there is a mutual, and I appreciate this, a

20   mutual acknowledgement on both sides, that this legal question

21   is relatively narrow based on a -- a theory of guilt as to one

22   of the counts, then I am going to wait.

23        I'm not going to deny it forever and a day.  But this

24   is -- this is maybe -- let me just put on the record where I

25   am, and that way you have the full benefit of my theory on it,

1   and I think we've now, again, thoroughly exhausted this.  We

2   put it to bed.  We deal with it after the presentation of the

3   government's case.

4        Where I am is that on this motion to reconsider, we can

5   all talk about the standard, that it's only proper to

6   reconsider when there is a clear error of law.  That's the one

7   that matters here.  And to prevent, manifest injustice.

8        And I invited the motion, because I wanted to ensure that

9   I'm not making a clear error of law, or any error, to the best

10  of my abilities, because I really want to get it right.

11       And Dr. Kazempour has effectively agreed that this

12  question of legal duty, a preexisting, standalone legal duty

13  does not affect the conspiracy count, it doesn't affect the

14  security fraud counts premised on A and C liability, or the

15  conspiracy theories in that regard, and it doesn't affect an

16  aiding and abetting theory as to Subsection B liability.

17       And in my view, it doesn't affect the fraud theory either,

18  for the following reasons, this is what I rely on.

19       So I deny the motion for reconsideration with regard to

20  these -- these counts.

21       The government, for the wire fraud count, pleads

22  Dr. Kazempour's involvement with the narrow slicing of duty

23  or -- I'm sorry, pleads involvement with Dr. Pourhassan in a

24  scheme to defraud, and the scheme liability as pled doesn't

25  require necessarily a narrow slicing of duty.  It's -- it's

1  that they, together, have -- have created a scheme or an

2  artifice to defraud by making material misrepresentations and

3  omissions to defraud the -- the investors.

4      But the wire fraud statute in that regard, it's broad, and

5  it's intended to punish all schemes and artifices to defraud by

6  using the wires.  And that has been robustly pled.

7      So I looked by way of analogy to *United States v. Colton,*

8  which is a case cited by -- a case that you cited to me, 231

9  F.3d 890, Fourth Circuit, 213.  Judge Motz had declined to

10 extend in the bank fraud context *Chiarella*.  And so in many

11 ways, I believe it really did tee up the issue well.

12     And in *Colton,* as in here, the defendant had been charged

13 with a bank fraud scheme arising from his involvement in

14 securing a corporate loan.

15     And Colton's argument on appeal was because the government

16 offered no evidence that Colton made any affirmative

17 misrepresentations or breached any fiduciary, statutory or

18 other independent legal duty to disclose, he cannot be held to

19 have violated the bank fraud statute, and cited heavily on the

20 securities and the securities fraud context.

21     And the Fourth Circuit rejected that contention

22 principally because, quote, the language of the bank fraud

23 statute was to be broadly construed so as to reach anyone

24 engaged in a scheme or artifice to defraud, including a scheme

25 to actively conceal material information through deceptive

215

 1  conduct with the intent to mislead and suppress the truth even

 2  in the absence of an independent legal duty to disclose such

 3  information.

 4       And that's at Page 904.

 5       So the wire fraud statute is substantially similar to the

 6  bank fraud statute, say for who the victims are designed to

 7  protect.  And you can compare the two statutes.

 8       So pursuant to *Colton,* I do reject these -- effort to

 9  extend any pleading requirement of an independent legal duty to

10  disclose in order for the government to go forward on the wire

11  fraud claims.

12       Now, the real fighting ground does seem to be Section B --

13  Subsection B of the securities fraud statute.

14       And I think we've come to some understanding that

15  *Prousalis* really does reject any applicability of *Janus* in the

16  criminal context.  Meaning, *Prousalis*, being a case about not

17  being the maker of the statement, but working with the maker of

18  the statement in a criminal enterprise, in a criminal scheme,

19  to defraud the investors, under Subsection B, still -- is

20  not -- is a permissible theory of guilt.

21       And I won't review.  It's too late to go through all of

22  the reasons why Judge Wilkinson found that *Janus* does not apply

23  to the criminal context.

24       Now, the defense is saying that may be, but that really

25  only addresses those statements in which there's some evidence

1  Dr. Kazempour was involved in the making of the statement, just

2  like *Prousalis*, that he worked with Dr. Pourhassan to review,

3  approve, correct, advance the false statement to the public.

