# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

**v.**

**NADER POURHASSAN and
KAZEM KAZEMPOUR,**

      **Defendants.**

**CRIMINAL NO.  8:22-cr-00440-PX**

## GOVERNMENT'S GUIDELINES MEMORANDUM

# TABLE OF CONTENTS

I.    BACKGROUND .......................................................................................... 1

    A.   The Defendants' Counts of Conviction.................................................... 1

    B.   Other Relevant Conduct.......................................................................... 1

    C.   United States Probation Office Offense Level Calculations.................... 3

        i.    Pourhassan ...................................................................................... 3

        ii.   Kazempour ...................................................................................... 4

II.   GOVERNMENT'S GUIDELINES CALCULATION .................................. 5

    D.   Pourhassan ............................................................................................. 5

    E.   Kazempour ............................................................................................. 6

III.  GUIDELINES ANALYSIS........................................................................ 6

    F.   Pourhassan's Loss ................................................................................. 7

        i.    The Court Should Reject Defendant Pourhassan's Proposed Expert Analysis............. 18

    G.   Kazempour's Gain ............................................................................... 30

    H.   Victim Enhancement............................................................................ 32

    I.    Zero-Point Offender ............................................................................ 35

    J.    Sophisticated Means ............................................................................ 35

    K.   Enhancements Based on Defendants' Positions.................................... 39

        iii.  Defendant Pourhassan was an Officer of a Public Company ....................... 39

        iv.  Defendant Kazempour Abused a Position of Trust...................................... 39

IV.  RESTITUTION ....................................................................................... 43

V.   CONCLUSION....................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ............................................................. 22, 24

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp.
3d 676 (D. Md. 2018) ........................................................................................... 22

*Dura Pharmaceuticals,* Inc. v. Broudo, 544 U.S. 336 (2005). ...................................................... 9

*Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir.1993) ................................................... 26

*Gariety v. Grant Thornton*, 368 F. 3d 356 (4th Cir. 2004) .................................................. 22, 26

*In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006) ........................... 25, 29

*In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) ..................................................... 24

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ............................................................ 22

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008) 24

*United States v. Adepoju*, 756 F.3d 250 (4th Cir. 2014) ...................................................... 36

*United States v. Amin*, 839 F.App'x 810 (4th Cir. 2021) ....................................................... 33

*United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009) ......................................................... 9

*United States v. Berman*, No. 20-cr-00278 (TNM), 2025 WL 1423702 (D.D.C. May 16, 2025) 10

*United States v. Berman*, No. 24-3044, 2025 WL 2088508 (D.C. Cir. July 25, 2025) ................. 17

*United States v. Brack*, 651 F.3d 388 (4th Cir. 2011) ...................................................... 40

*United States v. Brandriet*, 840 F.3d 558 (8th Cir. 2016) ..................................................... 34

*United States v. Brunner*, No. 5:08CR16, 2010 WL 148433 (W.D.N.C. Jan. 12, 2010) ............. 33

*United States v. Davis*, 834 F. App'x 20 (4th Cir. 2021) ...................................................... 40

*United States v. George*, 949 F.3d 1181 (9th Cir. 2020) ...................................................... 33

*United States v. Hagen*, 468 F. App'x 373 (4th Cir. 2012) ................................................ 10, 11

*United States v. Jinwright*, 683 F.3d 471 (4th Cir. 2012) ..................................................... 36

*United States v. Keita*, 742 F.3d 184 (4th Cir. 2014) ........................................................ 7, 9

*United States v. Llamas*, 599 F.3d 381 (4th Cir. 2010) ......................................................... 44

*United States v. Merilia*, 640 F. App'x 239 (4th Cir. 2016) ..................................................... 36

*United States v. Minhas*, 850 F.3d 873 (7th Cir. 2017)..................................................................... 33

*United States v. Poulson*, 872 F.3d 261 (3d Cir. 2017)..................................................................... 33

*United States v. Rand*, 835 F.3d 451 (4th Cir. 2016)........................................................... 9, 10, 21

*United States v. Stone*, 866 F.3d 219 (4th Cir. 2017) .....................................................................11

*United States v. Sunmola*, 887 F.3d 830 (7th Cir. 2018)................................................................. 33

*United States v. Walker*, 818 F.3d 416 (8th Cir. 2016)................................................................. 10

## Statutes

15 U.S.C. § 78ff ........................................................................................................................... 1

15 U.S.C. §§ 78j(b) ..................................................................................................................... 1

17 C.F.R. §240.10b-5 ................................................................................................................. 1

18 U.S.C. § 1343 ........................................................................................................................ 1

18 U.S.C. § 3663A(a)(1)........................................................................................................... 43

18 U.S.C. § 3742 ........................................................................................................................ 7

## Other Authorities

17 CFR § 242.203(c)(6) ........................................................................................................... 25

Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding*
*Effects, and Bias*, 93 WASH. U. L. REV. 583, 590 (2015)....................................................... 28

Andrew Ang, Assaf A. Shtauber & Paul C. Tetlock, *Asset Pricing in the Dark: The Cross-Section*
*of OTC Stocks*, 26 REV. FIN. STUD. 2985 (2013) ................................................................. 26

Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases*, 38 BUS. LAW. 1, 17
(1982)................................................................................................................................... 30

David Tabak, LOSS CAUSATION AND DAMAGES IN SHAREHOLDER CLASS ACTIONS: WHEN IT
TAKES TWO STEPS TO TANGO 6 (May 27, 2004) ...................................................................... 29

Dmitry Krivin, Robert Patton, Eric Rose, and David Tabak, *Determination of the Appropriate*
*Event Window Length in Individual Stock Event Studie*s, National Economic Research
Associates (November 4, 2003) (unpublished and available at https://www.nera.com/insights/

publications/2003/determination-of-the-appropriate-event-window-length-in-
individu.html?lang=en) ......................................................................................... 26

Frank Torchio, Journal of Corporation Law; Iowa City Vol. 35, Iss. 1, 160-61 (Fall 2009). 27, 29, 30

Gene D'Avolio, *The Market for Borrowing Stock*, 66 Jour. of Fin. Econ. 271 (2002) .............. 25

ill Fisch, Jonah Gelbach & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Texas L. Rev. 553 (2018) ........................................................ 21, 28

SEC Rule 203(c)(6) ...................................................................................................... 25

Stephen J. Brown & Jerold B. Warner, *Using Daily Stock Returns: The Case of Event Studies*, 14 J. Fin. Econ. 3 (1985) ............................................................................................. 21

U.S.S.G. § 2B1.1 .................................................................................................. passim

U.S.S.G. § 2B1.1 cmt. n.4(F) .................................................................................... 33

U.S.S.G. § 2B1.1 cmt. n.9(B) .................................................................................... 35

U.S.S.G. § 2B1.1, Application Note 3(C) ........................................................... 7, 8, 14

U.S.S.G. § 2B1.1, Application Note 3(F)(ix) ............................................................. 12

U.S.S.G. § 3B1.3 ...................................................................................................... 39

U.S.S.G. §1B1.3(c) .................................................................................................... 3

U.S.S.G. §4C1.1(6) ................................................................................................... 35

USSG §5E1.1 ............................................................................................................ 44

**Rules**

Fed. R. of Evid. 702 .................................................................................................. 22

The United States of America, by and through its undersigned attorneys, hereby files this memorandum outlining its position under the United States Sentencing Guidelines ("Guidelines") as to the applicable offense level for Defendant Nader Pourhassan and Defendant Kazem Kazempour. The government has calculated Defendant Pourhassan's offense level at 35, and Defendant Kazempour's at 27. Additionally, the government has calculated that Defendant Pourhassan is responsible for $5,286,268.16 in restitution, and Defendant Kazempour is responsible for $409,311.78 in restitution.

I.    **BACKGROUND**

A.    **The Defendants' Counts of Conviction**

On December 9, 2024, a federal jury found Nader Pourhassan and Kazem Kazempour guilty of securities fraud and wire fraud following an approximately twelve-day trial. Defendant Pourhassan was convicted of four counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §240.10b-5 (Counts 2-5), two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 7 and 10), and three counts of insider trading, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §240.10b-5 (Counts 11-13). Defendant Kazempour was convicted of one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. §240.10b-5 (Count 3) and one count of wire fraud in violation of 18 U.S.C. § 1343 (Count 8), as charged in the Superseding Indictment (ECF No. 185).

B.    **Other Relevant Conduct**

At trial, Defendant Kazempour took the position that he and others at Amarex believed that the FDA would accept the BLA and were surprised when the FDA refused to file the application. The jury rejected that defense, convicting Kazempour for securities fraud and wire fraud for his role in the scheme to defraud CytoDyn's investors by submitting an incomplete

1

BLA to the FDA to artificially inflate CytoDyn's stock price (Count 3) and attempting to trade in CytoDyn securities the following day (Count 8).

Kazempour's defense at trial directly contradicted what he told U.S. District Judge Peter J. Messitte in this same courthouse in 2021. As relevant conduct at sentencing, the government will introduce Dr. Kazempour's sworn declaration, filed on October 26, 2021, in *CytoDyn v. Amarex Clinical Research LLC, et al.*, Case No. 8:21-cv-2533 (D. Md. Oct. 4, 2021), in which he swore under oath that "a refusal to file" for "missing and incomplete information" was "not surprising" and "exactly what was to be expected." In his signed declaration—wholly inconsistent with what he (unsuccessfully) argued at trial—Dr. Kazempour stated under penalty of perjury:

> Dr. Nader Pourhassan wrongly attempts to blame Amarex for CytoDyn's own issues, this time for the FDA's rejection of CytoDyn's Biological License Application for HIV treatment (the "BLA"). **In actuality, the FDA rejected CytoDyn's BLA because Dr. Pourhassan directed Amarex to file the BLA prematurely, knowing it was incomplete, lacking in appropriate content, and not ready for submission.** Dr. Pourhassan was warned of the issue repeatedly.
>
> Dr. Pourhassan sent the following affirmative directions to Amarex: "Please file the BLA no later than next week Wednesday, even if we are short in no matter what portion of whatever it is that we are short." See Ex. C, April 14, 2020 email from Nader Pourhassan to Amarex. His justification for his premature direction, as stated in his email, stems from a stock price drop and to allay "investors who are very frustrated with me and CytoDyn." *Id.*
>
> At Dr. Pourhassan's direction, Amarex submitted the incomplete and lacking BLA to the FDA. **Not surprisingly, the FDA rejected the filing and refused to file it because the "application does not contain all the pertinent information and data needed to complete a substantive review." Ex D, FDA Refusal to File Letter dated July 8, 2020. Dr. Pourhassan and CytoDyn received exactly what was to be expected, a refusal to file for missing and incomplete information** or, as Dr. Pourhassan put it: "even if we are short in no matter what portion of whatever it is that we are short."