4  That really doesn't address this independent issue of the

5  legal -- preexisting legal duty to correct those statements

6  that his alleged co-schemer made, but that he didn't have -- at

7  least before me right now, any evidence of joint criminal

8  conduct.

9      And, tentatively, I tend to agree with that, but I'm

10  finding it almost impossible to disaggregate, to figure out

11  sort of the thread of this liability as it's pled versus how

12  it's going to come in.

13      Where I land on this is fundamental to Dr. Kazempour and

14  to the defense teams, that you're put on notice as to what the

15  theory is so you can hold the government into account on that

16  theory.  And if the theory shifts or changes, then you can

17  bring, you know, a due process and all the other constitutional

18  challenges to no, no, no, you're held to the theory.  That's

19  one.  And I think you've been protected in that regard.

20      Two, my ruling today, I don't believe, is a final ruling,

21  because we have to get into the jury instructions.  And you can

22  always tell me at the end of the -- the evidence presentation,

23  given that the government isn't going to open with this, I'm

24  not going to allow them to open with it, I don't see any

25  prejudice in waiting, especially because there's no particular

1  evidence that's going to come in that would be exclusive to

2  this theory.

3        It's going to come in with regard to the conspiracy or the

4  other -- many other ways in which it's permissible, relevant,

5  probative evidence.

6        So out of an abundance of caution, I'm going to deny the

7  motion for now, and I expect that we'll talk about it in jury

8  instructions.

9        And if it -- if you convince me that really this theory of

10 duty to disclose is not a viable argument, then we strike that

11 from the indictment.  It doesn't get read to the jury as part

12 of the instruction.  There's no instruction on it.  There's no

13 theory of liability that attaches to it.

14       That's the best I can do right now.

15             **MR. COWLEY:**  Your Honor, if I may?

16             **THE COURT:**  Yes, go ahead.

17             **MR. COWLEY:**  I mean, one, I really appreciate how

18 much time and attention the Court has given to this.  It is

19 really important to Dr. Kazempour, and so I appreciate that.

20       If I understand where the Court is at correctly, you know,

21 as long as the government, you know, during opening, you know,

22 or otherwise before we get to jury instructions -- the time

23 where we're negotiating, discussing final jury charge, you

24 know, as long as they are not putting in front of the jury the

25 conclusion that Dr. Kazempour owes a direct duty to --

1          THE COURT:  To correct.

2          MR. COWLEY:  -- to CytoDyn investors, right?

3          THE COURT:  To correct.

4          MR. COWLEY:  Yeah, I mean, to correct, to -- you

5     know -- I don't even know -- I think -- and I welcome -- the

6     government and I, we can confer on this.

7          But I think as long as the notion of Dr. Kazempour having

8     a direct duty to CytoDyn investors is not injected into the

9     proceeding before the request to charge, then that's fine, we

10     can deal with that and whether or not it's a viable theory

11     at -- at that time, and how that maps onto omissions.

12          THE COURT:  Well, that seems to me -- I don't know.

13     That seems to me -- the sands seem to be shifting again.

14          We were on -- where we were two minutes ago was an

15     independent duty to disclose or correct.

16          MR. COWLEY:  Uh-huh.

17          THE COURT:  That's different than whether there's a

18     duty to the CytoDyn investors based on whether it's a

19     contractual relationship, plus a -- you know, a membership of

20     the disclosure committee, plus any other evidence that

21     Dr. Kazempour had such a relationship, that a duty to the

22     investors in some other context was formed.

23          Now, I don't know if the government is going to do that

24     anyway.  I mean, I expect that the government is going to stand

25     up and say this was a big scheme to defraud.  You know, they

1    got together, they cooked it up.  Everybody had a role, or

2    they -- both, too, had a role, these were their roles, and this

3    is how it went down.  So the word -- maybe --

4         **MR. COWLEY:**  I guess phrased differently, Your Honor,

5    as long as they are not injecting legal conclusions about --

6    with relating to this duty issue, about being a regulatory

7    agent or sitting on --

8         **THE COURT:**  But they can -- they can argue, like, the

9    facts will show this is what Dr. Kazempour was, and -- he was a

10   member of the CytoDyn regulatory committee.

11        **MR. COWLEY:**  Agree.  Agree.

12        **THE COURT:**  Or the disclosure committee.