Kazempour Decl. ¶¶ 21-24 (emphasis added).

In the same civil matter, Defendant Pourhassan also signed a materially false and

misleading Declaration in which he claimed that the FDA's refusal to file was attributable to Amarex's conduct and failed to disclose that Defendant Pourhassan directed Amarex to file the BLA even if it was incomplete. Both defendants' civil declarations should be considered as relevant conduct for consideration in determining their sentences. Kazempour Decl., *CytoDyn v. Amarex Clinical Research LLC, et al.*, Case No. 8:21-cv-2533, ECF No. 27-1; Pourhassan Decl., *CytoDyn v. Amarex Clinical Research LLC, et al.*, Case No. 8:21-cv-2533, ECF No. 6-2.

Given the split verdict in this case, the government anticipates that Defendant Kazempour particularly will likely argue that the Court should disregard any acquitted conduct from consideration. However, the government's Guidelines analysis does not rely on acquitted conduct. *Cf.* U.S.S.G. §1B1.3(c) ("Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction.") Defendant Kazempour was convicted of a scheme to defraud Cytodyn investors in relation to the BLA, and that is what his Guidelines score is based on.

### C. United States Probation Office Offense Level Calculations

#### i. Pourhassan

The United States Probation Office calculated the applicable offense level for Pourhassan as follows[1]:

| | |
|---|---|
| **Base offense level (U.S.S.G. §2B1.1(a)(1)):** The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1, and the offense of conviction is referenced in the guideline and has a statutory maximum term of imprisonment of 20 years or more | 7 |
| **Loss (U.S.S.G. §2B1.1(b)(1)(K)):** According to the victim impact statements and victim interviews obtained by the Government, the loss amount is more than $9.5 million, which represents the aggregate loss amount for all of the victims who have provided | 20 |

---

[1] Pourhassan PSR, ¶¶ 62-73.

| | |
|---|---|
| statements or interviews in the case. | |
| **Victim Enhancement (U.S.S.G. §2B1.1(b)(2)(B)):** According to the facts provided by the Government, this fraud resulted in financial hardship to five or more victims. Specifically, the Government has approximately 20 victims who would qualify in category of substantial financial hardship based on either their victim impact statements, trial testimony, or statements given to law enforcement when they reported a total or almost total loss to their retirement accounts, savings accounts or investment accounts. | 4 |
| **Sophisticated Means (U.S.S.G. §2B1.1(b)(10)(C):** The offense otherwise involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. Specifically, according to the facts provided by the Government, the defendant engaged in a sophisticated scheme to defraud investors by submitting something to the FDA in order to provide cover for when he issued a false press release alleging that the BLA had been submitted incomplete. He also worked to downplay the corrections the FDA told him he had to issue. Additionally, the defendant used misleading subgroup analysis to mislead investors into thinking the COVID trials could lead to FDA approval when he knew that it could not. He told the FDA one thing in an addendum while he issued an addendum to shareholders that omitted key information. | 2 |
| **Officer or Director of a Public Company (U.S.S.G. §2B1.1(b)(20)(A)(i)):** The offense involved a violation of securities law, and at the time of the offense, the defendant was an officer or a director of a publicly traded company. Specifically, according to the facts provided by the Government, the defendant was the CEO, president, and a director of CytoDyn from 2012, until January 24, 2022. As part of his role as CEO, the defendant was integral to the issuance of CytoDyn press releases—he together with legal counsel, the Company's Chief Financial Officer, and a number of subject matter experts, was involved in directed the preparation of releases and typically reviewed, edited, and approved the final press release before they were issued by the company. | 4 |
| **TOTAL:** | 35 |

Probation calculated Pourhassan to have no criminal history score and put him in

Category I.

### ii.   Kazempour

The United States Probation Office calculated the applicable offense level for

Kazempour as follows[2]:

| | |
|---|---|
| **Base offense level (U.S.S.G. §2B1.1(a)(1)):** The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1, and the offense of conviction is referenced in the guideline and has a statutory maximum term of imprisonment of 20 years or more | 7 |
| **Loss (U.S.S.G. §2B1.1(b)(1)(G)):** The gain of the defendant's June 2020 stock sales was at least $340,000, which is used because there was a loss, but it cannot be reasonably | 12 |

---

[2] Kazempour PSR, ¶¶ 74-84.

| | |
|---|---|
| determined, is between $250,000 and $500,000. | |
| **Victim Enhancement (U.S.S.G. §2B1.1(b)(2)(B)):** According to the facts provided by the Government, this fraud resulted in financial hardship to five or more victims. Specifically, the Government provided information that more than five victims reported losing all or the majority of their retirement contributions, are now living paycheck to paycheck, and are now worried about paying bills on time. | 4 |
| **Sophisticated Means (U.S.S.G. §2B1.1(b)(10)(C)):** The offense involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. The defendant's conduct in relation to the intentional submission of an incomplete BLA and the simultaneous announcement to the market that they had submitted a completed BLA is sophisticated because the defendant's conduct was specifically designed to give him plausible deniability with respect to the Cytodyn announcement. | 2 |
| **Abuse of Trust (U.S.S.G. §3B1.3):** The defendant abused a position of public or private trust, specifically, CytoDyn's regulatory agent, in a manner that significantly facilitated the commission or concealment of the offense | 2 |
| **Zero-Point Offender (U.S.S.G. §§4C1.1(a) and (b)):** The defendant meets the criteria at USSG §§4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point Offender. | -2 |
| **TOTAL:** | 25 |

Probation calculated Kazempour to have no criminal history score and put him in Category I.

## II. GOVERNMENT'S GUIDELINES CALCULATION

### A. Pourhassan

The government largely concurs with the offense level calculation set forth in the PSR for Defendant Pourhassan, except that, as outlined below, the government's updated loss analysis places Pourhassan's loss one loss band lower than the calculation contained in the PSR. The government has calculated Pourhassan's Guidelines score as follows:

| | |
|---|---|
| **Base Offense Level (U.S.S.G. §2B1.1(a)(1))** | 7 |
| **Loss (U.S.S.G. §2B1.1(b)(1)(J)):** Between $3.5 million and $9.5 million | 18 |
| **Victim Enhancement (U.S.S.G. §2B1.1(b)(2)(B))** | 4 |
| **Sophisticated Means (U.S.S.G. §2B1.1(b)(10)(C))** | 2 |
| **Officer of Publicly Traded Company (U.S.S.G.** | 4 |

| §2B1.1(b)(20)(A)(i) | |
|---|---|
| **TOTAL** | **35** |

Taking into account a Criminal History Category I, the government calculates Pourhassan's advisory Guidelines range to be 168-210 months.

### B. **Kazempour**

As with Pourhassan, the government largely concurs with the offense level calculation set forth in the PSR for Kazempour, except that the government disagrees that Kazempour qualifies for the two-point reduction for zero-point offender, for the reasons discussed below. The government has calculated Kazempour's Guidelines score as follows:

| | |
|---|---|
| **Base Offense Level (U.S.S.G. §2B1.1(a)(1))** | 7 |
| **Gain (U.S.S.G. §2B1.1(b)(1)(G))**: Between $250K and $550K | 12 |
| **Victim Enhancement (U.S.S.G. §2B1.1(b)(2)(B))** | 4 |
| **Sophisticated Means (U.S.S.G. §2B1.1(b)(10)(C))** | 2 |
| **Abuse of a Position of Trust U.S.S.G (§3B1.3)** | 2 |
| **TOTAL** | **27** |

Taking into account a Criminal History Category I, the government calculates Kazempour's advisory Guidelines range to be 70-87 months.

## III.    GUIDELINES ANALYSIS

Defendants' challenges to the Guideline calculations set forth in the PSR are largely driven by disagreement as to the amount of loss or gain, the scope of conduct properly attributed to the offenses of conviction and relevant conduct, and the existence of individual victims. Specifically, defendants argue the securities fraud and wire fraud schemes of which they were convicted did not cause CytoDyn investors any loss at all. Alternatively, Defendant Pourhassan challenges the sufficiency and reliability of the evidence of loss, including whether the particular

victims that testified at trial and provided victim impact statements and brokerage statements have sufficiently demonstrated that they "suffered losses from the conduct of conviction." Dkt. 329 at 2. In other words, the CytoDyn investors who have come forward and represented that they incurred losses on their investments, are not victims of the defendants' crimes. Additionally, Defendant Kazempour argues that he should be sentenced based on a loss amount of zero, not gain; and alternatively, if he was to be sentenced based on gain, his actual gain from the offenses of conviction was $0. For the reasons outlined below, the defendants' arguments should be rejected. A careful examination of the record and the applicable sentencing enhancements shows that Defendant Pourhassan's offense level is 35 and Defendant Kazempour's offense level is 27.

### C. **Pourhassan's Loss**

In a securities fraud matter, the Court should look to U.S.S.G. § 2B1.1 to calculate the loss amount. "The determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court" that is reviewed as a finding of fact for clear error. *United States v. Keita*, 742 F.3d 184, 191 (4th Cir. 2014) (citation omitted). "The court need only make a reasonable estimate of the loss" and, because of the sentencing judge's "unique position to assess the evidence and estimate the loss[,]" that calculation is entitled to "appropriate deference." U.S.S.G. § 2B1.1, Application Note 3(C) (citing 18 U.S.C. § 3742(e) and (f)); *Keita*, 742 F.3d at 192 ("the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.") (internal punctuation omitted). When the loss amount exceeds $6,500, the Court then looks to table at U.S.S.G. § 2B1.1(b) to determine the additional increase to the Defendant's offense level based on the extent of the loss. The Guidelines instruct that loss estimates should be based on "available information, taking into account, as appropriate and practicable under the circumstances, factors such as … [t]he

reduction that resulted from the offense in the value of equity securities or other corporate assets." U.S.S.G. § 2B1.1, Application Note 3(C)(v). The government (and PSR) provide a conservative method to measure loss based on actual victims that came forward, purchased during a narrow view of the scheme, and substantiated their losses with brokerage records.[3] This approach both covers the entirety and full scope of Defendant Pourhassan's scheme while also deducting any victim sales that were made before the market learned the truth. It is a very cautious approach and soundly within the scope of the Court's discretion and at least consistent with the "appropriate and practical" approach directed by the Guidelines. U.S.S.G. § 2B1.1, Application Note 3(C). The Court should adopt a loss amount for Defendant Pourhassan of $5,286,268.16,[4] and, accordingly, add 18 offense levels. U.S.S.G. § 2B1.1(b)(1)(J).