13        **MR. COWLEY:**  Yeah.

14        **THE COURT:**  He was on the regulatory -- they did have

15   a contract, he worked closely.  That's all fair, right?

16        **MR. COWLEY:**  Yeah, yeah.  Those are facts.  Agree.

17        **THE COURT:**  And then if they set out the elements of

18   the offense, customarily what the government does, they just

19   follow the black letter law, right?  They don't get into the

20   minutia at opening statements because it's not proper.  It's

21   about what the evidence will show.  And you usually give a

22   roadmap.

23        And what you're saying is, the roadmap shouldn't get into

24   this esoteric question of independent duty?

25        **MR. COWLEY:**  Correct.

1          **THE COURT:**  Government, what say you on that?

2          **MR. ZELINSKY:**  It's fine.  I mean, as I said, we're

3     not going to argue -- first of all, we can't make any

4     conclusions of law in opening statement, because that's not

5     what opening statement is.

6          **THE COURT:**  Right.  And at best, what you do is give

7     a roadmap that's very general.

8          **MR. ZELINSKY:**  Right.

9        To be very clear, though, we do intend to put in evidence

10    supporting duty.

11         **THE COURT:**  Yeah.

12         **MR. ZELINSKY:**  So I think it's the word "inject" that

13    gives me some pause, that my colleague is using.  He doesn't

14    want us to inject, insofar as we're going to put on evidence of

15    exactly what's alleged in the indictment.  He was a member of

16    the disclosure committee which was responsible for reviewing

17    and approving CytoDyn's periodic reports filed with the SEC.

18         **THE COURT:**  Right.  But that goes to scheme, it goes

19    to conspiracy, it goes to knowledge.

20         **MR. ZELINSKY:**  It goes to a great number of things,

21    including duty.  We're not going to argue because it's not

22    appropriate to argue it in opening as to the duty that was

23    owed.  So we will deal with it when the instructions come in.

24         **THE COURT:**  Yeah.

25         **MR. ZELINSKY:**  But I just want to be clear, we hear

221

 1  the Court loud and clear.  There is no evidence that is

 2  precluded by -- from saying we can't argue this in opening.

 3  All the same evidence is going to come in.

 4      We're not planning to argue this independent sliver of

 5  duty in opening.  Frankly, candidly, I think it would be

 6  confusing to the jury to even try to bring it up at that point

 7  in time.

 8              THE COURT:  Agree.

 9              MR. ZELINSKY:  But we do intend to say the facts that

10  we prove, and those facts are related to this notion of duty,

11  the -- you know, the regulatory agent, contractual

12  relationship, existence on the committee, the disclosure

13  committee.

14              THE COURT:  Yeah.

15              MR. ZELINSKY:  So I think we are all on the same

16  page.

17              THE COURT:  I think we are, too.

18              MR. ZELINSKY:  But stuff shifts enough, that I -- no

19  pun intended, that I just want to be clear on where we are.

20              THE COURT:  Yeah, I think we are on the same page.

21  Everything that you allege in the indictment as a matter of

22  fact, you can discuss as a matter of fact that you intend to

23  prove.

24              MR. ZELINSKY:  Yep.

25              THE COURT:  And that you are likely to go very high

1  level on a roadmap of the -- of the charges, and that's it.

2  And we'll deal with this more esoteric question of duty in the

3  jury instructions.  And I think we're good.

4        **MR. COWLEY:**  That makes sense, Your Honor.

5        **THE COURT:**  Okay.

6        **MR. COWLEY:**  What's that?

7        **THE COURT:**  Okay.

8     So last question before you all get to enjoy your weekend,

9  is calendar.  We have a pretrial conference set for -- shout it

10  out.  What's our day?

11        **MS. ARCHER:**  October 21st.

12        **THE COURT:**  Thank you.  And then we begin trial the

13  week of -- wait.  We pick on the Monday, am I right?  The 4th?

14        **MS. JERRY:**  November 4th.

15        **THE COURT:**  So on the 21st is when I expect to

16  resolve Mr. Denis, the scope of his testimony.  And we'll deal

17  with voir dire, preliminary instructions.

18     Yes?

19        **MR. ZELINSKY:**  Your Honor, one question, given

20  counsel's trial schedules, and Mr. Reilly, who has recently

21  joined the team.  I think that tentatively works.  He has

22  something scheduled for the 21st.  We would like the Court's

23  ability to talk over the next couple of days with defense

24  counsel to see if we can propose another date at or around the

25  21st together with chambers.  Obviously that's contingent on

1    the Court's availability and working it out with counsel.