Defendant Pourhassan was unequivocally convicted of a scheme to defraud CytoDyn's investors concerning both its fraudulent submission—and subsequent touting—of a completed BLA for HIV and its falsehoods regarding the efficacy and viability of treating Covid-19 with

---

[3] A victim's actual brokerage statements are the best and most accurate evidence of their securities transactions. Defendant Pourhassan, in his expert's disclosure, *see* Ex. 2, seems to wrongly suggest that bluesheets are a more accurate tool for substantiating securities transactions. Defendant Pourhassan and his expert are severely mistaken. Brokerage records are the best and most accurate business records to show what transactions actually occurred in a given securities accounts. Bluesheets are primarily an investigative tool subject to errors produced by data feed errors, data inconsistencies, non-compliant brokers, the fact they must be affirmatively and manually requested by the SEC, missing entries due to omnibus accounts and clearing brokerage submissions, and their generally imprecise nature. It is for this reason that when discussing an individual's trading – such as in the sentencing proceedings here – the individualized brokerage statements are the best evidence. Individual brokerage statements are used to validate the accuracy of bluesheets, not – as Defendant Pourhassan suggests – the other way around.

[4] The PSR recommends adding 20 levels based on a loss amount of between $9.5 million and $25 million based on preliminary calculations offered by the government. Pourhassan PSR ¶ 63. This figure likely comes from initial loss analysis provided by the government. Based on the final analysis by FBI Forensic Accountant Peter Flack (*see* Ex. A) the government—applying even more restrictive measures on its analysis than in the preliminary calculations—now recommends the Court find a loss between $3.5 million and $9 million, resulting in the addition of 18 offense levels. U.S.S.G. §2B1.1(b)(1)(J).

leronlimab.  Moreover, he was convicted for insider trading—earning more than $4.4 million—on the basis of material, nonpublic information concerning the reality that the BLA was incomplete when submitted.  Defendant Pourhassan was not convicted simply for his role in isolated misstatements, as one might find in a typical civil securities fraud suit primarily against a corporation.  Instead, the jury found that he engaged in a securities fraud and wire fraud scheme that lasted from, at least, April 2020 to May 17, 2021.  *See* Defendant Pourhassan Jury Verdict (ECF No. 280) (convicting defendant of Counts 2-5, 7 charging schemes from 2018 to 2021).  Accordingly, the proper calculation of loss for his sentence requires considering his fraud throughout the time period of his scheme.  *See United States v. Rand*, 835 F.3d 451, 467 (4th Cir. 2016) (in securities fraud cases, the court is tasked with the "determination of loss attributable to a *fraud scheme*") (emphasis added) (quoting *Keita*, 742 F.3d at 191).  The Fourth Circuit has expressly rejected the use of *Dura Pharmaceuticals*[5] loss-causation standards in criminal securities fraud sentencings.  *Rand*, 835 F.3d at 469.  Instead, "[i]n criminal sentencing . . .  a court gauges the amount of loss <u>caused</u>, i.e., the harm that society as a whole suffered from the defendant's fraud" as opposed to focusing on particular individuals.  *Id.* (emphasis in original) (quoting *United States v. Berger*, 587 F.3d 1038, 1044 (9th Cir. 2009)).  "[W]here the value of securities have been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society in the amount of the fraud-induced overvaluation, even if various individual victims' respective losses cannot be precisely determined or linked to the fraud."  *Id.* (quoting *Berger*, 587 F.3d at 1044).  Accordingly, for sentencings, there is not the same reluctance to allowing "mere overvaluation as a basis for establishing loss . . . . in the criminal sentencing context[.]"  *Id.* (quoting *Berger*, 587 F.3d at 1044).  This permits a "fraud-on-the-market" theory

---

[5] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

for evaluating victim losses.  *See id.* at 468.  For the reasons discussed below, a loss amount of $5.286 million is a reasonable estimate of the loss comfortably within the parameters that courts use to calculate loss in complicated securities fraud matters.

The government proposes using the highly conservative approach of calculating loss based on victim investors who came forward, provided their supporting brokerage statements, and purchased CYDY between April 9, 2020 and May 17, 2021[6] (a narrow take on the duration of Defendant Pourhassan's securities fraud scheme).[7]  *See* Exhibit 1, Affidavit of FBI Forensic Accountant Peter Flack ("Flack Aff.") (describing the parameters by which the government included victims in its calculations).  The government calculated the real losses of these actual

---

[6] The method subtracts out any sales during the period of the fraud.  This accounts for the concerns addressed in *United States v. Hagen* that "only losses caused by the fraud may be attributed to [the defendant] for Guidelines purposes."  468 F. App'x 373, 390 (4th Cir. 2012). Because CytoDyn was arguably not a "worthless company" after the May 17, 2021 FDA Statement on Leronlimab, the government does not use "the entire amount raised by the schemes" but reduces that amount by its worth after the May 17, 2021 disclosure.  *Id.* (affirming the district court's finding that "the loss caused by the defendants' fraud was at least $20 million" for purposes of sentencing).

Although, it could reasonably be argued that CYDY has become "worthless" since the disclosure of defendants' fraud and many of the Victim Investors' submissions suggest they view it as much.  Notably, by Dec. 31, 2021, CYDY closed at under $1 per share.  Today, CYDY trades at $0.26 per share.  This is a long fall from the $3.73 that CYDY reached on April 27, 2020, the day of the fraudulent "completed BLA" press release, *see* GX 849; GX 35, and the $8.77 closing price on June 29, 2020, during the height of the scheme, GX 849.

[7] The government's approach takes the freedom permitted by *Rand* to consider "fraud-on-the-market[,]" 835 F.3d at 468, but still limits the pool of victim investors for calculation to those that came forward and provided supporting records for their investment. This method has the benefit of being both true to the Fourth Circuit's principals on securities fraud sentencing and grounded in unimpeachable factual support.  *See, e.g.*, *United States v. Walker*, 818 F.3d 416, 422-23 (8th Cir. 2016) ("The district court committed no clear error in reasonably estimating the actual loss resulting from [defendant's] fraud offenses as equaling the total amounts lost by [the] investors who submitted Victim Impact Statements.");  *United States v. Berman*, No. 20-cr-00278 (TNM), 2025 WL 1423702, at *7 (D.D.C. May 16, 2025) ("The victims signed their impact statements, establishing their veracity. And the Government need only substantiate the victims' losses by proving them by a preponderance of the evidence. The Government has done so here.").

victims based on comparing the prices they paid for CytoDyn securities (at a time when Defendant Pourhassan's fraud had inflated the value of the stock) to the value of those securities based on the closing price on May 17, 2021. *See id.* ¶¶ 4-15 (describing the process for calculating loss for Defendant Pourhassan). This was the date that the bubble was burst and the truth was revealed by the FDA's publication of its unprecedented Statement on Leronlimab. *See* GX 186; *see also Hagen*, 468 F. App'x at 390 ("cases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud" and finding such a case existed there in affirming district court's loss finding at sentencing); *United States v. Stone*, 866 F.3d 219, 228 (4th Cir. 2017) (affirming district court's loss finding and holding, in a mortgage fraud case, that "[b]ecause the evidence before the district court supported a finding of loss in the amount of the mortgage balances less the proceeds [defendant] sent to the lenders, and because any other valuation of the mortgages was too speculative, the court's loss calculation was reasonable").

This method has significant practical and equitable appeal. *First*, it does not rely on statistical modeling or theoretical financial economic principals to determine the loss. Instead, it tracks the real losses of actual victims as opposed to relying on mathematical tools to estimate what investors may have invested based on defendant's fraud. This method provides only verified victims' losses on the counts of conviction. *Second*, it is a verifiable method of measuring loss from the discrete pool of investors who came forward as victims and supported their claims of loss with actual brokerage statements. It removes any guesswork or attempts to extrapolate across the entire population of investor victims. The Court can take measure of this universe of investors and credit their loss claims. *Third*, this is a highly conservative method for

measuring loss. It results in a considerably lower loss amount than if the government had proceeded under the modified rescissory method ("MRM") discussed at U.S.S.G. § 2B1.1, Application Note 3(F)(ix)[8] or utilized a broad-based bluesheets method.[9] *Fourth*, the proposed loss calculation mirrors the restitution calculation for Defendant Pourhassan fostering consistency and judicial economy in the analysis. For all of these reasons, the government's proposed approach is well within the bounds of the healthy discretion given to district courts in calculating the loss amount in securities fraud cases.

The government's methodology involves the following steps and is explained in step-by-step detail in the attached Flack Affidavit (Ex. 1):

- The government isolated the 27 Victim Investors[10] that purchased CYDY during the period of Defendant Pourhassan's fraudulent scheme: April 9, 2020 through May 17,

---

[8] Under the MRM, Defendant Pourhassan's loss amount for the scheme of conviction would be approximately $1,147,769,187.06. Under that method, the Court calculates "the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and multiplying the difference in average price by the number of shares outstanding." U.S.S.G. § 2B1.1, Application Note 3(F)(ix). Here, the average price of CYDY during the scheme was $3.74 and, for the 90 dafter the scheme, it was $1.72. The difference is $2.01. The total number of shares outstanding was at least 568,242,391. *See* GX 4. Accordingly, under the MRM, the loss amount should be $1.147 billion. Even if there were other factors that caused a reduction in the amount, the loss amount under this methodology would likely be in the hundreds of millions and require 30 levels to be added under U.S.S.G. § 2B1.1(b)(1)(P).

[9] Even back of the napkin math on a bluesheets based calculation of loss – using all of the investors in defendant's expert's bluesheet March 30 – May 17 bluesheet March 30 – May 17 bluesheet March 30 – May 17 period – would yield a loss amount of $34 million to $35 million. If Defendant Pourhassan wants to use his proposed loss approach, there should be a 22 level increase for the entire bluesheet universe that purchased during his time period. *See* U.S.S.G. §2B1.1(b)(1)(L).

[10] Families were grouped as a single investor for purposes of these calculations.

2021.[11]  This pool was drawn from the victim investors that came forward and provided

supporting brokerage statements (either at trial or in connection with sentencing) for their

purchases of CYDY.

- The government then calculated the price paid by these victims for their shares.

- Then, the value of any CYDY sales prior to May 17, 2021 were removed from the

  calculation.[12]

- Ultimately, the government took the net total value of shares acquired between April 9,

  2020 and May 17, 2021 and held as of May 17, 2021, and subtracted the value of those

  shares after the corrective disclosure (*i.e.* the Statement on Leronlimab) was made public.

  The resulting figure—$5,286,268.16—is the inflated value paid by the Victim Investors

  as a result of Defendant Pourhassan's fraudulent scheme.

Accordingly, the reasonable estimate of loss from Defendant Pourhassan's fraudulent scheme is

at least $5,286,268.16.