2         But I just want to ask the Court for permission to have

3    that conversation with them.

4         And I think it's actually a conversation we started but

5    had not gotten to the end of.

6         I think we should go forward at this point in time with

7    that tentative planning.  And if it's permissible with the

8    Court, we will talk with defense counsel about whether or not

9    there's a mutually amenable time, or days --

10            **THE COURT:**  To change it?

11            **MR. ZELINSKY:**  -- right around that time, and we'll

12   consult with chambers to see if your chambers has availability.

13            **THE COURT:**  Let me make sure, though, for the

14   pretrial, what we're dealing with is voir dire, opening

15   instructions, resolving Mr. Denis, but nothing else, right?  I

16   think we have now -- oh, Mr. Melley.

17            **MR. ZELINSKY:**  Yeah.  We are working to negotiate

18   that issue as well.  So we are in contact, and we will advise

19   the Court promptly if there are additional issues that arise.

20            But we're trying to negotiate back and forth with

21   counsel -- I know it's hard for the Court to believe in the

22   context of this litigation, but actually limit us coming to the

23   Court if we don't need to.

24            **THE COURT:**  Well, hope springs eternal.  I'm a

25   glass-is-half-full kind of girl.

1      The reason why I'm asking is, you know, right now, we've

2  got two hours set aside.  I think that's plenty, but --

3      **MR. ZELINSKY:**  I mean, given our track record, I

4  would say two hours is probably not enough.  But hope springs

5  eternal, so --

6      **THE COURT:**  The thing is voir dire.  Have you all

7  done voir dire yet?  I can't remember.  I know we were on the

8  eve of trial and then we moved it.

9      **MR. ZELINSKY:**  I have to look.  I believe there's

10 been a preliminary voir dire that we have submitted to the

11 Court as to what we want and not.  But we can -- we can check

12 on that.

13     **THE COURT:**  Okay.  All right.  All I would ask you to

14 do is just revisit that it's in the format that I use, because

15 the format is no secret.

16     **MR. ZELINSKY:**  Yeah.

17     **THE COURT:**  And so there are many Greenbelt AUSAs who

18 have it, and it saves a ton of time if you just put it in that

19 format.

20     Okay.  All right.  So right now, we'll leave it as is, two

21 hours, 21st.

22     Otherwise, is there anything else we need to talk about?

23     **MR. ZELINSKY:**  Nothing further from the government.

24     **MR. LURIE:**  No, Your Honor.  Thank you.

25     **THE COURT:**  All right.  Thank you all.  Have a great

1    weekend.

2        Real quickly, for Mr. Ulander's benefit -- where's my

3    notes?  Hold on.

4        Okay.  So I am deferring on ECF -- well, 173, I have

5    granted -- I've denied in part.  I am not excluding Mr. Denis'

6    testimony on a Rule 16 violation or under Federal Rule of

7    Evidence 401, 403.  And I'm deferring on the question of

8    reliability and admissibility under Daubert and Federal Rule of

9    Evidence, 702, et cetera.

10       For ECF 174, I've granted in part and denied in part

11   consistent with my ruling on the record.

12       And then with respect to the motion to reconsider the

13   question of legal duty, I have denied it without prejudice for

14   the defense to revisit the question of independent legal duty

15   as it pertains to Subsection B of the substantive securities

16   fraud charge.

17           **DEPUTY CLERK:**  There's an ECF --

18           **THE COURT:**  Is there an ECF?  No, it was an oral

19   motion from the June 24th hearing.

20           **DEPUTY CLERK:**  Okay.  Got it.

21           **THE COURT:**  Okay.  I think that does it.  Thank you

22   all.

23           **DEPUTY CLERK:**  All rise.  This Honorable Court now

24   stands adjourned.

25       (Proceedings were concluded at 4:28 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5   and for the United States District Court for the District of

6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7   the foregoing is a true and correct transcript of the

8   stenographically-reported proceedings held in the

9   above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                               Dated this 11th day of September 2024.

13

14

15                          /S/ Paula J. Leeper
                          _____
16
                          Paula J. Leeper, RPR
17                        Federal Official Reporter

18

19

20

21

22

23

24

25