As discussed earlier, an essential finding that the Court should make to find the correct

loss amount is that Defendant Pourhassan engaged in a scheme to defraud investors from 2018 to

---

[11] These dates correspond with the CytoDyn 10-Q filed on April 9, 2020 disclosing that the company expected to file the remaining sections of the BLA by April 2020, GX 714, and the May 17, 2021 Statement on Leronlimab, GX 186.  This is a conversative measure of the start of defendant's fraudulent scheme with regard to the BLA and comes after the text message in February 2020 for which Defendant Pourhassan was acquitted.  *See* GX 6.  For the avoidance of doubt, the government does not agree that the acquittal on this count changes the relevant time period based on the jury's verdict on the other fraud counts that correspond to a scheme from 2018 to 2021.  However, consistent with the other proposals related to loss, the government utilizes this date as a particularly conservative measure for calculating loss.

The government uses May 17, 2021, the date of the FDA Statement on Leronlimab as the end of the scheme for sentencing as that is the date on which the market, for the first time, had full information about the true state of play for leronlimab's prospects for both HIV and Covid-19. *See* GX 186.

[12] *See* fn. 10 *supra*.

2021. This finding is not difficult to make and naturally flows from the jury's verdict on five different counts—three securities fraud and two wire fraud counts—all that explicitly charged a scheme to defraud. *See* Defendant Pourhassan Jury Verdict (ECF No. 280) (convicting defendant of Counts 2-5 and 7, charging schemes from 2018 to 2021). This entire trial was about Defendant Pourhassan's ubiquitous and systemic lies to investors about both the submission of the BLA for HIV and leronlimab's ability to treat Covid-19 and CytoDyn's prospects for obtaining an EUA for that purpose. Despite Defendant Pourhassan's anticipated attempts to recast it otherwise, this case was not about isolated misstatements. To evaluate the loss to investors by looking at specific misstatements—as opposed to the multi-year scheme Defendant Pourhassan was charged with and the jury convicted him of—would be to consider singular trees instead of the forest. Any attempt to parse out individual misstatements, when the record and counts of conviction were about an extensive scheme to deceive would be to improperly dilute investors' losses. The law does not require the Court to go down the path of ignoring the scheme convictions in favor of hyper-fixation on individual statements. U.S.S.G. §2B1.1, Application Note 3(C)(v) ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence . . . [t]he estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he reduction that resulted from the offense in the value of equity securities or other corporate assets.). The Court should decline Defendant Pourhassan's invitation to ignore the extent of the scheme and ascribe to him the loss he caused by continually perpetuating false information to investors, over multiple years, about whether CytoDyn's sole drug had a viable path to market.

Lies from Defendant Pourhassan about leronlimab were omnipresent in the CYDY marketplace. His lies polluted the entire pool of information about this company—there is no separating the lies about the BLA or COVID-19 from anything else occurring with the company from 2018 to 2021. These were touted as the immediate paths to purported marketability. And there was nothing else of substance happening with the company besides trying to get leronlimab to market. Tr. Vol. 8, 38:22 – 39:20 (Testimony of Michael Mulholland). This was "[c]entral to its existence." *Id.* at 39:18-20. As was referenced repeatedly at trial, CytoDyn was a single drug, pre-revenue company. *Id.* at 38:22-24. Investor funds served as the path to revenue; investment was essential to develop the drug and revenue was impossible without bringing the drug to market. *Id.* at 39:5-17. The trial evidence established that Defendant Pourhassan was continuously—rather than just during the executions of the scheme—advancing the false e narrative first that CytoDyn was on the precipice of submitting a BLA, then that the BLA submitted was complete, simultaneously that leronlimab could be commercialized for use in treating Covid-19, and ultimately that CytoDyn's clinical trials would support an EUA. *See generally* Testimony of Nitya Ray, Tr. Vol. 6-7; *see, e.g.,* GX 2 (April 13th e-mail from Defendant Pourhassan: "Please file the BLA no later than next week Wednesday, even if we are short in no matter what portion of whatever it is that we are short."); GX 35 (April 27, 2020 press release announcing submission of completed BLA); GX66C (video of Defendant Pourhassan holding up three fingers indicating his view of what he anticipated CYDY's stock price to reach); GX 71 (March 5, 2021 press release touting benefits of CD-12 clinical trial misleading indicating that it succeeded in meeting its primary endpoint). Additionally, the trial testimony and Victim Impact Statements from Victim Investors support that investors relied on defendant's misrepresentations regarding the BLA for HIV and the use of leronlimab for Covid-

19.[13]    Lastly, and most importantly, were Defendant Pourhassan's own admissions that his market-facing lies about leronlimab were what dictated stock price movements.  *See, e.g.*, GX 2 ("Today we have so far in 1 hour almost 20% drop in our stock price.  Yesterday we had drops also after putting out great results about Covid-19 patients we are seeing these type of decline. This drop will be much deeper if we don't file our BLA as the message board now is getting bombarded by investors who are very frustrated with me and CytoDyn." "THE MOST IMPORTANT thing now is BLA."); GX6 and GX30 (additional messages from February 2020 and April 2020, where Defendant Pourhassan also indicated that the submission of the BLA was central to the company's stock price); GX 36A (Defendant Pourhassan indicating on an investor call that leronlimab's use for Covid-19 and the BLA were the first and second most significant moves in the company's history); GX 159 and Tr. Vol. 9, 89:12-17 (Defendant Pourhassan rejecting edits to remove misleading language concerning the results of CD-12 "for the sake of our shareholders"); GX 66C (Defendant Pourhassan in investor video suggesting that Covid-19 clinical trial results were incredibly significant for the company and could result in a three times increase in the stock price).

As the D.C. Circuit recently approvingly discussed, there is a sensible and common sense approach that district courts can take when evaluating the time frame where a securities fraud

---

[13] Tr. Vol. 4, 154:15-20; 166 – 168 (victim investor Wei Kang testifying that she would not have invested had she known the BLA was incomplete when submitted); Vol. 3, Tr. 160:6 – 161:3 (victim investor David Horvath directly relied on press release re: BLA and said was "very important" because it allowed him to "make educated decisions about . . . investments" to hopefully be able to return an investment); Tr. Vol. 6, 165:4-16 (victim investor Russell Munves testimony); Tr. Vol 4, 128:18-24 (victim investor Christopher Lonsford testifying that knowing the BLA was incomplete would have led him to investing less in CytoDyn); C.L. Victim Impact Statement, VIS-110 ("I was following CYDY and Nader Pourhassan during covid.  I thought this was a miracle drug based on all other news and PR they were putting out.  I kept pouring more into the stock every time we seemed to have good news"  "Felt like I was just buttered up to have everything taken away"); GT Victim Impact Statement, VIS-183.

scheme, like here, inflated a company's stock price over a particular period of time: look at the stock chart.   In *United States v. Berman*, the D.C. Circuit affirmed the district court's loss calculation where the district court explained that the 'objective evidence' also supported [the district court's] determination that the fraud was disclosed only by the indictment."   *United States v. Berman*, No. 24-3044, 2025 WL 2088508, at *3 (D.C. Cir. July 25, 2025).   In *Berman*:

> DECN's stock price in 2020 roughly followed a bell-curve shape, increasing shortly after [the defendant's] first fraudulent statements and returning to its original level only after the indictment was unsealed. Before the fraud began, the "stock was around two cents a share." During the period in which Berman conducted the charged fraud, the stock traded "significantly above that true fair market value." And after the indictment disclosed the fraud, "the price returned to that true fair market value of two cents per share." That bell-curve, the district court reasoned, provides "further support" for the December 18 fraud-disclosure date.[14]

*Id.* (internal citations omitted).   The same objective evidence approach could be applied here. Once Defendant Pourhassan began amplifying his false and misleading statements concerning the forthcoming filing of the BLA and purported use of leronlimab for Covid-19, CYDY's stock price rose.   *See* PX0414; GX 714; 35; 36-A; 901; 849.   And the stock price returned to nearly the pre-pump level (and largely stayed there) following the May 17, 2021 Statement on Leronlimab. *See* GX 186; 901; 849.   As GX 901 shows, there is a discernible curve tracking the scheme and consistent with the government's loss calculation adding objective support to utilizing the proposed April 2020 to May 2021 time period to measure victim loss:

---

[14] The *Berman* court continued that "the court reinforced that finding by crediting the government expert's econometric analysis, which compared DECN's price movements to those of a biotechnology stock index to show that the price freefall in December was not attributable to general market conditions." *Berman*, 2025 WL 2088508, at *3.   Here, as explained below, even Defendant's Pourhassan offered expert analysis failed to show in its market model analysis that CYDY was statistically significantly correlated to the "peer companies" used in his event study.



### i. The Court Should Reject Defendant Pourhassan's Proposed Expert Analysis

Based on his expert disclosure, the government anticipates that Defendant Pourhassan will attempt to argue that the loss amount should be either $165,501 or $31,754 premising his entire theory of loss on CytoDyn's March 30, 2021 statement regarding COVID-19. *See* Ex. 2 (Expert Disclosure of David Denis "Denis Report"). The Denis Report is not a reliable method of measuring individual investor loss and should not be accepted by this Court. The Denis Report does two things: *first*, it conducts event studies on select misstatements from the Superseding Indictment[15] and, *second*, it attempts to implant event study methodology on top of actual victim investor losses and apply event study methodology to a scheme conviction. Put simply, Denis uses a test that theorizes market-wide reaction to certain misstatements and tries to apply it to dilute the actual harm suffered by specific victim investors. These are Victim

---

[15] This is seemingly the same event study that Defendant Pourhassan noticed before trial, which he ultimately abandoned and did not present at trial.

Investors that have come forward and, many of which, articulated their reliance on Defendant Pourhassan's fraudulent scheme. Denis's method is not an accepted approach and, in fact, the Denis Report offers no precedent in which a court has applied this extraordinary and ill-suited approach to measuring individual victim losses. That is likely because the methodology of the Denis Report makes little sense: it uses a tool meant to estimate unknown market-wide victim losses for isolated misstatements and slaps it onto the lived experience of specific victims of a fraudulent scheme. It is the epitome of comparing apples to oranges.

The event study itself should be facially rejected because the Denis Report fails to establish, on two separate essential grounds, that an event study is proper here: (1) Denis fails to show that CYDY traded in an efficient market and (2) Denis fails to show that the peer entities used in his market model are statistically significantly correlated to CYDY's market movements. In other words, Denis's event study is fatally flawed because he conducts an event study in an inefficient market. Denis has admitted to this Court that the market must be efficient for an event study to have value. *Daubert* Hearing, Sept. 6, 2024 Tr. 64:19-24.[16] Then, in the essential first step—determining the comparative market for which he will evaluate the significance of CYDY's price movements—he uses a comparative market model that <u>fails</u> to establish statistical significance.—he uses a comparative market model that <u>fails</u> to establish statistical significance. –he uses a comparative market model that <u>fails</u> to establish statistical significance. Then, in the essential first step—determining the comparative market for which he will evaluate the significance of CYDY's price movements—he uses a comparative market model that <u>fails</u> to establish statistical significance. *See* Ex. 2 at ¶¶ 33-34; *contra id.* fn. 26 (noting that the first step

---

[16] "THE COURT: But your ultimate opinion is -- it's based on an efficient market, right?
THE WITNESS: Correct. Without an efficient market, looking at stock price changes on a given day aren't going to tell you very much about the value relevance of that disclosure."

of an event study is to conduct a regression comparing the normal sensitivity of the stock price to market and industry movements).  As discussed below, a review of the supporting data provided by Denis for his event study reveals that for all days in Denis's study, the "industry index" used to compare CYDY had an insignificant factor (*i.e.* there was not a statistically significant correlation) and for eight of the days they were <u>negatively</u> correlated.  Denis should not have proceeded with his event study with this foundational flaw; but he did.[17]  Both of these components are essential to even consider an event study and Denis's event study fails at both steps.  Secondly, even if the event study were proper, there is no basis to lay it on top of individual victims.  An event study is a tool to use in the absence of the actual, specified victims and a statistical calculation cannot undermine the harm they actually suffered.  Worse, Denis's selection of misstatements to evaluate does not even include the critical May 17, 2021 Statement on Leronlimab, which is internally inconsistent with the methodology described in his expert report.  *Compare* Ex. 2 ¶ 19 and fn. 19.

Lastly, the use of an event study makes no sense in this case because Defendant Pourhassan was convicted of a scheme, not making specific isolated misstatements.  The effectiveness of Defendant Pourhassan's scheme was that he told lie after lie about CytoDyn's prospects for leronlimab for both HIV and COVID-19.  There is no singular misstatement that Defendant Pourhassan made to entice investors, it was built on a series of misleading statements

---

[17] Of concern, Defendant Pourhassan did not initially provide the necessary supporting material for the government to evaluate the regressions that Denis ran to evaluate his market model.  Only after the government had to specifically ask for the relevant information did Defendant Pourhassan provide such information.  This enabled the government to confirm what it had suspected: Denis's market model findings were not significant for the "peer index" and he should not have proceeded with an event study based on them.

that built over time.[18] And, even when one of his lies was exposed, he would regroup, reframe the misrepresentation, and conceal the original lie to investors. *See, e.g.*, GX 44-46 (CytoDyn putting out a series of press releases in May 2020 which, first, attempted to bury the fact that the FDA did not accept the BLA and then concealed that it had been incomplete when originally filed while failing to disclose that CytoDyn had submitted an incomplete BLA originally and did not have the information necessary to complete the BLA submission). In the end, an event study that measures the purported statistical significance of isolated misstatements is not an appropriate tool for determining "loss attributable to a *fraud scheme*" *Rand*, 835 F.3d at 467 (emphasis added). The absurdity of the Denis Report is revealed in its claim that only the March 30, 2021 press release about COVID-19, GX 52, was the only event that caused loss in the entire case. Anyone who actually attended the trial knows that this particular press release was after a series of other misleading press releases about Covid-19 and false and misleading results of the clinical trials, Ex. 2 at ¶ 41. And while it was certainly fraudulent, it was hardly the fulcrum of the trial. This alone reveals the disconnect between the Denis Report and the actual scheme for which Defendant Pourhassan was convicted at trial.

a. CYDY Does Not Trade in Efficient Market

---

[18] Separately, Denis's event study methodology improperly applies a three-month estimation window and also improperly incorporates the period of the fraud within his estimate of expected returns. This is inconsistent with the literature. Peer-reviewed literature estimating expected returns in event studies use a period excluding the events at issue and show a preference for examining the year prior to the period that the fraud occurred. *See, e.g.*, Stephen J. Brown & Jerold B. Warner, *Using Daily Stock Returns: The Case of Event Studies*, 14 J. FIN. ECON. 3 (1985) (setting estimation period for expected returns as day -244 to -6 before the event period); *see also* Jill Fisch, Jonah Gelbach & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 TEXAS L. REV. 553, 582 n. 164 (2018) ("Since the possibility of unusual stock return behavior is the object of an event study in the case, these dates should be removed from the set used in estimating the market model, and we do exclude them.").

As the Court is aware, and everyone agrees, an event study is only proper and therefore reliable for consideration under FRE 702 if it is evaluating a security in an efficient market. *See Daubert* Hearing Tr. 64:19-24. As was covered extensively before trial, courts look to a series of non-exhaustive factors to consider in determining whether a security trades in an efficient market. *See Gariety v. Grant Thornton*, 368 F. 3d 356, 368 (4th Cir. 2004) *(citing Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989)). The five *Cammer* factors are:

> (1) the average weekly trading volume of the [stock], (2) the number of securities analysts following and reporting on [it], (3) the extent to which market makers traded in the [stock], (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the [stock's] price[ ].

In addition, there is a second set of factors, set forth in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). These are the three *Krogman* factors: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')." *Id.* at 474; *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 690 (D. Md. 2018) (applying the *Cammer* and *Krogman* factors in determining if an efficient market existed). In light of Defendant Pourhassan's weak support for an efficient market finding during the *Daubert* hearing and Denis's own ever-shifting testimony concerning whether CYDY even traded in an efficient market,[19] the Court contemplated exercising its gatekeeping function and excluding Denis's event study altogether.[20] While the

---

[19] *Daubert* Hearing, Sept. 6, 2024 Tr. at 177:19 – 178:2 (The Court: "But the threshold issue of -- of efficiency, market efficiency, is very bothersome to me. And I think it's bothersome that the opinion moved. It moved from presumption, to 'I can't exclude it,' to 'This is my opinion,' and I do not -- and it is -- it is tied to all the metrics he then chose. The reason why he chose one day is because the market is efficient. Sort of everything -- so much of his opinion is based on that presumption."); 181:14-15 (the Court summarizing Denis's testimony on market efficiency as "it started off as 'I presume,' and then 'I reject,' and now 'I embrace.')

[20] *Id*. at 175:5-10: (The Court: "Did he adequately explain [market efficiency] today? I mean, if I were a juror, I would have no idea what he was talking about. Because it didn't -- you know, and

22

Court ultimately decided against excluding the study altogether, now, as the finder of fact, the Court can apply the overwhelming weight and credibility issues that compromised Denis's testimony the first time around and decline consideration of it at sentencing.

Nevertheless, a look at the relevant factors conclusively demonstrates that CYDY does not operate in an efficient market. The Denis Report glaringly did not fully evaluate certain relevant factors (*i.e.* he only looked at 2020, but the scheme covered 2018-2021) or they failed. Only one *Cammer* factor passed without issue.

| *Cammer* Factor | Denis Result/Status |
|---|---|
| The stock's average weekly trading volume | Only evaluated 2020 |
| The number of securities analysts that followed and reported on the stock | Failed |
| The presence of market makers and arbitrageurs | Did not evaluate |
| The company's eligibility to file a Form S-3 Registration Statement | Passed |
| A cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price | Did not evaluate |

Most critically, Denis did not evaluate whether CytoDyn's stock price responded to news over the relevant period. Multiple courts have concluded that this efficiency factor is "the most

---

that's my -- as the gatekeeper, I have to make sure that the opinion is well grounded in the first instance so that the jury can understand it and it can aid them."); 178:21-23 ("I'm not quite sure I can decide that it is sufficiently reliable under *Daubert* and 702."); 180:23-25 ("I think the credibility issue is not nearly as significant as the lack of evidence on the basis for the testimony, on the reliability of it."); Tr. 181:4-12 ("If I just take Mr. Denis, his -- his opinion where he agreed to a reasonable degree of certainty, this is an efficient market, and I look at the underlying basis for it, and I reject it, that's not a -- that's not a credibility determination. That's just you have no -- you know, you're pointing me to ten factors, seven of which, you know, you didn't -- you said either were a wash or point in the other direction, your opinion is not reliable. That's -- that's where I'm concerned right now[.]") 182:22-24 ("Listen, at the end of the day, I just got to wrestle with whether this is a showstopper in terms of Daubert and reliability, or whether it is fodder for cross.").

important factor." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008) ("Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered 'the most important[ ] Cammer factor[.]'" ) (quoting *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005)). The Denis Report claims that evaluation of a price response to news was not possible since the company was "pre-revenue" and "lacked the standard earnings events." Ex. 2 at fn. 38. Denis fails to justify that conclusion through any type of analysis. Even excluding earnings events, the *Cammer* court wrote that "unexpected corporate events" were also relevant events to consider in that test. *Cammer*, 711 F. Supp. at 1287 (D.N.J. 1989) ("[I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory."). Here, Denis does not provide a sufficient justification to exclude this test, which is particularly alarming given its critical importance. Worse, the Denis Report is internally inconsistent by claiming that it is impossible to evaluate a cause-and-effect relationship between events and stock price changes, and then using the impact of events on the firm's stock price changes to quantify inflation and investor loss.

The *Krogman* factors fare similarly:

| ***Krogman* Factor** | **Result/Status** |
|---|---|
| The market capitalization of the firm | Only evaluated 2020 |
| The bid-ask spread of the security | Did not evaluate |
| The size of the public float | Only evaluated 2020 |

Finally, on two other metrics that he considered, the factor fails or Denis applies sloppy workmanship:

| Metric | Result/Status |
|---|---|
| Serial correlation | Failed |
| Short sellers/constraints | Insufficient test[21] |

The Denis Report evaluates if changes in CYDY's stock price may be predicted using past price changes, known as a serial correlation test. Ex. 2 at fn. 38. He finds that CYDY fails that test, *id.*, which implies sluggishness in the stock's price discovery mechanism. This finding indicates that CYDY did not impound information quickly and that news impacting the stock on the first day of a price reaction also had an impact on the second day. *See In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278 (D. Mass. 2006) (holding that, to be efficient, "the reaction to news be fully completed on the same trading day as its release"). Despite finding that CytoDyn tends to react slowly, Denis inexplicably, but very purposefully, restricts his event studies to one-day intervals based on the efficiency findings. *Id.* at ¶ 32. This was an issue of

---

[21] Regarding short selling, the Denis Report uses a typical approach and claims that "fails-to-deliver in the market for CytoDyn did not exceed 0.5% of the shares outstanding for more than five consecutive settlement dates in accordance with SEC Rule 203(c)(6), indicating a lack of constraints on short selling." Ex. 2 at fn. 35. Denis fails to note that SEC Rule 203(c)(6) only relates to the designation of a security as a "threshold security" that are subject to certain trading rules. 17 CFR § 242.203(c)(6) (defining threshold security). This is not a comprehensive test for short sale constraints, but rather is a technical rule for broker-dealers and is insufficient to evaluate whether market participants, such as arbitrageurs, were subject to short sale constraints. The government understands that practitioners typically look at the lending rate that brokers charge to borrow the stock, not fails to deliver under an SEC rule for a separate purpose, to evaluate this step. Gene D'Avolio, *The Market for Borrowing Stock*, 66 JOUR. OF FIN. ECON. 271, 274 (2002) ("Several recent studies employ security loan rate data to directly measure the effects of short-sale constraints."). This is particularly concerning given that Denis failed to evaluate whether arbitrageurs were even present in the market (*i.e. Cammer* factor three). *See* Ex. 2 at fn. 38.

concern at the *Daubert* hearing and remains fatal to Denis's attempt to claim market efficiency. *Daubert* Hearing Tr. 176:7-22, (The Court: "And he did indicate that he chose one day because it's – it's a – it's an efficient market. But he didn't ground that in any sort of accepted – you know, larger accepted methodology. . . But I'm saying the way -- how do I assess that that's different -- how do I assess that what he's saying is based on his expertise and not *ipse dixit*, take my word for it? It's -- by saying, like, in my field, we have certain preestablished parameters, and these are the bases for those parameters.); *cf. Gariety*, 368 F.3d at 368 ("[t]he more thinly traded the stock, the less well the price reflects the latest pieces of information") (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1130 (7th Cir.1993).)   Compounding the issue, Denis inappropriately did not use a price reaction windows longer than one day for his event study.  Ex. 2 at ¶ 32.  Denis' strict consideration of single-day price reactions also contravenes standard practice, which prescribes that event window length should depend on the complexity of the information disclosed.[22]

And, all of Denis's analysis on this front is contrary to the financial literature stating that over-the-counter penny stocks like CYDY are illiquid and highly volatile, with changes in value unrelated to external market forces.  *See*, *e.g.*, Andrew Ang, Assaf A. Shtauber & Paul C. Tetlock, *Asset Pricing in the Dark: The Cross-Section of OTC Stocks*, 26 REV. FIN. STUD. 2985 (2013) ("traditional factor models—using factors constructed from listed returns—do not account for

---

[22] *See* Dmitry Krivin, Robert Patton, Eric Rose, and David Tabak, *Determination of the Appropriate Event Window Length in Individual Stock Event Studie*s, NATIONAL ECONOMIC RESEARCH ASSOCIATES (November 4, 2003) (unpublished and available at https://www.nera.com/insights/publications/2003/determination-of-the-appropriate-event-window-length-in-individu.html?lang=en) ("While a no-arbitrage analysis under the efficient market hypothesis states that stock price movements should be unpredictable, this does not mean that new information has to be incorporated instantaneously. Rather, the market must incorporate information as quickly as it can be processed.")

the large illiquidity, size, value, and volatility return premiums in OTC markets.")  For all of these reasons, Denis has not resolved the threshold issue that CYDY did not operate in an efficient market and therefore his event study cannot be utilized to evaluate loss in connection with Defendant Pourhassan's sentencing.[23]

### b.  Denis Fails to Establish a Proper Market Model

It is standard in the event study literature that if a stock is not correlated with the market model it is compared to, then it is improper to proceed to the next step of the event study analysis.  Nonetheless, Denis trudges ahead here.

In preparing an event study, as Denis recognizes in Ex. 2 at fn. 26, the economist first identifies comparable market on which to assess the expected returns of the stock in question on a given day (hereinafter the "Market Model").  The Market Model is the baseline on which the subsequent analysis is judged: how much a stock moves is compared to what it would be expected to move based on what the Market Model does on the same day.[24]  For his Market Model,[25] Denis uses the OCTQB market and a list of peer firms from CytoDyn's 2020 proxy statements (which were collected for the purpose of evaluating compensation, not formulating an appropriate event study).  Ex. 2 at ¶¶ 33-34.  However, once the government received Denis's

---

[23] Denis's contrary finding that finds "with a reasonable degree of certainty" that CYDY traded in an efficient market, Ex. 2 at ¶ 36, should be rejected as incredible based on the empirical flaws and credibility issues with that opinion discussed at length above.

[24] "When significant new information about the company (e.g., corrective disclosures, earnings reports, dividend changes, stock splits, regulatory rulings, acquisition bids, asset sales, or tax legislation) is disclosed to the market, the market model is used to determine the component of the stock return that would be expected based on the return of the overall market and industry. The remaining component of the stock return (that which cannot be explained by the return on the market and industry) is attributed to the new company-specific information or to chance." Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, JOUR. OF CORP. LAW; Iowa City Vol. 35, Iss. 1, 160-61 (Fall 2009).

[25] Denis conducted a separate Marlet Model for each of the 13 days he analyzed.

supporting analysis, it confirmed that there are serious issues with the regression used.  Most notably, for each of the 13 models ran, the peer index used was statistically *insignificant* and, even more surprisingly, most have a coefficient (or beta) that shows a *negative* relationship with CYDY (*i.e.* CYDY moved inconsistently with the peer index).  For eight of the models ran using the OTCQB, the correlation was also statistically *insignificant*.  The table below highlights the unsuitably of Denis's Market Model:

| Event Date | Insignificant Factor? | | Negative Coefficient? | |
|---|---|---|---|---|
| | OTCQB | Peers | OTCQB | Peers |
| 2018-11-13 | Yes | Yes | | |
| 2019-02-01 | | Yes | | Yes |
| 2019-03-18 | | Yes | | Yes |
| 2020-04-27 | Yes | Yes | | Yes |
| 2020-05-04 | Yes | Yes | | Yes |
| 2020-05-06 | Yes | Yes | | Yes |
| 2020-05-11 | Yes | Yes | | Yes |
| 2020-05-13 | Yes | Yes | | Yes |
| 2020-06-08 | Yes | Yes | | Yes |
| 2020-12-22 | | Yes | | |
| 2020-12-28 | | Yes | | |
| 2021-03-08 | | Yes | | |
| 2021-03-30 | Yes | Yes | | |

This begs the question as to why Denis included these indices in his Market Model given that it is contrary to standard practices.  *See* Fisch, Gelbach & Klick, 96 TEXAS L. REV. at 571 and fn. 119 ("To determine the expected return for the security in question, an expert will estimate a regression model that controls for the returns to market or industry stock indexes. The estimated coefficients from this model can then be used to measure the expected return for the firm in question, given the performance of the index variables included in the model." (citing Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 WASH. U. L. REV. 583, 590 (2015) ("The failure to make adjustments for the effect of market and industry moves nearly always dooms an analysis of securities prices in litigation.")).

The persistent lack of statistical significance also speaks to the reliability of the estimated magnitude of the industry index in estimating the return of CytoDyn on event days.[26]  Further, Denis's Market Model results fail to support the hypothesis that the price of CYDY was generally correlated with industry-specific events.  This indicates that CYDY's prices generally were uncorrelated with external market forces during the period he analyzed.  *See* Torchio, JOURNAL OF CORPORATION LAW, 165 ("Thus, stock price evidence to support an allegation of loss causation based on an inflated purchase price will only be readily available in cases where the defendant makes an affirmative misstatement *relative to market expectations*.") (emphasis added) (quoting David Tabak, *Loss Causation and Damages in Shareholder Class Actions: When It Takes Two Steps to Tango* 6 (May 27, 2004) (unpublished manuscript, available at https://www.nera.com/insights/publications/2004/loss-causation-and-damages-in-shareholder-class-actions-when-it.html?lang=en)).  This combined with the failure to find a cause-and-effect relationship between unexpected events and resulting movements in price (fifth *Cammer* factor), Ex. 2 at fn. 38, and that Denis found CYDY failed the serial correlation test for 2020, *id*. at fn. 36, only further indicate the lack of evidence that CYDY is operating in an efficient market and support a finding of unreliability for Denis's event study only using one-day return.  *See PolyMedica*, 453 F. Supp. 2d at 278 ("The positive serial correlation of PolyMedica's stock price, therefore, suggests that it did not "quickly" and "fully" respond to material information during the Contested Period.")

c.  Denis fails to Assess the May 17, 2021 Corrective Disclosure

---

[26] *See* Torchio, JOUR. OF CORP. LAW, 161 ("Event studies are most useful in determining the effects of new information on security prices when . . . it is possible to isolate the effect of the news item from market, industry, and other issuer-specific factors simultaneously affecting the issuer's security price.  The event study methodology involves the following well-defined steps: a) A market model is estimated to permit the removal of market and possibly industry-wide effects from the day-to-day security returns[.]"

As a final note, Denis's failure to include May 17, 2021 – a date he embraces as the corrective disclosure for the Covid-19 aspect of the fraudulent scheme (Ex. 2 at fn. 19) – is similarly problematic and inconsistent with the literature on the proper construction of event studies. *See* Torchio, JOURNAL OF CORPORATION LAW, 167 and fn. 30 ("the stock price reaction to information that corrects a prior misstatement, or to information that provides the previously omitted information, generally can be a more reliable measure of materiality than the stock return on days when information was misstated or omitted" and "[i]n general, the materiality of allegedly misstated or omitted information is measured on a corrective disclosure") (citing Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases*, 38 BUS. LAW. 1, 17 (1982)). Given that the FDA was correcting Defendant Pourhassan's false and misleading statements to ensure truthful information reached the market, that Defendant Pourhassan did not make the statement is irrelevant. *Cf.* Ex. 2 at fn. 19.

***

Defendant Pourhassan is committed to relitigating issues he lost at trial and desperate for a battle of the experts. The problem is that he was convicted of engaging in a securities fraud scheme—not making isolated misstatements—and the government and PSR use a simplified, specific victim forward approach that is quite conservative and does not invite the statistical battle he wants to wage. For these reasons, the Court should not consider the Denis Report and proceed with the simpler, victim-driven methodology that the government and PSR recommend.

### D.  **Kazempour's Gain**

The Guidelines Manual provides that "the court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." USSG §2B1.1(b)(1)(B).

Kazempour argues that the loss from the offense is zero, by citing to the fact that the share price continued to be elevated after the BLA scheme was largely complete in the summer of 2020. However, this argument demonstrates exactly why loss cannot be reasonably determined as to Defendant Kazempour. At trial, there was significant evidence about the overlapping nature of the schemes to defraud investors in relation to both the HIV BLA and COVID-19. For example, on the April 27, 2020 investor call, in which Cytodyn followed up its false press release with an investor call, in which Defendant Pourhassan repeated the lie that the company had submitted a completed BLA. *See* GX 36A. However, at the same time he was discussing that, he touted the company's purported prospects to treat COVID-19: "I thought the day we filed the BLA . . . that the BLA filing will be the biggest news of Cytodyn history, but thank God, it is not the case." GX36-A at 2. In the press release that Cytodyn announced that the BLA had been rejected by the FDA, the first section after the announcement is entitled, "About Coronavirus Disease 2019." PX2226. In the 10-K the company filed in August 2020 in which it discussed its strategy for moving forward on the rejected BLA, those discussions were interspersed with talk about treating COVID: "Our current business strategy is to resubmit our BLA filing for leronlimab as a combination therapy for highly treatment experienced HIV patients as soon as possible, to seek approval for leronlimab as a potential therapeutic benefit for COVID-19 patients." GX4 at 5.

The defendants' gain resulting from the offense is an alternative measure for use in calculating his Guideline range. If the court uses gain resulting from the offense as an alternative method of determining loss, then at a minimum, Kazempour's gain is $340,000 based on the proceeds from his June 2020.

On November 8, 2018, CytoDyn awarded a warrant of 150,000 share options to Amarex

that Defendant Kazempour attempted to exercise the day after CytoDyn falsely announced that it submitted a completed BLA to the FDA on April 27, 2020.

On April 28, 2020, the day after CytoDyn issued its materially false press release concerning a "completed" BLA submission, Kazempour emailed CytoDyn's CFO Mulholland, Pourhassan, and his broker, and indicated that he wanted to exercise a previously issued warrant so that he could obtain and sell 150,000 shares of CytoDyn common stock. In the email, Kazempour wrote in relevant part: "Several years ago, Board of CytoDyn gave me 150,000 share options, and after this many years, I am thinking to sell the shares now!!" That email is the transaction underlying Count 8.

Although he was not able to immediately sell the shares, Kazempour ultimately did exercise to purchase and sell CytoDyn stock for a profit of more than $340,000. The sales took place on June 9 and 10, 2020, when Kazempour sold 150,000 shares of CytoDyn stock for $427,475.67, which generated a profit of more than $340,000. At the time of these sales, Kazempour knew that the BLA had "filing issues" and the FDA's filing determination would be announced in less than a month.

This analysis differs from that of Defendant Pourhassan because Defendant Pourhassan was convicted of both schemes, so there is no need to disaggregate the effect of COVID on the share price from the effect on the BLA. For Defendant Kazempour, loss cannot be reasonably determined because it's impossible to separate out the harm caused by his lies in world where Defendant Pourhassan was simultaneously and constantly lying about COVID-19. Gain is the proper measure.

### E.  Victim Enhancement

The fraud schemes that the defendants were convicted of caused substantial financial hardship to five or more victims and therefore should qualify for the four-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

"In determining whether to apply an enhancement for substantial financial hardship, a court should consider whether the offense resulted in a victim: becoming insolvent; filing for bankruptcy; suffering substantial loss of a retirement, education, savings, or investment fund; making substantial changes to their employment; making substantial changes to their living arrangements; or suffering substantial harm to their ability to obtain credit." *United States v. Amin*, 839 F.App'x 810, 811-12 (4th Cir. 2021) (quoting U.S.S.G. § 2B1.1 cmt. n.4(F)).

Courts can base these findings on victim impact statements and the PSR. *See United States v. Brunner*, No. 5:08CR16, 2010 WL 148433, at *2 (W.D.N.C. Jan. 12, 2010) (relying, in part, on victim impact statements to show harm to victims); *United States v. Sunmola*, 887 F.3d 830, 836-37 (7th Cir. 2018) (adopting the findings of the PSR regarding substantial financial hardship, which were in part based on victim impact statements, and stating that the court only requires information introduced at sentencing to have a sufficient indicia of reliability); *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) (finding that that the district court did not have to identify the specific victims by name and much like estimating losses, estimating the number of victims who suffered a substantial financial hardship can be based on a reasonable estimate based on the available information).

Courts have also said that substantial financial hardship is subjective. *See United States v. Poulson*, 872 F.3d 261, 268-69 (3d Cir. 2017) (finding that the court not need to identify finite dollar amounts when it measures the hardship, and it may draw reasonable inferences from the record); *United States v. Minhas*, 850 F.3d 873, 877-78 (7th Cir. 2017) (finding that the whether a

victim has suffered a substantial hardship will be gauged relative to each victim); *United States v. Brandriet*, 840 F.3d 558, 561–62 (8th Cir. 2016) (noting that even though the district court relied on a "thin" evidentiary record as well as its own inference to determine "substantial financial hardship," it was not clear error for it to have done so).

Using both trial testimony and victim impact statements, the government has identified approximately 20 victims who suffered substantial financial hardship.[27]  This includes victims like M.B., who indicated that he was close to retirement but after his substantial losses in his investment in CytoDyn, he is now living paycheck to paycheck.  *See* M.B. Victim Impact Statement, VIS-043-44.  It also includes victims like M.H., who indicated that he would have to work an additional decade to make up the losses to his retirement.  *See* M.H. Victim Impact Statement, VIS-080.  Other victims also cited to their lost retirement, like victims R.R. and G.R., an elderly married couple who invested a large portion of their Individual Retirement Account in CytoDyn and who now worry they will not be able to make their mortgage payments and may be forced into a reverse mortgage.  *See* R.R./G.R. Victim Impact Statement, VIS-163.  But it also includes younger victims, like J.F., who lost less money than some of the other victims, but the amount that he lost represented "most of his money."  *See* J.F. Victim Impact Statement, VIS-067.  This court also heard the testimony of W.K., who testified that the losses she suffered at the hands of the defendants were "devastating" and wiped out virtually all her retirement savings.  Tr. Vol 4, 166:13-168:9.  She cited to the fact that at age 63, she did not know if she would have the time to make up her retirement losses.  *Id*. at 168:7-9.

The record here is clear—well over five victims suffered substantial financial hardship

---

[27] The list of victims the government has identified as having suffered substantial hardship is as follows: P.A., S.B., C.B., M.B., C.C., G.E. and family, J.F., M.H., E.H., W.K., D.L., C.L., D.L., R.R. and G.R., P.R., E.S., R.W., and Y.Y.  That list was provided to counsel for both defendants.

as a result of the defendants' offenses.  The four-level enhancement should be applied.

### F. Zero-Point Offender

Defendant Kazempour is not eligible for the zero-point offender reduction because he caused substantial financial hardship to the victims of the offenses.

While the substantial financial hardship guideline is offense specific, its interplay with the zero-point offender guideline is not.  *Compare* U.S.S.G. § 2B1.1(b)(2)(B) (if the *offense* resulted in substantial financial hardship to five or more victims . . . ;) (emphasis added), *with* U.S.S.G. §4C1.1(6) ("the defendant did not *personally* cause substantial financial hardship") (emphasis added).

Defendant Kazempour was involved in and convicted of the scheme to lie to investors that Cytodyn had successfully submitted a completed BLA when he knew it had not.  Victim W.K. testified at trial that she made decisions to invest in Cytodyn in part because of the false press release the company issued announcing that the completed BLA had been filed.  Tr. Vol. 4, 151:3-152:25, 154:14-20).  As discussed in the previous section, Victim W.K. suffered substantial financial hardship, and she suffered it, in part, due to the actions of Defendant Kazempour.  Pursuant to U.S.S.G. §4C1.1(6), he does not qualify for the two-level reduction.

### G. Sophisticated Means

Both Defendant Pourhassan and Defendant Kazempour intentionally engaged in or caused conduct that involved sophisticated means in the commission of the offenses of conviction.  U.S.S.G. § 2B1.1(b)(10)(C); U.S.S.G. § 2B1.1 cmt. n.9(B) ("sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense).  The Fourth Circuit has explained that while the enhancement requires more than "the concealment or complexities inherent in fraud," *United States v.*

*Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014), a defendant need "not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) ("The court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond ...) the concealment inherent in ... fraud.").

Additionally, the sophisticated-means enhancement "applies where the entirety of a scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014); *United States v. Merilia*, 640 F. App'x 239, 241 (4th Cir. 2016) ("[A] defendant's individual actions need not be sophisticated; what matters is the sophistication of the scheme as a whole."); *see also Jinwright*, 683 F.3d at 486 (affirming application of enhancement where fraudulent scheme spanned many years and finding scheme's ultimate sophistication is revealed by "the way all the steps were linked together").

The defendants' conduct in this case demonstrates sophisticated means that far exceed an ordinary fraud of lying to obtain money. Defendants participated in a multi-year scheme to that required specialized knowledge of agency regulations, securities law, and corporate disclosure requirements. Defendants employed sophisticated means by exploiting their understanding of FDA regulatory processes to create false impressions about leronlimab's development status. Defendants Pourhassan and Kazempour deliberately manipulated submissions to the FDA, to create a false narrative of regulatory progress for CytoDyn's investors. Defendant Pourhassan was convicted for a fraud scheme concerning the results and meaning of complex clinical trial findings. The defendants also manipulated stock option vesting tied to regulatory milestones, creating financial incentives aligned with their fraudulent timeline representations rather than

actual regulatory achievements.  This exploitation represents sophisticated means that goes well beyond typical fraud schemes where defendants simply lie about having money or assets.

The coordination between Pourhassan and Kazempour across multiple entities—CytoDyn and Amarex—demonstrates additional sophistication. Kazempour, serving on CytoDyn's Disclosure Committee while simultaneously acting as the regulatory agent through Amarex, created a sophisticated structure for coordinating false disclosures across organizational boundaries. This dual role allowed the defendants to control both the creation of misleading information (through Amarex's submissions to the FDA) and its public dissemination (through CytoDyn's public disclosures to investors), representing a level of manipulation that required sophisticated planning and coordination.

In addition, defendant Pourhassan employed sophisticated means through his orchestrated public relations campaigns designed to silence critics and manipulate public perception.  He also orchestrated the removal and marginalization of board members who questioned his public statements, effectively neutralizing corporate governance safeguards designed to institute oversight of his public representations. This multi-layered approach demonstrated sophistication far beyond simple misrepresentations to investors.

The temporal coordination of the defendants' conduct also reflects the sophistication of the scheme.  Defendants carefully timed press releases, SEC filings, and stock transactions to maximize the impact of their false representations while minimizing the risk of detection. For example, they issued press releases containing false BLA completion claims immediately after submitting incomplete applications, ensuring market impact before the FDA issued a response. *See* GX 35.

Defendant Kazempour's conduct in relation to the intentional submission of an incomplete BLA and the simultaneous announcement to the market that they had submitted a completed BLA is sophisticated because Defendant Kazempour's conduct was specifically designed to give him plausible deniability with respect to the CytoDyn announcement. When he was questioned after the fact by the FDA, he could falsely represent that he had nothing to do with the announcement that the BLA had been submitted complete by pointing to the fact that he had specifically called out in his submission that it was not complete. This deception covered up the fact that Kazempour had been fully aware of the plan to submit the BLA "even if it was short," GX 2, and Kazempour was fully informed of and participated in the scheme to defraud, *see* GX 167.

This Court, in a pretrial hearing in October 2023 specifically identified this conduct as sophisticated:

> THE COURT: And you're saying, one, that the BLA can't be a deceptive device because it wasn't deceptive at the time it was submitted.
> MR. O'NEIL: Correct.
> THE [COURT]: Even though there's plenty of evidence that the only reason it was submitted was because -- I mean, there's plenty of allegations, I should say, that the government will put in evidence to show that the only reason it was submitted is so that the stock price wouldn't tank. And they knew it was -- at the time it was submitted, they knew it was incomplete. And the FDA warned them don't do it, and they did it anyway.
> MR. O'NEIL: Except that he noted in the cover letter this is incomplete. So he was being honest –
> THE COURT: Right. **Which is a very sophisticated way to have something to hide behind** when it doesn't go your way.

Transcript of Motions Hearing, October 5, 2023, ECF No. 73 at p.23 (emphasis added).

Viewed as a whole, the defendants' scheme required sophisticated means. The coordination required between regulatory submissions, corporate disclosure processes, market timing, and public relations efforts demonstrates a level of complexity and sophistication that far

38

exceeds the ordinary concealment inherent in fraud schemes. Further, defendants' ability to conceal the scheme over several years required specialized knowledge, careful planning, and sophisticated execution that clearly warrants the enhancement under U.S.S.G. § 2B1.1(b)(10)(C).

## H.  Enhancements Based on Defendants' Positions

### iii.    Defendant Pourhassan was an Officer of a Public Company

At the time of the offenses, Defendant Pourhassan was the Chief Executive Officer of CytoDyn, a publicly traded company. U.S.S.G. § 2B1.1 provides, in pertinent part: if the offense involved (A) a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company. . . increase by 4 levels. U.S.S.G. §2B1.1(b)(20)(A). At trial, he was convicted of multiple counts of securities fraud and insider trading. Accordingly, the four-level enhancement under §2B1.1(b)(20)(A) applies to Defendant Pourhassan.

### iv.    Defendant Kazempour Abused a Position of Trust

The abuse of trust provision calls for an increase of two levels if the defendant utilized his position of trust to facilitate the commission of the offense. U.S.S.G. § 3B1.3. Specifically, the provision provides the following:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravated Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1.

For the enhancement to apply, the government must establish that "(1) the defendant held a position of 'private or public trust'; (2) the defendant 'abused that position in a way that significantly facilitated the commission or concealment of the offense'; and (3) the victim

'conferred the trust.'" A position of either public or private trust is defined as a position characterized by professional or managerial discretion, and individuals that hold such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. *United States v. Davis*, 834 F. App'x 20, 20 (4th Cir. 2021) (quoting *United States v. Brack*, 651 F.3d 388, 393 (4th Cir. 2011)) (explaining that the "central purpose" of the abuse of trust enhancement "is to penalize defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong"). The abuse of trust enhancement not only applies in situations in which the defendant uses his position of trust for the commission of an offense, but for the concealment of an offense from his victims or law enforcement as well.

Defendant Kazempour's position of trust with CytoDyn's investors stems from three sources: (1) his role as CytoDyn's regulatory agent; (2) his contractual obligations to CytoDyn as CEO of its Contract Research Organization; and (3) his position on CytoDyn's Disclosure Committee.

*First*, as CytoDyn's regulatory agent, Defendant Kazempour held a position of public or private trust. At trial, former Chairman of CytoDyn's Board, Anthony Caracciolo explained, "He was the official regulatory officer for CytoDyn, which was a formal position in representing CytoDyn to the government agency, specifically to Food and Drug Administration. So apart and aside from other employees at Amarex, it was a unique role." Trial Tr. Vol. 4 at 103. In this role, Defendant Kazempour had access to information that CytoDyn's investors did not. Caracciolo testified, "Kazem was, again, the point of contact. Any communication to the FDA either came from Kazem or went through Kazem to the FDA." Trial Tr. Vol. 3 at 241. Similarly, when asked who had the best information about where things stood for CytoDyn with the FDA, CytoDyn's

40

former CFO Michael Mulholland testified, "First and foremost, Dr. Kazempour," and noted that Pourhassan was a close second, "because Dr. Kazempour was in constant communication with Dr. Pourhassan." Trial Tr. Vol. 8 at 62-63.  In this role, Defendant Kazempour abused a position of trust because he knew through his years of communications with the FDA that they would not accept an incomplete BLA, and yet, he submitted an incomplete BLA for a fraudulent purpose, so that Defendant Pourhassan could announce to CytoDyn investors that a completed BLA had been submitted, which would fraudulently inflate CytoDyn's stock price.  It was explicitly his role to ensure that investors received complete and accurate information concerning CytoDyn's interactions with the FDA and he abused that role—and the trust put in him by CytoDyn's officers and board—by participating in the scheme to defraud investors concerning the BLA submission.

*Second*, as CEO of Amarex, CytoDyn's Contract Research Organization, Defendant Kazempour had contractual obligations to CytoDyn's investors that put him in a position of trust.  Specifically, Section 4.5 of the Master Services Agreement between CytoDyn and Amarex provided:

> All publicity, press releases, and other disclosures or announcements relating to this Agreement shall be reviewed in advance by, and subject to the approval of, both parties (which approval shall not be unreasonably withheld); provided, however, that either party may (a) disclose the terms of this Agreement insofar as required to comply with regulatory obligations as the sponsor of an IND, NDA, BLA, 510K, IDE, or PMA or applicable securities laws, provided that in the case of such disclosures the party proposing to make such disclosure notifies the other party reasonably in advance of such disclosure and cooperates to minimize the scope and content of such disclosure, and (b) disclose the terms of this Agreement to such party's investors, professional advisors or potential investors, acquirers, or merger candidates who are bound by obligations of confidentiality and non-use consistent with those set forth herein. The failure of a party to respond in writing to a publication proposal from the other party within five working days of such party's receipt of such publication shall be deemed as such party's approval of such publication as received by such party. Each party agrees that it shall cooperate fully and in a timely manner with the other with respect to any

disclosures to the Securities and Exchange Commission and any other governmental or regulatory agencies, including requests for confidential treatment of Confidential Information of either party included in any such disclosure.

GX 400 at 6.  In accordance with this agreement, Defendant Kazempour was required to review and approve publicity, press releases, and other disclosures or announcements by CytoDyn in advance of publication.  GX 400 at 6.  At trial, the government introduced evidence of Defendant Kazempour's knowledge of the false BLA press release before it was issued.  For example, GX 34 was an email from Amarex Employee Kush Dhody to Defendant Kazempour on April 27, 2020 at 3:42 a.m. regarding CytoDyn's press release announcing the submission of a completed BLA, "Hi Kazem, I have told Nader to hold off press release till the time he gets the confirmation from me.  Hopefully we can get the submission made before 9am ET."  Given his contractual obligation to review and approve CytoDyn's press releases, Defendant Kazempour abused a position of trust when he played in an integral role in a scheme to file a materially false and misleading press release on April 27, by submitting an incomplete BLA to investors for the purpose of announcing to investors that a completed BLA had been submitted.

*Third*, as a member of CytoDyn's Disclosure Committee, Defendant Kazempour was required to "assist the Senior Officers in fulfilling their responsibility for oversight of the accuracy, completeness, and timeliness of the public disclosure made by the Company by taking responsibility to ensure that: Information required by the Company to be disclosed to the SEC and other written information that the Company will disclose to the investment community is recorded, processed, summarized, and reported accurately and on a timely basis." GX 153; *see also* Testimony of Caracciolo, Trial Tr. Vol 3 240:25-241:4 and Vol 4 48:18-21[28].  As a member

---

[28] "It was quite a large role being in charge of all those regulatory and clinical activities. But we -- I personally considered him to be like one of the staff because he -- because of his, you know, integral importance to the ongoing operations to the company… he was involved in our staff

of the Disclosure Committee, Defendant Kazempour held a position of trust with CytoDyn's investors, and by participating in the scheme to defraud CytoDyn's investors through the making of materially false and misleading public announcements regarding the BLA, Kazempour abused his position of trust.

Moreover, during the jury charge conference, over Defendant Kazempour's counsel's objection, the Court found the jury could reasonably determine that he had a duty to CytoDyn's investors, finding the government had presented "sufficient evidence" that the jury should be instructed regarding Defendant Kazempour's duty to CytoDyn's investors.  Trial Tr. Vol 13 at 60 ("they alleged sufficient facts -- to create the duty. And now my view is that sufficient evidence has been generated").  The jury was so instructed:

> An omission of a material fact is only actionable if the defendant had a duty to disclose the fact. With regard to the fact whether the defendant had a duty to CytoDyn shareholders to disclose material facts, you should consider whether the defendant was an officer or a director of CytoDyn or had another position of trust or confidence within the corporation giving rise to such a duty.
> As to whether the defendant had a duty to CytoDyn shareholders to correct, you should consider whether the defendant was an officer or director of CytoDyn or had another position of trust or confidence within the corporation giving rise to such a duty.

Trial Tr. Vol. 14 at 53-54 (Instructions 40-41).  This instruction directly applies to the offense of conviction in Count 3.

## IV.      **RESTITUTION**

For both defendants, restitution is mandatory and should be ordered.   18 U.S.C. § 3663A(a)(1) (the Mandatory Victims Restitution Act of 1996 (the "MVRA") directs a sentencing court, when sentencing a defendant convicted of an offense involving, inter alia, fraud or deceit,

---

meetings, he was involved in our disclosure meetings. He was also involved in our occasional board meetings."

to order "that the defendant make restitution to the victim of the offense"); USSG §5E1.1. Restitution shall be paid to victims for "the losses to the victim *caused by the offense.*" *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010) (emphasis in original). Accordingly, the defendants should be sentenced to pay restitution for the schemes of their conviction. For Defendant Pourhassan, given the government's proposed methodology, the Court can apply to logic of the loss calculation to restitution and apply the same amount as restitution: $5,286,268.16. For Defendant Kazempour, the Court should apply the same methodology as it uses for Defendant Pourhassan but limited to the subset of Victim Investors that invested in connection with his scheme of conviction (the "complete BLA" scheme lasting from April to July 2020). The resulting restitution for Defendant Kazempour is therefore: $409,311.78. *See* Ex. 1 ¶¶ 16-20.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, this Court should calculate the applicable offense level for Pourhassan at 35 and the applicable offense level for Kazempour at 27. Additionally, this Court should calculate restitution for each defendant as outlined above.

Respectfully submitted,

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division

By:    /s/ Vasanth Sridharan
       Vasanth Sridharan
       Senior Litigation Counsel

       Lauren Archer
       Matthew Reilly
       Trial Attorneys

       1400 New York Avenue, NW
       Washington, DC 20005
       Phone: (202) 549-1903
       Email: Vasanth.Sridharan@usdoj.gov

       KELLY O. HAYES
       United States Attorney

By:    /s/ Adeyemi Adenrele
       Adeyemi Adenrele
       Assistant United States Attorney
       United States Attorney's Office
       District of Maryland
       36 South Charles Street
       Baltimore, Maryland 21201
       Phone: (410) 209-4928
       Email: Adeyemi.Adenrele@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing with the Court via CM/ECF, which sent a copy

to counsel of record.

By:   /s/ Vasanth Sridharan
      Vasanth Sridharan
      Senior Litigation Counsel